1   ROBBINS GELLER RUDMAN
   & DOWD LLP
2   WILLOW E. RADCLIFFE (200087)
   SARAH R. HOLLOWAY (254134)
3   100 Pine Street, Suite 2600
   San Francisco, CA  94111
4   Telephone:  415/288-4545
   415/288-4534 (fax)
5   willowr@rgrdlaw.com
   sholloway@rgrdlaw.com
6
   Liaison Counsel for Plaintiffs
7
   BROWER PIVEN
8     A Professional Corporation
   DAVID A.P. BROWER
9   488 Madison Avenue, 8th Floor
   New York, NY  10022
10  Telephone:  212/501-9000
   212/501-0300 (fax)
11  brower@browerpiven.com
12  Lead Counsel for Plaintiffs

13             UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 15 In re IMMERSION CORPORATION SECURITIES LITIGATION | ) ) ) Master File No. 09-cv-04073-MMC |
| 16 ──────────────────────────── | ) CLASS ACTION |
| 17 This Document Relates To: | ) CONSOLIDATED COMPLAINT FOR |
| | ) VIOLATION OF THE FEDERAL |
| 18     ALL ACTIONS. | ) SECURITIES LAWS |
| ──────────────────────────── | ) |
| 19 JOHN P. LOOS, Individually and on Behalf of | ) |
| All Others Similarly Situated, | ) |
| 20 | ) |
| 21            Plaintiff, | ) |
|    vs. | ) |
| 22 | ) |
| 23 IMMERSION CORPORATION, VICTOR A. VIEGAS, RALPH EDWARD CLENTON | ) ) |
| RICHARDSON, STEPHEN M. AMBLER, | ) |
| 24 RICHARD VOGEL and DANIEL J. | ) |
| CHAVEZ, | ) |
| 25 | ) |
|            Defendants, | ) |
| 26 ──────────────────────────── | ) DEMAND FOR JURY TRIAL |

27

28

1

# TABLE OF CONTENTS

2
Page

3 INTRODUCTION .................................................................................................1

4 STATEMENT OF THE CASE...............................................................................4

5     Defendants Fraudulently Recognized Revenue on Medical Sales and Issued False
and Misleading Statements About Immersion's Revenue, Growth, Earnings,
6     Internal Controls and Accounting Practices ........................................................4

7     Investors Begin to Learn the Truth ....................................................................9

8 JURISDICTION AND VENUE ...........................................................................10

9 PARTIES ...........................................................................................................10

10 CONFIDENTIAL WITNESSES .........................................................................13

11 FRAUDULENT SCHEME AND COURSE OF BUSINESS ..................................17

12 DEFENDANTS' FALSE REVENUE, GROWTH AND EARNINGS STATEMENTS
    DURING THE CLASS PERIOD ........................................................................18
13

14     Defendants' Statements Regarding Immersion's 2007 Revenue, Growth, Earnings
and Medical Sales Were False and Misleading ...............................................18

15     Reasons Why Defendants' 2007 Revenue, Growth, Earnings and Medical Sales
Statements Were Knowingly False and Misleading .........................................27
16

17     Defendants' Statements Regarding Immersion's 2008 Revenue, Growth, Earnings
and Medical Sales Were False and Misleading ...............................................31

18     Reasons Why Defendants' 2008 Revenue, Growth, Earnings and Medical Sales
Statements Were False and Misleading ...........................................................41
19

20     Defendants' Statements Regarding Immersion's 1Q09 Revenues, Growth,
Earnings and Medical Sales Were False and Misleading .................................46

21     Reasons Why Defendants' 1Q09 Revenue, Growth, Earnings and Medical Sales
Statements Were False and Misleading ...........................................................48
22

23 IMMERSION'S OTHER ACCOUNTING MISSTATEMENTS ............................51

24     Immersion Understated Stock-Based Compensation Expense ...........................51

25     Immersion Understated Amortization Expense ................................................52

    Immersion Improperly Accounted For Interest Income ...................................52
26

27 DEFENDANTS' FALSE STATEMENTS REGARDING IMMERSION'S REVENUE
    RECOGNITION AND INTERNAL CONTROLS ...............................................54
28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -    
09-cv-04073-MMC

1
2                                                                           **Page**

3          Defendants' Critical Accounting Policies and Estimates Statements Were False
           and Misleading...........................................................................................................54
4
           Defendants' Internal Controls and Procedure Statements Were False and
5          Misleading................................................................................................................58

6          Investors Begin to Learn the Truth .........................................................................64

7    ADDITIONAL SCIENTER ALLEGATIONS............................................................65

8          Insider Sales.............................................................................................................72

9    LOSS CAUSATION/ECONOMIC LOSS .......................................................................75

10   CLASS ACTION ALLEGATIONS ................................................................................77

11   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET
           DOCTRINE ..............................................................................................................78
12
     NO SAFE HARBOR ........................................................................................................79
13
     COUNT I ...........................................................................................................................79
14
15         For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
           Defendants ...............................................................................................................79

16   COUNT II ..........................................................................................................................80

17         For Violation of Section 20(a) of the Exchange Act Against All Defendants..................80

18   COUNT III .........................................................................................................................80

19         For Violation of Section 20A of the Exchange Act Against Defendants Viegas,
           Ambler and Vogel....................................................................................................80
20
     PRAYER FOR RELIEF ...................................................................................................81
21
     JURY DEMAND ...............................................................................................................82
22
23
24
25
26
27
28

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Immersion Corporation ("Immersion" or the "Company") between May 3, 2007 and July 1, 2009, inclusive (the "Class Period"), against Immersion, its former Presidents and Chief Executive Officers ("CEOs") Victor A. Viegas ("Viegas") and Ralph Edward Clenton Richardson ("Richardson"), its former Chief Financial Officer ("CFO") Stephen M. Ambler ("Ambler"), and its former Senior Vice Presidents and General Managers of the Company's wholly owned subsidiary, Immersion Medical Inc. ("Immersion Medical"), Richard Vogel ("Vogel") and Daniel J. Chavez ("Chavez"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Immersion is a provider of haptic technologies, which allow people to use their sense of touch while operating a variety of digital devices.  The Company develops and manufactures or licenses a range of hardware and software technologies and products.

3.      Prior to the Class Period, Immersion had yet to report a profitable quarter in its history.  Defendants knew that in order to increase revenue, and thereby profitability, they needed to enhance Immersion's medical sales, the largest contributor to the Company's overall revenue.  In particular, defendants told investors that they were focused on increasing Immersion's international medical sales, and repeated this throughout the Class Period.

4.      Defendants' stated goal of increasing medical sales appeared to be successful.  In 2007, Immersion reported its first three profitable quarters ever, with substantial increases in medical revenue (over 50% increase in 2Q07 alone, with a 200% increase in international sales).  Defendants continued to report substantial increases in Immersion's medical sales throughout the Class Period, telling investors that medical sales "doubled" and "tripled" during 2008 and resulted in the "highest" revenue in Immersion's history.

5.     Immersion's reported "record high[]" sales and earnings, however, were false.  At the same time defendants were reporting "dramatic increase[s]" in medical revenues, defendants were fraudulently recognizing revenue on premature, inflated and fictitious medical sales.  For example, throughout the Class Period, Immersion recognized revenue on medical sales even though: (i) the products were stored in a third-party warehouse until returned to Immersion, or not shipped at all; (ii) the products were unavailable or not functional; (iii) the customers returned the products shortly after shipment; (iv) contract terms caused the sales to be deemed "not final"; and (v) the sales lacked reasonable collectability at the time Immersion recognized revenue.  As a result of these fraudulent practices, defendants were able to, and did, report false and inflated revenue, earnings, sales and net income throughout the Class Period.  In total, defendants overstated Immersion's revenues by $3.7 million and net income by $3.3 million from 2006 to 2008, including an overstatement of ***over 20%*** of medical revenues in 2008.  Defendants have admitted that they improperly recognized revenue on Immersion's medical sales and that their misstatements were material.

6.     Defendants also made false and misleading statements regarding Immersion's revenue recognition practices, accounting policies and internal controls throughout the Class Period.  For example, contrary to defendants' assurances to investors that Immersion reported revenue "***in accordance with GAAP***,"[1] defendants' fraudulent revenue recognition practices plainly violated GAAP and other basic accounting principles.  In addition, Immersion's internal controls were ***not***

---

[1]     Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  U.S. Securities and Exchange Commission ("SEC") Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosures.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                                    - 2 -

"sufficiently effective" as defendants led investors to believe.  Indeed, defendants admitted after the Class Period that Immersion's "disclosure controls and procedures *were not effective*" during the Class Period.  A fact they were aware of during the Class Period.  Defendants also admitted after the Class Period that Immersion made other material accounting misstatements during the Class Period, including falsely reporting and accounting for stock-based compensation expense, amortization expense and interest income.

7.     As a result of defendants' fraudulent accounting and revenue recognition practices, Immersion stock traded at artificially inflated prices during the Class Period, reaching a high of $20.50 per share on July 13, 2007.  At the same time, while Immersion stock was trading at or near its Class Period high, defendants Viegas, Ambler and Vogel unloaded significant amounts of their personally held Immersion stock.  Notably, defendants Ambler and Vogel sold *100%* of their holdings, and defendant Viegas sold *93%* of his holdings, in 2007, while the stock price was most inflated from defendants' false representations.  All told, these defendants reaped proceeds of over $2.7 million from their well-timed sales.

8.     On July 1, 2009, before the market opened, Immersion issued a press release announcing that its Audit Committee was "conducting an internal investigation into certain previous revenue transactions in its Medical line of business" and that, "[a]s a result of this investigation, Immersion may discover information that could raise issues with respect to its previously-reported financial information, which could be material."

9.     In response to the July 1, 2009 press release, Immersion's stock dropped *over 23%*, with 1.5 million shares trading in a single day.  This substantial decrease in Immersion's stock price was a result of the artificial inflation caused by defendants' false and misleading statements coming out of the stock price, causing real economic loss to investors who purchased the securities during the Class Period.

10.     Subsequently, Immersion was forced to restate its 2007, 2008 and 1Q09 financial reports previously filed with the SEC as a result of defendants' material misstatements.

## STATEMENT OF THE CASE

11.     Immersion, incorporated in 1993, is a provider of haptic technologies, which allow people to use their sense of touch while operating a variety of digital devices.  The Company develops and manufactures or licenses a range of hardware and software technologies and products. It focuses on marketing and business development in the target application areas, which include automotive, consumer electronics, gaming, and commercial and industrial controls; medical simulation; and mobile communications.  The Company manages these application areas under two segments: the Touch line of business and the Medical line of business.  According to defendants, the Medical line is, "[h]istorically, the largest contributor of Immersion's revenue on a percentage basis" and "one of the most meaningful and vital growth drivers of [the] Company."  Immersion reported during the Class Period that its Medical line accounted for 44% of the Company's total revenue in 2007 and 41% in 2008.

**Defendants Fraudulently Recognized Revenue on Medical Sales and Issued False and Misleading Statements About Immersion's Revenue, Growth, Earnings, Internal Controls and Accounting Practices**

12.     At the beginning of the Class Period, Immersion reported its ***first profitable quarter ever***, with medical revenues of $2.66 million for 1Q07.  In 2Q07, Immersion again reported profitably, with medical revenues of $4.15 million, a ***56% increase*** over the prior quarter.  In 3Q07, Immersion reported that total medical revenues had increased ***another 26%*** to $5.24 million. According to Company insiders, between 2Q07 and 3Q07, international sales alone jumped approximately ***200%***.  Defendants touted these "profitable" results, telling investors that Immersion's international medical sales "grew substantially" and that, in particular, Immersion was having "a lot of interest and success in deploying products in China."

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                                          - 4 -

13.     Defendants continued to emphasize Immersion's international medical sales and its "record high[]" financial results throughout the Class Period.  For example, on May 1, 2008, defendants Viegas and Richardson told investors that their focus on international medical sales would result in a "***dramatic increase in the revenues***" in 2008.  On October 30, 2008, defendant Ambler told investors that Immersion's international medical sales "***grew more than 3 times***" over the prior-year's quarter and, as a result, revenue was "the ***highest*** . . . in [Immersion's] history."  On March 2, 2009, defendants reported that "[m]edical international revenues grew ***135%*** over the year-ago period," or nearly "***tripled***" over the prior-year's quarter, and nearly "***doubled***" in full year 2008.

14.     Defendants' reported revenues and earnings during the Class Period, and their positive statements about Immersion's international medical sales, were false.  At the same time defendants were telling investors that international medical sales had "doubled" and "tripled," and that revenues were at "record highs," defendants were fraudulently booking medical sales and recognizing revenue in order to inflate the Company's sales revenue and, in turn, its stock price. Notably, throughout the Class Period, defendants described revenue recognition as Immersion's "***most critical accounting polic[y]***."

15.     According to GAAP and SEC Staff Accounting Bulletin ("SAB") rules, revenue may be recognized ***only*** when: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable; ***and*** (iv) collectability is reasonably assured.  Indeed, Immersion recognized these requirements in its public filings with the SEC during the Class Period and assured investors that it recognized revenue ***only*** when all of these requirements were satisfied.

16.     Nevertheless, defendants disregarded these requirements and recognized revenue on medical sales in order to increase Immersion's revenue and earnings during the Class Period, in violation of GAAP and basic accounting principles.  According to percipient witnesses, Immersion:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                          - 5 -

(i) booked medical sales and recognized revenue when there was no suitable item in inventory to ship to the customer; (ii) shipped whatever medical products Immersion had on hand, such as road-worn demonstration units, in order to book the sale; (iii) recognized revenue on sales when no products had been shipped at all; (iv) shipped medical prototypes to customers, calling them "products," in order to book sales; (v) routinely accepted returned products shortly after shipment, sometimes within a matter of days, without reversing revenue or making other appropriate adjustments; and (vi) shipped products when there was no real evidence of acceptance or a signed purchase order ("PO"). Witnesses confirmed that defendants were aware of these practices through internal reports, meetings, internal complaints and direct participation. Indeed, defendant Richardson has admitted that he was **_personally involved_** in the Company's medical sales, and numerous witnesses confirm that defendant Ambler was directly responsible for recognizing revenue on these sales.

17.     Defendants also knew that collectability was not reasonably assured for Immersion's medical sales to certain Asian customers, thereby preventing revenue from being properly recognized at the time of sale, if at all. According to percipient witnesses, many of these customers' medical accounts remained unpaid throughout the Class Period. Defendants later admitted that these sales lacked probable collectability at the time revenue was recognized and that Immersion improperly recognized revenue on these medical sales. Specifically, defendants have **_admitted_** that Immersion recognized revenue on medical sales during the Class Period even though: (i) the products were stored in a third-party warehouse until returned to Immersion, or not shipped at all; (ii) the products had rights of return, and were in fact returned, shortly after shipment; (iii) certain contract terms caused sale terms to be deemed "not final" or payment terms not "fixed and determinable"; and (iv) the sales lacked probable collectability at the time Immersion recognized revenue.

18.     Defendants violated the basic tenets of accounting principles in order to deceive investors into believing that Immersion was growing and was profitable, when it was not.  In total, defendants overstated Immersion's revenues by at least $3.7 million and net income by at least $3.3 million from 2006 through 2008, including an overstatement of *over 20%* of Medical line revenue in 2008.  As a direct result of these fraudulent revenue recognition practices, defendants were forced to restate Immersion's 2006, 2007 and 2008 financial statements to account for their material revenue, growth and earnings misstatements, as shown below:

| | 2006 | 2007 | 2008 | | | | |
|---|---|---|---|---|---|---|---|
| | FY | FY | Q1 | Q2 | Q3 | Q4 | FY |
| **Revenue Misstatements:** | | | | | | | |
| Side Agreement | | | | ($511,000) | ($523,000) | ($585,000) | ($1,619,000) |
| Undelivered Product Elements | | | | | | ($727,000) | ($727,000) |
| Other | ($125,000) | $211,000 | ($89,000) | ($91,000) | ($1,299,000) | $166,000 | ($1,313,000) |
| Total Revenue Misstatements | ($125,000) | $211,000 | ($89,000) | ($602,000) | ($1,822,000) | ($1,146,000) | ($3,659,000) |
| **Total Revenue Originally Reported** | $ 27,853,000 | $ 34,702,000 | $ 8,155,000 | $ 9,313,000 | $ 10,081,000 | $ 8,986,000 | $ 36,535,000 |
| % overstated (understated) | 0.4% | -0.6% | 1.1% | 6.1% | 15.3% | 11.3% | 9.1% |
| **Total Medical Revenue Originally Reported** | $ 14,133,000 | $ 15,428,000 | $ 3,008,000 | $ 4,301,000 | $ 3,221,000 | $ 4,309,000 | $ 14,839,000 |
| % overstated (understated) | 0.9% | -1.4% | 2.9% | 12.3% | 36.1% | 21.0% | 19.8% |

Through its restatement of the revenue misstatements described above, Immersion has admitted that these misstatements were material.

19.     Not only did defendants' fraudulent revenue recognition practices falsely inflate Immersion's reported quarterly and fiscal revenues (and violate GAAP), they directly contradicted defendants' representations to investors in Immersion's Forms 10-Q and Forms 10-K filed with the SEC during the Class Period that Immersion: (i) recognized revenue *only* "when persuasive evidence of an arrangement exists, delivery has occurred . . . , the fee is fixed and determinable, and collectability is probable"; (ii) did *not* offer a "general right of return on its products"; and (iii) reported earnings "in accordance with GAAP."

20.     In addition to falsely reporting earnings and revenue, defendants also falsely reported Immersion's stock-based compensation expense, amortization expense and interest income in each

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                          - 7 -

quarter during the Class Period.  As part of Immersion's restatement, defendants have admitted that they improperly recognized stock-based compensation expense, amortization expense and interest income in violation of GAAP in 2006, 2007, 2008 and 1Q09.  As a result of these material errors, defendants were forced to restate Immersion's 2006, 2007, 2008 and 1Q09 results to account for these material misstatements, as shown below:

| | 2006 | 2007 | 2008 | | | | | 2009 |
|---|---|---|---|---|---|---|---|---|
| | FY | FY | Q1 | Q2 | Q3 | Q4 | FY | Q1 |
| **Income Statement Effect of Misstatements:** | | | | | | | | |
| Revenue | ($104,000) | $188,000 | ($68,000) | ($350,000) | ($1,021,000) | ($706,000) | ($2,145,000) | $999,000 |
| Stock-based Compensation | ($57,000) | ($717,000) | ($643,000) | ($187,000) | ($247,000) | ($192,000) | ($1,269,000) | ($163,000) |
| Amortization of Intangibles | ($57,000) | ($58,000) | ($35,000) | ($27,000) | ($22,000) | $21,000 | $105,000 | $161,000 |
| Total (before taxes) | ($161,000) | ($587,000) | ($746,000) | ($564,000) | ($1,290,000) | ($919,000) | ($3,519,000) | $997,000 |
| **Originally Reported Pre-Tax Income** Income | ($10,280,000) | $130,506,000 | ($3,593,000) | ($4,715,000) | ($25,036,000) | ($9,167,000) | ($42,511,000) | (7,770,000) |
| % overstated | 1.6% | -0.4% | 26.2% | 13.6% | 5.4% | 11.1% | 9.0% | -11.37% |
| | | | | | | | | |
| Other errors corrected as part of Restatement | $0 | $769,000 | $128,000 | $64,000 | $0 | ($64,000) | $128,000 | $352,000 |
| **Total Restatement Adjustments** (including Income Tax Effect) | ($158,000) | $68,000 | ($567,000) | ($352,000) | ($1,366,000) | ($1,020,000) | ($3,305,000) | $1,349,000 |
| | | | | | | | | |
| **Originally Reported Net Income (Loss)** | ($10,424,000) | $117,018,000 | ($2,585,000) | ($3,091,000) | ($32,298,000) | ($9,711,000) | ($47,685,000) | (7,459,000) |
| % overstated | 1.5% | 0.1% | 28.1% | 12.9% | 4.4% | 11.7% | 7.4% | -18.09% |

Through its restatement of these accounting misstatements, Immersion has admitted that these misstatements were material.

21.     Defendants also made false and misleading statements about Immersion's internal controls and procedures.  Throughout the Class Period, Immersion represented to investors that its internal controls over financial reporting were "***sufficiently effective***," and that its financial statements were "***prepared in accordance with GAAP***."  In addition, defendants Viegas, Richardson and Ambler certified that they were personally "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" and had "[e]valuated the effectiveness of [Immersion's] disclosure controls and procedures" regarding the Company's financial reporting during the Class Period.  As defendants have subsequently admitted, however, Immersion's "internal control over financial reporting was ***not*** effective" during the Class

1   Period and, as a result, defendants materially misstated Immersion's 2006, 2007, 2008 and 1Q09

2   earnings, revenues, stock-based compensation expense, amortization expense and interest income.

3        22.     At the same time defendants were fraudulently recognizing revenue on medical sales,

4   reporting false revenues and earnings, and falsely representing Immersion's internal controls and

5   accounting procedures, defendants Ambler, Viegas and Vogel were cashing in on their personally

6   held Immersion stock.  All told, these defendants sold 172,752 shares of Immersion common stock

7   (or 100%, 93% and 100% of their holdings, respectively) for gross proceeds of over $2.7 million

8   during the Class Period, while the stock was trading at or near record highs.

9

10  **Investors Begin to Learn the Truth**

11       23.     On July 1, 2009, after more than **two years** of reporting false medical sales and

12  revenues, the Company issued a press release announcing that its Audit Committee was "conducting

13  an internal investigation into certain previous revenue transactions in its Medical line of business"

14  and that, as a result, "Immersion may discover information that could raise issues with respect to its

15  previously-reported financial information, which could be material."  On this news, Immersion's

16  stock price dropped **over 23%** from a close of $4.94 on June 30, 2009 to a close of $3.80 on July 1,

17  2009, with 1.5 million shares trading in a single day.  Shortly after this announcement, defendant

18  Ambler resigned as CFO of the Company on July 31, 2009, and defendant Chavez resigned as

19  Senior Vice President and General Manager of Immersion Medical on August 7, 2009.  Defendant

20  Richardson also "agreed to resign" as CEO and Director of the Company on October 21, 2009, while

21  the internal investigation of Immersion's prior financials was pending.

22       24.     On August 10, 2009, Immersion announced that, because of "certain revenue

23  transactions in Immersion's Medical line of business," its previously issued quarterly and fiscal

24  financial statements for 2008 "should no longer be relied upon because of one or more errors in such

25  financial statements."  The Company also announced that it would be unable to timely file its 2Q09

1  Form 10-Q.  On August 17, 2009 and November 17, 2009, Immersion announced that it had

2  received notices of delisting from the NASDAQ Stock Market ("NASDAQ") for failing to file its

3  2Q09 and 3Q09 Forms 10-Q.  On February 8, 2010, Immersion finally issued restatements of its

4  2006, 2007, 2008 and 1Q09 financial statements, along with its delinquent 2Q09 and 3Q09 Forms

5  10-Q.  In its restatements, the Company admitted what defendants knew all along, that Immersion:

6  (i) improperly recognized revenue in its Medical line of business; (ii) improperly accounted for

7  stock-based compensation expense, amortization expense and interest income; and (iii) lacked

8  effective internal controls, throughout the Class Period.

9

10                          **JURISDICTION AND VENUE**

11      25.    Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein

12  arise under §§10(b), 20(a) and 20A of the Exchange Act and SEC Rule 10b-5.

13      26.    Venue is proper in this District pursuant to §27 of the Exchange Act.  Many of the

14  false and misleading statements were made in or issued from this District.

15

16      27.    Immersion's principal executive offices are located at 801 Fox Lane, San Jose,

17  California.

18                                **PARTIES**

19      28.    Lead plaintiff John P. Loos, as set forth in the accompanying certification filed

20  previously on November 2, 2009 and attached hereto as well as incorporated by reference herein,

21  purchased the common stock of Immersion at artificially inflated prices during the Class Period and

22  has been damaged thereby.

23

24      29.    Defendant Immersion is a provider of haptic technologies, which allow people to use

25  their sense of touch while operating a variety of digital devices.  Immersion is headquartered in San

26  Jose, California, and as of December 31, 2008 had 186 employees, including 68 in research and

27

28

1   development, 54 in sales and marketing, and 64 in legal, finance, administration and operations, and

2   four executive officers.

3       30.     Defendant Viegas was President and CEO of Immersion from October 2002 until

4   April 28, 2008 and was Chairman of Immersion's Board of Directors from October 2007 until

5   February 2009.  Defendant Viegas joined Immersion in August 1999 and previously held the

6   positions of CFO, Vice President of Finance and Chief Operating Officer.  He is a Certified Public

7   Accountant in the State of California and has an MBA from Santa Clara University as well as a

8   Bachelor of Science in Accounting.  Viegas signed Immersion's Forms 10-K filed with the SEC and

9   certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attached to the Company's

10  Forms 10-Q and Forms 10-K filed during the Class Period.

11      31.     Defendant Richardson was President and CEO of Immersion from April 28, 2008

12  until October 21, 2009 and was a Director of the Company from April 30, 2008 until October 21,

13  2009.  Richardson signed Immersion's Forms 10-K filed with the SEC and certifications pursuant to

14  SOX attached to the Company's Forms 10-Q and Forms 10-K filed during the Class Period.

15      32.     Defendant Ambler was CFO and Vice President of Finance of Immersion from

16  March 2005 until July 31, 2009.  Defendant Ambler has a diploma in Accounting Studies from

17  Oxford Polytechnic and is a Chartered Accountant in England and Wales.  Ambler signed

18  Immersion's Forms 10-Q and Forms 10-K filed with the SEC and certifications pursuant to SOX

19  attached to the Company's Forms 10-Q and Forms 10-K filed during the Class Period.

20      33.     Defendant Vogel was Senior Vice President and General Manager of Immersion

21  Medical from March 2004 until July 14, 2008.  Defendant Vogel has an MBA from Harvard

22  Business School.

23      34.     Defendant Chavez was the interim Senior Vice President and General Manager of

24  Immersion Medical from August 2008 until he was formally appointed to this position in

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                    - 11 -

1    December 2008.  Chavez then held this position from December 2008 until August 7, 2009.  He

2    holds a Bachelor of Arts in Economics from San Jose State University and an MBA from Stanford

3    Graduate School of Business.

4        35.    Defendants Viegas, Richardson, Ambler, Vogel and Chavez (the "Individual

5    Defendants"), by virtue of their high-level positions with Immersion, directly participated in the

6    management of Immersion, were directly involved in the day-to-day operations of Immersion at the

7    highest levels and were privy to confidential proprietary information concerning Immersion and its

8    business, operations, products, sales, growth, financial statements and financial condition and were

9    aware of, or deliberately disregarded, that the false and misleading statements made by and

10   regarding the Company were still alive in the market and causing the Company's stock to trade at

11   inflated prices.  Because of their managerial positions with Immersion, each had access to the

12   adverse undisclosed information about Immersion's business, financial condition and prospects and

13   knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive

14   representations made during the Class Period materially false and misleading.

15       36.    As a result of their positions with the Company, the nature of Immersion's business

16   and the small size of the Company (only 186 employees total), the Individual Defendants controlled

17   and/or possessed the authority to control the contents of its reports, press releases and presentations

18   to securities analysts and through them, to the investing public.  The Individual Defendants were

19   provided with copies of the Company's reports and press releases alleged herein to be misleading,

20   prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

21   cause them to be corrected.  The Individual Defendants also made statements alleged herein to be

22   misleading during Immersion's conference calls, reviewed and contributed to the statements prior to

23   their release, and/or were present when the statements were made, and had the ability and

24   opportunity to prevent the statements from being made or cause them to be corrected.  Because of

their managerial positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations being made were then materially false and misleading.   Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

37.   The Individual Defendants, by reason of their status as senior executive officers of Immersion and Immersion Medical, were also "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.   Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Immersion's business, the reported financials of its Medical line, and other Company officers and employees.

38.   As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Immersion's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Immersion's common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## CONFIDENTIAL WITNESSES

39.   The allegations herein are supported by first-hand accounts of confidential witnesses ("CWs").   These witnesses are comprised of former Immersion employees employed during the

1   Class Period and/or with knowledge of the events alleged herein.  The CWs provided facts from

2   different departmental and geographic vantage points within the Company.

3   40.     CW1 was a Senior Accountant at Immersion Medical in Gaithersburg, Maryland from

4   April 2004 to May 15, 2009.  His[2] job responsibilities included cash management, daily oversight of

5   bank accounts that received customer payments, and review of sales reports in order to make a

6   determination whether to recommend recognizing revenue on medical sales.  With regard to revenue

7   recognition, CW1 reviewed packets of information regarding medical sales to determine whether the

8   criteria for booking the sale and recognizing revenue had been met.  The criteria he used to decide

9   were: (i) whether there was an official PO signed by the customer; (ii) whether the customer was a

10  known entity; and (iii) whether the customer had passed a credit check.  If these criteria were met,

11  then CW1 would enter the sale status into a "Made to Manage" order system as final and would

12  recommend booking the revenue.  If CW1 found that a sale did not meet the criteria for booking, he

13  would "sound the alarm" to all who would hear it, including the Corporate Controller for Immersion

14  Medical and Medical Division Vice President of Finance and Operations Hernan Cortes ("Cortes"),

15  who in turn reported to defendant Ambler.  After that, the issue was sent to Immersion's Corporate

16  Controller who, along with defendant Ambler, made the final decision on whether to book the sale

17  and record revenue on it.  As a result of his position, CW1 had direct knowledge of Immersion

18  Medical's issues with booking sales and revenue recognition as well as payments received and

19  outstanding for Immersion Medical's customers.  Thus, CW1 was in a position to have knowledge of

20  the facts attributed to him throughout this complaint.

21  41.     CW2 was a Customer Service Manager, Director of Assembly and Production

22  Manager for Immersion Medical from October 2005 to July 2009.  His job involved managing the

---

[2]      The use of the words "he," "his" and "him" in connection with CWs is not meant to be gender specific and shall also be meant to pertain to the female gender.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                              - 14 -

operations of Immersion Medical, including product shipment and returns.  With regard to product returns, CW2 indicated that returned items were processed through Shipping and Receiving in Gaithersburg, Maryland and put into an "incoming line" in a room adjacent to the Shipping and Receiving Department.  The products were then sent to CW2's group for troubleshooting.  CW2 had weekly meetings with Cortes on Tuesdays in the Front Conference Room in Gaithersburg regarding disposition of customer complaints and whether to replace or repair returned products.  Cortes made the final decision on disposition of domestic product returns, whereas Vice President and General Manager, International Sales for the Medical Division, David Barkay ("Barkay") made the final decision on disposition of international product returns.  Cortes and Barkay then communicated these decisions to CW2.  Thus, CW2 had direct knowledge of Immersion Medical's product sales and returns and was in a position to have knowledge of the facts attributed to him throughout this complaint.

42.     CW3 was Vice President of Domestic Sales at Immersion Medical from February 1, 2009 to April 30, 2009.  His responsibilities included oversight of a domestic sales force of six regionally located sales people and preparing quarterly sales forecasts and Strategic Account Selling Sheets concerning each customer.  CW3 reported directly to defendant Chavez.  CW3 described Immersion Medical's sales process as follows: First, a PO was placed with Customer Service by the customer.  Then, Customer Service entered the PO into Immersion's system, and CW3 received an automated report about the order.  Once an order was shipped, the Finance Department issued an invoice.  Customer payments were sent to Accounts Receivable.  A sale was "booked" on an order when the product was shipped to the customer.  The booked order was then reported to Cortes, who reported to defendant Ambler.  Whether to recognize revenue on the sale was a function of defendant Ambler's office in San Jose, California.  CW3 also prepared sales forecasts using a manual system developed in-house.  The system ranked the probability of a sale based on where in the sales process

a customer fell.  Immersion maintained a sales process "checklist" that included identification of a prospective customer or "lead," qualification of the lead as a likely customer, and the technical close and financial close of the sale.  CW3 captured the forecast data on an Excel spreadsheet and sent his sales forecasts to defendant Chavez weekly via e-mail.  The sales forecasts were also available on the Company computer system for anyone to see.  Thus, CW3 had direct knowledge of Immersion Medical's sales process and was in a position to have knowledge of the facts attributed to him throughout this complaint.

43.  CW4 was Vice President of Domestic and International Sales for Immersion Medical from 2002 to March 2007.  According to CW4, reports of product sales came to him from the Customer Service group in Maryland who took in the POs.  For domestic medical sales, orders were placed by the in-house sales person who made the sale.  For international medical sales, orders were placed by an independent distributor who had made the sale to the end customer.  CW4 received sales reports via e-mail in Excel spreadsheet format.  CW4 indicated that because the Medical Division's sales volumes were so low, he typically knew about a sale before receiving the sales report from Customer Service.  This, coupled with the fact that he typically spent about 40 weeks per year on the road working with the international distributors directly, contributed to his knowledge of Immersion Medical's sales.  In addition, CW4 met with defendant Ambler, Cortes and the Corporate Controller for Immersion Medical whenever Ambler was in Gaithersburg.  Defendant Ambler went over the "days sale outstanding" ("DSO") numbers with CW4 during these meetings.  CW4 prepared the DSO data which included each customer and distributor and the number of days outstanding that money was due from each of them to Immersion Medical.  Thus, CW4 had direct knowledge of Immersion Medical's sales process and was in a position to have knowledge of the facts attributed to him throughout this complaint.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

44.     CW5 was the Corporate Controller for Immersion Medical in Gaithersburg, Maryland throughout the Class Period until June 2009.  His job responsibilities involved reviewing medical sales and related documentation and reporting the sales to Immersion's corporate headquarters. Prior to 2008, CW5 reported directly to Immersion's Corporate Controller, Mary Beth Baust ("Baust"), in the Company's San Jose, California headquarters.  From 2008 until his departure in June 2009, CW5 reported to Cortes.  CW5 confirmed that both Baust and Cortes reported directly to defendant Ambler.  Throughout his employment, CW5 reported that all Medical Division sales were fully documented and sent to the corporate headquarters in San Jose, where the decision on whether to recognize revenue on medical sales was made.  During defendant Viegas' tenure as CEO, CW5 submitted all medical sales information and supporting documentation directly to Baust in hard copy format, including the PO and any related e-mails or other documentation that related to the sale. CW5 and Baust reviewed every single medical sale and all documentation at the end of every quarter, then conferred with Ambler about whether to recognize revenue on the sales.  During defendant Richardson's tenure as CEO, Immersion's corporate headquarters closely controlled the Medical Division's operations.  Under this regime, CW5 simply supplied the sales data to corporate headquarters (rather than collaborating), and the decision on whether to recognize was made entirely at corporate headquarters.  CW5 reported that throughout the Class Period (under both Viegas and Richardson), defendant Ambler made the ultimate decision on whether to recognize revenue on medical sales.  As a result of his position, CW5 had direct knowledge of Immersion Medical's sales and revenue recognition process and was in a position to have knowledge of the facts attributed to him throughout this complaint.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

45.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Immersion.  Defendants' fraudulent scheme and course of

business operated as a fraud or deceit on purchasers of Immersion publicly traded securities and was

a success, as it: (i) deceived the investing public regarding Immersion's revenue, earnings, income

from operations, net income, gross profit, net income per share, accounts receivable, interest income

and stock-based compensation expense; (ii) deceived the investing public regarding Immersion's

accounting practices, revenue recognition practices and internal controls; (iii) artificially inflated the

price of Immersion's securities; (iv) enabled defendants Ambler, Viegas and Vogel, and other

Immersion insiders, to collectively sell 337,751 shares of their personally held Immersion common

stock for proceeds in excess of $4.88 million during the Class Period; and (v) caused lead plaintiff

and other members of the Class to purchase Immersion publicly traded securities at inflated prices

and be damaged thereby.

**DEFENDANTS' FALSE REVENUE, GROWTH AND EARNINGS STATEMENTS
DURING THE CLASS PERIOD**

**Defendants' Statements Regarding Immersion's 2007 Revenue, Growth, Earnings and
Medical Sales Were False and Misleading**

  46. On May 3, 2007, the start of the Class Period, Immersion issued a press release

reporting its 1Q07 financial results.  With regard to Immersion's revenues and earnings, the press

release stated[3]:

> ***Revenues*** were ***$6.4 million*** for the quarter ended March 31, 2007 compared to
> revenues of $6.0 million for the first quarter of 2006.
>
>  ***Operating income*** for the first quarter of 2007 was ***$131.0 million*** . . . .
>
>  ***Net income*** for the first quarter was ***$122.4 million*** compared to a net loss of
> $2.9 million for the first quarter of 2006.  ***Diluted earnings per share*** were ***$4.13*** for
> the quarter compared to $0.12 loss per share for the first quarter of 2006.

---

[3] Defendants' false and misleading statements are provided in quotation format to provide the
appropriate context for the false and misleading statements and omissions.  Specific false and
misleading statements in quotations are in bold throughout.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                      - 18 -

47.     That same day, May 3, 2007, following the press release, defendants held an earnings

conference call with investors and analysts.  During the conference call, defendant Viegas reiterated

Immersion's 1Q07 results:

> The first quarter *revenues* were *$6.4 million*, a *6%* growth over the same quarter last year.  The growth was led by our medical touch interface products, mobility, and gaming businesses offset by a decline in our 3D products group.  *Net income* for the first quarter was *$122.4 million* compared to a net loss of $2.9 million for the first quarter of 2006.
>
> *Diluted EPS* were *$4.13* for the quarter compared to a $0.12 loss per share for the first quarter of 2006.

48.     Defendant Ambler also reiterated Immersion's 1Q07 results on the earnings

conference call:

> For the first quarter of 2007, our *revenues* were *$6 million*, compared to $6 million in the first quarter of 2006, an increase of 6%.  Our *net income* was *$122.4 million* or *$4.13 profit per diluted share*, compared to a loss of $2.9 million, or $0.12 loss per share in the first quarter of 2006.
>
> *        *        *
>
> *[R]evenues from our medical business*, which comprised 41% of total company revenues, *grew 2% to $2.7 million*, from $2.6 million in the year ago quarter.
>
> *Medical product sales grew 17%* over the year ago quarter and comprised 93% of medical revenues in the quarter.

49.     With regard to revenue growth, defendant Viegas told investors to expect significant

growth in the Company's medical business in 2007:

> [INVESTOR]:  You said that your revenues are going to be pretty significant growth this calendar year, I think, to paraphrase you.  Can you define which division within the company you believe would have the biggest percentage growth?
>
> [VICTOR VIEGAS]:  Percentage is difficult because some of our businesses are more mature than others.  *I think If you're looking at revenue growth, we believe that the medical business with the new product platform, we believe there's significant orders in house already, if you will.  So we're seeing a strong remainder of the year from the medical side*.
>
> *        *        *
>
> We were transitioning away from an older laparoscopy product and so *we do have some visibility in Q2, we know it's going to be strong, and we see a strong conclusion to the year.  So I think you're going to see good growth*.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                      - 19 -

50.   On May 10, 2007, Immersion filed with the SEC its quarterly report on Form 10-Q for 1Q07, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as follows:

| 1Q07 Form 10-Q | | | |
|---|---|---|---|
| Revenue | Net Income | Product Sales | Revenue From Immersion Medical |
| "*6% increase*" *to $6.41 million* | "*$122.4 million*" | "*$3.6 million, an increase of $224,000 or 7%*" | "*$2.7 million, an increase of $56,000 or 2%*" |

51.   In addition, the Form 10-Q stated that 1Q07 "*was [Immersion's] first profitable quarter as a public company*."

52.   Shortly thereafter, on May 25, 2007, defendant Viegas sold 22,919 shares of his personally held Immersion stock for proceeds of over $252,000.

53.   On August 2, 2007, Immersion issued a press release reporting its 2Q07 financial results.  The press release stated, in pertinent part:

> **Revenues** were **$8.6 million** for the quarter ended June 30, 2007 or **29% higher** when compared to revenues of $6.7 million for the second quarter of 2006.
>
> **Net income** for the second quarter was **$176,000** compared to a net loss of $2.4 million for the second quarter of 2006.  **Diluted earnings per share** were **$0.01** for the quarter compared to $(0.10) loss per share for the second quarter of 2006.
>
> **Revenues** were **$15.0 million** for the six months ended June 30, 2007 compared to revenues of $12.7 million for the first six months of 2006.  **Net income** for the first six months of 2007 was **$122.6 million**, or **$4.03 diluted earnings per share**, compared to a net loss of $(5.3) million, or $(0.22) loss per share, for the first six months of 2006.

54.   In the press release, defendant Viegas touted the Company's 2Q07 results and "**back-to-back profitable quarters**":

> "Second quarter **revenue** from our Medical, Gaming, and Touch Interface Products groups led our **29% revenue growth** over the second quarter of last year," said Victor Viegas, Immersion CEO and president.  "**Our back-to-back profitable quarters this year reflect our continued efforts to achieve sustained profitability**."

1      55.    That same day, August 2, 2007, following the press release, defendants held an

2   earnings conference call with analysts and investors.  During the conference call, defendant Viegas

3   reiterated Immersion's 2Q07 financial results:

4
5          **Revenue** for the quarter grew to **$8.6 million**, an **increase of 29%** over the second quarter of 2006.  Our **net income** for the quarter was **$0.01 of earnings per diluted share** compared to a loss of $0.10 per share in the second quarter of 2006.  **This makes two profitable quarters in a row for Immersion**.

6
7                                    *      *      *

8          Moving on to a brief business update, our **medical revenue grew 19%** compared to the second quarter of last year.  **Product sales** for all product platforms **grew substantially, as did international sales**.

9

10      56.    Defendant Ambler also reiterated Immersion's 2Q07 false results:

11          For the second quarter of 2007, our **revenues** were **$8.6 million** compared to $6.7 million in the second quarter of 2006, an **increase of 29%**.  The revenues for the quarter equaled our previous highest quarterly revenues achieved in Q4 2006.  Our year-to-date **revenues** were **$15 million** compared to $12.7 million in 2006, an **increase of 18%**.  Our **net income** for the quarter was **$176,000**, or **$0.01 of earnings per diluted share** compared to a loss of $2.4 million, or $0.10 loss per share in the second quarter of 2006.

12

13

14

15                                    *      *      *

16          Looking at each of these businesses in turn, revenue from our **medical business**, which comprised 48% of total company revenues, grew **19% to $4.1 million** from $3.5 million in the year-ago quarter.  **Medical product sales grew 55%** over the year-ago quarter, and medical product sales comprised 98% of total medical revenues in the quarter.

17

18

19      57.    In addition, with regard to international medical sales, defendant Viegas assured

20   investors that the Company was having "a lot of interest and success in deploying products in

21   China":

22
23          [INVESTOR]:  Are you finding that the reception [for medical platforms] is a little bit stronger internationally versus domestically, or vice-versa?

24          [VICTOR VIEGAS]:  Hard to tell.  I think it's universally accepted and appreciated. I think we have a stronger set of resources and an established presence in the U.S. **But, I can also tell you that we've had a lot of interest and success in deploying products in China**, for example.  So, I think we see those potential advantages, and we want to deploy and take some time and add resources in these other markets. And we think we'll have a lot of success there.

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                            - 21 -

58.     In response to defendants' August 2, 2007 statements, the Company's stock price rose 8.51% to close at $16.55 on August 3, 2007.

59.     On August 8, 2007, Immersion filed with the SEC its quarterly report on Form 10-Q for 2Q07, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as follows:

| 2Q07 Form 10-Q | | | | |
|---|---|---|---|---|
| Period | Revenue | Net Income | Product Sales | Revenue From Immersion Medical |
| For the three months ended June 30, 2007 | "*29% increase*" to *$8.6 million* | "*$176,000*" | "*$5.3 million, an increase of $1.4 million or 35%*" | "*$4.1 million, an increase of $672,000 or 19%*" |
| For the six months ended June 30, 2007 | "*18% increase*" to *$15 million* | "*122.6 million*" | "*increased by $1.6 million or 22%*" | |

60.     In addition, the Form 10-Q stated that "[t]he increase in product sales was primarily due to *increased medical product sales of $1.4 million* [for the three months ended June 30, 2007, and] . . . *$1.8 million* [for the six months ended June 30, 2007]."

61.     Shortly thereafter, on August 27, 2007, defendant Ambler unloaded 20,000 shares of his personally held Immersion stock for proceeds of over $292,000.  Defendant Viegas followed suit, selling 102,081 shares of Immersion stock between September 27, 2007 and October 8, 2007 for proceeds of over $1.68 million.

62.     On November 1, 2007, Immersion issued a press release reporting its 3Q07 financial results.  The press release stated:

> *Revenues* were *$9.8 million* for the quarter ended September 30, 2007 or *49% higher* when compared to revenues of $6.6 million for the third quarter of 2006.
>
> *Net income* for the third quarter was *$493,000* compared to a net loss of $(3.2) million for the third quarter of 2006.  *Diluted earnings per share were $0.02* for the quarter compared to $(0.13) loss per share for the third quarter of 2006.
>
> *Revenues* were *$24.8 million* for the nine months ended September 30, 2007 compared to revenues of $19.2 million for the first nine months of 2006.  *Net income* for the first nine months of 2007 was *$123.1 million, or $3.93 diluted earnings per share*, compared to a net loss of $(8.4) million, or $(0.34) loss per share, for the first nine months of 2006.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

63.     In the press release, defendant Viegas emphasized Immersion's "***very strong year-to-date revenue growth***":

> "Immersion has now completed ***three consecutive profitable quarters*** with ***very strong year-to-date revenue growth*** compared to the first nine months of 2006. ***Revenue from our Medical business grew 22%***, Touch Interface Products 32%, and Gaming 47%.  We also reached a significant level of third-quarter revenue of $930,000 in our Mobility business," said Victor Viegas, Immersion CEO, president, and chairman of the board.

64.     In addition, the press release announced a new "strategic plan" to grow revenues.  As part of the plan, defendant Viegas would step down as CEO of the Company and become chairman of the board of directors, and Immersion would hire a new CEO to replace defendant Viegas.

65.     That same day, November 1, 2007, following the press release, defendants held an earnings conference call with analysts and investors.  On the conference call, defendant Viegas reiterated Immersion's false 3Q07 results:

> Immersion's third quarter performance was good.  Highlights of the third quarter include; number one, ***strong revenue growth of 49%*** over the third quarter of 2006, achieving a record $9.8 million in revenue.  This revenue level sets a ***new quarterly record***, surpassing our previous revenue record by $1.2 million.
>
> Profitability for each of the last three quarters; our ***net income*** for the third quarter was ***$0.02 of earnings per diluted share***, compared to a loss of $0.13 per share in the third quarter of 2006.  ***Medical revenue growth of 39% to $5.2 million***, compared to the third quarter of last year.
>
> *     *     *
>
> For the third quarter of 2007, our ***revenues*** were ***$9.8 million***, compared to $6.6 million in the third quarter of 2006, ***an increase of 49%***.  Our year-to-date revenue was ***$24.8 million***, compared to $19.2 million in 2006, an ***increase of 29%***.
>
> Our ***net income*** for the quarter was ***$493.000*** or ***$0.02 of earnings per diluted share***, compared to a loss of $3.2 million, or $0.13 loss per share in the third quarter of 2006. . . .
>
> Looking at each of these businesses in turn, ***revenue from our Medical business***, which comprised 53% of total company revenue, ***grew 39% to $5.2 million***, from $3.8 million in the year ago quarter.  ***Medical product sales grew 33%*** over the year ago quarter and Medical product sales comprised 77% of total Medical revenue in the quarter.

66.     Defendant Viegas also assured investors that defendants were focused on "***expanding international sales***" in Immersion's medical business:

First, ***expanding international sales; we are making plans to expand our reach into international markets for medical simulators by establishing a presence in Europe and Asia in 2008***.  This presence will include general management, sales, marketing, and technical support functions to service the local customers.

67.     In response to defendants' November 1, 2007 statements, the Company's stock price rose 12.67% over the next two trading days, to close at $17.57 on November 5, 2007.

68.     Six days later, defendants Ambler and Vogel unloaded ***all*** of their remaining Immersion stock.  Defendant Ambler sold 20,000 shares (100% of his holdings) for proceeds of over $347,000 on November 6, 2007, and defendant Vogel sold 7,752 shares (100% of his holdings) for proceeds of over $134,000 on November 7, 2007.

69.     On November 8, 2007, Immersion filed with the SEC its quarterly report on Form 10-Q for 3Q07, signed by defendant Ambler.  The Form 10-Q reported Immersion's 3Q07 earnings results as follows:

| 3Q07 Form 10-Q | | | | |
|---|---|---|---|---|
| Period | Revenue | Net Income | Product Sales | Revenue From Immersion Medical |
| For the three months ended September 30, 2007 | "*49% increase*" *to $9.8 million* | "***$493,000***" | "***$5.4 million***, *an increase of $1.2 million or 27%*" | "***$5.2 million, an increase of $1.5 million or 39%***" |
| For the nine months ended September 30, 2007 | "*29% increase*" *to $24.8 million* | "***123.1 million***" | "*increased by $2.8 million or 24%*" | "***$12.0 million***, *an increase of $2.2 million or 22%*" |

70.     In addition, the Form 10-Q stated that "[t]he increase in product sales was primarily due to ***increased medical product sales of $1.0 million*** [for the three months ended September 30, 2007, and] . . . ***$2.8 million*** [for the nine months ended September 30, 2007]."

71.     On February 28, 2008, Immersion issued a press release reporting its 4Q07 and fiscal 2007 financial results.  The press release stated, in pertinent part:

***Revenues*** were ***$9.9 million*** for the quarter ended December 31, 2007 or ***15 percent higher*** when compared to revenues of $8.6 million for the fourth quarter of 2006.

*Net income* for the fourth quarter was *$0.5 million* compared to a net loss of $(2.0) million for the fourth quarter of 2006. *Diluted earnings per share* were *$0.02* for the quarter compared to $(0.08) loss per share for the fourth quarter of 2006.

*Revenues* were *$34.7 million* for the year ended December 31, 2007 compared to revenues of $27.9 million for the year ended December 31, 2006, an *increase of 25 percent*. *Net income* for the year ended December 31, 2007 was *$117.0 million, or $3.71 diluted earnings per share*, compared to a net loss of $(10.4) million, or $(0.42) loss per share, for the year ended December 31, 2006.

72.     Regarding the Company's 4Q07 and 2007 results, defendant Viegas stated in the press release:

"*In 2007, Immersion achieved revenue growth of 25 percent and profitability in each of the four quarters*," said Victor Viegas, Immersion CEO, president, and chairman of the board.  "We have *substantial organic growth opportunities* in our medical, mobility, and touch interface products businesses.  We have a strong balance sheet that allows us to increase investment in new product development and in sales and marketing to drive a faster pace of customer adoption of our products and technologies worldwide."

73.     In addition, in the press release, Immersion disclosed that it had made an accounting error in its previously issued financial reports for the three months ended March 31, 2007 and for the six and nine months ended June 30, 2007 and September 30, 2007, respectively, with regard to its income tax accounting.  The Company stated, however, that "[t]his correction ha[d] *no effect* on revenue, operating income, or cash balances."  On this disclosure of an accounting misstatement, Immersion's shares dropped from over $10 per share to $8.43 per share, or nearly 18%.  However, because the accounting problem was purportedly related *only* to income tax expense, rather than core operations, the stock soon recovered.

74.     That same day, February 28, 2008, following the press release, defendants held an earnings conference call with analysts and investors.  During the conference call, defendant Viegas reiterated Immersion's 4Q07 and fiscal year 2007 results, calling them the "*best in Immersion's history*":

First, as summary of our fourth quarter and full-year 2007 financial results. We achieved a *record $9.9 million in revenue* in the fourth quarter, a *growth of 15%* over the same quarter in 2006.  For the year, *revenue grew 25% over 2006 to $34.7 million*.  *Immersion has been profitable for each of the last four quarters*.  Our *net*

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                          - 25 -

*income* for the fourth quarter was $511,000 or *$0.02 of earnings per diluted share* compared to a loss of $2 million or $0.08 loss per share in the fourth quarter of 2006.

For 2007, our *net income* was *$117 million* or *$3.71 of earnings per diluted share* compared to a net loss of $10.4 million or $0.42 loss per share in 2006. *Overall, our 2007 financial results are the best in Immersion's history*. These results coupled with cash, cash equivalents and short-term investments totaling $138.1 million, as well as numerous organic growth opportunities provide a solid foundation for continued growth into the future.

75.     Defendant Ambler also reiterated the Company's "*record high[]*" 4Q07 and fiscal 2007 results:

For the fourth quarter of 2007, our *revenues* were *$9.9 million* compared to $8.6 million for the fourth quarter of 2006, an *increase of 15%*. Our year's *revenues* totaled *$34.7 million* compared to $27.9 million in 2006, an *increase of 25%*. *Both the quarter and the annual revenue numbers were record highs for the Company*.

Our *net income* for the quarter was *$511,000* or *$0.02 of earnings per diluted share* compared to a loss of $2 million or $0.08 loss per share in the fourth quarter of 2006. *This was the fourth straight quarter the Company has had positive earnings*. For the year, our *net income* totaled *$117 million* or *$3.71 of earnings per diluted share* compared to a loss of $10.4 million or $0.42 loss per share in 2006.

*        *        *

Looking at each of these businesses in turn, *revenues from our medical business*, which comprised 34% of total Company revenues for the quarter, were *$3.4 million* compared to $4.3 million in the year ago quarter, which was when we launched our endovascular 3.0 product.

For the year, our *medical revenues* totaled *$15.4 million, up 9%* from 2006 and represented 44% of our total revenues.

76.     On March 17, 2008, Immersion filed its 2007 Form 10-K with the SEC, signed by defendants Viegas and Ambler. The Form 10-K reported Immersion's 2007 earnings results as follows:

| 2007 Form 10-K | | | | |
|---|---|---|---|---|
| Revenue | Net Income | Product Sales | Revenue From Immersion Medical | Net Income From Immersion Medical |
| "*increased by $6.8 million or 25% to $34.7 million*" | "*$117.0 million*" | "*increased by $1.5 million or 9%*" | "*increased by $1.3 million, or 9%*" | "*$635,000*" |

77.     In addition, the Form 10-K stated that "[t]he increase in product sales was primarily due to *increased medical product sales of $1.1 million* . . . ."

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                    - 26 -

**Reasons Why Defendants' 2007 Revenue, Growth, Earnings and Medical Sales Statements Were Knowingly False and Misleading**

78.      As set forth in further detail in ¶¶152-156, defendants' statements regarding Immersion's quarterly and fiscal 2007 sales, revenue and earnings were false when made. Immersion has admitted in its February 8, 2010 restatement that it did ***not*** properly recognize revenue in its medical business during 2007 due to: (i) "Premature recognition of revenue for products sold with ***FOB Destination*** or other similar shipping terms, or for ***incomplete shipment*** of products or storage of products following shipment"; (ii) "Non-standard terms and conditions that prevented recognition of revenue upon shipment, including ***rights of return***, extended payment terms, product replacement commitments, potential free upgrades and other non-standard commitments, that prevented recognition of revenue upon shipments"; and (iii) "***Lack of probable collectability*** at the time revenue was recognized."  As a result of these material misstatements, defendants were forced to restate Immersion's fiscal 2007 financial statements to account for $125,000 of improperly recognized revenue from these sales.

79.      In addition to falsely reporting sales and revenue, defendants' fraudulent revenue recognition practices violated basic accounting principles.  Principles that Viegas and Ambler as accountants and Vogel and Chavez with MBAs would have been well aware of.  Financial Accounting Standards Board Statement of Financial Accounting Concepts No. 5 ("FASCON 5") clearly and concisely states that revenue cannot be recognized until it is both realized (or realizable) and earned.  SEC SAB No. 104 ("SAB 104") has further clarified revenue rules under GAAP by requiring that revenue can be recognized only when ***all*** of the following criteria are met:

        (a)      persuasive evidence of an arrangement exists;

        (b)      delivery has occurred or services have been rendered;

        (c)      the seller's price to the buyer is fixed or determinable; and

        (d)      collectability is reasonably assured.

80.     Immersion's medical sales violated these basic accounting standards.   First, Immersion's sales transactions failed to meet the SAB 104 requirement of "persuasive evidence of an arrangement" because of the "non-standard" commitments associated with the sales.  Second, the sales transactions failed to meet the SAB 104 requirement that "[d]elivery has occurred" because of "FOB destination" or other similar shipping terms and/or incomplete shipment or storage of products.  Specifically, SAB 104 states:

> The staff believes that delivery generally is ***not*** considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement.  Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

Third, the sales transactions failed to meet the SAB 104 requirement that "collect[a]bility is reasonably assured" because, as defendants have admitted, the sales lacked probable collectability. Specifically, SAB 104 precludes revenue recognition when:

> (i)     The buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates; or
>
> (ii)    The buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product or subsequently consumes or uses the product.

Finally, the sales transaction included a "right of return."   Statement of Financial Accounting Standards ("SFAS" or "FAS") No. 48, *Revenue Recognition When Right of Return Exists* ("FAS 48") clearly and concisely states:

> If an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met:
>
> a.      The seller's price to the buyer is substantially fixed or determinable at the date of sale.
>
> b.      ***The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product***.
>
> c.      The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.
>
> d.      The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

1
2
                  e.      The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

3
                  f.      The amount of future returns can be reasonably estimated.

4
SAB 104 further states that if a sales transaction fails to meet all of the conditions of FAS 48, as

5
outlined above, "***no revenue may be recognized*** until those conditions are subsequently met or the

6
return privilege has substantially expired."  As defendants have admitted, Immersion's sales failed to

7
meet these requirements.

8
       81.    Reports of confidential witnesses confirm that defendants knew of Immersion's

9
improper revenue recognition during 2007.  According to CW1, Immersion was a small company

10
with few sales, so when a sale was made, everyone knew about it.  Sales were reported by the sales

11
representatives to the Sales Department Administrator, who entered the sale information into a

12
"Made to Manage" system.  The Sales Department Administrator then prepared a printed packet of

13
information regarding each sale and forwarded it to CW1, who reviewed the packet to determine

14
whether the criteria for booking the sale and recognizing revenue had been met.  CW1 used the

15
following criteria to make his recommendation: (i) whether there was an official PO signed by the

16
customer; (ii) whether the customer was a known entity; and (iii) whether the customer had passed a

17
credit check.  If these criteria were met, he would make a recommendation to CW5 and Cortes to

18
19
book the sale and record revenue.  If CW1 found that the sale did not meet the criteria for booking,

20
he would "sound the alarm" to all who would hear it.  After that, he sent the issue to Immersion's

21
Corporate Controller in San Jose, California, who, along with defendant Ambler, made the final

22
decision whether to book the sale and record revenue.  Once that decision was made, CW1 updated

23
the Made to Manage order entry for the customer, which was then uploaded into an Oracle system

24
and forwarded electronically to the Corporate Controller.

25
26
       82.    CW5 corroborated defendants' direct participation in revenue recognition on

27
Immersion's medical sales.  According to CW5, throughout the Class Period, all Medical Division

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                                    - 29 -

sales were fully documented and sent to Immersion's corporate headquarters in San Jose, California. During 2007, while defendant Viegas was CEO, CW5 submitted all medical sales information and supporting documentation directly to the Corporate Controller, Baust, in hard copy format, including the purchase order and any related e-mails or other documentation that related to the sale. CW5 and Baust reviewed every single medical sale and all related documentation at the end of every quarter, then conferred with defendant Ambler regarding whether to recognize revenue on the sales. CW5 stated that defendant Ambler made the ultimate decisions on whether to recognize revenue on Immersion's medical sales.

83.     According to CW1, and notwithstanding defendants' statements of "a lot of . . . success in deploying [medical] products in China," Immersion's main revenue recognition issues, resulting in its later restatement of 2007 revenue, related to its medical sales to Asian customers. CW1 reported that Immersion was booking medical sales to these customers when there was **no item in inventory** to ship to the customer, and that defendant Vogel **insisted** on shipping whatever medical products Immersion had on hand, such as road-worn demonstration units not proper for customer sale. CW1 also reported that defendant Vogel allowed medical products to be shipped without a signed PO from the customer, and that the Medical Division Vice President of Sales and Marketing, Mark Meents and later Barkay, bullied the shipping department into shipping products without a formal PO in place. Instead, Immersion would create an unofficial and unsigned "PO" in Microsoft Word, and would book sales based on these unofficial POs. According to CW1, this happened frequently, and he had constant disagreements with the Medical Division about booking sales on these orders, including with defendant Vogel. CW1's disagreements with Vogel regarding revenue recognition on these sales were both face-to-face and via e-mail.

84.     In addition, CW1 reported that it was often difficult to determine the legitimacy of these Asian customers, and that he was "bullied" by members of the sales department into

1  recognizing revenue on sales to these customers.  CW1 complained about the bullying via e-mail to

2  CW5 and Cortes, who reported directly to defendant Ambler.

3       85.    Other witnesses corroborated these reports of improper revenue recognition.

4  According to CW4, international medical sales had remained essentially flat from 2002 to 2007.

5  Between 2Q07 and 3Q07, however, international sales suddenly jumped approximately 200%.  In

6  addition, CW2 reported that Immersion Medical shipped medical prototypes to customers, calling

7  them "product[s]," in order to recognize a sale.  CW2 also reported that there were many instances

8  when customers returned products to the Medical Division, sometimes within a matter of days,

9  despite Immersion's publicly described no return policy.

10

11 **Defendants' Statements Regarding Immersion's 2008 Revenue, Growth, Earnings and**
   **Medical Sales Were False and Misleading**

12

13      86.    On April 24, 2008, Immersion issued a press release announcing that defendant

14 Richardson had been appointed President and CEO of the Company to replace defendant Viegas,

15 effective April 28, 2008.

16      87.    On May 1, 2008, Immersion issued a press release announcing its 1Q08 financial

17 results.  The press release stated:

18

19      *Revenues* were *$8.2 million* for the quarter ended March 31, 2008 or *27 percent*
        *higher* when compared to revenues of $6.4 million for the first quarter of 2007.

20
        *Net loss* for the first quarter was *$(2.6) million* compared to a net income of
21      $115.8 million for the first quarter of 2007. Net income for the first quarter of 2007
        included $134.9 million of litigation conclusions and patent license.  *Loss per share*
22      was *$(0.08)* for the quarter compared to $3.91 diluted earnings per share for the first
        quarter of 2007.

23      88.    That same day, on May 1, 2008, following the press release, defendants held an

24 earnings conference call with analysts and investors.  During the conference call, defendant Viegas

25 reiterated Immersion's 1Q08 results:

26
        Our *revenue grew 27%* in the first quarter, over the same quarter in 2007, *to $8.2*
27      *million*.  Our *net loss* for the first quarter was *$2.6 million or $0.08 per share*.

28      89.    With regard to Immersion Medical, defendant Viegas stated:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                           - 31 -

*We also added several sales management, sales and sales support people for the international business, with more hiring planned in order to establish a much stronger global presence.*  This staffing investment is critical because the medical simulation markets in Europe and Asia are each roughly equivalent to the size of the US market.  *The right people in the right places will help us capture substantial opportunity for increased revenues.*

90.     Defendant Ambler also reiterated Immersion's false 1Q08 results during the conference call:

For the first quarter of 2008, our *revenues* were *$8.2 million* compared to $6.4 million for the first quarter of 2007, an *increase of 27%*.  Our *net loss* for the quarter was *$2.6 million* or *$0.08 per share*, compared to net income of $115.8 million or $3.91 of earnings per diluted share in the first quarter of 2007, which is when we accounted for our litigation conclusion on patent license with Sony.

I would like to discuss each section of our income statement in order, starting with revenue.  Looking at each of these businesses in turn, *revenues from our medical business*, which comprised 37% of total company revenues for the quarter, were *$3 million* compared to $2.7 million in the year-ago quarter.  That's an *increase of 13%*.

*       *       *

Analyzing our first quarter revenues by category, first quarter *total product sales grew 7%* compared to the first quarter of 2007, and represented 47% of revenue for the quarter, compared to 56% in the year-ago period.  *64% of product sale revenues came from our medical business*, 31% came from our 3D business and 5% came from our touch interface products business.

91.     When questioned by analysts about the progress of Immersion's international medical sales, defendants Richardson and Viegas assured the analysts that the Company was adding "very senior type of VP people" and would see a "*dramatic increase in the revenues*":

[ANALYST]:  And then switching gears on the medical side, can you talk a little about the progress on the international channels?  I think in the past you've discussed bringing that to a higher level and I'm just curious if you can give some numbers in terms of the mix at this point or your expectations for the growth in the channel?

[CLENT RICHARDSON]:  I'll take a first pass and then ask Vic if he'd like to comment.  We are starting from the top down in the way we're staffing our international and *we've added VP level and Senior VP – not Senior VP, but very senior type of VP people to help us run our international sales efforts.  And we're building out those teams in important countries where we have and need relationships, and where we've seen both low-hanging fruit, but also tremendous long-term sustainable growth for the business.  And we will continue on that march for the foreseeable future until we're well staffed according to plan.*  Vic, is there more you'd like to add in terms of mix or other?

[VICTOR VIEGAS]:  I think that's pretty good.  I think, Michael, these types of sales require senior level salespeople and people who have contacts, connections

with medical device companies as well as hospitals and other teaching institutions. ***So, the kind of people that we're bringing on have years of experience in their relevant territories and we're already in the process of bidding on contracts and receiving purchase orders***. So, we're seeing – you know, someone asked earlier about measurement and reward. Here's an area where immediately hiring in the neighborhood of 5 to 10 people, ***we're going to see dramatic increase in the revenues that they bring and it's not long-term, it's very near-term, and we hold great expectation for increased revenues here in the next three quarters***.

92.     On May 9, 2008, Immersion filed with the SEC its quarterly report on Form 10-Q for 1Q08, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as follows:

| 1Q08 Form 10-Q | | | | |
|---|---|---|---|---|
| Revenue | Net Loss | Product Sales | Revenue From Immersion Medical | Net Loss From Immersion Medical |
| "*27% increase*" to $8.2 million | "*$2.6 million*" | "*$3.9 million, an increase of $261,000 or 7%*" | "*$3.0 million, an increase of $351,000 or 13%*" | "*$1.2 million, an increase of $297,000 or 34%*" |

93.     On July 14, 2008, Immersion issued a press release announcing defendant Vogel's resignation as Senior Vice President and General Manager of Immersion Medical for undisclosed reasons.  Defendant Chavez was appointed to replace Vogel in August 2008.

94.     On July 31, 2008, Immersion issued a press release reporting its 2Q08 financial results.  The press release stated, in pertinent part:

> ***Revenues*** were ***$9.3 million*** for the quarter ended June 30, 2008, compared to revenues of $8.6 million for the second quarter of 2007, an ***increase of 8%***.
>
> ***Net loss*** for the second quarter was ***$(3.1) million***, compared to net income of $176,000 for the second quarter of 2007.  ***Loss per share*** was ***$(0.10)*** for the quarter, compared to $0.01 diluted earnings per share for the second quarter of 2007.
>
> ***Revenues*** were ***$17.5 million*** for the six months ended June 30, 2008, compared to revenues of $15.0 million for the first six months of 2007, ***an increase of 16%.  Net loss*** for the first six months of 2008 was ***$(5.7) million***, or ***$(0.19) loss per share***, compared to net income of $116.0 million, or $3.81 diluted earnings per share, for the first six months of 2007.

95.     In the press release, defendant Richardson continued to stress defendants' focus on international sales:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                            - 33 -

1   "An important goal of ours for long term growth is increasing international
sales and balancing the mix of domestic and international revenue," said Immersion
2   president and CEO Clent Richardson. "We are aggressively expanding our global
reach to support our focused growth opportunities in medical, mobility, and
3   touchscreen tactile feedback. Our efforts include staffing with the very best people
and locating them where the opportunities exist around the world. *We are already*
4   *seeing positive and measurable results from our investments. Second quarter*
*international revenues reached $4.5 million, almost 50% of total revenue and an*
5   *increase of 25% compared to the year ago quarter*."

6   96.   That same day, July 31, 2008, following the press release, defendants held an

7   earnings conference call with analysts and investors. During the call, defendant Richardson

8   reiterated the Company's false 2Q08 results:

9
10   Our *revenue grew 8%* in the second quarter over the same quarter in 2007, to
*$9.3 million, a record second quarter revenue*.

11   Our *net loss* for second quarter was *$3.1 million, or $0.10 per share*,
compared to net income for the second quarter of last year of $176,000, or *$0.01 of*
12   *earnings per diluted share*.

13   97.   During the conference call, defendant Ambler also reiterated the Company's false

14   2Q08 results:

15   For the second quarter of 2008, our *revenues* were *$9.3 million*, compared to $8.6
16   million for the second quarter of 2007, an *increase of 8%*.

17   Our *net loss* for the quarter was *$3.1 million, or $0.10 per share*, compared
to net income of $0.2 million, or *$0.01 of earnings per diluted share*, in the second
18   quarter of 2007. . . .

19   *Revenues from our medical business*, which comprised 46% of total
company revenues, were *$4.3 million*, compared to $4.1 million in the year-ago
20   quarter, an increase of 4%.

21   *      *      *

22   Analyzing our second quarter revenues by category, second quarter *total*
*product sale revenues grew 2%* compared to the second quarter of 2007 and
23   represented *58% of revenue*, compared to 62% in the year-ago period. *75% of*
*product sales revenues came from our medical business*, with 19% coming from
24   our 3D business and 6% from our touch interface products business.

25   *      *      *

26   One major goal for the year has been to *grow our international revenues*.
*We are achieving this goal*. For the quarter, *international revenues grew 25%, to*
27   *$4.5 million*, from $3.6 million in the second quarter of 2007, and in percentage
terms represented *49% of our revenues* for the quarter, compared to 42% in the
28   comparable period.

98.     In addition, defendant Richardson reiterated Immersion's "substantial growth" in international sales, particularly in the Company's medical business:

> We are investing in growing the business.  An important goal of ours for long-term growth is increasing international sales and balancing the mix of domestic and international revenue.  ***We are aggressively expanding our global reach to exploit our substantial growth opportunities***.  This expansion includes staffing with the very best people and locating them around the world, wherever the opportunities exist.  In the first half of this year, we added 12 new sales, business development, sales support and marketing people across all of our businesses worldwide.  This investment is important to delivering our solutions to more customers and to supporting them in their locations.
>
> ***We are already seeing positive and measurable results from our investments.  Second quarter of international revenues reached $4.5 million, almost 50% of total revenue, and an increase of 25% compared to the year-ago quarter***.
>
> *        *        *
>
> ***Our international team is purs[u]ing major opportunities in Asia and is developing important channel relationships*** that we will announce at a later date.  Even though the team has been on board only a short time, ***we've seen substantial growth, up 60% in our international sales in the second quarter*** over the year-ago period.  We will continue to aggressively build our global team and establish the necessary infrastructure to support international operations, localize our solutions where appropriate, to capture additional market share and substantially grow revenue.

99.     Defendants' July 31, 2008 announcement of a net loss partially disclosed that Immersion's business was not doing as well as defendants had led investors to believe.  As a result, Immersion's stock price fell nearly 18% in the next two trading days, to close at $5.85 on August 4, 2008.  The Company's stock price remained artificially inflated, however, due to defendants' false and misleading statements.

100.     On August 8, 2008, Immersion filed with the SEC its quarterly report on Form 10-Q for 2Q08, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as follows:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                                    - 35 -

| 2Q08 Form 10-Q | | | | | |
| Period | Revenue | Net Loss | Product Sales | Revenue From Immersion Medical | Net Loss From Immersion Medical |
|---|---|---|---|---|---|
| Three months ended June 30, 2008 | "*8% increase*" *to $9.3 million* | "*$3.1 million*" | "*$5.4 million, an increase of $97,000 or 2%*" | "*$4.3 million, an increase of $154,000 or 4%*" | "*$456,000, an increase of $479,000*" |
| Six months ended June 30, 2008 | "*16% increase*" *to $17.5 million* | "*$5.7 million*" | "*$9.2 million, an increase of $358,000 or 4%*" | "*$7.3 million, an increase of $505,000 or 7%*" | "*$1.6 million, an increase of $776,000 or 92%*" |

101.    On October 30, 2008, Immersion issued a press release reporting its 3Q08 financial results.  The press release stated, in pertinent part:

> **Revenues** for the third quarter of fiscal 2008 were **$10.1 million**, an **increase of approximately 3%** over revenues of $9.8 million for the third quarter of 2007.  **Net loss** for the third quarter, which included a one-time charge of $20.75 million related to the settlement of Immersion's litigation with Microsoft, was **$(32.3) million**, or **$(1.10) per share**.  Excluding the one-time charge, and tax effects of $7.3 million, **net loss** for the third quarter was **$(4.3) million, or $(0.15) per share**.

102.    In the press release, defendant Richardson reiterated Immersion's 3Q08 revenue results and stated that its international medical sales were "***robust***":

> "**Immersion's revenue of $10.1 million was not only the highest revenue total in our history, but also the first time that quarterly revenue has exceeded the $10 million mark**," said Immersion president and CEO Clent Richardson. "Results for the touch side of our business were highlighted by strong adoption of our solutions in high-volume mobile phones, **while international sales for our medical line of business were robust**."

103.    That same day, October 30, 2008, following the press release, defendants held an earnings conference call with analysts and investors.  During the call, defendant Richardson again reiterated Immersion's 3Q08 revenue results:

> Immersion posted **record revenue of $10.1 million** in the third quarter of 2008.  This is not only the **highest revenue total in our company's history**, but also the first time that Immersion's quarterly revenue has exceeded the $10 million mark.

104.    Defendant Ambler also reiterated the Company's 3Q08 results:

> **Immersion's revenues of $10.1 for the third quarter of 2008 were a new quarterly record, and revenues exceeded $10 million for the first time in our history**.  Total revenues **increased approximately 3%** over the comparable period last year. . . .

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                    - 36 -

Looking at a breakdown of revenues across our various business lines, *revenues from medical of $3.2 million represented 32% of total revenues*, and were down 39% relative to the same quarter last year. As Clent will discuss in a few minutes, this decline was a result in a short fall in US sales, while *international sales and our global opportunity grew sharply during the quarter. We see very strong opportunities for our medical solutions globally*.

\*　　\*　　\*

We continue to make good progress in expanding our international revenues. For the quarter, *international revenues grew 112% year-over-year to $5.6 million*. That represented *56% of total revenues*. We are seeking significant opportunities for Immersion products on a global basis, and you will see a continued focus on international activities as we seek to capture additional revenue.

105.　　In addition, defendant Richardson further reported on Immersion's international medical sales, announcing that they had grown "*more than 3 times*" over 3Q07:

In contrast, as disappointing as our US sales were, *our international results were predictably and equally promising. Overseas revenue for medical grew more than 3 times* over the third quarter of last year. As I stated in our last quarterly call, we are committed and heavily focused on the global market for our medical solutions. As our research shows, the international market is in excess of 2 times that of the US market.

*Medical solutions are and will be an important growth driver for our business*. . . .

During the quarter, we expanded our market opportunity by signing agreements with several key partners that would develop and bring international channels to market, focusing on Asia, Pacific and Europe. . . . Products and solutions like Immersion Medical's *are now in high demand in China* as their health care system undergoes significant reform.

\*　　\*　　\*

[T]o reiterate, for the fourth quarter, we expect that the number of handsets sold worldwide featuring our technology will continue to increase, *that revenues from our medical line of business will increase*, and that legal expenses will decline.

106.　　In response to defendants' October 30, 2008 statements, the Company's stock price rose 23.56% over the next two trading days, to close at $5.75 on November 3, 2008.

107.　　On November 7, 2008, Immersion filed with the SEC its quarterly report on Form 10-Q for 3Q08, signed by defendant Ambler. The Form 10-Q reported Immersion's earnings results as follows:

| 3Q08 Form 10-Q | | | | | |
| Period | Revenue | Net Loss | Product Sales | Revenue From Immersion Medical | Net Loss From Immersion Medical |
|---|---|---|---|---|---|
| Three months ended September 30, 2008 | "*3% increase*" *to $10.1 million* | "*$32.3 million*" | "*$4.8 million, a decrease of $665,000 or 12%*" | "*3.2 million, a decrease of $2.0 million or 39%*" | "*$2.3 million, an increase of $3.6 million*" |
| Nine months ended September 30, 2008 | "*11% increase*" *to $27.5 million* | "*$38.0 million*" | "*$14.0 million, a decrease of $307,000 or 2%*" | "*$10.5 million, a decrease of $1.5 million or 13%*" | "*$3.9 million, an increase of $4.4 million*" |

108.     On March 2, 2009, Immersion issued a press release reporting its 4Q08 and fiscal 2008 financial results.  The press release stated:

*Revenues* for the fourth quarter of fiscal 2008 were *$9.0 million, a decrease of 9%* compared to revenues of $9.9 million for the fourth quarter of 2007 and a *decrease of 11%* compared to $10.1 million in the third quarter of 2008.  Excluding $1.1 million in one-time deferred revenues for the third quarter of 2008, revenues for the fourth quarter were flat sequentially.  *Net loss* for the fourth quarter, which included one-time charges of $2.6 million related to the divestiture of the 3D line of business, was *$(9.7) million*, or *$(0.35) per share*.  Excluding the one-time charges, net loss for the fourth quarter was $(7.1) million, or $(0.26) per share. . . .

*Revenues* for fiscal 2008 were *$36.5 million, an increase of 5%* over revenues of $34.7 million for fiscal 2007.  *Net loss* for fiscal 2008, which included one-time charges of $2.6 million related to the divestiture of the 3D line of business, and a $20.75 million settlement of Immersion's lawsuit with Microsoft, was *$(47.7) million*, or *$(1.61) per share*.  Excluding the one-time charges and settlement, *net loss* for fiscal 2008 was *$(24.4) million*, or *$(0.82) per share*.

109.     The same day, March 2, 2009, following the press release, defendants held an earnings conference call with analysts and investors.  During the call, defendants Richardson and Ambler reiterated Immersion's false 4Q08 and fiscal 2008 results and reported "*strong growth*" in Immersion's international medical sales:

[CLENT RICHARDSON]:  Immersion's fourth quarter *revenue* was *$9 million*, which was flat with last quarter, excluding the one-time deferred revenue from IS, LLC recognized in that period.

*Revenue* for the fiscal year grew to *$36.5 million, a 5% increase* over fiscal 2007.

*          *          *

[STEPHEN AMBLER]:  For the fourth quarter of 2008, *revenues* were *$9 million*, sequentially flat compared to the preceding quarter, when you exclude $1.1 million of one-time deferred revenues from IS, LLC recognized in Q3, and a *decrease of 9%* from $9.9 million in the comparable period last year. . . .

*Revenues* for the fiscal year totaled *$36.5 million, an increase of 5%*, compared to $34.7 million for fiscal 2007.  Excluding the 3D line of business, revenues totaled *$31.6 million in 2008*, and $29.9 million in 2007, *an increase of 6%*.  Looking at a breakdown of revenue across our various lines of business, fourth quarter *revenues from medical* were *$4.3 million*, represented *48% of total revenues*.  This is *up 27%* from the year ago period, and *up 34%* sequentially.  For the year, our *medical revenues* totaled *$14.8 million*, down 4% from 2007, and represented *41%* of our total revenues.

*We continued to see strong growth in international sales with our medical line of business.  Medical international revenues grew 135%* over the year-ago period, and also *grew 24%* sequentially.

\*       \*       \*

Analyzing our fourth quarter and year end revenues by category, *total product sale revenues increased 30%* compared to the fourth quarter of 2007, 16% sequentially, and represented 61% of revenue.  *72% of product sale revenue came from our medical business*, 24% came from our 3D business, and 4% came from our touch interface products business.

For the year, *product sale revenues* accounted for *53%* of total revenues, and *grew 5%* over 2007.

\*       \*       \*

After accounting for the one-time charge related to the disposal of our 3D line of business, our *net loss* for the quarter was *$9.7 million*, or *$0.35 per share*.  Excluding the one-time items, net loss would have been $7.1 million, or $0.26 per share. . . .

For the year, our *net loss* totaled *$47.7 million*, or *$1.61 per share*, including the one-time charges previously mentioned.  Excluding these items, net loss would have been $24.4 million, or $0.82 per share.

110.  Defendant Richardson also continued to reassure investors as to the strength of Immersion's medical business:

Medical represented 48% of our revenue in Q4, and 41% for fiscal 2008.  While Immersion's touch products are undeniably hot, and of great interest on Wall Street, it is critical for investors in our Company to understand our Medical line of business.  *Historically, the largest contributor of Immersion's revenue on a percentage basis, the Medical line of business, is one of the most meaningful and vital growth drivers of our Company*.  In Q4, our team delivered revenue that was up both year-over-year and sequentially, following a disappointing Q3.

While we are not yet satisfied with the results or growth rate for this line of business, the numbers are encouraging for several reasons.  First we did not launch

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                          - 39 -

any significant new products or procedures in 2008.  Meaning that our sales team *was able to grow revenue solely on current products, service, and technology*.

Second, this is a capital based business with reasonably high per unit pricing. Given the macroeconomic climate, we are pleased that our team is able to identify and close customers, and we believe this is a firm indicator of demand for Immersion Medical simulation products.  And finally, *international revenue for our Medical line of business nearly tripled in the fourth quarter of 2008 over Q4 2007, and doubled in full year 2008*, demonstrating the magnitude of the global opportunity for Immersion.

                                    *         *         *

*In summary, the 2008 year was a year of progress and reinvention for our Medical line of business.  Driven by new leadership, ongoing investment in new product development, as well as more aggressive marketing and channel expansions.  We have set the stage for growth in 2009 and beyond*.

111.    When questioned about Immersion's 4Q08 and fiscal 2008 results, defendant Ambler told analysts that the Company's medical business had "increased its revenues by over $1 million":

[ANALYST]:  [C]ould you help us understand a little bit, on the conference call for the third quarter earnings, if I am not mistaken you guys had guided to maybe a little bit better in revenues than what was reported.  That was around the end of October.

Obviously everyone has been going through this macro environment, certainly a change across the industry.  Could you guide us through what happened to Immersion specifically there, and where a lot of the erosion cam from in the timeframe from November to December?

[STEPHEN AMBLER]:  Yes.  I will take that one.  Hi, Jeff.  If you actually look at our revenue, *the Medical side of our business increased it's revenues by over $1 million compared to Q3*, so we are recently happy with that, and I think it shows that despite the tough economic environment out there, *Medical can grow*.

112.    These results were disappointing ($0.12 below estimates) and caused Immersion's stock to drop to $2.78 per share on March 3, 2009, or nearly 29%, down from $3.69 per share prior to the announcement.  The stock, however, remained artificially inflated as a result of defendants' false and misleading statements.

113.    On March 9, 2009, Immersion filed its 2008 Form 10-K with the SEC, signed by defendants Richardson and Ambler.  The Form 10-K reported Immersion's earnings results as follows:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                          - 40 -

| 2008 Form 10-K | | | | |
|---|---|---|---|---|
| Revenue | Net Loss | Product Sales | Revenue From Immersion Medical | Net Loss From Immersion Medical |
| *"increased by $1.8 million, or 5%, to $36.5 million"* | *$47.7 million* | *"increased by $963,000 or 5%"* | *"decreased by $589,000 or 4%"* | *"[t]he segment's results changed by $6.9 million to a loss"* |

114.    In addition, the Form 10-K stated that "[t]he increase in product sales was primarily due to *increased medical product sales of $746,000* . . . ."

**Reasons Why Defendants' 2008 Revenue, Growth, Earnings and Medical Sales Statements Were False and Misleading**

115.    Defendants' statements regarding Immersion's 2008 sales, revenues and earnings were false when made.  As part of its restatement, Immersion has admitted that it was not properly recognizing revenue in its medical business during 2008 due to: (i) "Premature recognition of revenue for products sold with *FOB Destination* or other similar shipping terms, or for *incomplete shipment* of products or storage of products following shipment"; (ii) "Non-standard terms and conditions that prevented recognition of revenue upon shipment, including *rights of return*, extended payment terms, product replacement commitments, potential free upgrades and other non-standard commitments, that prevented recognition of revenue upon shipment"; and (iii) "Lack of probable collectability at the time revenue was recognized."  For the same reasons set forth in ¶¶78-80, these sales transactions violated GAAP, SAB 104 and FAS 48 and falsely inflated Immersion's 2008 sales, revenues and earnings.  As a result of these material errors, defendants were forced to restate Immersion's fiscal 2008 results to account for at least *$1.3 million* of improperly recognized revenue.

116.    In addition, defendants were improperly recognizing revenue during 2008 with regard to a certain customer with which the Company had a "side agreement."  Defendants improperly recognized revenue of at least *$511,000* in 2Q08, *$523,000* in 3Q08, and *$585,000* in 4Q08 that should not have been recognized because: (i) the product was stored in a third-party warehouse and

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

was not shipped to the customer until a later quarter; (ii) the commitments in the side agreement caused the terms of earlier transactions to be deemed "not final" until the parties terminated the distribution agreement in the third quarter of fiscal 2009; (iii) defendants had conflicting exclusivity arrangements in effect from 2Q08 through 4Q08; and (iv) concessions related to payment terms caused the amount to not be "fixed and determinable."   As a result of these material errors, defendants were forced to restate Immersion's quarterly and fiscal 2008 results to account for at least **$1.6 million** of improperly recognized revenue.

117.    In addition to falsely inflating revenue and earnings, defendants' revenue recognition practices on these sales violated basic accounting standards.  FASCON 5 clearly and concisely states that revenue cannot be recognized until it is both realized (or realizable) and earned.  In addition, under SAB 104, revenue cannot be recognized unless: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the seller's price to the buyer is fixed or determinable; **and** (iv) collectability is reasonably assured.  Immersion's recognition of revenue on the sales with "side agreement[s]" violated these basic accounting standards.

118.    First, these sales violated the requirement that "[p]ersuasive evidence of an arrangement exists" because of the nature of the side agreements.  SAB 104 specifically states:

> [I]f an arrangement is subject to subsequent approval (*e.g.*, by the management committee or board of directors) or execution of another agreement, revenue recognition would be ***inappropriate*** until that subsequent approval or agreement is complete.

Immersion violated this requirement because the side agreements signed by Immersion resulted in earlier sales transactions to be deemed "not final" until a subsequent agreement between the parties was terminated.

119.    Second, Immersion's revenue recognition on these "side agreement" sales violated the SAB 104 requirement that "[t]he seller's price to the buyer is fixed or determinable" as a result of the payment term concessions offered by Immersion to its customer.  SAB 104 clearly states that

without a fixed price, "***revenue recognition is not appropriate***."  Third, Immersion violated the SAB 104 requirement that "[d]elivery has occurred" because the products were either not shipped at all or were stored in a third party warehouse rather than shipped to the customer.  SAB 104 specifically states:

> The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement.  Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

120.    Defendants knew or were reckless in not knowing about the side agreements signed by Immersion Medical's Vice President of Sales.  Importantly, the SEC has alerted companies to be aware of side agreements and their affect on revenue recognition:

> Registrants should ensure that appropriate policies, procedures, and internal controls exist and are properly documented so as to provide reasonable assurances that sales transactions, including those affected by side agreements, are properly accounted for in accordance with GAAP and to ensure compliance with Section 13 of the Securities Exchange Act of 1934 (*i.e.*, the Foreign Corrupt Practices Act).  Side agreements could include cancellation, termination, or other provisions that affect revenue recognition.  The existence of a subsequently executed side agreement may be an indicator that the original agreement was not final and revenue recognition was not appropriate.

SAB 104, §A.2, *Persuasive Evidence of an Arrangement*.

121.    Additionally, Immersion improperly recognized premature, inflated and fictitious revenue on several sales transactions during 2008 where the products were either unavailable or not yet functional.  In 4Q08, Immersion recorded revenue for five transactions where the product sold lacked sufficient functionality to permit recognition of revenue.  As a result of these material errors, defendants were forced to restate Immersion's 4Q08 and fiscal 2008 earnings to account for ***$727,000*** of improperly recognized revenue from these transactions.  The Company has admitted in its February 8, 2010 restatement that the revenue recognition on these transactions violated GAAP:

> In reviewing the transactions where sales personnel in our Medical line of business had made commitments by us to provide ***products that were not available*** or products that included ***components that were not fully developed at the time of sale***, we concluded that ***revenue was not appropriately recognized*** on certain transactions resulting in restatement adjustments to revenue in various reporting periods.

\*       \*       \*

In the fourth quarter of fiscal 2008, we recorded revenue for five transactions where *the product sold lacked sufficient functionality to permit recognition of revenue*. . . .   In the fourth transaction for which we had recorded $130,000 in revenue, sales personnel also *promised a deliverable that was not available* in the fourth quarter of fiscal 2008. . . . In the fifth transaction, for which we had recorded $129,000 in revenue, *the purchase order provided for certain acceptance criteria that were not met* in the fourth quarter of fiscal 2008.

122.    Well-established accounting principles require that, prior to revenue recognition, an entity must provide the actual product or service that entitles it to the revenue to be received:

Revenue should not be recognized until the seller has substantially accomplished what it must do pursuant to the terms of the arrangement, which usually occurs upon delivery or performance of the services.

*See* SAB 104 & FASCON 5, ¶84a, b, d.  Because Immersion failed to deliver a functional product on the transactions described above, Immersion had not substantially accomplished what it was required to do in order to recognize revenue under GAAP.  These sales transactions also failed to meet the SAB 104 requirement that "[d]elivery has occurred" because a functional product had not been delivered and/or acceptance criteria had not been met.  SAB 104 specifically states:

After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs.

123.    As result of these fraudulent revenue recognition practices, defendants materially overstated Immersion's earnings and revenue during 2008.   All told, defendants overstated Immersion's revenues by *over $3.6 million* in 2008, and overstated medical revenues by nearly *20%*.

124.    For the reasons set forth in ¶¶81-85, defendants knew that Immersion was improperly recognizing revenue during 2008.  According to confidential witnesses, Immersion was improperly recognizing revenue on medical sales where there products were not available for shipment or the products included components that were not fully developed at the time of sale.  CW1 reported that Immersion was booking medical sales during 2008 when there was no item in inventory to ship to the customer, and that defendant Vogel insisted on shipping whatever medical products Immersion had on hand, such as road-worn demonstration units not proper for shipment to customers.

1    Defendant Vogel also verbally harassed CW1 to approve shipment of medical products even though

2    the sale had not been finalized and there was no signed PO. In addition, according to CW2,

3    Immersion Medical was shipping prototypes to customers, calling them "product[s]," in order to

4    recognize a sale.

5         125.    CW2 also reported that there were many instances when customers returned products

6    to the Medical Division, sometimes within a matter of days. With regard to Asian customers in

7    particular, CW2 reported that by spring of 2008, medical products shipped to Asian customers were

8    being returned shortly after they were shipped.

9         126.    In addition, according to CW5, defendants Richardson and Ambler were also directly

10   involved in these fraudulent sales. Prior to Richardson's appointment as CEO, CW5 and Corporate

11   Controller Baust reviewed every single medical sale and relating documentation and conferred with

12   Ambler regarding whether to book revenue on a sale, who then made the final decision. When

13   Richardson became CEO on April 28, 2008, he brought a new philosophy to Immersion. According

14   to CW5, defendant Richardson wanted Immersion's corporate headquarters to more closely control

15   the Medical Division's operations. As a result, the Medical Division lost its autonomy under

16   Richardson, and revenue recognition decision-making on medical sales became even more

17   controlled by corporate headquarters. Under the new regime, CW5 would simply supply the sales

18   data and corporate would decide whether to recognize revenue on the sales. CW5 reiterated that

19   even under defendant Richardson's tenure as CEO, defendant Ambler still made the final decisions

20   on whether to recognize revenue recognition on medical sales.

21        127.    In addition to recognizing revenue, defendant Richardson was also heavily involved

22   in the fraudulent sales themselves. According to CW5, defendant Richardson was directly involved

23   with medical sales to a certain Chinese customer in 2008, which other CWs have confirmed were the

24   cause, in part, of the Company's subsequent restatement. CW5 reported that all information about

1  medical sales to this customer went directly from Barkay to defendant Richardson, via defendant

2  Ambler.  According to CW5, Barkay and Richardson had regular communications and spoke at

3  length about sales to this customer.

4
   **Defendants' Statements Regarding Immersion's 1Q09 Revenues, Growth, Earnings and**
5  **Medical Sales Were False and Misleading**

6      128.    On May 4, 2009, Immersion issued a press release reporting its 1Q09 financial

7  results.  The press release stated, in pertinent part:

8          *Revenues* from Continuing Operations for the first quarter of 2009 were ***$7.0***
           ***million***, *an increase of 1%* compared to revenues from Continuing Operations of
9          $6.9 million for the first quarter of 2008 and a ***decrease of 8%*** compared to revenues
           from Continuing Operations of $7.6 million for the fourth quarter of 2008.   Total
10         *revenue* generated during the first quarter of 2009 by the Company was ***$7.5 million***,
           $531,000 of which was included within Gain from Discontinued Operations.
11
                                    *       *       *
12
           *Net loss* for the first quarter of 2009 was ***$(7.5) million, or $(0.27) per share***,
13         compared to net loss for the first quarter of 2008 of $(2.6) million, or $(0.08) per
           share and net loss of $(9.7) million, or $(0.35) per share, for the fourth quarter of
14         2008, which included one-time charges of $2.6 million related to the divesture of the
           3D line of business.
15
16      129.    That same day, May 4, 2009, following the press release, defendants held an earnings

17  conference call with investors and analysts.  During the call, defendants Richardson and Ambler

18  reiterated Immersion's 1Q09 results:

19         [CLENT RICHARDSON]:   Immersion posted revenue of approximately ***$7.5***
           ***million*** in total revenue for the first quarter 2009[,] $7 million from continuing
20         operations and slightly over $0.5 million in discontinued operations.  Revenue mix
           from continuing operations was $4.5 million from our touch line of business and $2.5
21         million from our medical line of business.  Our ***net loss*** was approximately ***$7.5***
           ***million*** and cash burned during the quarter was approximately $5 million. . . .
22
           [STEPHEN AMBLER]: . . . Looking at a breakdown of revenue across our two lines
23         of business, medical and touch, first quarter ***revenues from medical of $2.5 million***
           ***represented 36% of total revenues***.  This is down 16% from the year-ago period and
24         down 41% sequentially.   Although we did experience significant weakness in
           revenue from our domestic medical market, which accounted for most of the
25         shortfall, some of the drop from Q4 2008 was caused by normal seasonal buying
           cycles.
26
27      130.    Regarding Immersion's medical business, defendant Richardson stated:

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                    - 46 -

[CLENT RICHARDSON]: *International demand for simulation remains strong, and we are making progress globally as we continue to add and expand relationships with important distribution partners*.  As mentioned at the top of the call, one such partnership is an exclusive new distribution agreement with Gadelius KK, one of Japan's prominent distributors of medical devices and industrial equipment. . . . *Demand for simulation solutions also remains extremely high in China* and on my recent trip there, I observed the construction of a 90 thousand square foot training center outside Beijing.

131.  Responding to a question regarding Immersion's accounts receivable, defendant Ambler admitted that they were seeing "longer payments" from "overseas customers":

[ANALYST]: Okay.  One last balance sheet question here, Stephen.  Just about the – anything changed year-over-year when we look at maybe the – who is making up now your AR balance as to maybe the increase we've seen?  If I'm not mistaken, I think it was around 36 days in Q1 '08 and it's about 52 when you net out reserves this quarter.  Has anything changed there?

[STEPHEN AMBLER]:  Yes, *we've seen a little bit of longer payments taking place, or payments not taking place on a timely basis from some of our overseas customers*. . . .  A year ago, international revenues were about 35% to 40% of our total revenues – of the company.  In Q1, our international revenues were 55% of total revenues, 45% domestically.  So we've seen more sales overseas.  *And for us, it's just going to take our customers longer to pay when they are based overseas than within the US*.

132.  Defendants' May 4, 2009 statements partially disclosed that Immersion was having problems receiving payment on its international sales, causing Immersion's stock price to fall 20% over the next three trading days, to close at $3.63 on May 7, 2009.  The Company's stock price remained artificially inflated, however, as a result of defendants' false and misleading statements.

133.  On May 6, 2009, Immersion filed with the SEC its quarterly report on Form 10-Q for 1Q09.  The Form 10-Q reported Immersion's earnings results as follows:

| 1Q09 Form 10-Q | | | | |
|---|---|---|---|---|
| Revenue | Net Loss | Product Sales | Revenues From Immersion Medical | Net Loss For Immersion Medical |
| "*1% increase*" to *$7.0 million* | "*$7.5 million*" | "*$2.8 million, an increase of $82,000 or 3%*" | "*$2.5 million, a decrease of $470,000 or 16%*" | "*$3.2 million, an increase of $2.0 million*" |

**Reasons Why Defendants' 1Q09 Revenue, Growth, Earnings and Medical Sales Statements Were False and Misleading**

134.    Defendants statements regarding Immersion's 1Q09 actual sales, revenues and earnings were false when made.  As part of its restatement, Immersion has admitted that it was not properly recognizing revenue in its medical business during 1Q09 due to: (i) "Premature recognition of revenue for products sold with ***FOB Destination*** or other similar shipping terms, or for ***incomplete shipment*** of products or storage of products following shipment"; (ii) "Non-standard terms and conditions that prevented recognition of revenue upon shipment, including ***rights of return***, extended payment terms, product replacement commitments, potential free upgrades and other non-standard commitments, that prevented recognition of revenue upon shipment"; and (iii) "***Lack of probable collectability*** at the time revenue was recognized."  For the same reasons set forth in ¶¶78-80, 115, these sales transactions were false and violated GAAP, SAB 104 and FAS 48.  As a result of these material errors defendants were forced to restate Immersion's 1Q09 results to account for at least $67,000 of improperly recognized revenue.  According to Immersion's 1Q09 Form 10-Q/A, filed on February 8, 2010, this restatement represented an increase of $536,000 of revenue that was improperly recorded in earlier periods and a decrease of $469,000 of revenue originally recorded in 1Q09 that was reversed.

135.    In addition, defendants improperly recognized revenue with regard to transactions with a certain customer with which the Company had a "side agreement."  For the same reasons set forth in ¶¶116-120, defendants' accounting of these transactions violated GAAP and basic accounting standards and resulted in a restatement in 2008 revenue.  As a result of these material misstatements, Immersion reversed $623,000 of bad debt expense and allowance for doubtful accounts in 1Q09 that had been inappropriately recorded in earlier periods.

136.    Immersion also restated its 1Q09 results to account for improperly recognized revenue on sales where products were not available or lacked functionally at the time of sale.  For

1   the same reasons set forth in ¶¶121-122, these transactions were false and violated GAAP and basic

2   accounting standards.  As a result of these material errors, Immersion recognized $468,000 in 1Q09

3   that had been improperly recognized in prior quarters.

4           137.    In total, Immersion recognized additional revenue of $528,000 in 1Q09 as part of its

5   restatement.  Not only was defendants' understatement of earnings in this quarter false, it was a

6   direct result of their significant overstatement of revenue in prior quarters and their intentional

7   manipulation of Immersion's financial statements in an attempt to cover up their fraudulent

8   accounting practices.  Defendants' understatement of Immersion's 1Q09 earnings further evidences

9   their manipulation of the Company's financial statements, their ongoing violation of GAAP, and

10  Immersion's complete lack of internal controls during the Class Period.

11          138.    For the reasons outlined in ¶¶81-85, 124-127, defendants knew that Immersion was

12  improperly recognizing revenue during 1Q09.  Confidential witnesses confirmed that Immersion was

13  improperly recognizing revenue on medical sales where there products were not available for

14  shipment or included components that were not fully developed at the time of sale.  CW1 reported

15  that Immersion was booking medical sales during the Class Period when there was no item in

16  inventory to ship to the customer, and that defendant Vogel insisted on shipping whatever medical

17  products Immersion had on hand, including products not proper for shipment to customers.  In

18  addition, CW2 reported that Immersion was shipping prototypes to customers, calling them

19  "product[s]," in order to recognize a sale.

20          139.    CW2 also reported that there were many instances when customers returned products

21  to the Medical Division, sometimes within a matter of days.  With regard to Asian customers in

22  particular, CW2 reported that by spring of 2008, medical products shipped to Asian customers were

23  being returned shortly after they were shipped.  Moreover, according to CW5, defendant Richardson

24  was directly involved in certain sales to Asian customers, which led to the restatement of

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                          - 49 -

1    Immersion's revenue and earnings, and defendant Ambler was personally responsible for deciding

2    whether to recognize revenue on these sales.

3          140.    Defendants also knew that Immersion did not expect timely payments for its medical

4    sales to certain Asian customers, if at all, thereby preventing revenue from being properly

5    recognized at the time of sale.  According to CW1, many Asian medical accounts remained unpaid

6    throughout the Class Period.  When payment did suddenly come in, in early 2009, CW1 reported that

7    Immersion's Finance group, including defendant Ambler, made a big deal of it and scrambled to

8    update their reports for review by Deloitte & Touche, Immersion's outside auditor.  Thus, defendant

9    Ambler was aware of the timing and amounts of payments, or lack thereof, from international

10   medical sales.

11

12         141.    In addition, CW1 reported that payments from Asian customers, when received, were

13   often from unknown Asian-named subjects other than the customer, such as "Peking Duck

14   Restaurant" in Los Angeles, California.  CW1 was told that certain Asian customers paid in this

15   manner because of difficulties in getting money out of mainland China.  Because he was not

16   comfortable with this practice, CW1 escalated such transactions to Cortes, who reported directly to

17   defendant Ambler.

18

19         142.    CW1 also reported that, because of its overdue receivables, the Medical Division did

20   not have enough money to make payroll and pay vendor invoices during the Class Period and, as a

21   result, had to "beg" for money from Corporate Accounting to cover payroll and accounts payable.

22   Corporate Accounting would then ask for the status of collections on outstanding receivables, and an

23   e-copy of a collections report would be forwarded to Corporate Accounting for review.  Thus,

24   Corporate Accounting was aware of the lack of collectability of Immersion Medical's sales

25   throughout the Class Period.

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                           - 50 -

1

## IMMERSION'S OTHER ACCOUNTING MISSTATEMENTS

2

143.    As part of its restatement, Immersion has admitted that, during the Class Period, its

3

accounting and financial reporting violated GAAP in several other areas in addition to revenue

4

recognition.  The additional accounting misstatements include improperly accounting for stock-

5

based compensation expense, amortization and impairment of intangibles, and interest income

6

associated with a significant license agreement.  These misstatements resulted in an understatement

7

of expenses which, consistent with the overstating of its revenue, allowed Immersion to overstate its

8

net income during the Class Period.

9

10

**Immersion Understated Stock-Based Compensation Expense**

11

144.    Defendants made the following false and misleading statements regarding

12

Immersion's stock-based compensation expense during the Class Period:

13

(a)    In a May 3, 2007 press release, the Company reported "stock-based

14

compensation expense of ***$634,000***" for 1Q07.

15

(b)    During an August 2, 2007 earnings conference call, defendant Viegas stated

16

that: "We incurred non-cash stock-based compensation charges of ***$609,000*** in the [2Q07] quarter,

17

of which $583,000 are included in operating expenses."

18

(c)    During a November 1, 2007 earnings conference call, defendant Viegas

19

stated: "We incurred non cash stock-based compensation charges of ***$699,000*** in the [3Q07] quarter,

20

of which $667,000 is included in operating expenses."

21

(d)    During a May 1, 2008 earnings conference call, defendant Ambler stated: "We

22

incurred non-cash stock based compensation charges of ***$963,000*** in the [1Q08] quarter, of which

23

$943,000 were included in operating expenses."

24

(e)    During a July 31, 2008 earnings conference call, defendant Ambler stated:

25

"We incurred non-cash stock-based compensation charges of ***$964,000*** in the [2Q08] quarter, of

26

which $912,000 were included in operating expenses."

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                      - 51 -

1    (f)    In each of its Forms 10-Q for 1Q07, 2Q07, 3Q07, 1Q08, 2Q08, 3Q08 and

2    1Q09, filed May 10, 2007, August 8, 2007, November 8, 2007,  May 9, 2008, August 8, 2008,

3    November 7, 2008, and May 6, 2009, respectively, and its 2007 and 2008 Forms 10-K, filed

4    March 17, 2008 and March 9, 2009, respectively, Immersion represented to investors that: "*[w]e*

5    *account for stock-based compensation in accordance with SFAS No. 123R*."

6    145.    Defendants' statements regarding Immersion's stock-based compensation expense

7    were false and misleading.  As part of its restatement, Immersion has admitted that it improperly

8    accounted for stock-based compensation expense in violation of GAAP and SFAS No. 123R.  As a

9    result of these errors, defendants were forced to restate Immersion's 2007, 2008 and 1Q09 results to

10   account for $717,000, $1.3 million, and $163,000, respectively, of improperly accounted for stock-

11   based compensation expense.

12

13   **Immersion Understated Amortization Expense**

14   146.    As part of its restatement, Immersion has admitted that, during the Class Period, its

15   accounting for amortization expense associated with certain patents violated GAAP.  Specifically,

16   the Company disclosed on February 8, 2010 that:

17
18   > We identified instances where we had not commenced amortization of patents in the
     > periods the patents were granted.   In addition, we identified certain patent
     > applications that were abandoned but had not been previously identified as such and
19   > have corrected this error by increasing amortization and impairment of
     > intangibles . . . .

20   As a result of this material error, defendants were forced to restate Immersion's 2007, 2008 and

21   1Q09 results to account for $58,000, $105,000 and $161,000, respectively, of improperly accounted

22   for amortization and impairment of intangibles.

23   **Immersion Improperly Accounted For Interest Income**

24   147.    Defendants also made false statements regarding Immersion's interest income during

25   each of its 1Q07 through 1Q09 quarters.  During these quarters, defendants made the following false

26   statements:

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                  - 52 -

1       (a)     Immersion's 1Q07 Form 10-Q, filed on May 10, 2007, stated: "Interest and other income *increased by $258,000* in the first three months of 2007 compared to the same period in 2006."

       (b)     During an August 2, 2007 earnings conference call, defendant Viegas stated: "Interest and other income *totaled $1.8 million* for the [2Q07] quarter while interest expense totaled $407,000 in the period, for a net total of $1.4 million income."

       (c)     Immersion's 2Q07 Form 10-Q, filed August 8, 2007, stated: "Interest and other income *increased by $1.7 million* in the second quarter of 2007 compared to the same period in 2006."

       (d)     During a November 1, 2007 earnings conference call, defendant Viegas stated: "Interest and other *income totaled $1.9 million* for the [3Q07] quarter, while interest expense and accretion totaled $211,000 in the period, for a net total of $1.6 million in income."

       (e)     Immersion's 3Q07 Form 10-Q, filed November 8, 2007, stated: "Interest and other income *increased by $1.8 million* in the third quarter of 2007 compared to the same period in 2006. . . .   Interest and other income *increased by $3.8 million* in the first nine months of 2007 compared to the same period in 200[6]."

       (f)     Immersion's 2007 Form 10-K, filed March 17, 2008, stated: "Interest and other income *increased by $5.6 million* from 2006 to 2007."

       (g)     During a May 1, 2008 earnings conference call, defendant Ambler stated: "Interest and other income expense *totaled $1.5 million* income for the [1Q08] quarter."

       (h)     Immersion's 1Q08 Form 10-Q, filed May 9, 2008, stated: "Interest and other income *increased by $1.1 million* in the first quarter of 2008 compared to the same period in 2007."

       (i)     During a July 31, 2008 earnings conference call, defendant Ambler stated: "Interest and other income *totaled $909,000* for the [2Q07] quarter . . . ."

       (j)     Immersion's 2Q08 Form 10-Q, filed August 8, 2008, stated: "Interest and other income *decreased by $911,000* in the second quarter of 2008 compared to the same period in 2007. . . .   Interest and other income *increased by $235,000* in the first six months of 2008 compared to the same period in 2007."

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

1        (k)     During an October 30, 2008 earnings conference call, defendant Ambler

2 stated: "Interest and other income ***totaled $988,000*** for the [3Q08] quarter . . . ."

3        (l)     Immersion's 3Q08 Form 10-Q, filed November 7, 2008, stated: "Interest and

4 other income ***decreased by $868,000*** in the third quarter of 2008 compared to the same period in

5 2007. . . .   Interest and other income ***decreased by $633,000*** in the first nine months of 2008

6 compared to the same period in 2007."

7        (m)     Immersion's 2008 Form 10-K, filed March 9, 2009, stated: "Interest and other

8 income ***decreased by $1.8 million*** from 2007 to 2008."

9        (n)     Immersion's 1Q09 Form 10-Q, filed May 6, 2009, stated: "Interest and other

10 income ***decreased by $1.1 million*** in the first three months of 2009 compared to the same period in

11 2008."

12       148.    Defendants' statements regarding Immersion's interest income during the Class

13 Period were false.  As part of its restatement, Immersion has admitted that it improperly recognized

14 interest income on installment payments associated with a significant license agreement with Sony

15 Computer Entertainment in violation of GAAP.  As a result of this material error, defendants were

16 forced to restate Immersion's 2007, 2008 results and 1Q09 results to account for $769,000, $128,000

17 and $128,000, respectively, of improperly accounted for interest income.

18

19 **DEFENDANTS' FALSE STATEMENTS REGARDING IMMERSION'S REVENUE RECOGNITION AND INTERNAL CONTROLS**

20 **Defendants' Critical Accounting Policies and Estimates Statements Were False and**

21 **Misleading**

22       149.    In each quarter from Immersion's 1Q07 through 1Q09, the Company made false and

23 misleading statements in its Forms 10-Q and Forms 10-K filed with the SEC regarding its

24 accounting policies and estimates, GAAP compliance, revenue recognition practices and internal

25 controls.

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC          - 54 -

150.    Regarding Immersion's accounting policies and revenue recognition, the Company's 1Q07, 2Q07 and 3Q07, filed on May 10, 2007, August 8, 2007 and November 8, 2007, respectively, stated:

CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Our discussion and analysis of our financial condition and results of operations are based upon our condensed consolidated financial statements, *which have been prepared in accordance with GAAP. . . .  On an ongoing basis, we evaluate our estimates and assumptions, including those related to revenue recognition, stock-based compensation*, bad debts, inventory reserves, warranty obligations, patents and intangible assets, contingencies, and litigation. . . .

We believe the following are our *most critical accounting policies* as they require our significant judgments and estimates in the preparation of our condensed consolidated financial statements:

*Revenue Recognition – We recognize revenues in accordance with applicable accounting standards . . . .  Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or service has been rendered, the fee is fixed and determinable, and collectibility[sic] is probable*.

\*      \*      \*

*Product sales – We recognize revenues from product sales when the product is shipped, provided collection is determined to be probable and no significant obligation remains*. . . .  We offer a general right of return on the MicroScribe product line for 14 days after purchase.  We recognize revenue at the time of shipment of a MicroScribe digitizer and provide an accrual for potential returns based on historical experience.  *We offer no other general right of return on our products*.

\*      \*      \*

Our revenue recognition policies are *significant* because our revenues are a key component of our results of operations.

151.    Regarding Immersion's accounting policies and revenue recognition, the Company's 1Q08, 2Q08, 3Q08 and 1Q09 Forms 10-Q and 2007 and 2008 Forms 10-K, filed on May 9, 2008, August 8, 2008, November 7, 2008, May 6, 2009, March 17, 2008 and March 9, 2009, respectively, stated:

CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Our discussion and analysis of our financial condition and results of operations are based upon our condensed consolidated financial statements, *which have been prepared in accordance with GAAP. . . .  On an ongoing basis, we evaluate our estimates and assumptions, including those related to revenue*

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

- 55 -

*recognition, stock-based compensation*, bad debts, inventory reserves, short-term investments, warranty obligations, patents and intangible assets, contingencies, and litigation. . . .

We believe the following are our *most critical accounting policies* as they require our significant judgments and estimates in the preparation of our condensed consolidated financial statements:

*Revenue Recognition – We recognize revenues in accordance with applicable accounting standards . . . . Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or service has been rendered, the fee is fixed and determinable, and collectability is probable*.

\*      \*      \*

*Product sales – We recognize revenues from product sales when the product is shipped, provided the other revenue recognition criteria are met, including that collection is determined to be probable and no significant obligation remains*. . . . We offer a general right of return on the MicroScribe product line for 14 days after purchase. We recognize revenue at the time of shipment of a MicroScribe digitizer and provide an accrual for potential returns based on historical experience. *We offer no other general right of return on our products*.

\*      \*      \*

Our revenue recognition policies are *significant* because our revenues are a key component of our results of operations.

152.    Defendants' critical accounting policies and estimates statements were false and misleading when made. As detailed in ¶¶79-80, 115-119, 121-123, 134-137, Immersion did *not* "recognize revenues in accordance with applicable accounting standards" during the Class Period. Moreover, as set forth in ¶¶78, 80, 85, 115, 125, 139, Immersion offered, and accepted, right of returns on its medical products. According to CW2, there were many instances when customers returned products to the Medical Division, sometimes within a matter of days. With regard to Asian customers in particular, CW2 reported that by spring of 2008, medical products shipped to Asian customers were being returned shortly after they were shipped.

153.    As detailed herein, in order to improperly inflate Immersion's revenue, income from operations, net income, and earnings per share, defendants caused the Company to falsely report its financial results included in Immersion's publicly issued financial statements and related earnings

releases during the Class Period.  These financial results were materially false and misleading and in violation of GAAP because:

(a)     Immersion improperly recognized premature, inflated and fictitious revenue on several transactions in its Medical line of business; and

(b)     Immersion improperly accounted for several other items including stock-based compensation expense, amortization and impairment of intangibles and interest income.

154.     As a result of these GAAP violations, each of Immersion's quarterly and annual public financial statements filed with the SEC during the Class Period were materially false and misleading.  In total, Immersion overstated Class Period revenue by at least *$3.7 million*, including an overstatement of over *20% of Medical line revenue* in fiscal year 2008.  In addition, Immersion also materially overstated income from operations, net income and earnings per share during the Class Period.  Defendants do not dispute the fact that these overstatements were material. Defendants' accounting violations were deliberate and the means by which defendants accomplished their improper revenue recognition scheme, including but not limited to storing products at third-party warehouses and providing undocumented rights to return products by customers, was intended to deceive Immersion's outside auditors and the investing public, and made it difficult, if not impossible, for a proper, independent third-party review of the Company's true financial condition and results.

155.     On August 10, 2009, the Company announced a massive restatement and admitted that its "previously issued consolidated financial statements as of and for the year ended December 31, 2008 and auditor's report thereon,[4] and previously issued unaudited financial statements as of and for the periods ended March 31, 2009, December 31, 2008, September 30, 2008, June 30, 2008

_____

[4]     Subsequently, on November 17, 2009, the Company announced that it would also restate its financial statements for the fiscal year ended December 31, 2007.  On February 28, 2010, the Company announced further restatement adjustments for the year ended December 31, 2006.

and March 31, 2008, ***should no longer be relied upon*** because of one or more errors in such financial statements."

156.    The restatement of previously issued public financial statements is a serious and meaningful event.  The accounting rules governing correction of errors or fraud in previously issued financial statements do not allow a registrant any discretion or election in deciding whether or not to retroactively restate the previous financial statements.   GAAP only permits (and requires) restatements of previously issued financial statements to correct ***material*** errors, resulting from either: (a) mathematical mistakes, mistakes in the application of GAAP or oversight ***or misuse of facts that existed at the time the financial statements were prepared***; or (b) a change in accounting principle or change in the reporting entity.  *See* SFAS No. 154, *Accounting Changes and Error Corrections*, ¶¶2, 4-10, 23-26.  In this case, Immersion has admitted that its restatement was done solely to correct "errors," and not to change accounting principles or the reporting entity.  Therefore, Immersion's restatement of its previous financial statements is an admission that: (i) Immersion's financial results originally issued during the Class Period and defendants' public statements regarding those results were ***materially false***; and (ii) Immersion's financial statements reported during the Class Period were incorrect ***based on information available to the defendants at the time the results were originally reported***.

**Defendants' Internal Controls and Procedure Statements Were False and Misleading**

157.    In each quarter from Immersion's 1Q07 through 1Q09, the Company made false and misleading statements in its Forms 10-Q and Forms 10-K filed with the SEC regarding its internal controls and procedures.

158.    With regard to Immersion's internal controls and procedures, the Company's 1Q07, 2Q07 and 3Q07 Forms 10-Q, filed on May 10, 2007, August 8, 2007 and November 8, 2007, respectively, stated:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                  - 58 -

**CONTROLS AND PROCEDURES**

Based on their evaluation as of [March 31, 2007/June 30, 2007/September 30, 2007], our management with the participation of our Chief Executive Officer and Chief Financial Officer, have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were ***sufficiently effective*** to ensure that the information required to be disclosed by us in this quarterly report on Form 10-Q was recorded, processed, summarized and reported within the time periods specified in the SEC's rules for Form 10-Q.

There were ***no changes*** to internal controls over financial reporting during the quarter ended [March 31, 2007/June 30, 2007/September 30, 2007] that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

159.    With regard to Immersion's internal controls and procedures, the Company's 2007 Form 10-K, filed March 17, 2008, reported a material weakness with respect to accounting for income taxes.   The Company reassured investors, however, that its financial statements were otherwise "***prepared in accordance with [GAAP]***":

**Management's Evaluation of Disclosure Controls and Procedures**

Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of December 31, 2007.   Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that, as of December 31, 2007, due to a material weakness related to our internal controls ***with respect to the accounting for income taxes*** . . . our disclosure controls and procedures were not effective.  ***Additional review, evaluation and oversight were undertaken on the part of management in order to ensure our consolidated financial statements were prepared in accordance with generally accepted accounting principles and, as a result, management has concluded that the consolidated financial statements in this Annual Report on Form 10-K fairly presents, in all material respects, our financial position, results of operations and cash flows for the periods presented***.

\*       \*       \*

Except for the material weakness described above, there were no changes to internal controls over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended) for the quarter ended December 31, 2007, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

160.    The Company's 1Q08 Form 10-Q, filed on May 9, 2008, similarly reported a material weakness with internal controls, but ***only*** with respect to accounting for income taxes:

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                     - 59 -

**CONTROLS AND PROCEDURES**

Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2008.  Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that due to a material weakness related to our internal controls *with respect to the accounting for income taxes* identified at December 31, 2007 that has not been remediated as of March 31, 2008, our disclosure controls and procedures were not effective as of March 31, 2008. *Additional review, evaluation and oversight were undertaken on the part of management in order to ensure that the information required to be disclosed by us in this quarterly report on Form 10-Q was recorded, processed, summarized and reported within the time periods specified in the SEC's rules for Form 10-Q.*

161.    Immersion's 2Q08 and 3Q08 Forms 10-Q, filed on August 8, 2008 and November 7, 2008, respectively, similarly represented that the Company's *only* weakness with respect to internal controls related to accounting for income taxes:

**CONTROLS AND PROCEDURES**

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of [June 30, 2008/September 30, 2008].  Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were not effective as of [June 30, 2008/September 30, 2008] due to a material weakness in our internal control over financial reporting *with respect to accounting for income taxes* that was initially determined and disclosed in our Annual Report on Form 10-K for our fiscal year ended December 31, 2007.

The material weakness we disclosed was in the area of accounting for income taxes.

*       *       *

In connection with our plan to remediate this material weakness, we have engaged in, and are continuing to engage in, substantial efforts to improve our internal control over financial reporting and disclosure controls and procedures *related to income tax matters* . . . .

162.    With regard to internal controls and procedures, Immersion's 2008 Form 10-K, filed on March 9, 2009, similarly stated:

**Management's Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act as

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                      - 60 -

of December 31, 2008. ***The purpose of these controls and procedures is to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules, and that such information is accumulated and communicated to our management, including our CEO and our CFO, to allow timely decisions regarding required disclosures***.  As set forth in our Annual Report on Form 10-K for the fiscal year ended December 31, 2007, our management determined that a material weakness existed in controls over accounting ***for income taxes*** as of December 31, 2007. . . .  Our management, including the CEO and the CFO, has concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2008 due to the continuing presence of the material weakness ***with respect to income taxes*** or ongoing implementation of remedial actions as of December 31, 2008.

\*       \*       \*

Other than the activities to remediate our material weakness [regarding income taxes], there were ***no changes*** in our internal control over financial reporting during the three months ended December 31, 2008 that have materially affected or are reasonably likely to materially affect, our internal control over financial reporting.

163.     The Company's 1Q09 Form 10-Q, filed May 6, 2009, made similar representations regarding Immersion's internal controls and procedures:

**CONTROLS AND PROCEDURES**

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2009.  Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were not effective as of March 31, 2009 due to the previously reported material weakness in our internal control over financial reporting ***with respect to accounting for income taxes*** that was disclosed in our Annual Report on Form 10-K for our fiscal year ended December 31, 2008.

\*       \*       \*

In connection with our plan to remediate this material weakness, we have engaged in, and are continuing to engage in, substantial efforts to improve our internal control over financial reporting and disclosure controls and procedures ***related to income tax matters*** . . . .

164.     In addition, Immersion's 1Q07, 2Q07, 3Q07, 1Q08, 2Q08, 3Q08 and 1Q09 Forms 10-Q and 2007 and 2008 Forms 10-K, filed on May 10, 2007, August 8, 2007, November 8, 2007, May 9, 2008, August 8, 2008, November 7, 2008, May 6, 2009, March 17, 2008 and March 9, 2009, respectively, contained the following certification pursuant to SOX.  The 1Q07, 2Q07 and

3Q07 Forms 10-Q and 2007 Form 10-K certifications were signed by defendants Viegas and Ambler, and the 1Q08, 2Q08, 3Q08 and 1Q09 Forms 10-Q and 2008 Form 10-K certifications were signed by defendants Richardson and Ambler:

> *[T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;
>
> . . . [T]he financial statements, and other financial information included in this report, *fairly present in all material respects* the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
>
> . . . The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a)       Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to *ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities*, particularly during the period in which this report is being prepared;
>
> b)       Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to *provide reasonable assurance regarding the reliability of financial reporting* and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c)       *Evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d)       Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> . . . The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):
>
> a)       *All significant deficiencies and material weaknesses* in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

b)      *Any fraud, whether or not material, that involves management or other employees* who have a significant role in the registrant's internal control over financial reporting.

\*      \*      \*

(1)      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)      The information contained in the Report *fairly presents, in all material respects, the financial condition and result of operations of the Company*.

165.      Defendants' internal controls and procedure statements and SOX certifications were false and misleading.   As detailed herein, defendants caused the Company to falsely report its financial results included in Immersion's publicly issued financial statements and related earnings releases during the Class Period in order to improperly inflate Immersion's revenue, income from operations, net income and earnings per share.   The Company has admitted in its February 8, 2010 restatement that its 2007, 2008 and 1Q09 financial statements did *not* "fairly present in all material respects the financial condition, results of operations, and cash flows of [Immersion]."   The Company has also admitted that it did *not* maintain effective disclosure controls or internal controls over financial reporting during the Class Period.   In its Form 10-K/A for 2008, the Company stated:

Based on this re-evaluation and because of the material weaknesses described below, our Interim Chief Executive Officer and Interim Chief Financial Officer have concluded that our *disclosure controls and procedures were not effective* as of December 31, 2008.

\*      \*      \*

[O]ur management concluded that, as of December 31, 2008, our internal control over financial reporting *was not effective* to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP because of the following material weaknesses:

\*      \*      \*

• *Revenue Recognition*: Modifications to Sales Arrangements – Our controls relating to the modification of our standard sales arrangements *were not designed or operating effectively* as of December 31, 2008.   These controls are intended to ensure that changes, written or otherwise, to the terms and conditions governing each sale are documented, approved and recorded timely and accurately.   This control deficiency led to a misstatement in our consolidated financial statements which resulted in a restatement thereof.

1
2
3
4
5

- *Revenue Recognition*: Compliance with Specified Shipping Terms – Our controls relating to the identification of and accounting for shipping terms in our sales arrangements **were not operating effectively** as of December 31, 2008. These controls are intended to determine the point at which title and risk of loss passes to the customer and to properly apply this information in the determination of our revenue recognition. This control deficiency led to a misstatement in our consolidated financial statements which resulted in a restatement thereof.

6
7
8
9

- *Revenue Recognition*: Release of New Products for sale – Our controls relating to the release and approval for sale of new products **were not operating effectively** as of December 31, 2008. These controls are intended to ensure that revenue is recognized only on fully functional products which have final approval by management prior to release for sale to customers. This control deficiency led to a misstatement in our consolidated financial statements which resulted in a restatement thereof.

10
11
12

- Stock-based Compensation – Our controls related to the application of forfeiture rates in the determination of stock-based compensation **were not operating effectively** as of December 31, 2008. This control deficiency led to a misstatement in our consolidated financial statements which resulted in a restatement thereof.

13

**Investors Begin to Learn the Truth**

14

166.    On July 1, 2009, before the market opened, the Company issued a press release entitled "Immersion Corporation Announces Internal Investigation." The press release stated, in part:

15
16
17
18
19
20
21

Immersion Corporation (NASDAQ:IMMR) announced that the Audit Committee of the Board of Directors of Immersion Corporation ("Immersion") **is conducting an internal investigation into certain previous revenue transactions in its Medical line of business**. The investigation is being conducted with the assistance of outside counsel. The Audit Committee has not yet determined the impact, if any, to Immersion's historical financial statements. **As a result of this investigation, Immersion may discover information that could raise issues with respect to its previously-reported financial information, which could be material**. Immersion will not be able to evaluate the full impact of the aforementioned matters until the Audit Committee completes its review and further analysis is completed.

22
23
24

Although Immersion currently intends to be in a position to file its quarterly report on Form 10-Q for the second quarter of fiscal 2009 on time and is diligently pursuing this investigation, it is possible that as a result of the investigation, Immersion would be unable to file its quarterly report and announce financial results in a timely manner.

25
26

167.    On this news, Immersion's stock dropped **over 23%** from a close of $4.94 per share on June 30, 2009 to a close of $3.80 per share on July 1, 2009, a drop of $1.14 per share on volume of 1.5 million shares in one day.

27
28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                      - 64 -

168.   Shortly thereafter, on July 31, 2009, defendant Ambler resigned as CFO of the Company.  Defendant Chavez similarly resigned as Senior Vice President and General Manager of Immersion Medical as of August 7, 2009, and defendant Richardson "agreed to resign" as CEO and Director of the Company as of October 21, 2009, while the internal investigation into Immersion's accounting practices was pending.

169.   As a result of defendants' false and misleading statements, Immersion's publicly traded securities traded at inflated levels during the Class Period.  This drop removed inflation from Immersion's securities, causing real economic loss to investors who had purchased the securities during the Class Period.

## ADDITIONAL SCIENTER ALLEGATIONS

170.   As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Immersion were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Immersion, their control over, and/or receipt and/or modification of Immersion's allegedly materially misleading misstatements, participated in the fraudulent scheme alleged herein.

171.   Defendants knew that Immersion was booking medical sales when there was no suitable inventory to ship.  According to CW1, Immersion booked medical sales during the Class Period when there was no item in inventory to ship to the customers or when the only items available were unsuitable for shipment.  CW1 reported that defendant Vogel insisted on shipping whatever products Immersion had available, such as road-worn demonstration units, in order to book a sale.

CW1 also reported that defendant Vogel allowed products to be shipped without a signed PO from the customer, and, instead, Immersion created an unofficial (and unsigned) "PO" in Microsoft Word on which the product was booked.  CW1 reported that defendant Vogel verbally harassed him to approve product shipments even though the sale had not been finalized and Immersion did not have a signed PO from the customer.  Further, CW1, CW2, CW3, CW4 and CW5 all reported that defendant Ambler was ***directly responsible*** for deciding whether to recognize revenue on these sales.

172.    In addition, according to CW5, defendant Richardson was directly involved with medical sales to a certain Chinese customer in 2008, which other CWs have confirmed were the cause, in part, of the Company's subsequent restatement.  CW5 reported that all information about medical sales to this customer went directly from Barkay to defendant Richardson, via defendant Ambler.  According to CW5, Barkay and Richardson had regular communications and spoke at length about sales to this customer.  Indeed, Richardson admitted on October 30, 2008 that he traveled to Asia and "***personally assist[ed]***" Barkay and Immersion Medical's sales team with its medical sales to Asian customers.

173.    Defendants also knew that numerous products booked as sales were being returned to Immersion during the Class Period.  According to CW2, there were many instances when customers returned products to the Medical Division, sometimes within a matter of days.  By the spring of 2008, numerous medical products shipped to Asian customers were being returned shortly after they were shipped.  Immersion tracked this information closely.  According to CW2, all information regarding product returns and dispositions was entered into the Company's Made to Manage system in the form of entries into the Customer Service Response ("CSR") module.  Typically, all e-mails relating to a return were pasted into the CSR, along with photos of the product as shipped and as returned, the product serial number and any shipment tracking information.

174.    Immersion also tracked its individual sales and customers closely.   According to CW3, Immersion prepared and tracked sales forecasts using a manual system.  The system ranked the probability of a sale based on where in the sales process a customer fell.  Immersion maintained a sales process "checklist" that included identification of a prospective customer or "lead," qualification of the lead as a likely customer, the technical close and the financial close of the sale. Thus, this checklist would have captured Immersion Medical's fraudulent medical sales.  CW3 captured this forecast data on an Excel spreadsheet.  According to CW3, these sales forecasts were available on the Company computer system for anyone to see.  CW3 sent these forecasts directly to defendant Chavez via e-mail on a weekly basis.

175.    In addition, CW1 generated a monthly Excel spreadsheet report on payment collection projections for the Medical Division.  The report listed any sales for which collection was pending, and included the customer contact name, the date by which payment was promised, and any notes on the status of the collection based on conversations with the customer for each sale.  CW1 reported that defendant Ambler periodically asked for status updates on collections based on these reports and focused specifically on customers whose payment was long overdue.  In addition, defendant Ambler sometimes requested copies of the report itself.  According to CW1, these reports indicated that Immersion Medical's Chinese customers were typically very tardy on their payments.

176.    Defendants also held regular meetings to discuss Immersion's medical business. According to CW4, defendants held quarterly management meetings during the Class Period to discuss Immersion's medical business.  These meetings were sometimes held in Gaithersburg, Maryland (in a first floor conference room) or in San Jose, California.  Attendees included Immersion Medical personnel and Immersion's CEO and CFO, defendants Viegas (and later Richardson) and Ambler.  Defendant Vogel also held weekly management meetings on Monday mornings to discuss the Medical Division.  These meetings were held in Vogel's office and typically

1    lasted one and a half to two hours.  Attendees included defendant Vogel and other Medical Division

2    personnel.

3        177.    When defendant Ambler traveled to Gaithersburg for the quarterly management

4    meetings, he also met with CW4, along with Cortes and CW5.  During these meetings, Ambler went

5    over the DSO numbers.  CW4 prepared the DSO data that included each customer and distributor

6    and the number of days outstanding that money was due from each of them to Immersion Medical.

7    Thus, defendant Ambler knew exactly how many days payment was outstanding for each medical

8    customer.  According to CW4, the DSO number for international medical customers typically ran

9    higher than 180 days, and the Company's Chinese distributor typically had the longest outstanding

10   payments due of all customers.

11       178.    Defendants' reorganization of Immersion Medical's business during the Class Period

12   further evidences their knowledge of its accounting and internal control problems.  According to

13   CW5, defendant Richardson, upon becoming CEO on April 28, 2008, wanted Immersion's corporate

14   headquarters to more closely control the Medical Division's operations.  As a result, the revenue

15   recognition decision-making on medical sales became even more controlled by corporate

16   headquarters.  In addition, on March 2, 2009, defendants announced that they were restructuring

17   Immersion Medical and relocating it to Immersion's corporate headquarters in San Jose, California,

18   in order to improve its "execution, operations, and management."  On May 4, 2009, defendant

19   Richardson admitted that as a result of the restructuring, reorganization and relocating of Immersion

20   Medical, defendants had "***an opportunity to take a look at the entire business inside out, which***

21   ***we've done***."  A look at Immersion Medical's entire business "inside out" would have undoubtedly

22   revealed the glaring accounting improprieties and GAAP violations alleged herein.

23       179.    In addition, Immersion's restatement establishes scienter.  As described above,

24   Immersion's restatement is an admission that: (i) Immersion's financial statements originally issued

during the Class Period and defendants' public statements regarding those results were ***materially***

***false and misleading***; and (ii) the financial statements reported during the Class Period were

incorrect ***based on information available to the defendants at the time the results were originally***

***reported***.  Additionally, Immersion's restatement, as described herein, contains at least the following

indicators of defendants' knowledge:

(a)     **The type of restatement (misuse of the facts)** – The restated items at issue

were not due to simple mathematical error or honest misapplication of an accounting standard or

oversight.  For example, as set forth in ¶¶78-80, 115-123, 134-137, the restatement of revenue was

the result of several sales transactions that were structured to circumvent GAAP revenue recognition

criteria in order to record premature and inflated revenues on sales that otherwise would have

resulted in delayed, decreased, and/or no revenue recognition at all.

(b)     **The duration over which the improper accounting was perpetrated** – As

detailed herein, the restatement does not hinge on an honest mistake or oversight during a single

quarter or even a single year that was later corrected on a good faith basis.  Here, Immersion was

forced to restate its financial statements covering fiscal years 2006, 2007 and 2008, each quarterly

period during 2008, and the first quarter of 2009 to correct its accounting improprieties that could no

longer be concealed.

(c)     **The magnitude or size of the restatement** – The magnitude of Immersion's

restatement was material.  Overall, Immersion overstated its fiscal year 2006 through fiscal year

2008 revenues by at least $3.7 million, including an overstatement of over 20% of its Medical line

revenue in fiscal year 2008.  Immersion also materially overstated income from operations, net

income, and earnings per share during the Class Period.  For example, from 2006 to 2008,

Immersion overstated net income by at least $3.3 million.

(d)     **The types of accounting gimmicks employed** – As detailed herein, the

improper accounting corrected by this restatement did not occur as a result of good faith differences

in accounting judgments, or interpretations of complicated, vague or arcane accounting rules, and the

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                                          - 69 -

1    Company does not claim otherwise.  Rather, Immersion's accounting improprieties violated clear

2    and well-established basic revenue recognition and accounting standards.

3           (e)     **The income statement effect of the misstatements** – The aggregate

4    purported "errors" in five of the seven restated periods had the effect of inflating, not reducing,

5    revenues and net income.

6           180.    In addition, it is notable that in 2002, the SEC reiterated its position that, in its

7    investigations of restated financial statements, it often finds that the persons responsible for the

8    improper accounting acted with scienter:

9
10          [T]he Commission often seeks to enter into evidence restated financial statements,
            and the documentation behind those restatements, in its securities fraud enforcement
11          actions in order, ***inter alia, to prove the falsity and materiality of the original
            financial statements [and] to demonstrate that persons responsible for the original
            misstatements acted with scienter*** . . . .

12   *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and

13   Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude

14   Evidence of the Restatement and Restatement Report (S.D. Fla. Feb. 22, 2002).

15          181.    In addition to defendants acute awareness during the Class Period of the Company's

16   violations of basic accounting principals based on their accounting backgrounds, defendants' SOX

17   certifications attached to Immersion's Forms 10-Q and Forms 10-K also establish scienter.  As set

18   forth in ¶164, defendants Viegas, Richardson and Ambler certified that they had personally reviewed

19
20   Immersion's  financial  statements,  evaluated  Immersion's  disclosure  controls  and  evaluated

21   Immersion's internal controls over financial reporting.  Such reviews and evaluations would have

22   undoubtedly alerted defendants to the presence of Immersion's glaring accounting misstatements and

23   material weaknesses in internal and disclosure controls described herein.  Therefore, defendants

24   either knew of the material misstatements in the financial statements, the ineffectiveness of the

25   disclosure controls, and the material weaknesses in internal controls, ***or*** defendants knowingly failed

26
27   to carry out the required review of the financial statements, evaluation of internal controls and

28   evaluation of disclosure controls and falsely represented that they had.  In either case, defendants

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                    - 70 -

1  knew or recklessly disregarded that the SOX certifications defendants Viegas, Richardson and

2  Ambler signed were false and misleading.

3        182.   Further, the Individual Defendants, as senior executive officers of Immersion, can be

4  presumed to have knowledge of adverse facts affecting the Company's core business.   That

5  Immersion  listed  the  Individual  Defendants'  positions,  CEO,  CFO  and  Senior  Vice

6  President/General Manager of Immersion Medical, as the *only executive officers* at Immersion

7  during 2007 and 2008 further supports this inference.   During the Class Period, over 40% of

8  Immersion's total revenue came from the Medical line of business.   Indeed, defendant Richardson

9  himself characterized the Medical line of business during the Class Period as "the *largest* contributor

10  of Immersion's revenue on a percentage basis" and "*one of the most meaningful and vital growth*

11  *drivers of [the] Company*."   In addition, defendants admitted in Immersion's Forms 10-Q and

12  Forms 10-K that its "revenue recognition policies are significant because our revenues are a key

13  component of our results of operations."   Notably, defendant Chavez was the top executive officer of

14  Immersion Medical from August 2008 to August 2009, during which time Immersion overstated

15  medical revenue by at least *36.1%* in 3Q08, *21.0%* in 4Q08 and *19.8%* in fiscal 2008.   Likewise,

16  defendants Viegas and Ambler were the President and CEO/Chairman of the Board of Directors and

17  CFO, respectively, during the *entire Class Period*.   Further, confidential witnesses have confirmed

18  that defendants Vogel, Richardson and Ambler were personally involved in the Company's

19  fraudulent operations.   Thus, the Individual Defendants, as the top officers of Immersion and

20  Immersion Medical, can be presumed to have knowledge of the adverse facts alleged herein

21  affecting the Company's core operations.

22        183.   In addition, defendant Richardson admitted, on March 2, 2009, that "*the leadership*

23  *team [Immersion] ha[s] in place is very, very hands-on, as you know that I am*."   As "very, very

24  hands-on" executives, the Individual Defendants can be presumed to have knowledge of the adverse

facts outlined in ¶¶78-85, 115-127, 134-142, 145, 146, 148, 152-154, 165, affecting the Company's revenues and operations during the Class Period.

**Insider Sales**

184.    Defendants were further motivated to engage in this course of conduct in order to allow defendants Ambler, Viegas and Vogel, and other Company insiders, to collectively sell ***287,751 shares*** of their personally held Immersion common stock for gross proceeds of ***over $4.45 million*** during the Class Period.  The insider trading is set forth in detail in the chart attached as Exhibit A to this complaint.

185.    Defendants Ambler, Viegas and Vogel sold significant amounts of their personally held Immersion stock during the Class Period while in possession of material, non-public information about Immersion.  As set forth in ¶¶81-85, 124-127, 138-142, 170-183, defendants Ambler, Viegas and Vogel knew, and failed to disclose, at the time they sold their Immersion stock that: (i) Immersion had materially overstated its revenues, product sales, earnings, income from operations, net income, gross profit, net income per share and understated its inventory; (ii) Immersion was improperly recognizing revenue on its medical sales; (iii) Immersion was improperly accounting for and reporting stock-based compensation expense, amortization expense and interest income; (iv) Immersion lacked effective internal controls and procedures; and (v) as a result, defendants' Class Period statements were false and misleading.

186.    Defendants Ambler's, Viegas' and Vogel's insider sales were suspicious in both timing and amount and provide additional indicia of scienter.  Defendant Ambler sold 40,000 shares (***100%*** of his holdings) for proceeds of ***over $639,000*** during the Class Period; defendant Viegas sold 125,000 shares (***93%*** of his holdings) for proceeds of ***over $1.9 million*** during the Class Period; and defendant Vogel sold 7,752 shares (***100%*** of his holdings) for proceeds of ***over $134,000*** during the Class Period, all while Immersion's stock price was artificially inflated as a result of defendants'

false and misleading statements and material omissions.  Other Immersion insiders sold significant amounts during the Class Period as well:

- John Hodgman, Director, sold 40,000 shares (**90%** of his holdings) for proceeds of **over $686,000**;

- Emily Liggett, Director, sold 14,999 shares (**70%** of her holdings) for proceeds of **over $219,000**;

- Jack Saltich, Director, sold 30,000 shares (**67%** of his holdings) for proceeds of **over $482,000**; and

- Robert Van Naarden, Director, sold 30,000 shares (**87%** of his holdings) for proceeds of over **$351,000**.

While options are not stock holdings and should not be included in the insiders' retained holdings, even including options, the percentages and amounts sold are highly suspicious, especially when considered with the suspicious timing of the sales.  *See* Exhibit A.

187.    The timing of defendants Ambler's, Viegas' and Vogel's insider sales was also highly suspicious, as they were timed to take maximum advantage of the artificial price inflation caused by defendants' misrepresentations and while Immersion stock was trading at or near Class Period highs. Defendant Ambler sold 20,000 shares on August 27, 2007 (following defendants' August 2, 2007 misrepresentations) and 20,000 shares on November 6, 2007 (following defendants' November 1, 2007 misrepresentations), for prices as high as **$17.37 per share**.  Likewise, defendant Viegas sold 22,919 shares on May 25, 2007 (following defendants' May 3, 2007 misrepresentations) and 102,081 shares between September 27 and October 8, 2007 (following defendants' August 2, 2007 misrepresentations), for prices as high as **$18.02 per share**.  And defendant Vogel sold 100% of his shares on November 7, 2007, (following defendants' November 1, 2007 misrepresentations), for prices of **$17.29 per share**, much higher than the **$3.80** investors received after defendants' misrepresentations were revealed.  Indeed, the vast majority of insider sales during the Class Period were between May 2007 and November 2007, when Immersion's stock price was most inflated from defendants' misrepresentations.

188.    Defendant Ambler's, Viegas' and Vogel's Class Period sales were also suspicious as they were out of line with defendants' prior trading histories.  Prior to his Class Period sales, defendant Viegas had sold stock only *twice* since 2000, when he sold 10,113 shares on November 30, 2005 and 5,100 shares on December 1, 2005.  Defendants Ambler and Vogel had *no sales* in the past several years prior to their Class Period sales.  In addition, defendant Ambler's, Viegas' and Vogel's sales are not protected under Rule 10b5-1 as pursuant to a predetermined trading plan.  *None* of defendant Vogel's Class Period sales were pursuant to a predetermined trading plan.  Defendants Ambler's and Viegas' Class Period sales on August 27, 2007 and May 25, 2007, respectively, were also *not* pursuant to predetermined trading plans.  Shortly after these sales, however, defendants Ambler and Viegas adopted trading plans to allow them to sell more stock and through which they made their remaining Class Period sales.  Defendant Ambler adopted his trading plan on September 7, 2007, and defendant Viegas adopted his trading plan on June 8, 2007.  As set forth in ¶¶81-85, 170-183, however, defendants Ambler and Viegas had knowledge of numerous materially adverse, non-public facts at the time they entered into these trading plans.  Thus, any trades made pursuant to these plans are *not* protected under Rule 10b5-1.

189.    Defendants were also personally motivated to fraudulently report Immersion's medical business unit revenue, particularly revenue obtained from overseas transactions.  For example, according to Immersion's Form 8-K filed on May 23, 2008, defendant Vogel's bonus plan for 2008 was intended to focus on "Immersion's revenue."  The bonus plan directly tied Vogel's bonus to Immersion's 2008 fiscal results in the medical business unit (52.5%) as well as the expansion of Immersion's medical business, including its international revenues (17.5%).  Similarly, Immersion's Form 8-K filed on April 21, 2008, indicated that defendants Viegas' and Ambler's fiscal 2008 bonuses depended, *inter alia*, on revenue targets as well as "increasing the percentage of Immersion's total revenue that is derived from international sources."

**LOSS CAUSATION/ECONOMIC LOSS**

190.    By misrepresenting its financial results and condition, defendants presented a misleading picture of Immersion's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that: (i) Immersion's revenues from its Medical line of business had been inflated; (ii) Immersion was fraudulently recognizing revenue in its Medical line of business; (iii) Immersion was improperly reporting revenue, earnings, interest income and stock-based compensation expense; and (iv) Immersion lacked effective internal controls and procedures, defendants falsely reported the Company's business condition and financial results.  These false financial results caused and maintained the artificial inflation in Immersion's stock price throughout the Class Period until the truth began to be revealed to the market as reflected in the following chart:



191.    On July 31, 2008, the Company announced a net loss for 2Q08.  The announcement of a net loss partially disclosed that Immersion's business was not doing as well as defendants had led investors to believe.  As a result, Immersion's stock price fell nearly 18% in the next two trading days, to close at $5.85 on August 4, 2008.  The Company's stock price remained artificially inflated, however, due to defendants' false and misleading statements.

192.    On March 2, 2009, the Company announced disappointing results for 4Q08 and fiscal 2008 ($0.12 below estimates).  This announcement partially disclosed that Immersion's business was not doing as well as defendants had led investors to believe.  As a result, Immersion's stock price fell nearly 29% to close at $2.78 on March 3, 2009.  The Company's stock price remained artificially inflated, however, due to defendants' false and misleading statements.

193.    On May 4, 2009, defendants partially disclosed that Immersion was having difficulty receiving payments from certain international customers, causing Immersion's stock price to fall 20% over the next three trading days, to close at $3.63 on May 7, 2009.  The Company's stock price remained artificially inflated, however, due to defendants' false and misleading statements.

194.    On July 1, 2009, before the market opened, defendants were forced to publicly disclose that Immersion had launched an investigation into the Company's previous revenue transactions in its medical business, which could impact Immersion's historical financial statements.  As a result of this investigation, defendants later admitted that Immersion: (i) improperly recognized revenue in its Medical line of business; (ii) improperly accounted for stock-based compensation expense, amortization expense and interest income; and (iii) lacked effective internal controls, during the Class Period.

195.    As a direct result of defendants' admissions and the public revelations of the investigation into Immersion's accounting practices, which put Immersion's prior reported results into question, Immersion's stock closed at $3.80 per share on July 1, 2009, down from $4.94 per

share just one day earlier, a decline of $1.14 per share, or 23%. This drop removed the inflation from Immersion's publicly traded securities, causing real economic loss to investors who had purchased the securities during the Class Period.

**CLASS ACTION ALLEGATIONS**

196. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Immersion publicly traded securities during the Class Period (the "Class"). Defendants are excluded from the Class.

197. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Immersion has over 27 million shares of stock outstanding, owned by hundreds if not thousands of persons.

198. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether defendants violated the Exchange Act;

(b) whether defendants omitted and/or misrepresented material facts;

(c) whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) whether the prices of Immersion publicly traded securities were artificially inflated; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

199. Lead plaintiff's claims are typical of those of the Class because lead plaintiff and the Class sustained damages from defendants' wrongful conduct.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                    - 77 -

200.   Lead plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead plaintiff has no interests which conflict with those of the Class.

201.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

202.   At all relevant times, the market for Immersion common stock was an efficient market for the following reasons, among others:

(a)   Immersion common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Immersion filed periodic reports with the SEC and the NASDAQ;

(c)   Immersion regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Immersion was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

203.   As a result of the foregoing, the market for Immersion common stock promptly digested current information regarding Immersion from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Immersion common stock during the Class Period suffered similar injury through their purchase of Immersion common stock at artificially inflated prices, and a presumption of reliance applies.

1

**NO SAFE HARBOR**

2      204.    The statutory safe harbor provided for forward-looking statements under certain

3    circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

4    Many of the specific statements pleaded herein were not identified as and were not "forward-looking

5    statements" when made.  To the extent there were any forward-looking statements, there were no

6    meaningful cautionary statements identifying important factors that could cause actual results to

7    differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

8    extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

9    defendants are liable for those false forward-looking statements because at the time each of those

10   forward-looking statements was made, the particular speaker knew that the particular forward-

11   looking statement was false, and/or the forward-looking statement was authorized and/or approved

12   by an executive officer of Immersion who knew that those statements were false when made.

13

14                                   **COUNT I**

15   **For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
     **Against All Defendants**

16

17      205.    Lead plaintiff incorporates ¶¶1-204 by reference.

18      206.    During the Class Period, defendants disseminated or approved the false statements

19   specified above, which they knew or deliberately disregarded were misleading in that they contained

20   misrepresentations and failed to disclose material facts necessary in order to make the statements

21   made, in light of the circumstances under which they were made, not misleading.

22

23      207.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

24          (a)    employed devices, schemes and artifices to defraud;

25          (b)    made untrue statements of material facts or omitted to state material facts

26   necessary in order to make the statements made, in light of the circumstances under which they were

27   made, not misleading; or

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC                                                                    - 79 -

1  (c)  engaged in acts, practices and a course of business that operated as a fraud or

2  deceit upon lead plaintiff and others similarly situated in connection with their purchases of

3  Immersion publicly traded securities during the Class Period.

4  208.  Lead plaintiff and the Class have suffered damages in that, in reliance on the integrity

5  of the market, they paid artificially inflated prices for Immersion publicly traded securities.  Lead

6  plaintiff and the Class would not have purchased Immersion publicly traded securities at the prices

7  they paid, or at all, if they had been aware that the market prices had been artificially and falsely

8  inflated by defendants' misleading statements.

9

10  ## COUNT II

11  ### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants

12  209.  Lead plaintiff incorporates ¶¶1-208 by reference.

13  210.  The Individual Defendants acted as controlling persons of Immersion within the

14  meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their

15  ownership of Immersion stock, the Individual Defendants had the power and authority to cause

16  Immersion to engage in the wrongful conduct complained of herein.  Immersion controlled the

17  Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable

18  pursuant to §20(a) of the Exchange Act.

19

20  ## COUNT III

21  ### For Violation of Section 20A of the Exchange Act
### Against Defendants Viegas, Ambler and Vogel

22  211.  Lead plaintiff incorporates ¶¶1-210 by reference.

23  212.  While Immersion securities traded at artificially inflated prices, defendants Viegas,

24  Ambler and Vogel personally profited by selling 172,752 shares of their holdings in Immersion

25  securities while in possession of adverse, material non-public information about Immersion,

26  pocketing over $2.71 million in illegal insider trading proceeds, as detailed above.

27

28

213.    By contrast, lead plaintiff purchased contemporaneously, as follows:

(a)    Lead plaintiff and members of the Class traded contemporaneously with defendant Viegas by purchasing Immersion securities at artificially inflated prices on September 25, 2007 and were damaged thereby.

(b)    Lead plaintiff and members of the Class traded contemporaneously with defendant Ambler by purchasing Immersion securities at artificially inflated prices on November 6, 2007 and were damaged thereby.

(c)    Lead plaintiff and members of the Class traded contemporaneously with defendant Vogel by purchasing Immersion securities at artificially inflated prices on November 7, 2007 and were damaged thereby.

214.    As a result of the wrongful conduct alleged herein, lead plaintiff and other members of the Class have suffered damages.

215.    By reason of the foregoing, defendants Viegas, Ambler and Vogel violated §20A of the Exchange Act and are liable to lead plaintiff and other members of the Class.  Lead plaintiff and other members of the Class are entitled to disgorgement of defendant Viegas', Ambler's and Vogel's profits in connection with their sale of Immersion securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, lead plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding lead plaintiff and the members of the Class damages, including interest;

C.    Awarding lead plaintiff reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

1

## JURY DEMAND

2      Lead plaintiff demands a trial by jury.

3  DATED: April 9, 2010

4

BROWER PIVEN
  A Professional Corporation
DAVID A.P. BROWER

5

6

7

DAVID A.P. BROWER

8

488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: 212/501-9000
212/501-0300 (fax)

9

10

Lead Counsel for Plaintiffs

11

ROBBINS GELLER RUDMAN
  & DOWD LLP
WILLOW E. RADCLIFFE
SARAH R. HOLLOWAY
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

12

13

14

15

Liaison Counsel for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS -
09-cv-04073-MMC

CERTIFICATE OF SERVICE

1

2   I hereby certify that on April 9, 2010, I electronically filed the foregoing with the Clerk of the

3 Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

4 denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

5 foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6 indicated on the attached Manual Notice List.

7   I further certify that I caused this document to be forwarded to the following Designated

8 Internet Site at:  http://securities.stanford.edu.

9   I certify under penalty of perjury under the laws of the United States of America that the

10 foregoing is true and correct.  Executed on April 9, 2010.

11

12            s/ Willow E. Radcliffe
             WILLOW E. RADCLIFFE

13         ROBBINS GELLER RUDMAN
           & DOWD LLP

14         100 Pine Street, 26th Floor

15         San Francisco, CA  94111
         Telephone:  415/288-4545

16         415/288-4534 (fax)

17         E-mail:willowr@rgrdlaw.com

18

19

20

21

22

23

24

25

26

27

28

513561_3

## PLAINTIFF'S CERTIFICATION

John P. Loos ("Plaintiff") declares that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.      Plaintiff's transactions in Immersion Corporation securities during the Class Period are attached hereto.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.  Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 30 day of October 2009.

_____
John P. Loos

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:  410-332-0030
Facsimile:   410-685-1300
www.browerpiven.com

# John P. Loos

## Immersion Corporation Securities Litigation

### Schedule of Transactions

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 300 | $10.3000 | | | |
| 5/3/2007 | Buy | 300 | $10.3000 | | | |
| 5/9/2007 | Sell | 500 | $9.7600 | | | |
| 5/9/2007 | Sell | 100 | $9.7600 | | | |
| 5/9/2007 | Sell | 100 | $9.7600 | | | |
| 5/9/2007 | Sell | 100 | $9.7500 | | | |
| 5/9/2007 | Sell | 100 | $9.7100 | | | |
| 5/9/2007 | Sell | 6,700 | $9.7000 | | | |
| 5/9/2007 | Sell | 5,000 | $9.7000 | | | |
| 5/9/2007 | Sell | 900 | $9.7000 | | | |
| 5/9/2007 | Sell | 700 | $9.7000 | | | |
| 5/9/2007 | Sell | 350 | $9.7000 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 5/9/2007 | Sell | 250 | $9.7000 | | | |
| 5/9/2007 | Sell | 100 | $9.7000 | | | |
| 5/9/2007 | Sell | 100 | $9.7000 | | | |
| 5/30/2007 | Sell | 900 | $11.9900 | | | |
| 5/30/2007 | Sell | 500 | $11.9900 | | | |
| 5/30/2007 | Sell | 200 | $11.9900 | | | |
| 5/30/2007 | Sell | 100 | $11.9900 | | | |
| 5/30/2007 | Sell | 100 | $11.9900 | | | |
| 5/30/2007 | Sell | 100 | $11.9900 | | | |
| 5/30/2007 | Sell | 100 | $11.9900 | | | |
| 5/30/2007 | Sell | 27 | $11.9900 | | | |
| 5/30/2007 | Sell | 200 | $11.9800 | | | |
| 5/30/2007 | Sell | 200 | $11.9800 | | | |
| 5/30/2007 | Sell | 100 | $11.9800 | | | |
| 5/30/2007 | Sell | 100 | $11.9800 | | | |
| 5/30/2007 | Sell | 100 | $11.9800 | | | |
| 5/30/2007 | Sell | 100 | $11.9800 | | | |
| 5/30/2007 | Sell | 1,100 | $11.9700 | | | |
| 5/30/2007 | Sell | 1,000 | $11.9700 | | | |
| 5/30/2007 | Sell | 200 | $11.9700 | | | |
| 5/30/2007 | Sell | 200 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 73 | $11.9700 | | | |
| 5/30/2007 | Sell | 27 | $11.9700 | | | |
| 5/30/2007 | Sell | 800 | $11.9500 | | | |
| 5/30/2007 | Sell | 700 | $11.9500 | | | |
| 5/30/2007 | Sell | 300 | $11.9500 | | | |
| 5/30/2007 | Sell | 200 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 27 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 55 | $11.9500 | | | |
| 5/30/2007 | Sell | 18 | $11.9500 | | | |
| 6/1/2007 | Sell | 400 | $12.5800 | | | |
| 6/1/2007 | Sell | 1,671 | $12.5600 | | | |
| 6/1/2007 | Sell | 100 | $12.5600 | | | |
| 6/1/2007 | Sell | 100 | $12.5600 | | | |
| 6/1/2007 | Sell | 100 | $12.5600 | | | |
| 6/1/2007 | Sell | 100 | $12.5500 | | | |
| 6/1/2007 | Sell | 100 | $12.5200 | | | |
| 6/1/2007 | Sell | 100 | $12.5200 | | | |
| 6/1/2007 | Sell | 3,300 | $12.5100 | | | |
| 6/1/2007 | Sell | 100 | $12.5100 | | | |
| 6/1/2007 | Sell | 5,000 | $12.5000 | | | |
| 6/1/2007 | Sell | 1,600 | $12.5000 | | | |
| 6/1/2007 | Sell | 800 | $12.5000 | | | |
| 6/1/2007 | Sell | 500 | $12.5000 | | | |
| 6/1/2007 | Sell | 200 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 29 | $12.5000 | | | |
| 7/13/2007 | Sell | 700 | $20.3800 | | | |
| 7/13/2007 | Sell | 100 | $20.3800 | | | |
| 7/13/2007 | Sell | 100 | $20.3800 | | | |
| 7/13/2007 | Sell | 200 | $20.3700 | | | |
| 7/13/2007 | Sell | 200 | $20.3700 | | | |
| 7/13/2007 | Sell | 100 | $20.3700 | | | |
| 7/13/2007 | Sell | 2,554 | $20.3600 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 7/13/2007 | Sell | 2,095 | $20.3600 | | | |
| 7/13/2007 | Sell | 1,000 | $20.3600 | | | |
| 7/13/2007 | Sell | 795 | $20.3600 | | | |
| 7/13/2007 | Sell | 656 | $20.3600 | | | |
| 7/13/2007 | Sell | 300 | $20.3600 | | | |
| 7/13/2007 | Sell | 200 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/16/2007 | Buy | 93 | $17.3500 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 107 | $17.3000 | | | |
| 7/16/2007 | Buy | 107 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 275 | $17.3000 | | | |
| 7/16/2007 | Buy | 377 | $17.3000 | | | |
| 7/16/2007 | Buy | 3,280 | $17.3000 | | | |
| 7/16/2007 | Buy | 50 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2900 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 7/16/2007 | Buy | 100 | $17.2900 | | | |
| 7/16/2007 | Buy | 500 | $17.2900 | | | |
| 7/16/2007 | Buy | 1,223 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2800 | | | |
| 7/16/2007 | Buy | 100 | $17.2800 | | | |
| 7/16/2007 | Buy | 100 | $17.2800 | | | |
| 7/16/2007 | Buy | 88 | $17.2700 | | | |
| 7/16/2007 | Buy | 100 | $17.2700 | | | |
| 7/16/2007 | Buy | 100 | $17.2700 | | | |
| 7/16/2007 | Buy | 100 | $17.2700 | | | |
| 7/30/2007 | Buy | 100 | $15.3000 | | | |
| 7/30/2007 | Buy | 100 | $15.3000 | | | |
| 7/30/2007 | Buy | 200 | $15.3000 | | | |
| 7/30/2007 | Buy | 200 | $15.3000 | | | |
| 7/30/2007 | Buy | 300 | $15.3000 | | | |
| 7/30/2007 | Buy | 400 | $15.3000 | | | |
| 7/30/2007 | Buy | 100 | $15.2900 | | | |
| 7/30/2007 | Buy | 2,000 | $15.2900 | | | |
| 7/30/2007 | Buy | 100 | $15.2800 | | | |
| 7/30/2007 | Buy | 100 | $15.2800 | | | |
| 7/30/2007 | Buy | 100 | $15.2800 | | | |
| 7/30/2007 | Buy | 100 | $15.2700 | | | |
| 7/30/2007 | Buy | 100 | $15.2700 | | | |
| 7/30/2007 | Buy | 100 | $15.2700 | | | |
| 7/30/2007 | Buy | 100 | $15.2700 | | | |
| 7/30/2007 | Buy | 200 | $15.2600 | | | |
| 7/30/2007 | Buy | 5,700 | $15.2600 | | | |
| 7/31/2007 | Sell | 600 | $16.3000 | | | |
| 7/31/2007 | Sell | 800 | $16.2900 | | | |
| 7/31/2007 | Sell | 200 | $16.2900 | | | |
| 7/31/2007 | Sell | 900 | $16.2700 | | | |
| 7/31/2007 | Sell | 100 | $16.2700 | | | |
| 7/31/2007 | Sell | 700 | $16.2600 | | | |
| 7/31/2007 | Sell | 300 | $16.2600 | | | |
| 7/31/2007 | Sell | 200 | $16.2600 | | | |
| 7/31/2007 | Sell | 100 | $16.2600 | | | |
| 7/31/2007 | Sell | 100 | $16.2600 | | | |
| 7/31/2007 | Sell | 701 | $16.2500 | | | |
| 7/31/2007 | Sell | 600 | $16.2500 | | | |
| 7/31/2007 | Sell | 299 | $16.2500 | | | |
| 7/31/2007 | Sell | 800 | $15.8200 | | | |
| 7/31/2007 | Sell | 300 | $15.8200 | | | |
| 7/31/2007 | Sell | 100 | $15.8200 | | | |
| 7/31/2007 | Sell | 100 | $15.8200 | | | |
| 7/31/2007 | Sell | 100 | $15.8200 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 7/31/2007 | Sell | 100 | $15.8200 | | | |
| 7/31/2007 | Sell | 100 | $15.8200 | | | |
| 7/31/2007 | Sell | 800 | $15.8100 | | | |
| 7/31/2007 | Sell | 500 | $15.8100 | | | |
| 7/31/2007 | Sell | 200 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 700 | $15.8000 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 2,800 | $13.4900 | | | |
| 8/16/2007 | Buy | 200 | $13.4400 | | | |
| 8/16/2007 | Buy | 200 | $13.4400 | | | |
| 8/16/2007 | Buy | 200 | $13.4400 | | | |
| 8/16/2007 | Buy | 100 | $13.4300 | | | |
| 8/16/2007 | Buy | 100 | $13.3700 | | | |
| 8/16/2007 | Buy | 100 | $13.3600 | | | |
| 8/16/2007 | Buy | 100 | $13.3600 | | | |
| 8/16/2007 | Buy | 200 | $13.3600 | | | |
| 8/16/2007 | Buy | 400 | $13.3600 | | | |
| 8/16/2007 | Buy | 1,200 | $13.3600 | | | |
| 8/16/2007 | Buy | 200 | $13.3200 | | | |
| 8/16/2007 | Buy | 200 | $13.3200 | | | |
| 8/16/2007 | Buy | 700 | $13.3200 | | | |
| 8/16/2007 | Buy | 900 | $13.3200 | | | |
| 8/16/2007 | Buy | 100 | $13.3100 | | | |
| 8/16/2007 | Buy | 100 | $13.2900 | | | |
| 8/16/2007 | Buy | 300 | $13.2800 | | | |
| 8/16/2007 | Buy | 100 | $13.2500 | | | |
| 8/16/2007 | Buy | 100 | $13.2500 | | | |
| 8/16/2007 | Buy | 200 | $13.2500 | | | |
| 8/16/2007 | Buy | 200 | $13.2500 | | | |
| 8/16/2007 | Buy | 200 | $13.2500 | | | |
| 8/16/2007 | Buy | 200 | $13.2400 | | | |
| 8/16/2007 | Buy | 100 | $13.2200 | | | |
| 8/16/2007 | Buy | 100 | $13.2100 | | | |
| 8/16/2007 | Buy | 200 | $13.2100 | | | |
| 8/31/2007 | Sell | 1,000 | $15.0700 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 8/31/2007 | Sell | 1,000 | $15.0700 | | | |
| 8/31/2007 | Sell | 1,000 | $15.0700 | | | |
| 8/31/2007 | Sell | 1,000 | $15.0700 | | | |
| 8/31/2007 | Sell | 900 | $15.0700 | | | |
| 8/31/2007 | Sell | 900 | $15.0700 | | | |
| 8/31/2007 | Sell | 800 | $15.0700 | | | |
| 8/31/2007 | Sell | 400 | $15.0700 | | | |
| 8/31/2007 | Sell | 400 | $15.0700 | | | |
| 8/31/2007 | Sell | 300 | $15.0700 | | | |
| 8/31/2007 | Sell | 300 | $15.0700 | | | |
| 8/31/2007 | Sell | 300 | $15.0700 | | | |
| 8/31/2007 | Sell | 200 | $15.0700 | | | |
| 8/31/2007 | Sell | 200 | $15.0700 | | | |
| 8/31/2007 | Sell | 200 | $15.0700 | | | |
| 8/31/2007 | Sell | 200 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 9/7/2007 | Buy | 100 | $14.0000 | | | |
| 9/7/2007 | Buy | 100 | $14.0000 | | | |
| 9/7/2007 | Buy | 200 | $14.0000 | | | |
| 9/7/2007 | Buy | 2,734 | $14.0000 | | | |
| 9/7/2007 | Buy | 200 | $13.9900 | | | |
| 9/7/2007 | Buy | 500 | $13.9700 | | | |
| 9/7/2007 | Buy | 100 | $13.9600 | | | |
| 9/7/2007 | Buy | 200 | $13.9600 | | | |
| 9/25/2007 | Buy | 8,900 | $14.5400 | | | |
| 9/25/2007 | Buy | 100 | $14.5300 | | | |
| 9/25/2007 | Buy | 100 | $14.5300 | | | |
| 9/25/2007 | Buy | 100 | $14.5300 | | | |
| 9/25/2007 | Buy | 100 | $14.5300 | | | |
| 9/25/2007 | Buy | 200 | $14.5300 | | | |
| 9/25/2007 | Buy | 400 | $14.5300 | | | |
| 9/25/2007 | Buy | 100 | $14.5200 | | | |
| 10/15/2007 | Buy | 100 | $17.1200 | | | |
| 10/15/2007 | Buy | 100 | $17.1200 | | | |
| 10/15/2007 | Buy | 200 | $17.1200 | | | |
| 10/15/2007 | Buy | 200 | $17.1200 | | | |
| 10/15/2007 | Buy | 232 | $17.1200 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 10/15/2007 | Buy | 400 | $17.1200 | | | |
| 10/15/2007 | Buy | 500 | $17.1200 | | | |
| 10/15/2007 | Buy | 1,714 | $17.1200 | | | |
| 10/15/2007 | Buy | 100 | $17.1000 | | | |
| 10/15/2007 | Buy | 2,000 | $17.1000 | | | |
| 10/15/2007 | Buy | 100 | $17.0800 | | | |
| 10/15/2007 | Buy | 400 | $17.0800 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 200 | $17.0700 | | | |
| 10/15/2007 | Buy | 1,000 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0600 | | | |
| 10/15/2007 | Buy | 100 | $17.0600 | | | |
| 10/15/2007 | Buy | 100 | $17.0600 | | | |
| 10/15/2007 | Buy | 100 | $17.0600 | | | |
| 10/15/2007 | Buy | 200 | $17.0600 | | | |
| 10/15/2007 | Buy | 500 | $17.0600 | | | |
| 10/15/2007 | Buy | 100 | $17.0500 | | | |
| 10/15/2007 | Buy | 100 | $17.0400 | | | |
| 10/15/2007 | Buy | 100 | $17.0400 | | | |
| 10/15/2007 | Buy | 107 | $17.0400 | | | |
| 10/15/2007 | Buy | 147 | $17.0400 | | | |
| 10/15/2007 | Buy | 500 | $17.0400 | | | |
| 10/16/2007 | Buy | 1,300 | $17.0000 | | | |
| 10/16/2007 | Buy | 1,600 | $17.0000 | | | |
| 10/16/2007 | Buy | 2,200 | $17.0000 | | | |
| 10/16/2007 | Buy | 100 | $16.9900 | | | |
| 10/16/2007 | Buy | 16 | $16.9800 | | | |
| 10/16/2007 | Buy | 42 | $16.9800 | | | |
| 10/16/2007 | Buy | 42 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 200 | $16.9800 | | | |
| 10/16/2007 | Buy | 200 | $16.9700 | | | |
| 10/16/2007 | Buy | 220 | $16.9500 | | | |
| 10/16/2007 | Buy | 300 | $16.9500 | | | |
| 10/16/2007 | Buy | 1,206 | $16.9500 | | | |
| 10/16/2007 | Buy | 1,274 | $16.9500 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 10/16/2007 | Buy | 100 | $16.8500 | | | |
| 10/16/2007 | Buy | 1,900 | $16.8500 | | | |
| 10/16/2007 | Buy | 100 | $16.8000 | | | |
| 10/16/2007 | Buy | 1,900 | $16.8000 | | | |
| 10/18/2007 | Buy | 15 | $16.9800 | | | |
| 10/18/2007 | Buy | 100 | $16.9800 | | | |
| 10/18/2007 | Buy | 100 | $16.9800 | | | |
| 10/18/2007 | Buy | 796 | $16.9800 | | | |
| 10/18/2007 | Buy | 100 | $16.9500 | | | |
| 10/18/2007 | Buy | 100 | $16.9500 | | | |
| 10/18/2007 | Buy | 189 | $16.9500 | | | |
| 10/18/2007 | Buy | 400 | $16.9500 | | | |
| 10/24/2007 | Buy | 8 | $15.9800 | | | |
| 10/24/2007 | Buy | 33 | $15.9800 | | | |
| 10/24/2007 | Buy | 41 | $15.9800 | | | |
| 10/24/2007 | Buy | 41 | $15.9800 | | | |
| 10/24/2007 | Buy | 100 | $15.9800 | | | |
| 10/24/2007 | Buy | 100 | $15.9800 | | | |
| 10/24/2007 | Buy | 100 | $15.9800 | | | |
| 10/24/2007 | Buy | 1,000 | $15.9800 | | | |
| 10/24/2007 | Buy | 3,577 | $15.9800 | | | |
| 11/7/2007 | Buy | 866 | $16.0100 | | | |
| 11/8/2007 | Sell | 100 | $16.7200 | | | |
| 11/8/2007 | Sell | 100 | $16.7000 | | | |
| 11/8/2007 | Sell | 100 | $16.7000 | | | |
| 11/8/2007 | Sell | 100 | $16.7000 | | | |
| 11/14/2007 | Sell | 200 | $15.3200 | | | |
| 11/14/2007 | Sell | 100 | $15.3200 | | | |
| 11/14/2007 | Sell | 500 | $15.3100 | | | |
| 11/14/2007 | Sell | 100 | $15.2200 | | | |
| 11/14/2007 | Sell | 476 | $15.1900 | | | |
| 11/14/2007 | Sell | 200 | $15.1900 | | | |
| 11/14/2007 | Sell | 100 | $15.1900 | | | |
| 11/14/2007 | Sell | 100 | $15.1900 | | | |
| 11/14/2007 | Sell | 2,125 | $15.1800 | | | |
| 11/14/2007 | Sell | 699 | $15.1800 | | | |
| 1/9/2008 | Sell | 10,000 | $9.3914 | | | |
| 1/25/2008 | Buy | 10,000 | $9.4149 | | | |
| 1/25/2008 | Buy | 10,000 | $8.9981 | | | |
| 2/6/2008 | Buy | 100 | $8.5100 | | | |
| 2/6/2008 | Buy | 100 | $8.5100 | | | |
| 2/6/2008 | Buy | 200 | $8.5100 | | | |
| 2/6/2008 | Buy | 300 | $8.5100 | | | |
| 2/6/2008 | Buy | 1,000 | $8.5100 | | | |
| 2/6/2008 | Buy | 1,116 | $8.5100 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 2/6/2008 | Buy | 1,200 | $8.5100 | | | |
| 2/6/2008 | Buy | 5,984 | $8.5100 | | | |
| 2/11/2008 | Sell | 1,500 | $9.0000 | | | |
| 2/11/2008 | Sell | 900 | $9.0000 | | | |
| 2/11/2008 | Sell | 1,300 | $8.9900 | | | |
| 2/11/2008 | Sell | 900 | $8.9900 | | | |
| 2/11/2008 | Sell | 200 | $8.9900 | | | |
| 2/11/2008 | Sell | 100 | $8.9900 | | | |
| 2/11/2008 | Sell | 100 | $8.9900 | | | |
| 2/11/2008 | Buy | 5,000 | $8.5000 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 200 | $9.2500 | | | |
| 2/12/2008 | Buy | 200 | $9.2500 | | | |
| 2/12/2008 | Buy | 200 | $9.2500 | | | |
| 2/12/2008 | Buy | 200 | $9.2500 | | | |
| 2/12/2008 | Buy | 400 | $9.2500 | | | |
| 2/12/2008 | Buy | 500 | $9.2500 | | | |
| 2/12/2008 | Buy | 2,500 | $9.2500 | | | |
| 2/12/2008 | Buy | 3,371 | $9.2500 | | | |
| 2/12/2008 | Buy | 5,000 | $9.2400 | | | |
| 2/12/2008 | Buy | 100 | $9.2000 | | | |
| 2/12/2008 | Buy | 100 | $9.2000 | | | |
| 2/12/2008 | Buy | 100 | $9.2000 | | | |
| 2/12/2008 | Buy | 129 | $9.2000 | | | |
| 2/12/2008 | Buy | 200 | $9.2000 | | | |
| 2/12/2008 | Buy | 300 | $9.2000 | | | |
| 2/12/2008 | Buy | 500 | $9.2000 | | | |
| 2/12/2008 | Buy | 500 | $9.2000 | | | |
| 2/13/2008 | Sell | 200 | $9.3100 | | | |
| 2/13/2008 | Sell | 200 | $9.3100 | | | |
| 2/13/2008 | Sell | 100 | $9.3100 | | | |
| 2/13/2008 | Sell | 3,750 | $9.3000 | | | |
| 2/13/2008 | Sell | 200 | $9.3000 | | | |
| 2/13/2008 | Sell | 134 | $9.3000 | | | |
| 2/13/2008 | Sell | 100 | $9.3000 | | | |
| 2/13/2008 | Sell | 100 | $9.3000 | | | |
| 2/13/2008 | Sell | 100 | $9.3000 | | | |
| 2/13/2008 | Sell | 100 | $9.3000 | | | |
| 2/13/2008 | Sell | 16 | $9.3000 | | | |
| 2/14/2008 | Buy | 100 | $8.9400 | | | |
| 2/14/2008 | Buy | 200 | $8.9400 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 2/14/2008 | Buy | 400 | $8.9400 | | | |
| 2/14/2008 | Buy | 4,300 | $8.9400 | | | |
| 2/15/2008 | Buy | 300 | $8.9900 | | | |
| 2/15/2008 | Buy | 500 | $8.9900 | | | |
| 2/15/2008 | Buy | 2,686 | $8.9900 | | | |
| 2/15/2008 | Buy | 100 | $8.9800 | | | |
| 2/15/2008 | Buy | 14 | $8.9700 | | | |
| 2/15/2008 | Buy | 50 | $8.9700 | | | |
| 2/15/2008 | Buy | 50 | $8.9700 | | | |
| 2/15/2008 | Buy | 100 | $8.9700 | | | |
| 2/15/2008 | Buy | 200 | $8.9700 | | | |
| 2/15/2008 | Buy | 500 | $8.9700 | | | |
| 2/15/2008 | Buy | 500 | $8.9700 | | | |
| 2/20/2008 | Buy | 100 | $8.9000 | | | |
| 2/20/2008 | Buy | 100 | $8.9000 | | | |
| 2/20/2008 | Buy | 700 | $8.9000 | | | |
| 2/20/2008 | Buy | 8,300 | $8.9000 | | | |
| 2/20/2008 | Buy | 100 | $8.8900 | | | |
| 2/20/2008 | Buy | 100 | $8.8900 | | | |
| 2/20/2008 | Buy | 200 | $8.8900 | | | |
| 2/20/2008 | Buy | 400 | $8.8900 | | | |
| 2/21/2008 | Buy | 37 | $9.2500 | | | |
| 2/21/2008 | Buy | 100 | $9.2500 | | | |
| 2/21/2008 | Buy | 300 | $9.2500 | | | |
| 2/21/2008 | Buy | 376 | $9.2500 | | | |
| 2/21/2008 | Buy | 400 | $9.2500 | | | |
| 2/21/2008 | Buy | 400 | $9.2500 | | | |
| 2/21/2008 | Buy | 427 | $9.2500 | | | |
| 2/21/2008 | Buy | 500 | $9.2500 | | | |
| 2/21/2008 | Buy | 924 | $9.2500 | | | |
| 2/21/2008 | Buy | 1,536 | $9.2500 | | | |
| 2/21/2008 | Buy | 5,000 | $8.7500 | | | |
| 2/25/2008 | Sell | 400 | $9.5300 | | | |
| 2/25/2008 | Sell | 200 | $9.5300 | | | |
| 2/25/2008 | Sell | 100 | $9.5300 | | | |
| 2/25/2008 | Sell | 100 | $9.5300 | | | |
| 2/25/2008 | Sell | 100 | $9.5300 | | | |
| 2/25/2008 | Sell | 100 | $9.5300 | | | |
| 2/25/2008 | Sell | 200 | $9.5100 | | | |
| 2/25/2008 | Sell | 2,900 | $9.5000 | | | |
| 2/25/2008 | Sell | 187 | $9.5000 | | | |
| 2/25/2008 | Sell | 113 | $9.5000 | | | |
| 2/25/2008 | Sell | 100 | $9.5000 | | | |
| 2/25/2008 | Sell | 100 | $9.5000 | | | |
| 2/25/2008 | Sell | 100 | $9.5000 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 700 | $9.0500 | | | |
| 2/25/2008 | Buy | 1,301 | $9.0500 | | | |
| 2/25/2008 | Buy | 1,999 | $9.0500 | | | |
| 2/28/2008 | Buy | 100 | $10.2000 | | | |
| 2/28/2008 | Buy | 100 | $10.2000 | | | |
| 2/28/2008 | Buy | 100 | $10.2000 | | | |
| 2/28/2008 | Buy | 100 | $10.2000 | | | |
| 2/28/2008 | Buy | 200 | $10.2000 | | | |
| 2/28/2008 | Buy | 1,500 | $10.2000 | | | |
| 2/28/2008 | Buy | 1,800 | $10.2000 | | | |
| 2/28/2008 | Buy | 100 | $10.1900 | | | |
| 2/28/2008 | Buy | 100 | $10.1800 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 200 | $10.1700 | | | |
| 2/28/2008 | Buy | 200 | $10.1700 | | | |
| 2/28/2008 | Buy | 33 | $10.0100 | | | |
| 2/28/2008 | Buy | 200 | $10.0100 | | | |
| 2/28/2008 | Buy | 367 | $10.0100 | | | |
| 2/28/2008 | Buy | 500 | $10.0100 | | | |
| 2/28/2008 | Buy | 1,100 | $10.0100 | | | |
| 2/28/2008 | Buy | 2,800 | $10.0100 | | | |
| 2/29/2008 | Sell | 20,000 | $9.4100 | | | |
| 3/6/2008 | Sell | 200 | $8.0200 | | | |
| 3/6/2008 | Sell | 100 | $8.0200 | | | |
| 3/6/2008 | Sell | 100 | $8.0200 | | | |
| 3/6/2008 | Sell | 100 | $8.0200 | | | |
| 3/6/2008 | Sell | 100 | $8.0100 | | | |
| 3/6/2008 | Sell | 30,000 | $8.0000 | | | |
| 3/6/2008 | Sell | 12,500 | $8.0000 | | | |
| 3/6/2008 | Sell | 5,000 | $8.0000 | | | |
| 3/6/2008 | Sell | 600 | $8.0000 | | | |
| 3/6/2008 | Sell | 400 | $8.0000 | | | |
| 3/6/2008 | Sell | 300 | $8.0000 | | | |
| 3/6/2008 | Sell | 200 | $8.0000 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 3/6/2008 | Sell | 100 | $8.0000 | | | |
| 3/6/2008 | Sell | 100 | $8.0000 | | | |
| 3/6/2008 | Sell | 100 | $8.0000 | | | |
| 3/6/2008 | Sell | 100 | $8.0000 | | | |
| 3/6/2008 | Sell | 800 | $7.9800 | | | |
| 3/6/2008 | Sell | 300 | $7.9800 | | | |
| 3/6/2008 | Sell | 100 | $7.9800 | | | |
| 3/6/2008 | Sell | 91 | $7.9800 | | | |
| 3/6/2008 | Sell | 400 | $7.9600 | | | |
| 3/6/2008 | Sell | 100 | $7.9500 | | | |
| 3/6/2008 | Sell | 100 | $7.9500 | | | |
| 3/6/2008 | Sell | 100 | $7.9400 | | | |
| 3/6/2008 | Sell | 100 | $7.9300 | | | |
| 3/6/2008 | Sell | 200 | $7.9200 | | | |
| 3/6/2008 | Sell | 500 | $7.9100 | | | |
| 3/6/2008 | Sell | 200 | $7.9100 | | | |
| 3/6/2008 | Sell | 200 | $7.9100 | | | |
| 3/6/2008 | Sell | 100 | $7.9100 | | | |
| 3/6/2008 | Sell | 100 | $7.9100 | | | |
| 3/6/2008 | Sell | 11,168 | $7.9000 | | | |
| 3/6/2008 | Sell | 1,500 | $7.9000 | | | |
| 3/6/2008 | Sell | 700 | $7.9000 | | | |
| 3/6/2008 | Sell | 600 | $7.9000 | | | |
| 3/6/2008 | Sell | 500 | $7.9000 | | | |
| 3/6/2008 | Sell | 400 | $7.9000 | | | |
| 3/6/2008 | Sell | 250 | $7.9000 | | | |
| 3/6/2008 | Sell | 200 | $7.9000 | | | |
| 3/6/2008 | Sell | 200 | $7.9000 | | | |
| 3/6/2008 | Sell | 200 | $7.9000 | | | |
| 3/6/2008 | Sell | 191 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 5/2/2008 | Sell | 7,075 | $10.7500 | | | |
| 5/2/2008 | Sell | 1,300 | $10.7500 | | | |
| 5/2/2008 | Sell | 1,225 | $10.7500 | | | |
| 5/2/2008 | Sell | 200 | $10.7500 | | | |
| 5/2/2008 | Sell | 100 | $10.7500 | | | |
| 5/2/2008 | Sell | 100 | $10.7500 | | | |
| 5/7/2008 | Buy | 100 | $10.3500 | | | |
| 5/7/2008 | Buy | 100 | $10.3500 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 5/7/2008 | Buy | 200 | $10.3500 | | | |
| 5/7/2008 | Buy | 300 | $10.3500 | | | |
| 5/7/2008 | Buy | 500 | $10.3500 | | | |
| 5/7/2008 | Buy | 700 | $10.3500 | | | |
| 5/7/2008 | Buy | 700 | $10.3500 | | | |
| 5/7/2008 | Buy | 5,000 | $10.3500 | | | |
| 5/7/2008 | Buy | 100 | $10.3400 | | | |
| 5/7/2008 | Buy | 2,000 | $10.3200 | | | |
| 5/7/2008 | Buy | 200 | $10.3000 | | | |
| 5/7/2008 | Buy | 100 | $10.2800 | | | |
| 5/8/2008 | Sell | 1,400 | $10.6750 | | | |
| 5/8/2008 | Buy | 11 | $10.5300 | | | |
| 5/8/2008 | Buy | 44 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 500 | $10.5300 | | | |
| 5/8/2008 | Buy | 200 | $10.5250 | | | |
| 5/8/2008 | Buy | 745 | $10.5250 | | | |
| 5/8/2008 | Buy | 2,000 | $10.5250 | | | |
| 5/8/2008 | Buy | 111 | $10.5200 | | | |
| 5/8/2008 | Buy | 400 | $10.5150 | | | |
| 5/8/2008 | Buy | 489 | $10.5150 | | | |
| 5/8/2008 | Buy | 100 | $10.1000 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 400 | $10.0800 | | | |
| 6/13/2008 | Sell | 5,500 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 125 | $7.7700 | | | |
| 6/13/2008 | Sell | 100 | $7.7700 | | | |
| 6/13/2008 | Sell | 100 | $7.7700 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 6/13/2008 | Sell | 100 | $7.7700 | | | |
| 6/13/2008 | Sell | 75 | $7.7700 | | | |
| 6/13/2008 | Sell | 100 | $7.7600 | | | |
| 6/13/2008 | Sell | 200 | $7.7400 | | | |
| 6/13/2008 | Sell | 700 | $7.7200 | | | |
| 6/13/2008 | Sell | 700 | $7.7200 | | | |
| 6/13/2008 | Sell | 100 | $7.7100 | | | |
| 6/13/2008 | Sell | 1,300 | $7.7000 | | | |
| 6/13/2008 | Sell | 300 | $7.7000 | | | |
| 6/13/2008 | Sell | 100 | $7.7000 | | | |
| 6/24/2008 | Buy | | | 160 | Call $7.50 Nov. | $125.00 |
| 6/24/2008 | Buy | | | 40 | Call $7.50 Nov. | $130.00 |
| 6/26/2008 | Sell | 14,400 | $6.7700 | | | |
| 6/26/2008 | Sell | 600 | $6.7700 | | | |
| 8/12/2008 | Buy | | | 24 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 13 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 11 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 10 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 13 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 34 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 34 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 11 | Call $7.50 Nov. | $135.00 |
| 10/30/2008 | Sell | 2,800 | $4.7800 | | | |
| 3/10/2009 | Sell | 44,200 | $2.6015 | | | |
| 3/11/2009 | Sell | 225 | $2.6700 | | | |
| 5/5/2009 | Sell | 3,000 | $4.3180 | | | |
| 5/5/2009 | Sell | 9,775 | $4.3055 | | | |
| 5/26/2009 | Sell | 20,000 | $4.1590 | | | |
| 5/26/2009 | Sell | 10,000 | $4.1040 | | | |
| 5/26/2009 | Sell | 10,000 | $4.0175 | | | |

**Exhibit A**

**Immersion Insider Sales During the Class Period:**

| Insider | Date | Shares | Price | Proceeds | % of Holdings Sold | % of Holdings Sold incl. options |
|---|---|---|---|---|---|---|
| **STEPHEN AMBLER** CFO and Vice President, Finance | 08/27/2007 11/06/2007 | 20,000 20,000 **40,000** | $14.61 $17.37 | $292,200 $347,400 **$639,600** | **100.00%** | **20.19%** |
| **JOHN HODGMAN** Director | 11/06/2007 11/06/2007 11/06/2007 | 20,000 10,000 10,000 **40,000** | $17.16 $17.16 $17.16 | $343,200 $171,600 $171,600 **$686400** | **89.99%** | **36.95%** |
| **EMILY LIGGETT** Director | 09/05/2007 | 14,999 **14,999** | $14.66 | $219,885 **$219,885** | **69.77%** | **27.46%** |
| **JACK SALTICH** Director | 08/07/2007 | 30,000 **30,000** | $16.08 | $482,400 **$482,400** | **67.42%** | **25.37%** |
| **ROBERT VAN NAARDEN** Director | 11/27/2007 12/07/2007 05/16/2008 06/13/2008 | 10,000 10,000 5,000 5,000 **30,000** | $12.25 $14.00 $10.00 $7.82 | $122,500 $140,000 $50,000 $39,100 **$351,600** | **86.96%** | **30.53%** |
| **VICTOR VIEGAS** President and CEO, Director | 05/25/2007 09/27/2007 09/28/2007 10/08/2007 | 22,919 52,081 25,000 25,000 **125,000** | $11.01 $15.60 $16.99 $18.02 | $252,338 $812,464 $424,750 $450,500 **$1,940,052** | **92.88%** | **9.72%** |
| **RICHARD VOGEL** Senior Vice President and General Manager, Immersion Medical Inc. | 11/07/2007 | 7,752 **7,752** | $17.29 | $134,032 **$134,032** | **100.00%** | **100.00%** |
| **TOTAL** | | **287,751** | | **$4,453,969** | | |

## Mailing Information for a Case 3:09-cv-04073-MMC

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Corinne Bretan**
  jbretan@fenwick.com,mbafus@fenwick.com,kayoung@fenwick.com,kdeleon@fenwick.com

- **David A.P. Brower**
  brower@browerpiven.com

- **Steven D. Cohn**
  scohn@kmllp.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Frank James Johnson**
  frankj@johnsonbottini.com,brett@johnsonbottini.com,paralegal@johnsonbottini.com,frankb@johnsonbottini.com

- **Felix Shih-Young Lee**
  flee@fenwick.com

- **Betsy Carol Manifold**
  manifold@whafh.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Susan Samuels Muck**
  smuck@fenwick.com,kayoung@fenwick.com,cprocida@fenwick.com,kdeleon@fenwick.com

- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com

- **Jay L. Pomerantz**
  jpomerantz@fenwick.com,slim@fenwick.com,tfinlev@fenwick.com

- **Ira M. Press**
  ipress@kmllp.com,plinden@kmllp.com,lmorris@kmllp.com,slopez@kmllp.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,SHolloway@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David C. Walton**
  davew@csgrr.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,travisd@rgrdlaw.com,ptiffith@rgrdlaw.com,cwood@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com,khuang@rgrdlaw.com,e_file_

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)