1   ROBBINS GELLER RUDMAN
    & DOWD LLP
2   WILLOW E. RADCLIFFE (200087)
    SARAH R. HOLLOWAY (254134)
3   100 Pine Street, Suite 2600
    San Francisco, CA  94111
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   willowr@rgrdlaw.com
    sholloway@rgrdlaw.com
6
    Liaison Counsel for Plaintiff
7
    BROWER PIVEN
8     A Professional Corporation
    DAVID A.P. BROWER
9   488 Madison Avenue, 8th Floor
    New York, NY  10022
10  Telephone:  212/501-9000
    212/501-0300 (fax)
11  brower@browerpiven.com
12  Lead Counsel for Plaintiff

13            UNITED STATES DISTRICT COURT

14          NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 15  In re IMMERSION CORPORATION SECURITIES LITIGATION | )  Master File No. 09-cv-04073-MMC |
| 16  ——————————————— | )  <u>CLASS ACTION</u> |
| 17  This Document Relates To: | )  PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| 18      ALL ACTIONS. | )  PLAINTIFF'S CONSOLIDATED COMPLAINT |
| 19  ——————————————— | ) |
| 20 | DATE:         October 29, 2010<br>TIME:         9:00 a.m. |
| 21 | COURTROOM: The Honorable Maxine M. Chesney |

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3  I.      INTRODUCTION AND FACTUAL OVERVIEW ...........................................1

4  II.     THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER....................3

5       A.      The Nature and Impact of Immersion's Restatement Along with
         Violations of Immersion's Own Accounting Policies Raise a Strong

6           Inference of Scienter ......................................................................4

7           1.      Defendants Have Admitted Violating Basic Accounting Principles ..........4

8           2.      Defendants' Accounting Manipulations Are Consistent with Fraud ..........6

9       B.      The Confidential Witnesses Tie Defendants to the Fraud .........................9

10      C.      The Core Business Inference  – Even Standing Alone – Satisfies the Ninth

11          Circuit's Standard for Pleading Scienter.............................................13

12      D.      Defendants Received Millions from Insider Trading and Other
         Compensation as a Result of Their Fraud Which Reinforce Scienter ..................14

13      E.      The Abrupt Departures of Defendants Ambler, Chavez and Richardson

14          Add Weight to the Scienter Mix .....................................................17

15      F.      Defendants' False SOX Certifications Contribute to a Strong Inference of
         Scienter ...................................................................................18

16 III.    DEFENDANTS CHAVEZ AND VOGEL ARE LIABLE FOR MATERIALLY
      FALSE AND MISLEADING STATEMENTS AND OMISSIONS.............................19

17

18 IV.     PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION .....................................20

19 V.      DEFENDANTS ARE LIABLE AS CONTROL PERSONS UNDER §20(a) .................23

20 VI.     DEFENDANTS VIEGAS, AMBLER AND VOGEL VIOLATED §20A OF THE
      EXCHANGE ACT............................................................................24

21 VII.    CONCLUSION .............................................................................25

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ..............................................................4

5

6

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1972)................................................................................19

7

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ..........................................................21, 22

8

9

*Atlas v. Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008)..................................................6

10

11

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009)........................................5, 7, 15

12

*Batwin v. Occam Networks, Inc.*,
   No. CV 07-2750 CAS (SHx), 2008 U.S. Dist. LEXIS 52365
   (C.D. Cal. July 1, 2008) ..................................................................7, 15

13

14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 555, 570 (2007).............................................................23

15

16

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ...............................................................13

17

18

*Brodsky v. Yahoo Inc!*,
   592 F. Supp. 2d 1192 (N.D. Cal. 2008) ...............................................25

19

20

*Burritt v. NutraCea*,
   No. CV-09-00406-PHX-FJM, 2010 U.S. Dist. LEXIS 17544
   (D. Ariz. Feb. 25, 2010)................................................................17, 21

21

22

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
   497 F.3d 546 (5th Cir. 2007) ...............................................................15

23

24

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................20, 21, 22

25

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) .............................................................25

26

27

*Fouad v. Isilon Sys., Inc.*,
   No. C 07-1764 MJP, 2008 WL 5412397
   (W.D. Wash. Dec. 29, 2008)......................................................16, 17, 18

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC

Page

*Freeland v. Iridium World Commc'ns, Ltd.*,
   233 F.R.D. 40 (D.D.C. 2006).................................................................22

*Freudenberg v. E*Trade Fin. Corp.*,
   No. 07 CIV. 8538, 2010 U.S. Dist. LEXIS 46053
   (S.D.N.Y. May 11, 2010).....................................................................15

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255, 1266 (11th Cir. 2006) ................................................18

*Gebhardt v. ConAgra Foods, Inc.*,
   335 F.3d 824 (8th Cir. 2003) .............................................................7, 8

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ........................................................18, 20

*Hollinger v. Titan Capital Corp.*,
   914 F.2d 1564 (9th Cir. 1990) ...........................................................23

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) .................................................18, 20, 23

*Huberman v. Tag-It Pac., Inc.*,
   314 Fed. Appx. 59 (9th Cir. 2009).....................................................22

*In re Adaptive Broadband Sec. Litig.*,
   No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887
   (N.D. Cal. Apr. 2, 2002)...................................................4, 6, 18, 24

*In re Am. Serv. Group, Inc.*,
   No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237
   (M.D. Tenn. Mar. 30, 2009).............................................................19

*In re AOL Time Warner, Inc. Sec. & "Erisa" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004).................................................9

*In re Apollo Group, Inc. Sec. Litig.*,
   No. 08-16971, 2010 U.S. App. LEXIS 14478
   (9th Cir. June 23, 2010) .....................................................................21

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) .............................................................9

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002)............................................................6, 11

**Page**

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   654 F. Supp. 2d 1037 (N.D. Cal. 2009) .................................................................10, 11

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010) ..........................................12, 19, 20, 24

*In re Century Aluminum Co. Sec. Litig.*,
   No. C 09-1001 SI, 2010 WL 1729426
   (N.D. Cal. Apr. 27, 2010) ...........................................................................................13

*In re Charles Schwab Corp. Sec. Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009)................................................................................22

*In re Commtouch Software Ltd. Sec. Litig.*,
   No. C 01-00719 WHA, 2002 U.S. Dist. LEXIS 13742
   (N.D. Cal. July 24, 2002) ............................................................................................14

*In re Connectics Corp. Sec. Litig.*,
   No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515
   (N.D. Cal. Aug. 14, 2008) .............................................................................................9

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ....................................................................24

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................................................................16

*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d (N.D. Cal. 2001) ..............................................................................19

*In re Daou Sys., Inc., Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................................. *passim*

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006)..........................................................................15

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008),
   *cert. denied, Gilead Scis., Inc. v. St. Clare*, __ U.S. __, 129 S. Ct. 1993 (2009) ..............21, 22

*In re Homestore.com, Inc. Sec. Litig.*,
   252 F. Supp. 2d 1018, 1041 (C.D. Cal. 2003) ....................................................20

*In re IMAX Sec. Litig.*,
   587 F. Supp. 2d 471 (S.D.N.Y. 2008)..........................................................................6

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC

1

2                                                                                       **Page**

3    *In re Impax Labs., Sec. Litig.*,
        No. C 04-04802 JW, 2007 U.S. Dist. LEXIS 52356
4       (N.D. Cal. July 18, 2007)........................................................................18

5    *In re Lattice Semiconductor Corp. Sec. Litig.*,
        No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
6       (D. Or. Jan. 3, 2006) ............................................................................18

7
     *In re LDK Solar Sec. Litig.*,
8       255 F.R.D. 519 (N.D. Cal. 2009).........................................................22

9    *In re McKesson HBOC, Inc. Sec. Litig.*,
        126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................4
10

11   *In re MicroStrategy, Inc. Sec. Litig.*,
        115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................6, 9

12
     *In re New Century*,
13      588 F. Supp. 2d 1206 (C.D. Cal. 2008) .................................17, 21, 23

14   *In re Nextcard, Inc. Sec. Litig.*,
        No. C 01-21029 JF (RS), 2006 U.S. Dist. LEXIS 16156
15      (N.D. Cal. Mar. 20, 2006)......................................................................20

16   *In re Omnivision Techs.*,
        No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009
17      (N.D. Cal. July 29, 2005)................................................................1, 4, 8

18
     *In re Oxford Health Plans, Inc. Sec. Litig.*,
19      187 F.R.D. 133 (S.D.N.Y. 1999) ..........................................................15

20   *In re The PMI Group, Inc. Sec. Litig.*,
        No. C 08-1405 SI, 2009 U.S. Dist. LEXIS 101582
21      (N.D. Cal. Nov. 2, 2009).......................................................................13

22   *In re Scholastic Corp. Sec. Litig.*,
        252 F.3d 63 (2d Cir. 2001).....................................................................12
23

24   *In re Secure Computing Corp. Sec. Litig.*,
        184 F. Supp. 2d 980 (N.D. Cal. 2001) ..............................................14, 15
25

26   *In re SeeBeyond Techs. Corp. Sec. Litig.*,
        266 F. Supp. 2d 1150 (C.D. Cal. 2003) .................................................17

27
     *In re Silicon Graphics Inc., Sec. Litig.*,
28      183 F.3d 970 (9th Cir. 1999) ...................................................................3

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
        CONSOLIDATED COMPLAINT - 09-cv-04073-MMC

1

2                                                                                    **Page**

3  *In re Sipex Corp. Sec. Litig.*,
     No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854
4    (N.D. Cal. Nov. 17, 2005)................................................................4

5  *In re Skechers U.S.A., Inc. Sec. Litig.*,
     273 Fed. Appx. 626 (9th Cir. 2008)..........................................15
6

7  *In re Suprema Specialties, Inc. Sec. Litig.*,
     438 F.3d 256 (3d Cir. 2005).......................................................15
8

9  *In re Tut Sys. Sec. Litig.*,
     No. C 01-02659 CW, 2002 U.S. Dist. LEXIS 27092
10   (N.D. Cal. Aug. 15, 2002)..........................................................14

11 *In re U.S. Aggregates, Inc. Sec. Litig.*,
     235 F. Supp. 2d 1063 (N.D. Cal. 2002) ......................................7
12

13 *In re U.S. Aggregates, Inc. Sec. Litig.*,
     No. C 01-1688 CW, 2003 U.S. Dist. LEXIS 12168
14   (N.D. Cal. Jan. 24, 2003) .......................................................4, 7

15 *In re UTStarcom, Inc. Sec. Litig.*,
     617 F. Supp. 2d 964 (N.D. Cal. 2009) ..............................4, 5, 22
16

17 *In re VeriFone Sec. Litig.*,
     11 F.3d 865 (9th Cir. 1993) .......................................................25

18 *In re VeriFone Sec. Litig.*,
     784 F. Supp. 1471 (N.D. Cal. 1992),
19   *aff'd*, 11 F.3d 865 (9th Cir. 1993)...........................................25

20 *In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*,
     694 F. Supp. 2d 1192 (W.D. Wash. 2009)..............................17, 21
21

22 *Johnson v. Aljian*,
     257 F.R.D. 587 (C.D. Cal. 2009) ..............................................24
23

24 *Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
     513 F.3d 702 (7th Cir. 2008) ................................................13, 19

25 *McCasland v. Formfactor Inc.*,
     No. C 07-5545 SI, 2009 WL 2086168
26   (N.D. Cal. July 14, 2009)............................................................8

27 *Merck & Co. Inc. v. Reynolds*,
     __ U.S. __, 130 S. Ct. 1784 (2010)...........................................22
28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                          - vi -

Page

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...........................................................................21

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) .............................................................24

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) .................................................................................25

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding
    Corp.*,
    320 F.3d 920 (9th Cir. 2003) ..................................................................... *passim*

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...........................................................................14

*Paracor Fin., Inc. v. GE Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) .............................................................................24

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Group*,
    No. CV-09-00214-JLQ, 2010 WL 2264962
    (E.D. Wash. Jun. 2, 2010)..................................................................................20

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .............................................................................6

*Rudolph v. UTStarcom*,
    No. C 07-04578 SI, 2008 WL 4002855
    (N.D. Cal. Aug. 21, 2008)..................................................................................23

*SEC v. Leslie*,
    No. C 07-3444, 2010 U.S. Dist. LEXIS 76826
    (N.D. Cal. July 29, 2010)....................................................................................7

*SEC v. Reyes*,
    491 F. Supp. 2d 906 (N.D. Cal. 2007) ...............................................................7

*SEC v. Zandford*,
    535 U.S. 813 (2002) ..........................................................................................19

*South Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...................................................................3, 13, 14

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009).................................................................16

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC

**Page**

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) .................................................................................................19

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*,
  690 F. Supp. 2d 959 (D. Ariz. 2010) ........................................................................23

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
  551 U.S. 308 (2007) ..............................................................................................3, 11

*United States v. O'Hagan*,
  521 U.S. 642, 658 (1977) .........................................................................................20

*Wool v. Tandem Computers, Inc.*,
  818 F.2d 1433 (9th Cir. 1987) ..................................................................................23

**STATUTES, RULES AND REGULATIONS**

**RULES**

Federal Rule of Civil Procedure
  Rule 8 .............................................................................................................3, 23, 24
  Rule 8(a) ...................................................................................................................20
  Rule 9 .......................................................................................................................25
  Rule 10b-5 ................................................................................................................19
  Rule 12(b)(6) ............................................................................................................21

**REGULATIONS**

15 U.S.C. §78
  §78t(a) .............................................................................................................3, 19, 23, 24
  §78j(b) .................................................................................................................. *passim*
  §78t-1 ................................................................................................................... *passim*

17 C.F.R.
  §210.4-01(a)(1) ...........................................................................................................4

**SECONDARY AUTHORITIES**

Conference Report on H.R. 3763, SOX,
148 Cong. Rec. H5462 (July 25, 2002) .......................................................................18

## I.  INTRODUCTION AND FACTUAL OVERVIEW

Having conceded in the face of an internal investigation and resulting restatement of financial results that during the Class Period (May 3, 2007 to July 1, 2009) they issued materially false statements to investors, defendants[1] move to dismiss plaintiff's well-pled allegations on other grounds, primarily scienter.  Defendants take a myopic view of plaintiff's allegations, choosing to categorically ignore facts, including many false statements that, viewed holistically, support a strong inference of scienter.  The Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint")[2] sets forth with particularity a fraudulent scheme hatched by defendants to make it appear that Immersion was on a trajectory for organic growth by: (i) falsifying reported revenue, growth, earnings and income; (ii) understating expenses; and (iii) lying to investors about the quality of Immersion's accounting policies and internal controls.  On February 8, 2010, defendants issued a massive restatement of Immersion's 2006, 2007, 2008 and 1Q09 financial statements.  Pursuant to the restatement, defendants have admitted that defendants overstated Immersion's revenues by $3.7 million from 2006 to 2008, including nearly 20% in medical revenues in 2008, while permitting defendants Ambler, Vogel and Viegas to sell $2.7 million in Immersion stock.  ¶¶5, 7.

Defendants gloss over the Complaint's allegations and instead claim that because Immersion's 2007 revenue was understated by 0.6%, there cannot be scienter.  Defendants' theory has previously been rejected in this district.  *See In re Omnivision Techs.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009, at *15-*16 (N.D. Cal. July 29, 2005) ("Defendants rely on their misconstrued theory that because this case involves earnings understatements, instead of overstatements, insider sales are not indicative of scienter.").  Defendants overlook Immersion's

---

[1]     Collectively the defendants are Immersion Corporation ("Immersion" or the "Company"), its former Presidents and Chief Executive Officers ("CEOs") Victor A. Viegas ("Viegas") and Ralph Edward Clenton Richardson ("Richardson"), its former Chief Financial Officer ("CFO") Stephen M. Ambler ("Ambler"), and its former Senior Vice Presidents and General Managers of the Company's wholly owned subsidiary, Immersion Medical Inc. ("Immersion Medical"), Richard Vogel ("Vogel") and Daniel J. Chavez ("Chavez").

[2]     All ¶ references are to the Complaint.  Emphasis is added and internal quotations and citations and footnotes are omitted unless otherwise noted.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                              - 1 -

other accounting violations and lack of internal controls, which resulted in an **overstatement** of **net income** for 2007 as well as overstatements of revenue and net income in 2006 and 2008. ¶¶20-21. Defendants' use of "cookie jar" accounting (*i.e.*, "smoothing" earnings by under-reporting revenues in fat quarters so that they can be reported in lean quarters) does not negate scienter.

The fact that defendants, including two certified accountants and three MBAs, violated basic accounting principals further supports an inference of scienter. ¶¶30-34. Revenue can only be recognized when: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; and (iii) the seller's price to the buyer is fixed or determinable. ¶¶15, 79-80. Even most non-accountant business executives are well aware that without an agreement (*e.g.*, signed Purchase Orders ("POs")) or shipment of proper products (*e.g.*, not visibly used demonstration units), a company cannot recognize the sale as revenue. ¶16. Former Chairman of the Securities and Exchange Commission ("SEC"), Arthur Levitt, described such accounting hocus-pocus to obscure "the actual financial volatility" of a company as follows:

> Lastly, companies try to boost earnings by manipulating the recognition of revenue. Think about a bottle of fine wine. You wouldn't pop the cork on that bottle before it was ready. But *some companies are doing this with their revenue – recognizing it before a sale is complete, before the product is delivered to a customer, or at a time when the customer still has options to terminate, void or delay the sale.*

Radcliffe Decl., Exhibit 1 at 5.[3]

Defendants also ignore the confidential witness ("CW") accounts that place defendants in the direct line of knowledge of the basic accounting violations that resulted in the false financial statements. The CWs include a Senior Accountant, the VP of Domestic and International Sales and the Corporate Controller of Immersion Medical, the very division at the heart of defendants' accounting fraud. Likewise, defendants are silent on the clear application of the core business inference to support scienter, as well as the sudden departures of three of the five individual defendants in the midst of the internal investigation into accounting irregularities. While defendants

---

[3]   "Radcliffe Decl." refers to the Declaration of Willow E. Radcliffe in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiff's Consolidated Complaint, filed herewith.

1   do address the insider trading, they neither explain the suspicious nature or amounts defendants

2   traded nor offer any competing inference as to why defendant Vogel deviated from a 10b5-1 trading

3   plan to sell stock.  ¶188.  The well-pled allegations of the Complaint, when viewed in totality, tip the

4   scales overwhelmingly towards a strong inference of scienter.

5          In addition to the cogent and compelling allegations of scienter, plaintiff has met the Rule 8

6   notice pleading requirements for alleging loss causation, as set forth in §IV.  The Complaint also

7   provides defendants with the requisite notice of control liability under §20(a).  Finally, plaintiff's

8   allegations that defendants violated the insider trading provisions of §20A when they sold their

9   Immersion stock for millions of dollars contemporaneously with plaintiff's trades while in

10  possession of material non-public information satisfy the Ninth Circuit's pleading standards.

11  Accordingly, defendants' motion should be denied.

12  **II.     THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER**

13         A complaint sufficiently alleges scienter if, "[w]hen the allegations are accepted as true and

14  taken collectively," a reasonable person would "deem the inference of scienter *at least as strong* as

15  any opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights Ltd. ("Tellabs I")*, 551 U.S. 308,

16  326 (2007).  The Supreme Court has cautioned that "courts must consider the complaint in its

17  entirety" and determine "whether *all of the facts* alleged, taken collectively, give rise to a strong

18  inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

19  standard."  *Id.* at 322-23.  "The inference that the defendant acted with scienter need not be

20  irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences'" –

21  the inference need only be equally plausible as any non-culpable inference.  *Id.* at 324.

22         Defendants' heavy reliance on *In re Silicon Graphics Inc., Sec. Litig.*, 183 F.3d 970 (9th Cir.

23  1999) and its progeny to argue that plaintiff's allegations fail to raise a strong inference of scienter is

24  unavailing.  The Ninth Circuit has construed *Tellabs I* as "suggest[ing] that perhaps *Silicon*

25  *Graphics*, *Vantive*, and *Read-Rite* are too demanding."  *South Ferry LP v. Killinger*, 542 F.3d 776,

26  784 (9th Cir. 2008).  Instead, "*Tellabs* counsels [the court] to consider the totality of circumstances,

27  rather than to develop separately rules of thumb for each type of scienter allegation."  *Id.*

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                          - 3 -

A. **The Nature and Impact of Immersion's Restatement Along with Violations of Immersion's Own Accounting Policies Raise a Strong Inference of Scienter**

1. **Defendants Have Admitted Violating Basic Accounting Principles**

A restatement is an admission that prior financial statements were materially incorrect based on information available at the time they were issued. *See* ¶156 (explaining SFAS No. 154); *Omnivision*, 2005 U.S. Dist. LEXIS 16009, at *10 ("Given that the financial results for these periods were restated, the originally announced results were clearly misleading."); *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854, at *2 (N.D. Cal. Nov. 17, 2005) ("Sipex's own public admission that its financial reports . . . would be 'restated' meant that the as-issued reports were materially inaccurate under GAAP."); *In re U.S. Aggregates, Inc. Sec. Litig.*, No. C 01-1688 CW, 2003 U.S. Dist. LEXIS 12168, at *6 (N.D. Cal. Jan. 24, 2003); SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1). The explanations that accompany Immersion's restatement are an admission that defendants deliberately and falsely recognized revenue in violation not only of Generally Accepted Accounting Principles ("GAAP"), but of Immersion's "most critical accounting polic[y]." ¶¶14, 134, 152.

The Ninth Circuit recognizes that restatements and violations of GAAP, when pled with particularity, can support a strong inference of scienter. *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1016 (9th Cir. 2005) ("'overstating of revenues may state a claim for securities fraud, as under GAAP, revenue must be *earned* before it can be recognized'") (emphasis in original); *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *38 (N.D. Cal. Apr. 2, 2002) ("[I]f pled in detail and read in context, GAAP violations may support an inference of scienter."). Indeed, "books do not cook themselves." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

Here, plaintiff has alleged with particularity material restatements and GAAP violations for 2006, 2007, 2008 and 1Q09 that, coupled with other particularized facts, support a strong inference of scienter. *See, e.g.*, ¶179; *see also Daou*, 411 F.3d at 1022; *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D.

1   Cal. 2009) ("'[P]roperly pled, overstating of revenues may state a claim for securities fraud . . . .'").[4]

2   For example, in 3Q08, Immersion falsely reported medical revenues of $3.2 million and total

3   revenue of $10.1 million.  ¶18.  When it restated, Immersion conceded that it had overstated its

4   medical revenues by 36.1% and its total revenue by 15.3% for that period.  *Id.*  Of the revenue

5   falsely reported, $523,000 was booked improperly due to an improper side agreement and an

6   additional $1,299,000 because of "Undelivered Product Elements," consisting, *inter alia*, of: (i)

7   "Premature recognition of revenue for products sold with FOB [Freight on Board] Destination or

8   other similar shipping terms, or for incomplete shipment of products or storage of products following

9   shipment"; (ii) "Non-standard terms and conditions that prevented recognition of revenue upon

10  shipment . . ."; and (iii) "Lack of probable collectability at the time revenue was recognized."  ¶¶18,

11  115, 121-127.  The side agreement, signed by Immersion Medical's VP of Sales, caused $523,000

12  booked as revenue in 3Q08 to be deemed "not final" until 3Q09.  ¶¶116-120.  Revenue was

13  recognized on sales to this distributor despite the fact that "the product remained in a third-party

14  warehouse and was not shipped to the customer until the fourth quarter of fiscal 2008."  Declaration

15  of Susan S. Muck in Support of Defendants' Motion to Dismiss Consolidated Complaint ("Muck

16  Decl."), Ex. A at 6; *see also* ¶116.  Ultimately, more than $620,000 of the revenue recognized in

17  fiscal 2008 to this customer was reversed as improper and additional amounts deferred.[5]  Muck

18  Decl., Ex. A at 6.

19       That defendants violated basic accounting principals further supports a strong inference of

20  scienter.  *See, e.g., Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185-87 (S.D. Cal. 2009)

21

22  ---

    [4]     Defendants cite to a litany of cases for the unremarkable proposition that the publication of a
23  restatement and/or the acknowledgement of a GAAP violation without more does not give rise to a
    strong inference of scienter.  *See* defendants' Motion to Dismiss Plaintiff's Consolidated Complaint
24  ("MTD") at 9-10.  The Ninth Circuit clearly recognizes, however, that "significant violations of
    GAAP standards can provide evidence of scienter so long as they are pled with particularity" as they
25  are here.  *Daou*, 411 F.3d at 1022.

26  [5]     As discussed In §II.B., CW5 explains defendants Richardson and Ambler's involvement with
    international medical sales in 2008 along with the VP of Immersion Medical's International Sales
27  who signed the side agreement.  ¶127.  The sales to the side agreement customer accounted for more
    than 10% of Immersion Medical's revenue in 2Q08, 3Q08 and 4Q08.  ¶18.

28

1   (allegations that defendants shipped products prematurely in violation of basic accounting principles

2   supported the inference of scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637-

3   38 (E.D. Va. 2000) ("[V]iolations of simple rules are obvious, and an inference of scienter becomes

4   more probable as the violations become more obvious.").  Defendants also violated Immersion's

5   own internal accounting policies. *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (GAAP

6   errors that violate an internal accounting policy raise an inference of scienter.); *Atlas v. Accredited*

7   *Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) (deviation from

8   defendant's internal underwriting standards supports a strong inference of scienter); *Adaptive*, 2002

9   U.S. Dist. LEXIS 5887, at *38-*39 (violation of internal accounting policies considered as one

10  factor supporting a strong inference of scienter).  Indeed, here, defendants' conduct directly

11  contradicted their public reassurances that they "recognize revenue in accordance with applicable

12  accounting standards," and only "when persuasive evidence of an arrangement exists, delivery has

13  occurred[,] . . . the fee is fixed and determinable, and collectibility[sic] is probable."  ¶¶150-156.

14       Adding weight to the allegations of defendants' deliberate recklessness is the wealth of

15  defendants' accounting experience: (i) defendant Viegas was formerly Immersion's CFO, is a CPA,

16  and has a B.S. in Accounting and an MBA; (ii) defendant Ambler was Immersion's CFO, has a

17  degree in Accounting Studies, and is a Chartered Accountant in England and Wales; and (iii)

18  defendants Vogel and Chavez have MBAs. ¶¶30, 32-34.  Each of the defendants were well versed in

19  the basics of accounting and understood the principals of proper revenue recognition, as evidenced

20  by their stated policies. ¶¶150-151; *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 482-83 (S.D.N.Y.

21  2008) (defendants' understanding of the relevant accounting principles is a factor in finding

22  scienter).

23       **2.  Defendants' Accounting Manipulations Are Consistent with Fraud**

24       "Accurate earnings figures are vital aspects of the 'total mix of information' which investors

25  would consult when evaluating [the Company]'s stock." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 35

26  (1st Cir. 2002).  Here, defendants overstated Immersion's medical revenue by nearly 20% and

27  overall revenue by over 9% in 2008 – overstatements that were significant at the time they were

28

1   reported.   ¶18[6]; *Backe*, 642 F. Supp. 2d at 1185.   Moreover, from 2006 to 2008, defendants

2   overstated revenues by $3.7 million and net income by $3.3 million – an enormous amount for a

3   Company that reported *no* profits prior to 2007.   ¶¶3, 18, 20.   That defendants shifted fraudulently

4   reported revenues between reporting periods does not negate their fraud.   *See Batwin v. Occam*

5   *Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 U.S. Dist. LEXIS 52365, at *19, *35-*38 (C.D.

6   Cal. July 1, 2008) (finding scienter where a company understated and overstated revenue); *see also*

7   *SEC v. Leslie*, No. C 07-3444, 2010 U.S. Dist. LEXIS 76826, at *64-*65 (N.D. Cal. July 29, 2010)

8   (rejecting defendants' claim that because the company was exceeding investor expectations there

9   was no inference of scienter).

10          Defendants attempt to minimize the importance of their admittedly false reports of revenue

11   by claiming that in 2008, Immersion merely "deferred" $2 million in revenue to a later period.   MTD

12   at 10-11.   The Eighth Circuit has rejected this contention.   *Gebhardt v. ConAgra Foods, Inc.*, 335

13   F.3d 824, 830-31 (8th Cir. 2003) (rejecting defendants' ***"timing of revenue recognition" argument***

14   ***because*** a court "look[s] at the information from the perspective of a reasonable investor ***at the time***

15   ***of the misrepresentation***, not from the perspective of a reasonable investor looking back on how

16   events unfolded"; the fact that "the economy held up during the time in question, and that UAP was

17   able to deliver as promised . . . [was] not sufficient to defeat this case at the stage of a motion to

18   dismiss for failure to state a claim").   Other courts agree.   *Backe*, 642 F. Supp. 2d at 1185-86

19   (scienter sufficiently alleged where defendant violated GAAP by "mov[ing] $3.4 million originally

20   recognized in 1Q08 to 2Q08, 4% of its revenues, after conducting an enhanced review of

21   accounting"); *SEC v. Reyes*, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007) (finding that whether

22   revenue was eventually realized "is of limited significance.   ***The law assesses the materiality of a***

23   ***misrepresentation at the time it is made***, not after intervening events or remedial action . . . .").

24   _____

25   [6]       Defendants' reliance on *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063 (N.D.
Cal. 2002) is misplaced.   MTD at 11.   There, Judge Wilken specifically noted that the plaintiff did

26   not allege that the largest contributor to the restatement, a change in accounting treatment, was the
result of fraud.   *Id.* at 1073.   Further, after amendment, Judge Wilken found the plaintiff's allegations

27   of scienter based on the reports of confidential witnesses were sufficient.   *U.S. Aggregates*, 2003
U.S. Dist. LEXIS 12168.

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                                - 7 -

1   Defendants' contention that Immersion's understatement of 2007 revenue "eviscerates

2   plaintiff's fraud theory" also lacks merit.  MTD at 10.  First, "the investing community finds

3   improper revenue recognition incidents to be serious matters regardless of the direction of the

4   improper recognition."  *Omnivision*, 2005 U.S. Dist. LEXIS 16009, at *4.  Second, including

5   defendants' numerous other accounting manipulations, Immersion **overstated** its 2007 total **net**

6   **income**.  ¶20.  *Gebhardt*, 335 F.3d at 830 (overstatement of net income "may be of more

7   significance to investors" than overstatement of revenue).  Third, defendants have admitted that

8   revenue falsely reported in 2006 and 2008 (the fiscal bookends of 2007) was simply shifted to 2007.

9   ¶18; *see also* Muck Decl., Ex. A at 7 ("revenue improperly recognized in fiscal 2006 was recognized

10  in fiscal 2007").  These admissions are consistent with defendants' fraudulent scheme and are

11  bolstered by CW allegations that defendants were improperly recognizing revenue throughout the

12  Class Period.  ¶¶81-85, 124-127, 138-142.

13  Unlike *McCasland v. Formfactor Inc.*, No. C 07-5545 SI, 2009 WL 2086168, at *8 (N.D.

14  Cal. July 14, 2009), cited by defendants (MTD at 10-11), plaintiff here has "advance[d] [a]

15  persuasive theory of how" the understatement was part and parcel of defendants' fraud.  Specifically,

16  plaintiff here alleges that defendants manipulated Immersion's reported revenue and net income to

17  create the false impression that Immersion's medical line was experiencing organic growth, when it

18  was not.  These manipulations included, *inter alia*, recognizing revenue: (i) when there was no

19  suitable item in inventory to ship to the customer; (ii) on shipments of used demonstration units; (iii)

20  on products that had not shipped at all; (iv) on prototypes; (v) where there was no real indicia of

21  acceptance or assigned purchase order; and (vi) on products that were returned days after shipment

22  without adjusting the reported revenue.  ¶16; *see also* ¶¶78-85, 124-127, 138-142.  Further,

23  defendants ignore Immersion's other admitted accounting violations – which bear on the falsity of

24  defendants' representations that Immersion's financial statements fairly presented its financial

25  results and operations (when they did not).  ¶¶149-154.  Indeed, in 2007, defendants understated

26  Immersion's amortization expenses by nearly $60,000 and improperly accounted for $717,000 in

27  stock-based compensation expenses and $769,000 in interest income – resulting in an **overstatement**

28  of net income in 2007.  ¶20.

1    Finally, defendants ignore their false and misleading statements regarding 2007 revenue and

2  growth, including: (i) "if you're looking at revenue growth, we believe that the medical business

3  with the new product platform, we believe there's significant orders in the house already"[7]; (ii) that

4  the Company's 2Q07 results represented "back-to-back profitable quarters"; (iii) "we've had a lot of

5  . . . success in deploying products in China"; (iv) that the Company's 3Q07 results meant "three

6  consecutive profitable quarters with very strong year-to-date revenue growth"; (v) that as to 4Q07

7  and 2007 results, "Immersion achieved revenue growth of 25 percent and profitability in each of the

8  four quarters"; and (vi) "We have substantial organic growth opportunities."  ¶¶49, 54, 57, 63, 72.

9  These statements reflect the importance of growth in international medical sales and are belied by

10  Immersion's restatement and CW accounts of blatant earnings management, improper shipment

11  practices and GAAP violations to increase the appearance of such sales.  ¶¶78-85.  *See*

12  *Microstrategy*, 115 F. Supp. 2d at 624 (upholding §10(b) allegations that defendants left "investors

13  with the false impression that the Company's earnings and revenues were ***consistently*** increasing").[8]

14    **B.    The Confidential Witnesses Tie Defendants to the Fraud**

15    The CWs' descriptions of defendants' direct involvement and knowledge of the Company's

16  fraudulent sales and accounting practices are both reliable and indicative of scienter.  Here, the

17  Complaint describes with particularity the CWs and their positions, responsibilities and knowledge:

---

19  [7]    "Opinions such as [we believe] are actionable where there is no reasonable basis for the
20  belief or where the 'speaker is [] aware of [] undisclosed facts tending to seriously undermine the
accuracy of the statement.'" *In re Connectics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 U.S. Dist.
21  LEXIS 62515, at *23 (N.D. Cal. Aug. 14, 2008) (alterations in original) (quoting *In re Apple
Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).  Here, there was no reasonable basis for
22  defendants' beliefs.

23  [8]    Defendants insinuate – without context – that two false statements are forward-looking.
MTD at 18 n.13.  In context, for example, the statement that "significant orders in house already"
24  from the medical business gave defendants visibility into "good growth" is ***not*** forward-looking.
¶49; *see also In re AOL Time Warner, Inc. Sec. & "Erisa" Litig.*, 381 F. Supp. 2d 192, 222
25  (S.D.N.Y. 2004) ("It is well recognized that even when an allegedly false statement 'has both a
forward-looking aspect and an aspect that encompasses a representation of present fact,' the safe
26  harbor provision of the PSLRA does not apply.").  Regardless, even if viewed as forward-looking,
defendants had actual knowledge of their falsity, and no meaningful warnings are claimed.
27  Therefore, the statements are actionable.  *No. 84 Employer-Teamster Joint Council Pension Trust
Fund v. Am. West Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003).

28

1   (i) a Senior Accountant at Immersion Medical from April 2004 to May 15, 2009 (CW1); (ii) a

2   Customer Service Manager, Director of Assembly and Production Manager for Immersion Medical

3   from October 2005 to July 2009 (CW2); (iii) a VP of Domestic Sales at Immersion Medical from

4   February 1, 2009 to April 30, 2009 (CW3); (iv) a VP of Domestic and International Sales for

5   Immersion Medical from 2002 to March 2007 (CW4); and (v) a Corporate Controller from

6   Immersion Medical throughout the Class Period until June 2009 (CW5).   ¶¶40-44.   These

7   descriptions are more than adequate to meet the PSLRA's requirements for confidential witnesses.

8   *Daou*, 411 F.3d at 1015-16 (allegations of job description and job responsibilities provides a "large

9   degree of specificity" which "'support[s] the probability that a person in the position occupied by the

10  source would possess the information alleged'").

11          The CW allegations also establish scienter.  For example, CW1, a Senior Accountant, details

12  defendants' direct involvement in Immersion's improper sales and revenue recognition.  ¶40.  CW1

13  explained that: (i) Immersion booked medical sales to Chinese customers when there was no item in

14  inventory to ship; (ii) defendant Vogel insisted on shipping units not proper for sale; (iii) Immersion

15  executives were aware that the shipping department was bullied to ship products without signed

16  POs; (iv) Immersion booked sales to Asian customers whose legitimacy was difficult to ascertain;

17  (v) many Asian medical accounts remained unpaid throughout the Class Period; and (vi) by early

18  2009, defendant Ambler and the Finance Group he headed were scrambling to provide information

19  to Immersion's outside auditor, Deloitte & Touche LLP, regarding certain Asian sales.  ¶¶83-84,

20  124, 138, 140-141, 171.  CW1 had constant disagreements with the Medical Division about booking

21  sales on these orders, including with defendant Vogel face-to-face and by e-mail.  ¶83.  CW1 also

22  details defendants' knowledge of the lack of collectability of Immersion Medical's accounts – the

23  Medical Division had to inform corporate of the status of its outstanding receivables in order to

24  borrow money to make its payroll.  ¶142.

25          Relying on *In re Cadence Design Sys., Inc. Sec. Litig. ("Cadence I")*, 654 F. Supp. 2d 1037

26  (N.D. Cal. 2009), defendants claim that "the brand of intentional fraud alleged here" would have

27  required CW1 (as well as a "team" of finance personnel and accountants) to be complicit in the

28  fraud.  MTD at 16 n.12.  Not so.  First, *all* five CWs state that Ambler made the decisions to

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                    - 10 -

1   recognize revenue, not a "team" of finance personnel.  ¶¶42, 82, 85, 171; *see also Cabletron*, 311

2   F.3d at 30 (consistent witness accounts reinforce one another).  Second, CW5 makes it clear that,

3   after defendant Richardson was appointed CEO, there was ***no*** collaboration on revenue recognition

4   for Immersion Medical.  ¶¶44, 126-127.  Third, both CW1 and CW5 explain that the level of review

5   for revenue recognition was limited to a handful of people, hardly the "multiple personnel and levels

6   of review" at issue in *Cadence I*.  ¶¶40, 44; MTD at 16.  Fourth, defendants' fraud was not limited to

7   issuing false statements regarding Immersion's revenue but also included statements regarding

8   Immersion's stocked based compensation (¶¶144-145), amortization expenses (¶146), interest

9   income (¶¶147-148), accounting policies (¶¶149-156) and internal controls (¶¶157-165) – areas of

10  defendants' expertise.

11      Defendants also contend that the witnesses must cry fraud in order for the Court to consider

12  the facts attributed to them.  MTD at 15 ("Not One of Plaintiff's Confidential Witnesses Alleges

13  That Defendants Committed Fraud."); *id.* at 14 (no "first-hand knowledge of any impropriety or

14  event giving rise to a strong inference of scienter" is ascribed to the CWs).  Not so.  Even at trial,

15  percipient witnesses are not required to be experts in securities law.  The CWs' accounts are to be

16  viewed in totality with other allegations inferring scienter.  *Tellabs I*, 551 U.S. at 322-32.[9]

17      Other CWs corroborate CW1's allegations.  For example, CW2 confirmed that Immersion

18  improperly shipped medical prototypes to customers in order to recognize sales and accepted

19  returned products, despite its stated no return policy.  ¶¶41, 85, 124-125, 138, 151.  CW2 identified

20  ***many instances*** when customers returned products to the Medical Division, sometimes within a

21  matter of days, and specifically recalled numerous such returns by Asian customers by the spring of

22  2008.  ¶173.  CW2 also explained that Immersion closely tracked its returns.  *Id.*

23      CW3 specifically ties defendant Chavez to the transactions involving Immersion's Medical

24  sales.  ¶42.  CW3 provided defendant Chavez with forecast information that informed him (and all

25

26  [9]     The who, what, when and why standard defendants seek for the Court to impose in
    determining scienter does not exist – that standard applies to falsity.  MTD at 17.  Under *Tellabs I*,
27  the correct standard here is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong
    inference of scienter."  *Tellabs I*, 551 U.S. at 322-23 (emphasis in original).

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                    - 11 -

1  defendants, as it was widely available) of when sales were technically closed and financially closed.

2  ¶174.  Given the nature of the fraud here (*e.g.*, improperly recognizing revenue on products not

3  shipped or knowing they would be returned), the information provided by CW3 to defendant Chavez

4  would have alerted him that revenue recognition on such sales was improper.

5       CW4 directly informed defendant Ambler of Immersion Medical's Daily Sales Outstanding

6  ("DSOs").  ¶¶43, 177.  According to CW4, international medical customers typically had DSOs

7  greater than 180 days, and the Company's Chinese distributor had the longest outstanding payments

8  due of any customer – evidencing problems receiving payments from these customers. ¶177. CW4

9  also details weekly Medical Division management meetings held by defendant Vogel and quarterly

10  management meetings held to discuss Immersion's medical business attended by defendants Viegas,

11  Richardson and Ambler.  ¶176.[10]

12       CW5 details defendants Ambler's and Richardson's involvement in medical sales and states

13  that ***all*** sales documentation regarding the improper medical sales was sent to Immersion's

14  headquarters for revenue recognition.  ¶¶44, 82, 126, 172.  CW5 specifically details defendants

15  Richardson and Ambler's involvement with medical sales to a certain Chinese customer in 2008,

16  which other CWs confirm was part of the restated transactions. ¶¶127, 139, 172.  CW5's account is

17  corroborated by defendant Richardson's own admission on October 30, 2008 that he traveled to Asia

18  and "personally assist[ed]" with medical sales.  ¶172.  CW5 also directly informed defendant

19  Richardson and Ambler about these improper sales and conferred with defendant Ambler regarding

20  revenue recognition on medical sales at the end of every quarter until defendant Richardson was

21  appointed CEO on April 28, 2008, when the collaboration ceased.  ¶¶44, 126, 172.  At that time,

22  defendant Richardson wanted Immersion's corporate headquarters (*i.e.*, Richardson and Ambler) to

23

24  [10]   That CW4 was employed at Immersion immediately prior to the Class Period, rather than

25  during the Class Period, does not discount his reliability, as defendants claim.  *See In re Cadence Design Sys., Inc. Sec. Litig. ("Cadence II")*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010)

26  ("'personal knowledge'" is not "a hard-and-fast requirement"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (holding that "[p]re-class data is relevant" to defendants knowledge

27  of the basis of the fraud).  Here, the Complaint specifically describes CW4's experience and knowledge at Immersion sufficient to establish his reliability.  ¶¶43, 85, 171, 176-177.

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                    - 12 -

1   more closely control the Medical Division's operations and recognition of revenue.  ¶¶44, 126.

2   Notably, Immersion entered into an improper "side agreement" with an international customer

3   shortly thereafter, at a time when defendants Richardson and Ambler controlled Immersion's

4   revenue recognition.  ¶¶116-120, 126-127.  The CW allegations here are far weightier than "bare

5   allegations" that defendants' access to financial statements would have informed them of an

6   accounting error.  MTD at 17 (citing *In re Century Aluminum Co. Sec. Litig.*, No. C 09-1001 SI,

7   2010 WL 1729426, at *7 (N.D. Cal. Apr. 27, 2010)).  Here, the allegations provide specifics about

8   defendants' direct involvement in fraudulently reporting false financial statements and support a

9   strong inference of scienter.

10   **C.     The Core Business Inference  – Even Standing Alone – Satisfies the
              Ninth Circuit's Standard for Pleading Scienter**

11       In *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), the Ninth Circuit found

12   that management's role in the business could satisfy the pleading requirement for scienter – even

13   standing alone – where the events were so significant to the business's present and future revenues

14   that it would be "absurd" to suggest that management was unaware of them.  *Id.* at 987-88.  In *South

15   Ferry*, the court acknowledged that "the core-operations inference can be one relevant part of a

16   complaint that raises a strong inference of scienter."  *South Ferry*, 542 F.3d at 784.

17       Here, it is undisputed that Immersion is a small company with relatively few medical sales

18   which were a "vital growth" driver and that leadership was "very hands-on."  ¶¶36, 182-183.  It is

19   also undisputed that during the Class Period, defendants controlled Immersion's Medical Division,

20   improperly recognized revenue on nearly 20% of its medical sales in 2008 alone and falsely reported

21   Immersion's financials.  As in *Berson*, it would be "absurd" to infer that defendants were unaware of

22   these violations.  *Berson*, 527 F.3d at 987-88; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*

23   *("Tellabs II")*, 513 F.3d 702, 709 (7th Cir. 2008) ("That no member of the company's senior

24   management who was involved in authorizing or making public statements about the demand for the

25   [company's key products] knew that they were false is very hard to credit . . . ."); *In re The PMI*

26   *Group, Inc. Sec. Litig.*, No. C 08-1405 SI, 2009 U.S. Dist. LEXIS 101582, at *8-*9 (N.D. Cal.

27   Nov. 2, 2009) (scienter shown by access to negative internal reports regarding area of business that

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                    - 13 -

1  defendants touted as critical to the company's success); *In re Commtouch Software Ltd. Sec. Litig.*,

2  No. C 01-00719 WHA, 2002 U.S. Dist. LEXIS 13742, at *27-*28 (N.D. Cal. July 24, 2002) (finding

3  that given the modest size of the company, top management, particularly the CEO and CFO, were

4  likely to have been aware of accounting problems that led to a restatement of at least $500,000 in

5  revenue for each of several transaction).  Here, the Complaint's allegations "are particular and

6  suggest that defendants had actual access to the disputed information," such that they "independently

7  satisfy the PSLRA." *South Ferry*, 542 F.3d at 786.

8      **D.    Defendants Received Millions from Insider Trading and Other**
        **Compensation as a Result of Their Fraud Which Reinforce Scienter**
9

10      "'Unusual trading or trading at suspicious times or in suspicious amounts by corporate

11  insiders has long been recognized as probative of scienter.'"  *Daou*, 411 F.3d at 1022-24; *see also*

12  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).

13  "'Among the relevant factors to consider are: (1) the amount and percentage of shares sold by

14  insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior

15  trading history.'"  *Am. West*, 320 F.3d at 938.

16      Here, defendants' sales were suspicious in timing and amount and inconsistent with their

17  prior trading practices.  During the Class Period, defendants Viegas, Ambler and Vogel sold ***93%***,

18  ***100%***, and ***100%*** of their holdings, respectively, shortly after defendants' 2007 misrepresentations

19  while Immersion's stock was trading at or near all-time highs.   ¶¶186-87; *see In re Secure*

20  *Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 989-90 (N.D. Cal. 2001) (sales shortly after

21  management's optimistic statements to the market "makes them suspicious"); *In re Tut Sys. Sec.*

22  *Litig.*, No. C 01-02659 CW, 2002 U.S. Dist. LEXIS 27092, at *39 (N.D. Cal. Aug. 15, 2002) (sales

23  while "stock was trading at all-time highs, give rise to a strong inference of scienter").  These sales

24  were accompanied by four Immersion directors selling 67%-90% of their holdings.  *See* Complaint,

25  Ex. A; *Am. West*, 320 F.3d at 940 (insider sales of non-speakers indicative of scienter); *Daou*, 411

26  F.3d at 1024 (sales by non-defendant executives add to scienter); *Secure*, 184 F. Supp. 2d 980, 989

27

28

1   (N.D. Cal. 2001) (selling in unison found "uniquely" suspicious); *compare* MTD at 19 n.14 (citing

2   case with sales of 1.4% by a single insider)).[11]

3         Further, defendant Viegas had sold only twice since 2000 (15,213 shares total compared to

4   125,000 during the Class Period), and defendants Ambler and Vogel had no sales in the several years

5   prior to the Class Period.  ¶188; *see Backe*, 642 F. Supp. 2d at 1191 (finding that stock sales raise a

6   "strong inference of scienter" where "sales are out of proportion with prior trading practices and

7   suspiciously timed"); *compare* MTD at 19 n.14 (citing case where defendants had a history of selling

8   stock following earnings releases).  Viegas sold for proceeds of $1.9 million, six times his 2007

9   salary of $300,000.  Radcliffe Decl., Ex. 2.  Ambler sold for proceeds of $639,000, almost triple his

10   2007 salary of $214,240.  *Id.  In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d

11   Cir. 2005) (finding that a defendant's stock sales earning him multiples of his annual salary to be

12   probative of scienter).

13         That some of these sales were made pursuant to 10b5-1 trading plans does not "rebut[] any

14   inference of scienter," as defendants claim.  MTD at 18.  It is well established that "[t]rading plans

15   are ***not*** a cognizable defense to scienter allegations on a motion to dismiss where, as here, they were

16   adopted during the Class Period."  *Freudenberg v. E*Trade Fin. Corp.*, No. 07 CIV. 8538, 2010

17   U.S. Dist. LEXIS 46053, at *78 (S.D.N.Y. May 11, 2010); *Cent. Laborers' Pension Fund v.*

18   *Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) ("[T]he attempt to use the 10b5-1

19   Plan as a non-suspicious explanation is flawed because, *inter alia*, Reynolds entered into the Plan

---

22   [11]     Defendants hope to minimize the percentage of shares sold by including options as retained

23   holdings.  MTD at 19.  However, "vested options are ***not*** shares" and should not be included in defendants' retained holdings.  *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999); *Am. West*, 320 F.3d at 939 n.16 (considering only actual stock holdings and

24   ***exercised*** options to calculate the percentage of shares sold); *Backe*, 642 F. Supp. 2d at 1184 (excluding vested options); *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100

25   (S.D.N.Y. 2006) (same).  Even including options, however, defendants' Class Period sales – ***10%*** (Viegas), ***20%*** (Ambler) and ***100%*** (Vogel) – were unusual and suspicious.  Complaint, Ex. A; *see,*

26   *e.g.*, *Batwin*, 2008 U.S. Dist. LEXIS 52365, *41-*48 (sale of 7% was suspicious); *Secure*, 184 F. Supp. 2d at 989 (sales of 6.3%, 7% and 13.6% were suspicious); *compare In re Skechers U.S.A., Inc.*

27   *Sec. Litig.*, 273 Fed. Appx. 626, 628 (9th Cir. 2008) (noting defendants had sold large amounts of stock during the same period the prior year).

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC           - 15 -

during the Class Period.").  Moreover, the use of a trading plan is an affirmative defense that is inappropriate to consider on a motion to dismiss:

> "[A] 10b5-1 trading plan does not provide an absolute defense to a claim of insider trading.  Rather, it requires an additional factual finding of good faith.  Not only can this Court not make such factual findings when considering a motion to dismiss, but this Court must also draw all inferences in favor of the non-moving party."  Therefore, here, the Court cannot, as Defendants suggest, infer from the fact that Defendant Yoseloff entered into a 10b5-1 trading plan as a "strong inference against scienter."

*Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009).  Critically, here, none of Vogel's sales were made pursuant to a 10b5-1 trading plan, nor were defendants Ambler's and Viegas' sales on August 27, 2007 and May 25, 2007, respectfully.  ¶188.[12]

Immersion's stock repurchase plan also does not help defendants.  Here, Immersion initiated the stock repurchase plan to "complement Immersion's recently announced growth initiatives," while at the same time defendants were: (i) touting Immersion's "expanding international [medical] sales"; (ii) improperly recognizing revenue on those sales; and (iii) just days before Ambler and Vogel unloaded *all* of their remaining Immersion stock.   Radcliffe Decl., Ex. 3; ¶¶66, 187.  Moreover, the Company's stock repurchase had the effect of increasing its reported earnings because the denominator used for calculating earnings per share was reduced.  Rather than rebut scienter, these facts "create[] a strong inference that [Immersion's] explanation for its stock repurchase plan was economically suspect."  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1188 (C.D. Cal. 2008); *Am. West*, 320 F.3d at 928-29, 938-41 (finding scienter where a stock repurchase plan was used "as a 'manipulative device designed to further inflate its price'").[13]

---

[12]     Defendants hope to minimize the percentage of Vogel's sales by including options he forfeited during the Class Period as retained holdings.  MTD at 19.  These options, however, were *not* retained.  Rather, Vogel sold *100%* of his actual holdings and was forced to forfeit his remaining options in connection with his ouster from the Company during the Class Period – facts that weigh strongly *in favor* of an inference of scienter.  *Fouad v. Isilon Sys., Inc.*, No. C 07-1764 MJP, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) ("The timing of [defendants'] departure from [the company] supports an inference of scienter.").

[13]     Defendants' claim that "[n]o rational officer or director would approve these purchases at a time he knew the stock was artificially inflated" lacks merit.  MTD at 20.  Here, Immersion's board of directors, *not* management, authorized the share repurchases in November 2007 pursuant to a

Defendants Chavez and Richardson's minimal purchases of shares in 2008 and 2009, following the partial disclosures alleged, likewise do not negate scienter.  *See Fouad*, 2008 WL 5412397, at *11 (rejecting defendants' argument that class period stock purchases negate a strong inference of scienter); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (same).  Indeed, defendant Chavez received 4,000 shares for free based on Immersion's misstated 4Q08 performance.  Muck Decl., Ex. F.

"A motive to defraud based on compensation incentives such as bonuses . . . also may strengthen an inference of scienter."  *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008).  Here, defendants received bonuses tied **directly** to the Company's misstated financial performance, including the Medical Division and international revenue in that division.  ¶189; *see Am. West*, 320 F.3d at 944 (executive bonuses tied to the company's financial performance supported a "strong inference of scienter"); *In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1216 (W.D. Wash. 2009) (same).  Such bonuses are "probative of scienter because they show a motive to commit securities fraud."  *Burritt v. NutraCea*, No. CV-09-00406-PHX-FJM, 2010 U.S. Dist. LEXIS 17544, at *15 (D. Ariz. Feb. 25, 2010).

E.      **The Abrupt Departures of Defendants Ambler, Chavez and Richardson Add Weight to the Scienter Mix**

Defendants also tactically ignore that three of the five individual defendants left the Company under the taint of accounting violations.  Here, the terminations of defendants Ambler, Chavez and Richardson were sudden and uncharacteristic of the Company's hiring and firing practices.  ¶168.  Ambler was Immersion's CFO and VP of Finance for five years before he departed, and Immersion had no immediate replacement.  ¶32.  Likewise, Immersion had no ready replacement for defendant Richardson, who had been Immersion's CEO for less than a year and half before he was ousted.  ¶¶31, 168.  The last person to hold the position of Immersion's CEO had been defendant Viegas, who held the position for five and a half years.  ¶30.  Similarly, Immersion had no

_____

trading plan.  Muck Decl., Ex. A at 38.  Thus, here, **none** of the defendants "approve[d]" share repurchases in 2008 (or at the time of the improper side agreement), as defendants suggest.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                    - 17 -

1  ready replacement for defendant Chavez, who acted as the Senior VP and General Manager of

2  Immersion for one year, while his predecessor held the same position for over four years. ¶¶33-34.

3  Here, the circumstances and "timing of [defendants'] departure from [the Company] supports an

4  inference of scienter." *Fouad*, 2008 WL 5412397, at *11; *see Adaptive*, 2002 U.S. Dist. LEXIS

5  5887, at *14 (terminations or resignations may support a strong inference of scienter at or near the

6  time of a restatement); *In re Impax Labs., Sec. Litig.*, No. C 04-04802 JW, 2007 U.S. Dist. LEXIS

7  52356, at *26-*27 (N.D. Cal. July 18, 2007) ("particularly when such 'corporate reshuffling' occurs

8  in tandem with financial restatements, these changes 'add one more piece to the scienter puzzle'").

9      **F.**    **Defendants' False SOX Certifications Contribute to a Strong**
   **Inference of Scienter**

10

11      The Sarbanes-Oxley Act of 2002 ("SOX") requires CEOs and CFOs to know and certify: (i)

12  that the Company's financial results are accurate; and (ii) that they "designed," reviewed, and

13  ensured that internal disclosure controls were adequate to prevent misstatements and fraud.

14  (Conference Report on H.R. 3763, SOX, 148 Cong. Rec. H5462 (July 25, 2002)); (also available at

15  www.sec.gov/rules/final/33-8124.htm); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061

16  (9th Cir. 2000) ("[W]hen a corporate officer signs a document on behalf of the corporation, that

17  signature will be rendered meaningless unless the officer believes that the statements in the

18  document are true.").

19      SOX certifications are "'probative of scienter if the person signing the certification was

20  severely reckless in certifying the accuracy of the financial statements.'" *Glazer Capital Mgmt., LP*

21  *v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d

22  1255, 1266 (11th Cir. 2006) (finding that false certifications raise strong inference of scienter if a

23  person "had reason to know, or should have suspected, due to the presence of glaring accounting

24  irregularities or other 'red flags,' that the financial statements contained material misstatements or

25  omissions")). Courts also recognize that SOX certifications are actionable as misrepresentations and

26  evidence of a strong inference of scienter where, as here, those certifications contradict known facts

27  concerning accounting violations and reckless internal controls. *See In re Lattice Semiconductor*

28  *Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *50-*51 (D. Or. Jan. 3, 2006);

1   *In re Am. Serv. Group, Inc.*, No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, at *116-*118 (M.D.

2   Tenn. Mar. 30, 2009).  Here, the Complaint specifically alleges both falsity and scienter as to the

3   SOX certifications signed by Richardson, Viegas, and Ambler (¶¶164-165), and as to defendants'

4   statements concerning Immersion's internal controls and accounting policies (¶¶149-163, 165).

5   Defendants have no response other than to say there is no scienter.

6   **III.  DEFENDANTS CHAVEZ AND VOGEL ARE LIABLE FOR
        MATERIALLY FALSE AND MISLEADING STATEMENTS AND**
7   **    OMISSIONS**

8        Defendants contend that plaintiff fails to state a claim against defendants Vogel and Chavez

9   because they are not alleged to have made any statements.[14]  The Supreme Court has rejected this

10  argument:

11        If this conclusion were read to suggest there must be a specific oral or written
          statement before there could be liability under §10(b) or Rule 10b-5, it would be
12        erroneous.  ***Conduct itself can be deceptive***.

13  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008)[15]; *see also*

14  *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 153 (1972) (noting that Rule 10b-5 is not

15  limited to untrue statements, but also prohibits a deceptive "course of business," "'device, scheme,

16  or artifice'"); *SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("neither the SEC nor this Court has ever

17  held that there must be a misrepresentation about the value of a particular security in order to run

18  afoul of the Act").  Rather, §10(b) and Rule 10b-5 should be interpreted flexibly in order "'to insure

19  honest securities markets'" and "'to achieve a high standard of business ethics.'"  *Id.* at 819 (quoting

20  _____

21  [14]     Defendants Chavez and Vogel are also charged with violations as control persons under
22  §20(a) and, as to defendant Vogel, insider trading in violation of §20A.  The arguments raised by
     defendants as to attribution do not pertain to these separate claims.  It is also worth noting that
23  scienter is imputed to Immersion for the acts of these and other defendants and officers, including
     the Medical VP of International Sales, who signed the improper side agreement.  *See In re Cylink*
24  *Sec. Litig.*, 178 F. Supp. 2d at 1077, 1088 (N.D. Cal. 2001) ("So long as scienter is appropriately
     alleged for the officers and directors of a company, then it is appropriately alleged for the company
25  itself."); *Cadence II*, 692 F. Supp. 2d 1181 (imputing scienter to corporation); *Tellabs II*, 513 F.3d at
     710 (same).

26  [15]     The defendants here are not customers or supplies as in *Stoneridge*, 552 U.S. at 160-61, they
27  were responsible for the natural consequence of their deceptive acts – false and misleading
     statements issued to investors.

28

1   *United States v. O'Hagan*, 521 U.S. 642, 658 (1977)).  Moreover, "[c]orporate officers . . . may not

2   stand idly by as investors and analysts, upon whose recommendations other investors rely, are

3   misled."  *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Group*, No. CV-09-00214-

4   JLQ, 2010 WL 2264962, at *9 (E.D. Wash. Jun. 2, 2010).

5          Here, defendants Vogel and Chavez "substantially participated" in the preparation of the

6   alleged misstatements and were direct participants in the scheme to defraud investors.  *Howard*, 28

7   F.3d at 1061.  As Senior VPs and General Managers of Immersion Medical, the division that was

8   falsifying financials, Vogel and Chavez were ***directly responsibl***e for the fraudulent revenue, income

9   and earnings reported to investors.  ¶¶36, 38.  *See In re Nextcard, Inc.  Sec. Litig.*, No. C 01-21029

10   JF (RS), 2006 U.S. Dist. LEXIS 16156, at *12 (N.D. Cal. Mar. 20, 2006) ("Section 10(b) liability

11   extends to those who substantially contribute to the drafting of allegedly misleading statements.")

12   (citing *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1041 (C.D. Cal. 2003)).  Both

13   were involved in shipping, booking and monitoring the fraudulent medical sales during the Class

14   Period.  ¶¶35, 83, 124, 138, 171, 174, 182.  Additionally, where, as here, defendants were in a

15   position of power in a close knit executive group of a small company, defendants' participation in

16   the alleged fraud is inferred.  *Cadence II*, 692 F. Supp. 2d at 1191-93 (finding allegations of fraud

17   sufficient as to a corporate officer who did not sign the false statements at issue).[16]

18   **IV.    PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION**

19          To plead loss causation after *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), a

20   plaintiff need only provide a short, plain statement, consistent with Federal Rule of Civil Procedure

21   8(a), that "provides the defendants with notice of what the relevant economic loss might be or of

22   what the casual connection might be between that loss and the misrepresentation" alleged in the

23   complaint.  *Id.  See also Daou*, 411 F.3d at 1026 (Loss causation is adequately pled where the

24   ───────────────

25   [16]    While plaintiff has alleged a cause of action against defendants Vogel and Chavez without
    the group pleading doctrine, the Ninth Circuit has not shut the door on the use of the group pleading
26   doctrine in this Circuit.  *Glazer*, 549 F.3d at 743-44 (discussing the rejection of the group pleading
    doctrine in other circuits but not adopting that position).  This recent guidance from the Ninth Circuit
27   deviates from the district court opinions defendants cite for the proposition that the group pleading
    doctrine has been rejected.

28

1    plaintiff gives "some indication" that the drop in stock price was "causally related" to the

2    defendants' fraud.).  This requirement "should not prove burdensome for a plaintiff."  *Dura*, 544

3    U.S. at 347.  "[S]o long as the plaintiff alleges facts to support a theory that is not facially

4    implausible . . . a Rule 12(b)(6) dismissal is inappropriate."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d

5    1049, 1057 (9th Cir. 2008), *cert. denied, Gilead Scis., Inc. v. St. Clare*, __ U.S. __, 129 S. Ct. 1993

6    (2009).

7           "A plaintiff is not required to show 'that [defendants'] misrepresentation was the ***sole*** reason

8    for the investment's decline in value[.]'"  *Daou*, 411 F.3d at 1025 (emphasis in original).  Rather,

9    plaintiff need only allege that defendants' misrepresentations were a "'***substantial cause***' . . . for the

10   decline in the value of the securities[.]"  *Gilead*, 536 F.3d at 1055-56.  So "'long as the

11   misrepresentation is one substantial cause of the investment's decline in value, other contributing

12   forces will not bar recovery under the loss causation requirement[.]"  *Daou*, 411 F.3d at 1025.

13          Defendants contend that "[n]ot one of the four alleged corrective disclosures reveals any

14   prior misstatement or other misconduct, and therefore . . . the associated stock price declines cannot

15   be linked to fraud."  MTD at 22.  Defendants misconceive the loss causation standard.  A

16   "corrective" disclosure need not specifically admit the defendants' misconduct or correct a prior

17   misstatement.  *See Daou*, 411 F.3d at 1026.  As defendants' cited authority makes clear, "neither

18   *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled."

19   *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008); *see also In re*

20   *Apollo Group, Inc. Sec. Litig.*, No. 08-16971, 2010 U.S. App. LEXIS 14478, at *2-*3 (9th Cir. June

21   23, 2010).

22          Instead, as here, "'loss causation may be premised on partial revelations that do not uncover

23   the complete extent of the falsity of specific prior statements.'"  *Burritt*, 2010 U.S. Dist. LEXIS

24   17544, at *26; *New Century*, 588 F. Supp. 2d at 1236 ("The truth need not be revealed to the market

25   through a single, complete disclosure."); *Wash. Mut.*, 694 F. Supp. 2d at 1224 ("Revelation of the

26   fraud need not be complete for loss causation to be adequately pled.").  Indeed, "if a 'complete'

27   corrective disclosure were required, defendants could 'immunize themselves with a protracted series

28   of partial disclosures.'"  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir.

1  2009); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("[R]eading

2  *Dura* to require proof of a complete, corrective disclosure [of prior misstatements] would allow

3  wrongdoers to immunize themselves with a protracted series of partial disclosures.").  The Supreme

4  Court in *Merck & Co. Inc. v. Reynolds*, __ U.S. __, 130 S. Ct. 1784 (2010) recently recognized that a

5  loss can occur before discovery of the fraud that caused it.  *Id.* at 1793-94.

6        Here, the Complaint identifies four partial disclosures that removed the artificial inflation

7  caused by defendants' fraud.  First, on July 31, 2008 and March 2, 2009, defendants announced

8  disappointing results for 2Q08 and 4Q08/fiscal 2008, respectively.  ¶¶191-192. Despite defendants'

9  characterization of these announcements as "run-of-the-mill earnings releases" (MTD at 22), these

10  negative disclosures were the ***direct result*** of defendants' fraudulent accounting practices.  ¶¶98-99,

11  110-112, 115-116; *see Daou*, 411 F.3d at 1026 (finding loss causation where disclosure of financial

12  loss was the "***direct result of prematurely recognizing revenue***") (emphasis in original);

13  *UTStarcom*, 617 F. Supp. 2d at 977-78 (finding loss causation where defendants partially disclosed

14  the negative impact of revenue recognition problems over time).  As a result of these disclosures,

15  Immersion's stock price collapsed 18% and 29%, respectively.  ¶¶191-192; *see In re LDK Solar Sec.*

16  *Litig.*, 255 F.R.D. 519, 529 (N.D. Cal. 2009) (Stock price drops following alleged corrective

17  disclosures suggest that the disclosures "introduced significant new information into the market

18  regarding the fraud."); *see also Huberman v. Tag-It Pac., Inc.*, 314 Fed. Appx. 59, 61-62 (9th Cir.

19  2009).[17]

20        Next, on May 4, 2009, defendants disclosed that the Company was having problems

21  receiving payments from international customers - directly contradicting their earlier statements that

22

23  [17]      Defendants' claim that an announcement of disappointing earnings results cannot serve as a
24  corrective disclosure as a matter of law lacks merit.  MTD at 22.  That contention was flatly rejected
   in *Flowserve*, 572 F.3d at 230-32.  As the Ninth Circuit recognized in *Daou* and *Gilead*, it makes
25  little sense to require a full public disclosure of defendants' fraudulent practices in order for
   plaintiffs to plead loss causation.  *See Daou*, 411 F.3d at 1026; *Gilead*, 536 F.3d at 1058.  Rarely are
26  defendants so forthcoming about their fraud.  Losses can be, and often are, caused by partial
   disclosures of the ***impact*** of the fraud, *e.g.*, a less-robust financial condition caused or concealed by
27  defendants' fraud.  *See Daou*, 411 F.3d at 1026; *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D.
   534, 546-47 (N.D. Cal. 2009).

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC                                          - 22 -

1    Immersion was experiencing "a lot of success," "substantial growth" and "robust" sales from these

2    customers and partially revealing defendants' improper revenue recognition on these sales. ¶¶57, 83,

3    98, 102, 105, 131-132. Immersion's stock price fell another 20% as a result of this disclosure. ¶193.

4         Finally, on July 1, 2009, defendants disclosed that Immersion was conducting an internal

5    investigation into improper revenue transactions in its medical business. ¶¶166-167. This disclosure

6    "put the market on notice that [a restatement] might be forthcoming" and caused the Company's

7    stock price to plummet another 23%. ¶193; *Rudolph v. UTStarcom*, No. C 07-04578 SI, 2008 WL

8    4002855, at *4 (N.D. Cal. Aug. 21, 2008) (announcement of internal investigation into fraudulent

9    practices is a sufficient corrective disclosure); *New Century*, 588 F. Supp. 2d at 1237 (same).

10   Accepted as true, these allegations of significant price declines and partial negative news "are

11   sufficient to provide [defendants] with some ***indication*** that the drop in [Immersion's] stock price

12   was causally related to [defendants'] financial misstatements reflecting [their] practice of

13   prematurely recognizing revenue before it was earned." *Daou*, 411 F.3d at 1026.

14   **V.   DEFENDANTS ARE LIABLE AS CONTROL PERSONS UNDER §20(a)**

15        To state a §20(a) claim, plaintiff must allege, consistent with Rule 8: (i) a primary violation,

16   of the Exchange Act; and (ii) that defendants had direct or indirect power or control over the primary

17   violator. *Am. West*, 320 F.3d at 945; *Teamsters Local 617 Pension & Welfare Funds v. Apollo*

18   *Group, Inc.*, 690 F. Supp. 2d 959, 965-70 (D. Ariz. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550

19   U.S. 544, 555, 570 (2007). "[I]t is not necessary to show actual participation or the exercise of

20   actual power," rather, a plaintiff need only show that defendants were in a position of control.

21   *Howard*, 228 F.3d at 1065. Because §20(a) is remedial in purpose, it "should be construed liberally

22   and flexibly." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987); *accord*

23   *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990) (en banc). Any doubts

24   concerning control should be resolved in favor of upholding §20(a) pleading and allowing the

25   development of proof in discovery. *Howard*, 228 F.3d at 1065-66.

26        As set forth above, plaintiff has sufficiently alleged primary violations of both §§10(b) and

27   20A of the Exchange Act. Plaintiff also alleges that each of the individual defendants exercised

28   control over Immersion's medical sales and revenue recognition, and that Immersion itself controlled

the individual defendants as well as all of Immersion's officers, directors and employees, including Immersion Medical's VP of International Sales who entered into the improper side agreement. ¶¶36, 37, 210. These allegations are sufficient to state a §20(a) claim. *See Cadence II*, 692 F. Supp. 2d at 1193-94; *Adaptive*, 2002 U.S. Dist. LEXIS 5887, at *56-*57.[18]

## VI. DEFENDANTS VIEGAS, AMBLER AND VOGEL VIOLATED §20A OF THE EXCHANGE ACT

To adequately plead a §20A violation, "a plaintiff must plead (1) a predicate violation of the securities laws, . . . and (2) facts showing that the trading activity of plaintiffs and defendants occur[red] 'contemporaneously[.]'" *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1074 (C.D. Cal. 2008). As set forth above, plaintiff has adequately alleged a predicate violation under §10(b). Plaintiff has also adequately alleged contemporaneous trades with defendants. Specifically, plaintiff purchased Immersion stock: (i) on September 25, 2007 – within two and three days of defendant Viegas' September 27 and 28, 2007 sales, respectively; (ii) on November 6, 2007 – ***the same day*** as defendant Ambler's November 6, 2007 sales; and (iii) on November 7, 2007 – within one day of defendant Ambler's November 6, 2007 sales and ***the same day*** as defendant Vogel's November 7, 2007 sales. ¶213; Complaint, Ex. A. Such allegations suffice. *Johnson v. Aljian*, 257 F.R.D. 587, 593-95 (C.D. Cal. 2009) (Purchases within four days of defendants' sales "are properly treated as contemporaneous trades."); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (Purchases within three and eight days of defendants' sales were "contemporaneous.").

Defendants nevertheless contend that "plaintiff's 20A claim fail because the Complaint lacks particularized facts establishing that defendants sold Immersion stock on the basis of material non-public information." MTD at 25. The Ninth Circuit, however, does not require plaintiff to specify the precise material non-public information known to defendants at the exact moment they sell

---

[18]     Defendants' reliance on *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996) is unavailing. *Paracor* addressed a "director-corporation relationship" at summary judgment, not management's liability as control person under a Rule 8 standard on a motion to dismiss, as here. *Id.* at 1163-64. The Ninth Circuit acknowledged that a defendants' position as an officer or director "is sort of a red light" with respect to being in control of a company. *Id.*

1  stock; rather plaintiff need only allege scienter as to his §10(b) claims (which he has done here) to

2  properly allege that defendants sold Immersion stock on the basis of material, non-public

3  information. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870, 872 (9th Cir. 1993).

4      *Neubronner v. Milken*, 6 F.3d 666 (9th Cir. 1993), on which defendants rely, is inapposite.

5  There, the court found that the plaintiff failed to sufficiently plead an insider trading violation ***under***

6  ***§10(b)*** because he failed to allege: (i) the date of his contemporaneous trades; and (ii) the

7  defendant's involvement in the fraud with particularity, under Rule 9 (*i.e.*, a §10(b) violation). *Id.* at

8  669, 671-72. *Neubronner* did ***not*** involve the requirements of §20A. *See In re VeriFone Sec. Litig.*,

9  784 F. Supp. 1471, 1488-89 (N.D. Cal. 1992) (noting the distinction between alleging a §20A insider

10  trading claim and insider trading as evidence of scienter "in the context of an implied 10b-5 action

11  against an insider"), *aff'd*, 11 F.3d 865 (9th Cir. 1993). Here, plaintiff has satisfied the requirements

12  of §20A by adequately alleging an underlying §10(b) violation and contemporaneous trades. *See,*

13  *e.g.*, ¶¶78-85, 143-148, 152-156, 165, 213.[19]

14  **VII.    CONCLUSION**

15      For the reasons set forth, defendants' motion to dismiss should be denied. If the Court grants

16  any part of defendants' motion, plaintiff requests leave to amend. *Eminence Capital, L.L.C. v.*

17  *Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

18  DATED: August 16, 2010                    Respectfully submitted,

19                                            ROBBINS GELLER RUDMAN
                                                & DOWD LLP
20                                            WILLOW E. RADCLIFFE
                                              SARAH R. HOLLOWAY

21

22
                                              _____
23                                                        /s/
                                              WILLOW E. RADCLIFFE

24

25

26  ─────────────────
    [19]    *Brodsky v. Yahoo Inc!*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008) is also distinguishable, as
27  there, the plaintiffs failed to plead a primary violation under §10(b) or otherwise identify nonpublic
    information at the time of defendants' trades. *Id.* at 1207-08. Such is not the case here.

28

1

2          100 Pine Street, 26th Floor
           San Francisco, CA  94111
3          Telephone:  415/288-4545
           415/288-4534 (fax)

4          Liaison Counsel for Plaintiff

5          BROWER PIVEN
             A Professional Corporation
6          DAVID A.P. BROWER
           488 Madison Avenue, 8th Floor
7          New York, NY  10022
           Telephone:  212/501-9000
8          212/501-0300 (fax)

9          Lead Counsel for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT - 09-cv-04073-MMC

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on August 16, 2010, I authorized the electronic filing of the foregoing

3  with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4  the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5  caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6  CM/ECF participants indicated on the attached Manual Notice List.

7       I further certify that I caused this document to be forwarded to the following Designated

8  Internet Site at:  http://securities.stanford.edu.

9       I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on August 16, 2010.

11

12                               /s/

                          WILLOW E. RADCLIFFE

13                        ROBBINS GELLER RUDMAN

                            & DOWD LLP

14                        100 Pine Street, Suite 2600

                        San Francisco, CA  94111

15                        Telephone:  415/288-4545

16                        415/288-4534 (fax)

17                        E-mail:willowr@rgrdlaw.com

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:09-cv-04073-MMC

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Corinne Bretan**
  jbretan@fenwick.com,mbafus@fenwick.com,kayoung@fenwick.com,knesbit@fenwick.com

- **David A.P. Brower**
  brower@browerpiven.com

- **Steven D. Cohn**
  scohn@kmllp.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Frank James Johnson**
  frankj@johnsonbottini.com,brett@johnsonbottini.com,paralegal@johnsonbottini.com,frankb@johnsonbottini.com

- **Felix Shih-Young Lee**
  flee@fenwick.com

- **Betsy Carol Manifold**
  manifold@whafh.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Susan Samuels Muck**
  smuck@fenwick.com,kayoung@fenwick.com,cprocida@fenwick.com,knesbit@fenwick.com,kdeleon@fenwick.com

- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com,ptoovey@bramsonplutzik.com

- **Jay L. Pomerantz**
  jpomerantz@fenwick.com,slim@fenwick.com,tfinlev@fenwick.com

- **Ira M. Press**
  ipress@kmllp.com,plinden@kmllp.com,lmorris@kmllp.com,slopez@kmllp.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,SHolloway@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,travisd@rgrdlaw.com,ptiffith@rgrdlaw.com,cwood@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com,khuang@rgrdlaw.com,e_file_

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)