IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re IMMERSION CORPORATION SECURITIES LITIGATION<br>_____/ | Master File No. C-09 4073 MMC<br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED COMPLAINT** |

Before the Court is defendants Victor A. Viegas ("Viegas"), Clent Richardson ("Richardson"), Stephen Ambler ("Ambler"), Richard Vogel ("Vogel"), and Daniel Chavez's ("Chavez") (collectively, "Individual Defendants") and defendant Immersion Corporation's ("Immersion") motion, filed June 15, 2010, to dismiss plaintiff's Consolidated Complaint ("Complaint"). Plaintiff John Loos has filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**

According to the Complaint, Immersion is a "provider of haptic technologies, which allow people to use their sense of touch while operating a variety of digital devices" (see Compl. ¶¶ 2, 11), including medical devices, and that defendants have described their "Medical line of business" as "'historically, the largest contributor of Immersion's revenue on

---

[1] On October 25, 2010, the Court took the matter under submission and vacated the hearing scheduled for October 29, 2010.

a percentage basis and one of the most meaningful and vital growth drivers of the Company'" (see Compl. ¶ 11). Further, according to the Complaint, Viegas was President and CEO of Immersion until April 28, 2008, and was Chairman of Immersion's Board of Directors until February 2009 (see Compl. ¶ 30); Richardson was President and CEO of Immersion from April 28, 2008 until October 21, 2009, and was a Director of the company from April 30, 2008 until October 21, 2009 (see Compl. ¶ 31); Ambler was CFO and Vice President of Finance of Immersion until July 31, 2009 (see Compl. ¶ 32); Vogel was Senior Vice President and General Manager of Immersion Medical until July 14, 2008 (see Compl. ¶ 33); and Chavez was interim Senior Vice President and General Manager of Immersion Medical from August 2008 until he was formally appointed to that position in December 2008, which he then held until August 7, 2009 (see Compl. ¶ 34).

Plaintiff alleges that, from May 3, 2007 to July 1, 2009 ("the class period"), defendants prematurely recognized revenue on sales of medical devices (see Compl. ¶¶ 1, 18), in particular, by recognizing revenue, in contravention of GAAP, (a) for products sold with "FOB Destination or other similar shipping terms, or for incomplete shipment of products or storage of products following shipment," (b) where rights of return and other "[n]on-standard terms and conditions [ ] prevented recognition of revenue upon shipment," and (c) where revenues "[l]ack[ed] probable collectability at the time revenue was recognized" (see Compl. ¶¶ 78, 115, 134). In addition, plaintiff alleges defendants falsely reported stock-based compensation expense, amortization expense, and interest income. (See Compl. ¶ 20.) Plaintiff alleges the above-described accounting practices led defendants to materially misstate Immersion's revenue and income in financial disclosures, as well as misrepresent the quality of Immersion's internal controls and Immersion's compliance with GAAP. (See Compl. ¶¶ 19, 21.)

Plaintiff further alleges that on July 1, 2009, Immersion issued a press release announcing its Audit Committee was "conducting an internal investigation into certain previous revenue transactions in its Medical line of business" (see Compl. ¶ 23); that on August 10, 2009, Immersion announced that "because of 'certain revenue transactions in

1  Immersion's Medical line of business,' its previously issued quarterly and fiscal financial
2  statements for 2008 'should no longer be relied upon because of one or more errors in
3  such financial statements'" (see Compl. ¶ 24); and that on February 8, 2010, Immersion
4  issued restatements of its 2006, 2007, 2008, and first quarter 2009 financial statements,
5  revising revenue, as well as stock-based compensation expense, amortization expense,
6  and interest income, for those periods (see Compl. ¶¶ 18, 20, 24).

7  Based on said allegations, plaintiff asserts three causes of action:  (1) as against all
8  defendants, violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange
9  Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder; (2) as against all
10 defendants, violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and (3) as against
11 Viegas, Ambler, and Vogel, violation of Section 20A the Exchange Act, 15 U.S.C. § 78t-1.
12 Plaintiff brings said claims as a putative class action, alleging that he, and others similarly
13 situated, purchased Immersion stock at artificially inflated prices during the class period.
14 (See Compl. ¶¶ 1, 28.)

**LEGAL STANDARD**

16 Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based
17 on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a
18 cognizable legal theory.  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.
19 1990).  In analyzing a motion to dismiss, a district court must accept as true all material
20 allegations in the complaint, and construe them in the light most favorable to the
21 nonmoving party.  See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).
22 Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual
23 material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft
24 v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S.
25 544, 570 (2007)).  "Factual allegations must be enough to raise a right to relief above the
26 speculative level[.]"  Twombly, 550 U.S. at 555.  Courts "are not bound to accept as true a
27 legal conclusion couched as a factual allegation."  See Iqbal, 129 S. Ct. at 1950 (internal
28 quotation and citation omitted).

**DISCUSSION**[2]

**I.  Section 10(b)**

To allege a § 10(b) and Rule 10b-5 claim, plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005).  Claims brought under § 10(b) and Rule 10b-5 must meet the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 9(b) ("In alleging fraud . . . , a party must state with particularity the circumstances constituting the fraud . . . ."); Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985).  "In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer." Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995).

Further, the plaintiff must meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, which requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  § 78u-4(b)(1).  Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2).

**A.  Liability of Nonspeakers**

Section 10(b) of the Exchange Act prohibits "misrepresentations, omissions by those with a duty to disclose, or manipulative acts." Desai v. Deutsche Bank Sec. Ltd., 573 F.3d

---

[2] Defendants request the Court take judicial notice of certain of Immersion's filings with the SEC as well as a chart listing the prices for Immersion stock during the class period.  (See Decl. of Susan S. Muck in Supp. of Defs.' Mot. to Dismiss Pl.'s Consolidated Compl. Exs. A-G.)  Plaintiff opposes defendants' request to the extent Immersion offers its SEC filings for the truth of the matters stated therein.  Additionally, plaintiff requests the Court take judicial notice of certain of Immersion's other SEC filings.  (See Decl. of Willow E. Radcliffe in Supp. of Pl.'s Opp. to Defs.' Mot. to Dismiss Pl.'s Consolidated Comp. Exs. 2, 3.)  Defendants have not opposed plaintiff's request.  Plaintiff's request is hereby GRANTED; defendants' request is hereby GRANTED to the extent such request is unopposed and DENIED as moot to the extent opposition thereto has been made, the Court not having relied on the truth of the noticed documents' contents for purposes of its analysis.

931, 938 (9th Cir. 2009) (citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 158 (2008)).[3]

Defendants move to dismiss the claims against Chavez and Vogel because "neither defendant is alleged to have made a single challenged statement." (See Mot. at 20:27-28.) Plaintiff responds that a statement made by the named defendant himself is not necessary to a finding of liability under §10(b), and that the Complaint's allegations that Chavez and Vogel participated in the creation of the allegedly misleading financial statements suffice. (See Opp. 19:6-20:17.) Although plaintiff is correct as to the general rule of law, see Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) (noting "substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though the participation might not lead to the actors actual making of the statements"), plaintiff is not correct as to the sufficiency of his pleadings.

In particular, plaintiff's allegation that the "Individual Defendants," and thus, implicitly, Chavez and Vogel, "controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public" (see Compl. ¶ 36), is conclusory and fails to allege specific facts to show either defendants' "substantial participation or intricate involvement in the preparation of fraudulent statements," see Howard, 228 F.3d at 1061 n.5.

Indeed, as to Chavez, the Complaint fails to identify any acts at all, other than Chavez's position as an officer of Immersion during the class period (see Compl. ¶ 34) and, in that position, his receipt of sales forecasts (see Compl. ¶¶ 42, 174). Such allegations fail to support a claim against Chavez for securities fraud. Cf. In re Software Toolworks, Inc., 50 F.3d 615, 628 n.3 (9th Cir. 1994) (finding triable issue under § 10(b) where plaintiffs submitted evidence that defendant "played a significant role in drafting and editing" SEC

---

[3] "'Manipulation' . . . is 'virtually a term of art when used in connection with securities markets'" and "refers generally to practices, such as wash sales, matched orders, or rigged [share] prices, that are intended to mislead investors by artificially affecting market activity.'" Desai, 573 F.3d at 938-39 (quoting Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977)).

5

letter).

As to Vogel, plaintiff's allegations are based on a confidential witness, "CW1," a "Senior Accountant at Immersion Medical" who worked with Vogel and whose job responsibilities included the "review of sales reports in order to make a determination whether to recommend recognizing revenue on medical sales." (See Compl. ¶¶ 40, 83.) According to CW1, Vogel "insisted on shipping whatever medical products Immersion had on hand, such as road-worn demonstration units not proper for customer sale," Vogel "allowed medical products to be shipped without a signed [purchase order] from the customer," and CW1 had "disagreements with Vogel regarding revenue recognition on these sales [ ] both face-to-face and via e-mail." (See Compl. ¶ 83; see also Compl. ¶¶ 124, 138, 171.) Such allegations as to Vogel's conduct, however, are insufficient to state a claim of fraud under the securities laws. First, Vogel's alleged conduct does not constitute "manipulation," in the "technical sense" relevant hereto. See Santa Fe, 430 U.S. at 476-77  Second, the Complaint does not allege Vogel had any role in the preparation of information concerning revenue recognition, nor does it allege facts showing Vogel's conduct made it "necessary or inevitable," see Stoneridge, 552 U.S. 161, that Immersion would overstate its revenues, see id. at 160-61 (rejecting theory that "efficient market investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect"). Indeed, plaintiff alleges Ambler, not Vogel, "made the ultimate decision on whether to recognize revenue," and, after Richardson became CEO, Immersion's corporate headquarters excluded Medical, the division in which Vogel worked, from revenue recognition decisions. (See Compl. ¶¶ 44, 82, 126.)

**B.    Scienter**

Defendants also move to dismiss the Complaint in its entirety for failing to plead scienter on behalf of any defendant. (See Mot. 8:17-20:20.) Plaintiff responds that the Complaint sufficiently alleges scienter based on Immersion's restatement of its financial statements for 2006, 2007, 2008, and the first quarter of 2009 (see Opp. 4:1-9:13), as well as management's role in the business (see Opp. 13:10-14:7), information conveyed by

confidential witnesses (see Opp. 9:14-13:9), individual defendants' departures from Immersion (see Opp. 17:16-18:8), SOX certifications (see Opp. 18:9-19:5), and insider trading (see Opp. 14:8-17:15).

Pursuant to the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To create a "strong inference," the allegations must raise an inference that is "more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues and Rights, Ltd., 551 U.S. 308, 314 (2007). The plaintiff need not allege facts giving rise to an "irrefutable" inference of scienter and the complaint must be "viewed in the required holistic context," but the plaintiff "must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." Id. at 324, 326, 328 (emphasis in original). In that regard, the complaint must state with particularity facts that "constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388-89 (9th Cir. 2002) (citing In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).) To raise a strong inference of deliberate recklessness, the plaintiff "must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." Silicon Graphics, 183 F.3d at 974.

Here, plaintiff first argues an inference of scienter can be drawn from the need for and magnitude of Immersion's restatement of financial statements for 2006, 2007, 2008, and the first quarter of 2009, and in particular the restatement of its Medical line revenue. (See Compl. ¶¶ 179, 182.) "In general, the mere publication of a restatement is not enough to create a strong inference of scienter." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1000 (9th Cir. 2009).[4] Nor, in the absence of "unusual circumstances" will the "core

---

[4] Plaintiff's allegations that defendants violated GAAP and Immersion's own accounting policy to recognize revenue in accordance with GAAP (see Compl. ¶¶ 19, 79-80), likewise are unavailing. See In re Cadence Design Sys., Inc. Sec. Litig., 654 F. Supp. 2d 1037, 1046 (N.D. Cal. 2009) (holding plaintiffs failed to plead scienter where defendant admittedly "violated GAAP, as well as its own policies"; noting "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish

7

operations inference," without more, be applicable. See South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784-85 & n.3 (9th Cir. 2008) (citing as example of "unusual circumstances" case where defendant allegedly failed to disclose loss of two largest customers, comprising 80% of company's revenue). Rather,"[w]here a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." See id. at 784; see also In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994) ("The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter").

In this case, the Complaint alleges Immersion restated its reported revenues by increasing revenue for 2007 by .6%, decreasing revenue for 2008 by 9.1%, and decreasing revenue for the first quarter of 2009 by $67,000, or about .9%, with the greatest revision occurring in the third quarter of 2008, where Immersion revised its reported revenue by 15.3%, or $1.8 million. (See Compl. ¶¶ 18. 133-34.) Similarly, the Complaint alleges Immersion restated reported income by increasing pre-tax income by .4% and net income by $68,000, or about .1%, in 2007,[5] reducing pre-tax income by 9% and net income by 7.4% for 2008, and increasing pre-tax income by 11.37% and net income by 18.09% for the first quarter of 2009. (See Compl. ¶ 20.) With respect to 2008, however, the Complaint also alleges that close to half of the restated revenue resulted from a "side agreement" with one customer (see Compl. ¶ 116), which agreement is not alleged to have been made known to defendants. Moreover, the remainder of the restated revenue, as alleged in the Complaint, was not due to clearly obvious facts, such as the loss of a major customer, but, rather, to an unspecified number of sales involving "FOB" terms, rights of return, and lack of probability of collection. (See Compl.¶¶ 78, 115, 134.) Such circumstances are not of

---

scienter" (quoting Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996)).

[5] The Complaint's allegation that Immersion "overstated" net income in 2007 by .1% (see Compl. ¶ 20) reflects a mathematical error, as the Complaint also alleges the restatement showed an increase in net income of $68,000, i.e., a .1% increase over the figure originally reported (see id.).

8

such "unusual" nature as to give rise to an inference of scienter on the part of the named defendants. See South Ferry, 542 F.3d at 786 (holding, "without particularized allegations" as to "actual access" to restated information, plaintiff must show "the nature of the relevant fact is of such prominence that it would be 'absurd to suggest that management was without knowledge of the matter" or that defendants had "actual access" to the restated information); cf. Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 984, 987-88 & n.5 (9th Cir. 2008) (inferring scienter from knowledge of stop-work orders on contracts totaling tens of millions of dollars, which knowledge defendants admitted having shortly after alleged misstatements made); Makor Issues & Rights, Ltd. v. Tellabs Inc. ("Tellabs II"), 513 F.3d 702, 709 (7th Cir. 2008) (inferring scienter on part of corporate executives where statements regarding "strong demand" and "availab[ility]" of "flagship" product made at time product development not yet complete); In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2008) (inferring scienter where "revenue inflation exceeded 25% in some quarters"). Nor are plaintiff's allegations relating to defendants' educational backgrounds (see Compl. ¶ 79), or Richardson's "hands-on" management style (see Compl. ¶ 183), sufficient. See In re Apple Computer, Inc. Sec. Litig., 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002) (finding allegations of "'hands-on' management insufficient to infer scienter).

Plaintiff next argues his allegations as to information conveyed by confidential witnesses show defendants had actual access to the truth at the time Immersion misstated its financials. Even assuming the confidential witnesses were in a position to obtain the information they provided to plaintiff, however, none provides sufficient facts to show defendants, at the time the incorrect financial reports were made, had actual access to information showing the content therein was incorrect. In particular, the Complaint's allegations that any such confidential witness reported to a superior, who "in turn reported to" a defendant (see Compl. ¶¶ 40, 42, 44, 81, 84, 127, 141, 172), that "CW1" and "CW3" created reports "available . . . for anyone to see" on the company's computer system (see Compl. ¶ 42, see also Compl. ¶ 175 (alleging "Ambler sometimes requested copies of

9

1  [CW1's] report[s]"), that "Ambler made the ultimate decision on whether to recognize
2  revenue on medical sales" (see Compl ¶¶ 44, 82, 126, 171), and that certain of the
3  defendants attended quarterly or weekly management meetings (see Compl. ¶ 176) are
4  insufficient to give rise to an inference of scienter under the PSLRA.  See In re Daou Sys.,
5  Inc., 411 F.3d 1006, 1022 (9th Cir. 2005) ("General allegations of defendants' 'hands-on'
6  management style, their interaction with other officers and employees, their attendance at
7  meetings, and their receipt of unspecified weekly or monthly reports are insufficient."); see
8  also Rudolph v. UTStarcom, 560 F. Supp. 2d 880, 890 (N.D. Cal. 2008) (finding allegation
9  of "defendants' responsibility for approving stock option grants" insufficient, as it "could
10 equally support the inference that the stock options had been backdated through innocent
11 bookkeeping error").

12         Further, although CW1 states his responsibilities included determining "whether to
13 recommend recognizing revenue on medical sales" and that if he determined particular
14 revenue should not be recognized, he would "sound the alarm to all who could hear it" (see
15 Compl. ¶ 40), CW1 does not state he ever did "sound the alarm," let alone that he did and
16 that one of the defendants actually heard it.  Similarly, while CW4 states he met with
17 Ambler to go over the "days sale outstanding ('DSO') numbers" (see Compl. ¶¶ 43, 177),
18 CW4 does not allege that he, or anyone else at  such meetings, informed Ambler that
19 revenue was being improperly booked.

20         Similarly unavailing is CW1's statement that when certain accounts, "remain[ing]
21 unpaid throughout the Class Period, . . . suddenly came in, in early 2009, . . . Ambler made
22 a big deal of it and scrambled to update their reports for review by Deloitte & Touche,
23 Immersion's outside auditor."  (See Compl. ¶  140.)  Such facts do not support a strong
24 inference that Ambler had believed such accounts would never be paid; indeed, there is no
25 allegation that any revenue recognized in said accounts contributed to Immersion's
26 restatement.  Although CW5 stated to plaintiff that "medical sales to a certain Chinese
27 customer in 2008" were "the cause, in part, of the Company's subsequent restatement"
28 (see Compl. ¶ 127), plaintiff's allegation that Richardson was "directly involved" in such

sales is not sufficiently specific to show Richardson, at the time of the erroneous financial reports, had access to any information from which he could determine revenue was not properly being recognized.  Lastly, as discussed above, although CW1 states he had disagreements with Vogel about recognizing revenue for the shipment of nonconforming goods (see Compl. ¶¶ 83, 124, 138, 171), CW1 does not state he made his complaints known to any defendant responsible for Immersion's financial statements.

In short, no confidential witness provides facts demonstrating defendants, at the relevant time, had knowledge of information showing revenues were improperly recognized.  See Zucco, 552 F.3d at 1000-01 (finding complaint insufficient to support inference of scienter where complaint alleged "management had access to purportedly manipulated quarterly accounting numbers [and] analyzed the inventory numbers closely," but failed to allege management was in a position to know data was being so "manipulated").

Plaintiff asserts the departures of Ambler, Chavez, and Richardson, shortly after the Audit Committee announced its investigation in June 2009, also support an inference of scienter.  The Complaint, however, alleges these defendants "resigned," not that they were terminated for wrongdoing.  See In re Cornerstone Propane Partners L.P. Sec. Litig., 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) (holding departures, absent termination on basis of fraud, did not give rise to inference of scienter); see also In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) ("[T]he mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management.").

Plaintiff also asserts Sarbanes-Oxley ("SOX") certifications signed by defendants Richardson, Viegas, and Ambler are sufficient to support an inference of scienter.  There is no dispute that those defendants certified that the relevant financial reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" such reports, which

11

certification was incorrect. (See Compl. ¶ 164.) Nevertheless, "[i]f [courts] were to accept [plaintiff's] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." Glazer Capital Mgmt. LP v. Magistri, 549 F.3d 736, 747 (9th Cir. 2008) (internal quotation and citation omitted). Absent facts showing a defendant was "severely reckless" in making such certification, facts not alleged here, plaintiff cannot establish scienter based on SOX certification. See id.

Lastly, plaintiff alleges that stock sales by defendants Ambler and Viegas support an inference of scienter (See Compl. ¶¶ 7, 45, 52, 61, 68, 186-188.)[6] "[S]uspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter." Silicon Graphics, 183 F.3d at 986 (citation omitted). To evaluate such stock sales, courts consider (1) the amount and percentage of shares sold, (2) the timing of the sales, and (3) the consistency with prior trading history. See id. In this instance, although the Complaint includes a number of facts related to the subject stock sales, the allegations are insufficient to raise an inference of scienter. First, while the Complaint alleges the sales by Ambler and Viegas were inconsistent with said defendants' prior trading histories, and represented 100% and 92.88%, respectively, of said defendants' stock holdings (see Compl. ¶¶ 186, 188), the Complaint also alleges Ambler and Viegas retained 79.11% and 90.28%.

---

[6] Plaintiff also alleges class-period sales of stock by certain non-defendant Immersion directors in late 2007, and, for one director, early 2008. (See Compl. ¶¶ 45, 186, Ex. A.) "[T]he Court finds no reason to consider [the non-defendants'] sales in determining the scienter of the named defendants." In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1082 n.22 (N.D. Cal. 2001). Similarly, the Court has not considered stock sales by Vogel; as discussed above, plaintiff's allegations are insufficient to show Vogel's substantial participation in any erroneous financial report. In any event, even if the Court were to consider Vogel's sales, the timing of those sales, all made during 2007 (see Compl. ¶ 68) as discussed below, weighs against an inference of scienter. Moreover, plaintiff does not allege any sales were made by defendant Richardson, a circumstance that weighs against an inference of scienter as well. See Ronconi v. Larkin, 253 F.3d 423, 436 (9th Cir. 2001) ("One insider's well timed sales do not support the 'strong inference' required by the [PSLRA] where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company affairs were known to be false when made.")

12

respectively, of their holdings, when exercisable options are included (see Compl. Ex. A), none of which are alleged to have been exercised at a time when revenues and income were overstated. See Silicon Graphics, 183 F.3d at 986-87 ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone.").[7]

Second, the timing of the sales does not support a strong inference of scienter, and, indeed, weighs against an inference of scienter, as all of the class-period sales occurred in 2007, a period for which the Complaint alleges Immersion was understating its revenue and net income (see Compl. ¶¶ 18, 20), i.e., at a time when the value of Immersion's stock presumably would have been artificially depressed, and the Complaint alleges no facts showing how sales under such circumstances would serve to benefit any defendant. See Tellabs, 551 U.S. at 314 (requiring courts to consider an "opposing inference of nonfraudulent intent").

In sum, plaintiff fails to allege facts, whether viewed individually or "holistic[ally]", see id. at 326, sufficient to raise a strong inference of scienter.

**C.   Loss Causation**

`      Lastly, defendants move to dismiss the Complaint for failure to plead loss causation. (See Mot. 21:15-23:22.)

To state a claim for securities fraud under the Exchange Act, a plaintiff must plead

---

[7] Plaintiff also alleges Ambler and Viegas profited from the misstatements because their 2008 bonus plans "depended, inter alia, on revenue targets as well as 'increasing the percentage of Immersion's total revenue that is derived from international sources.'" (See Compl. ¶ 189.) Such allegations are insufficient, however, to support a strong inference of scienter. See Zucco, 552 F. 3d at 1004-05 (finding allegations based on defendants' bonuses insufficient where "no allegation indicating how intimately the bonuses were tied to the company's financials"). Plaintiff's reliance on the ratio between Ambler and Viegas's salaries and the amounts of their stock sales likewise is insufficient to show scienter in the absence of other persuasive evidence to support such an inference. Cf. In re Suprema Specialities, Inc. Sec. Litig., 438 F.3d 256, 277-78 (3d Cir. 2006) (inferring scienter where trades "were substantial in comparison to [corporate officers'] overall compensation" and "key customers [had] pled guilty to fraud charges . . . and admitted in their plea allocutions that they had created false invoices . . .'at the direction and with the participation of [defendants]'").

"loss causation," the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." Dura, 544 U.S. at 342. To plead loss causation, a plaintiff must allege (1) the fraudulent statement that caused the stock price to increase, (2) the disclosure that revealed the statement was fraudulent, and (3) the decline in stock price after the truth became known. See id. at 346-47. While a plaintiff must show the revelation of the fraud was a "substantial cause of the investment's decline in value," a plaintiff does not need to show, however, that the misrepresentation was the only reason for the decline in value. See In re Daou, 411 F.3d at 1025.

Here, plaintiff's loss causation allegations are based on a series of disclosures from July 31, 2008 to July 1, 2009 (see Compl.¶¶ 191-195); in particular, plaintiff alleges a July 31, 2008 announcement of a net loss for the second quarter of 2008, "partially disclos[ing] that Immersion's business was not doing as well as defendants had led investors to believe," caused the company's stock to fall "nearly 18%" (see Compl. ¶ 191); a March 2, 2009 disclosure "announcing disappointing results for [fourth quarter of 2008] and fiscal 2008" of "$0.12 below estimates," which "partially disclosed that Immersion's business was not doing as well as defendants had led investors to believe," resulted in a 29% drop in Immersion's stock price (see Compl. ¶ 192); a May 4, 2009 disclosure that "Immersion was having difficulty receiving payments from certain international customers" resulted in a 20% fall in stock price over the following three trading days (see Compl. ¶ 193); and the July 1, 2009 announcement that Immersion's Audit Committee was "conducting an internal investigation into certain previous revenue transactions in its Medical line of business" resulted in a 23% drop in Immersion's stock (see Compl. ¶¶ 166, 194-195).

With the exception of the July 1, 2009 announcement, however, plaintiff fails to plead facts sufficient to connect any of the above disclosures to the alleged fraud, such as to show any decline in stock price was caused by the alleged fraud rather than a typical market reaction to disappointing financial reports, as well as a continuation of the general decline evident in Immersion's stock, and indeed the entire stock market, during the class period. See Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1063-64 (9th

Cir. 2008) (holding, to plead loss causation, plaintiff must allege facts to show "the market learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally"). Disclosures that Immersion "was not doing as well" as investors may have hoped (see Compl. ¶¶ 191, 192), and a disclosure about Immersion's "difficulty receiving payments from certain international customers" (see Compl. ¶ 193) do not tend to show previously reported revenue was incorrectly recognized. Without factual allegations to tie the disclosures to the purported fraud, the above allegations are insufficient to plead loss causation. Although the final disclosure, on July 1, 2009, is at least conceptually tied to the purported fraud in that it announced an Audit Committee investigation into previous Medical line transactions (see Compl. ¶¶ 194-195), the announcement of an investigation, standing alone, does not give rise to a viable loss causation allegation. See In re Maxim Integrated Products, Inc, Sec. Litig., 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) (holding announcement of "SEC investigation, subpoenas from the United States Attorney's office, and the formation of [defendant's] own Special Committee to investigate options granting practices do not reveal the alleged fraud"); cf In re New Century, 588 F. Supp. 2d 1206, 1214, 1237 (C.D. Cal. 2008) (finding announcement of internal investigation accompanied by disclosure of "improper accounting and weak internal controls" sufficient to plead loss causation).

Accordingly, plaintiff fails to adequately plead loss causation.

## II.   Section 20(a)

As discussed above, plaintiff fails to state a primary violation of the securities laws. Consequently, plaintiff's allegations under § 20(a) of the Exchange Act likewise fail. See 15 U.S.C. § 78t(a) (providing, to allege control person liability, plaintiff must allege (1) primary violation of federal securities laws and (2) defendant exercised actual power or control over primary violator).

## III.   Insider Trading

Similarly, plaintiff's claim of insider trading under § 20A of the Exchange Act fails because plaintiff fails to plead a primary violation of the securities laws. See 15 U.S.C.

§ 78t-1(a) (limiting insider trading liability to "[a]ny person who violates any provision of this chapter"); In re Verifone Sec. Litig., 11 F.3d 865, 872 (9th Cir. 1993) (dismissing § 20A claim where complaint failed to plead primary violation).

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the Complaint is hereby GRANTED, and the Complaint is hereby DISMISSED with leave to amend.

The Amended Complaint, if any, shall be filed no later than April 22, 2011.

**IT IS SO ORDERED.**

Dated: Mach 11, 2011

_____
MAXINE M. CHESNEY
United States District Judge