1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  WILLOW E. RADCLIFFE (200087)
   SARAH R. HOLLOWAY (254134)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   willowr@rgrdlaw.com
6  sholloway@rgrdlaw.com

7  Liaison Counsel for Plaintiffs

8  BROWER PIVEN
     A Professional Corporation
9  DAVID A.P. BROWER
   488 Madison Avenue, 8th Floor
10  New York, NY  10022
   Telephone:  212/501-9000
11  212/501-0300 (fax)
   brower@browerpiven.com

12
   Lead Counsel for Plaintiffs

13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15

16  In re IMMERSION CORPORATION       )   Master File No. 09-cv-04073-MMC
    SECURITIES LITIGATION             )
                                      )   CLASS ACTION
17  _____    )
                                      )
    This Document Relates To:         )   AMENDED CONSOLIDATED
18                                    )   COMPLAINT FOR VIOLATION OF THE
         ALL ACTIONS.                 )   FEDERAL SECURITIES LAWS
19  _____    )

20

21

22

23

24

25

26

27

28

620905_1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Page**

INTRODUCTION ................................................................................................................1

STATEMENT OF THE CASE.............................................................................................6

    Defendants Deliberately Manipulated Immersion's 2006 and 2007 Revenue and
    Falsely Reported 2007 Revenue Growth ........................................................................6

    Defendants Continued to Fraudulently Recognize Revenue on Medical Sales and
    Reported False Revenues and Growth in 2008 and 1Q09 ...............................................11

    Defendants Issued False Statements About Other Income and Expense Items,
    Accounting Practices and Internal Controls Throughout the Class Period......................16

    Investors Begin to Learn the Truth ..................................................................................18

JURISDICTION AND VENUE .........................................................................................19

PARTIES ...........................................................................................................................19

CONFIDENTIAL WITNESSES ........................................................................................24

FRAUDULENT SCHEME AND COURSE OF BUSINESS .............................................30

DEFENDANTS' FALSE REVENUE, GROWTH AND EARNINGS STATEMENTS
DURING THE CLASS PERIOD .......................................................................................31

    Defendants' Statements Regarding Immersion's 2007 Revenue, Growth, Earnings
    and Medical Sales Were False and Misleading ...............................................................31

    Reasons Why Defendants' 2007 Revenue, Growth, Earnings and Medical Sales
    Statements Were Knowingly False and Misleading ........................................................41

    Defendants' 2007 Revenue Statements Were Also False Because They Violated
    GAAP.................................................................................................................................46

    Defendants' Statements Regarding Immersion's 2008 Revenue, Growth, Earnings
    and Medical Sales Were False and Misleading ...............................................................49

    Reasons Why Defendants' 2008 Revenue, Growth, Earnings and Medical Sales
    Statements Were False and Misleading ...........................................................................62

    Defendants' 2008 Revenue Statements Were Also False Because They Violated
    GAAP.................................................................................................................................68

    Defendants' Statements Regarding Immersion's 1Q09 Revenues, Growth,
    Earnings and Medical Sales Were False and Misleading ................................................71

    Reasons Why Defendants' 1Q09 Revenue, Growth, Earnings and Medical Sales
    Statements Were False and Misleading ...........................................................................73

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC

- ii -

DEFENDANTS' FALSE STATEMENTS REGARDING IMMERSION'S REVENUE
RECOGNITION AND INTERNAL CONTROLS ...................................................................75

    Defendants' Critical Accounting Policies and Estimates Statements Were False
    and Misleading..........................................................................................................75

    Defendants' Internal Controls and Procedure Statements Were False and
    Misleading..............................................................................................................80

Immersion's Other Accounting Misstatements ...................................................................85

    i.      Immersion Understated Stock-Based Compensation Expense ..............................86

    ii.     Immersion Understated Amortization Expense .......................................................87

    iii.    Immersion Improperly Accounted For Interest Income .........................................87

INVESTORS BEGIN TO LEARN THE TRUTH..................................................................89

ADDITIONAL SCIENTER ALLEGATIONS .......................................................................90

    Defendants Were Directly Responsible For Immersion's Falsely Recognized
    Revenue...................................................................................................................91

    Defendants Were Deliberately Reckless in Ignoring Numerous Red Flags that
    Would Have Alerted Them to Immersion's Improper Revenue Recognition and
    GAAP Violations....................................................................................................94

    Defendants' Reorganization of Immersion Medical During the Class Period
    Supports a Strong Inference of Scienter ................................................................99

    The Magnitude and Nature of Immersion's Restatement Reinforces a Strong
    Inference of Scienter ..............................................................................................99

    Defendants' SOX Certifications Support a Strong Inference of Scienter.......................101

    The Pervasiveness and Effect of the Fraud on Immersion's Core Business
    Supports a Strong Inference of Scienter ..............................................................102

    Immersion's Corporate Scienter .........................................................................103

    Defendants' Insider Sales Support a Strong Inference of Scienter..................................104

LOSS CAUSATION/ECONOMIC LOSS ...........................................................................107

CLASS ACTION ALLEGATIONS ....................................................................................111

APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET
DOCTRINE ........................................................................................................................112

NO SAFE HARBOR ..........................................................................................................113

COUNT I ............................................................................................................................113

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) & (c) Against All Defendants ................................................................................. 113

COUNT II ............................................................................................................... 115

For Violation of Section 20(a) of the Exchange Act Against All Defendants ................ 115

COUNT III .............................................................................................................. 115

For Violation of Section 20A of the Exchange Act Against Defendants Viegas, Ambler and Vogel ...................................................................................... 115

PRAYER FOR RELIEF ........................................................................................... 116

JURY DEMAND ...................................................................................................... 116

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Immersion Corporation ("Immersion" or the "Company") between May 3, 2007 and July 1, 2009, inclusive (the "Class Period"), against Immersion, its former Presidents and Chief Executive Officers ("CEOs") Victor A. Viegas ("Viegas") and Ralph Edward Clenton Richardson ("Richardson"), its former Chief Financial Officer ("CFO") Stephen M. Ambler ("Ambler"), and its former Senior Vice President and General Manager of the Company's wholly owned subsidiary, Immersion Medical Inc. ("Immersion Medical"), Richard Vogel ("Vogel"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendants Viegas, Richardson, Ambler and Vogel are herein referred to as the Individual Defendants.

2.      Immersion provides haptic technologies, allowing people to use their sense of touch while operating a variety of digital devices.  The Company develops and manufactures or licenses a range of hardware and software technologies and products.  Its application areas include automotive, consumer electronics, gaming, and commercial and industrial controls; medical simulation; and mobile communications.  As of December 31, 2008, Immersion had only 186 employees.  During the Class Period, the Company operated through two segments:  Touch and Medical.

3.      This case stems from defendants' deliberate manipulation of Immersion's Medical revenues and net income.  The Medical line was, "[h]istorically, the largest contributor of Immersion's revenue on a percentage basis" and "one of the most meaningful and vital growth drivers of [the] Company."  Immersion reported during the Class Period that its Medical line contributed 44% of the Company's total revenue in 2007 and 41% in 2008.

4.      During the Class Period, defendants recognized and reported Medical revenues that were not earned to create the appearance of sequential, organic sales growth.  Defendants' scheme involved recognizing revenue prematurely and on fictitious sales – classic fraudulent practices.  As

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                          - 1 -

1   former U.S. Securities and Exchange Commission ("SEC") Chief Accountant Walter Schuetze once

2   recognized, "*[p]remature revenue recognition appears to be the first choice for cooking the*

3   *books*."[1]  Such fraudulent practices include "[r]ecognizing revenue in advance of the customer's

4   acceptance of the product[,] [r]ecognizing revenue when right of return exists[,] [and] [s]hipping

5   product[s] to company warehouses . . . and recognizing sales revenues."[2]  Defendants employed *all*

6   of these nefarious practices during the Class Period to inflate Immersion's revenues and create the

7   appearance of growth.

8

9       5.      On February 8, 2010, Immersion filed Amended Forms 10-K and 10-Q restating its

10  financials for 2006, 2007, 2008 and 1Q09 that contained a series of admissions regarding Class

11  Period events.  **First**, Immersion admitted that it had violated its own revenue recognition policies

12  and *intentionally recognized false revenue* on Medical sales during the Class Period.  For instance,

13  Immersion recognized revenue on Medical sales *without shipping the products* to the customer and

14  on shipment of products that it knew *did not work*.  In some instances, the products were not even

15  *available* for sale.  In others, the products were shipped to a warehouse or were returned by the

16  customer to Immersion shortly after shipment.  Immersion also recognized revenues prematurely,

17  *i.e.*, *before* the products were shipped or the sales finalized, despite clear assurances to investors of

18  the contrary.  In addition, Immersion booked inflated and fictitious revenues pursuant to an improper

19  "side agreement," signed by a senior officer of Immersion, which contained payment and shipping

20

21

22

23

24

---

25  [1]      *See* Walter P. Schuetze, *Speech by SEC Staff: Enforcement Issues, and Is the Cost of
26  Purchased Goodwill an Asset?*, Aug. 17, 1998, http://www.sec.gov/news/speech/speecharchive/
    1998/spch219.htm.

27  [2]      *Id.*

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                    - 2 -

1   terms that violated the Company's publicly stated revenue recognition policies and Generally

2   Accepted Accounting Principles ("GAAP"). [3]

3        6.      **Second**, Immersion admitted in its February 8, 2010 restatement that, as a result of its

4   pervasive and improper Medical sales, it had falsely reported and overstated its revenues and net

5   income over the course of ***three years***.  In some instances, Immersion falsely overstated Medical

6   revenues by ***over 130%***.  In total, Immersion reported false revenues of at least $3.7 million (over

7   30% of its Medical revenues) and overstated net income by at least $3.3 million from 2006 to 2008.

8        7.      **Third**, Immersion admitted in its February 8, 2010 restatement that, contrary to

9   defendants' Class Period assurances, its "internal control over financial reporting ***was not effective***"

10  and its financial reporting ***was not in accordance with GAAP*** throughout the Class Period.  Finally,

11  as a result of its deficient internal controls, Immersion admitted that, in addition to falsely reporting

12  revenue and net income, it had falsely reported stock-based compensation expense, amortization

13  expense and interest income during the Class Period.  As a result of the foregoing, Immersion was

14  forced to restate its 2006, 2007, 2008 and 1Q09 financial statements.

15       8.      In contrast to these post-Class Period admissions, during the Class Period, defendants

16  actively reported the "***dramatic increase in . . . revenues***" resulting from Immersion's fraudulent

17  Medical sales.  Specifically, defendants celebrated Immersion's international Medical revenues as

18  having "doubled" and "tripled," resulting in the "highest" revenue in Immersion's history, and that

---

[3]      Generally Accepted Accounting Principles are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosures.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                      - 3 -

Immersion had hit the "$10 million mark" – "a new quarterly record" – in 2008.  Defendants' laudatory revenue statements, however, were based on unearned revenue.

9.     Defendants knew prior to and during the Class Period that Immersion's reported revenue was false and did not accurately portray the financial condition of the Company.  For instance, **defendant Vogel**, along with his right-hand-man, Vice President of Immersion Medical Sales and Marketing Mark Meents ("Meents"), **personally insisted** on recognizing revenue on sales of known non-functional products and based on fictitious invoices.  In addition, **defendant Richardson** was **directly involved** in sales to the Company's Chinese distributor (a party to Immersion's improper side agreement), which later proved to be fraudulent.  Further, **defendant Ambler** was **directly responsible** for reviewing and recognizing revenue on Immersion's improper Medical sales.

10.     In addition to their direct involvement, as set forth below, defendants recklessly ignored numerous red flags that would have alerted them to Immersion's blatant violations of its own revenue recognition policies.  For example, defendants had access to and regularly reviewed periodic reports throughout the Class Period identifying numerous returned Medical products, significant days sales outstanding ("DSO"), and lack of probable collectability on certain Medical sales – particularly with regard to Immersion's Chinese customers.  Defendant Ambler personally reviewed the Company's DSO numbers and sales packets for each Medical account receivable throughout the Class Period – both of which indicated that Immersion's Chinese accounts were long overdue and that Immersion was recognizing revenue before sales were finalized.  In addition, Immersion's relatively few Medical sales (approximately 25 per quarter) represented **over 40%** of its total revenue during the Class Period.  Defendants were acutely aware of these sales and, indeed, specifically focused on them in press releases and conference calls throughout the Class Period.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                     - 4 -

11.     In addition, the Individual Defendants were responsible for Immersion's internal controls, including controls to ensure accurate reporting of sales and revenue.  Defendants Viegas, Richardson and Ambler certified that they had **personally reviewed** Immersion's disclosure controls and evaluated Immersion's internal controls over financial reporting during the Class Period.  Under these circumstances, the strongest (almost irrefutable) inference is that defendants either knew that Immersion was improperly recognizing and reporting revenue or, at the very least, were deliberately reckless in not knowing.

12.     Immersion's fraudulent revenue recognition practices and falsely reported revenues and earnings had their intended effect, causing the Company's stock to trade at artificially inflated prices during the Class Period, reaching a high of $20.50 per share on July 13, 2007.  At the same time, defendants Viegas, Ambler and Vogel unloaded 93%, 100% and 100%, respectively, of their personally held Immersion stock.  These unprecedented and unusual sales by these defendants occurred shortly after they reported **overstated** 2Q07 and 3Q07 revenues and while the stock was trading at or near its Class Period highs.

13.     On July 1, 2009, before the market opened, Immersion issued a press release disclosing that its Audit Committee was "conducting an internal investigation into certain previous revenue transactions in its Medical line of business" and that, "[a]s a result of this investigation, Immersion may discover information that could raise issues with respect to its previously-reported financial information, which could be material."  This disclosure related directly to Immersion's fraudulent revenue recognition practices and lack of internal controls.

14.     In response to the July 1, 2009 disclosure, Immersion's stock dropped **over 23%**, with 1.5 million shares trading in a single day, resulting in a market capitalization loss of $31.9 million.  This substantial decrease in Immersion's stock price was a result of the artificial inflation caused by defendants' false and misleading statements coming out of the stock price, causing real economic

1    loss to investors who purchased Immersion's securities during the Class Period at artificially inflated

2    prices.

3                              **STATEMENT OF THE CASE**

4         15.    Immersion was incorporated in 1993 and provides haptic technologies, which allow

5    people to use their sense of touch while operating a variety of digital devices.  During the Class

6    Period, the Company managed these application areas under two segments: Touch and Medical.

7

8    **Defendants Deliberately Manipulated Immersion's 2006 and 2007 Revenue and Falsely
     Reported 2007 Revenue Growth**

9         16.    From the time it went public in 1999 until the first quarter of 2007 (the beginning of

10   the Class Period), Immersion had not reported a profitable quarter.  While the Company offered

11   investors the prospect of high growth technology, it struggled with high operating costs in relation to

12   its revenue growth.  In early 2007, however, the Company appeared to turn a pivotal corner.  In

13   March 2007, the Company successfully concluded a highly publicized five-year patent litigation

14   with Sony Computer Entertainment ("Sony"), resulting in the payment of over $150 million to

15   Immersion.  As a result of the Sony judgment, Immersion was able to report its "first profitable

16   quarter" ever in 1Q07.

17        17.    The publicity surrounding Immersion's success in the Sony lawsuit generated

18   significant investor interest, with, as one investor put it, "the expectation that once [Immersion] had

19   that wad of cash in [its] pocket, [it] would really be able to ramp things [up]."  After winning the

20   lawsuit, defendants continued to stoke investors' interest, telling them to "expect profitable quarters"

21   and "substantial revenue growth over the balance of 2007," particularly from the Company's

22   Medical line.

23        18.    In line with defendants' expectations, Immersion reported small profits throughout

24   2007.  Defendants used these unprecedented results to hype Immersion's operations, stating that

25   "[o]ur back-to-back profitable quarters this year reflect our continued efforts to achieve ***sustained***

1    *profitability*."   The profits, however, were largely the result of interest earned on the large cash

2    payment from Sony.  Thus, investors were focused on actual sales revenue to drive future growth.

3         19.    To bolster their claim of achieving "sustained profitability," defendants relied on

4    Immersion's "substantial[]" revenue growth, particularly with regard to its Medical sales.  For

5    example, in 2Q07, Immersion reported revenues of $8.6 million, a 34% increase over the prior

6    quarter, with a *52% increase* in Medical revenues alone.  Likewise, in 3Q07, Immersion reported

7    that revenues had increased another 14% to $9.8 million, with a *27% increase* in Medical revenues.

8    Defendants told investors that Immersion's Medical sales "grew substantially" and that, in particular,

9    Immersion was having "a lot of interest and success in deploying products in China."  In truth,

10   Immersion's inflated, sequential 2007 revenue growth was based on unearned revenue.

11        20.    Immersion admitted in its February 8, 2010 restatement that defendants' 2007

12   revenue statements were false when made due to improper revenue recognition, including revenue

13   improperly recognized on Medical sales where: (i) the products were placed in a storage facility

14   instead of shipped to the customer; (ii) the products were not shipped at all; and (iii) the products

15   were sold with Freight on Board ("FOB") Destination or other similar shipping terms.  These

16   practices are commonly known as "bill and hold sales" (*i.e.*, where a sale is booked and revenue

17   recognized *before* the product is shipped to the customer) and, here, represented a *prima facie*

18   violation of basic revenue recognition accounting principles.  ***Under Immersion's own stated***

19   ***revenue recognition policies***, revenue should not be recognized ***until the product is shipped to the***

20   ***customer***, provided that other revenue recognition criteria are met.  Moreover, revenue on a sale

21   with FOB Destination should not be recognized ***until the product reaches the customer***.  The SEC

22   has specifically warned that such "[b]ill and hold sales are ***unusual transactions*** subject to stringent

23   accounting criteria."  *See In re Sunbeam Corp.*, Exchange Act Release No. 44305, Accounting &

24   Auditing Enforcement Release No. 1393 (May 15, 2001) at 7.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                                                          - 7 -

21.     Immersion also admitted in its February 8, 2010 restatement that it improperly recognized revenue on Medical sales in 2007 due to non-standard terms and conditions, including rights of return, extended payment terms, product replacement commitments, and other commitments that prevented recognition of revenue upon shipment.  In other words, Immersion recognized revenue on sales knowing that it would not receive ***timely payment*** or that the products were likely to be ***returned***.

22.     Lastly, Immersion admitted in its February 8, 2010 restatement that it improperly recognized revenue in 2007 on sales that ***lacked probable collectability*** at the time revenue was recognized.  In other words, Immersion recognized revenue without verifying the credit or legitimacy of the customer or knowing that it would not receive timely payment – basic criteria for recognizing revenue.

23.     Former Immersion employees confirm defendants' direct involvement in and knowledge of Immersion's improper revenue manipulation throughout 2007.  For instance, a marketing product manager at Immersion Medical during the Class Period confirmed that defendants intentionally recognized revenue prematurely on FOB Destination sales.  The product manager understood that revenue recognition on these sales was not proper until ***after*** the Company received proof of delivery from the customer.  Defendant Vogel and Meents, however, intentionally recognized revenue prematurely on these sales, ***before*** receiving proof of delivery.  Based on his conversations with Meents, the product manager further stated that defendants Viegas and Ambler were involved in and aware of these sales, and often had discussions with defendant Vogel and Meents regarding the timing of their revenue recognition.  Ultimately, defendant Ambler made the final decision to improperly recognize revenue on these sales.

24.     In addition, a former senior accountant at Immersion Medical stated that defendant Vogel and Meents knowingly shipped Medical products and recognized revenue ***before*** the sales

1   were finalized (*i.e.*, prematurely) and without signed purchase orders ("POs") (a criteria for

2   recognizing revenue).  Moreover, defendant Vogel regularly shipped known non-functional Medical

3   products, many of which were returned shortly thereafter, in order to book a sale and recognize

4   revenue.  A former production manager at Immersion Medical corroborated that Immersion regularly

5   accepted returns of Medical products during the Class Period – directly contradicting the Company's

6   no return policy set forth in its Forms 10-K and 10-Q filed during the Class Period.

7

8       25.     In addition, a former senior accountant at Immersion Medical responsible for

9   reviewing Immersion's revenue recognition criteria on Medical sales stated that defendant Vogel and

10  Meents often shipped products and recognized revenue ***before*** verifying the legitimacy of certain

11  customers (a criteria for recognizing revenue).   The accountant stated that, with regard to

12  Immersion's Asian customers in particular, it was often difficult to determine the customers'

13  legitimacy and creditworthiness.  The accountant, however, was "bullied" by persons working under

14  defendant Vogel in Immersion Medical's sales department into recognizing revenue on sales to these

15  customers.  The accountant complained about the bullying and had numerous disagreements with

16  defendant Vogel and Meents regarding improper revenue recognition on these sales.  Numerous

17  former Immersion employees have confirmed that defendant Ambler, to whom Vogel reported,

18  reviewed the Company's Medical sales and made the ultimate decision to improperly recognize

19  revenue on these sales.

20

21      26.     The revenue recognition violations described above represent egregious and brazen

22  accounting fraud and are highly indicative of intentional misconduct.  Revenues do not recognize

23  themselves (improperly, no less).  Notably, Immersion's improper revenue recognition – which

24  defendants described in Immersion's 2008 Form 10-K as its "***most critical accounting polic[y]***" –

25  was not due to mathematical error or interpretations of complicated, vague or arcane accounting

26  rules.  Rather, defendants' practices violated clear, well-established and basic revenue recognition

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                    - 9 -

and accounting standards, as well as Immersion's own publicly stated policies.  The Individual

Defendants' knowledge of these accounting standards and violations is further evidenced by their

backgrounds and experience in business and accounting – defendant Viegas is a Certified Public

Accountant and has an MBA and Bachelor of Science in Accounting from Santa Clara University;

defendant Ambler has a diploma in Accounting Studies from Oxford Polytechnic and is a Chartered

Accountant in England and Wales; and defendant Vogel has an MBA from Harvard.

       27.     As a result of their improper practices, defendants prematurely recognized $125,000

in product sales in 2006 (thereby inflating 2006 revenues) that should not have been recognized until

1Q07.  Defendants also deliberately inflated Immersion's 2Q07 and 3Q07 revenues by improperly

recognizing $154,000 and $121,000 in fictitious or incomplete product sales in those quarters.  These

improperly recognized revenues were material and represented a significant portion of Immersion's

reported net income of $176,000 in 2Q07 and $493,000 in 3Q07.  Moreover, by manipulating

revenues, defendants falsely portrayed that Immersion was experiencing sequential and substantial

growth, thereby fundamentally distorting the Company's operations, financial condition and

prospects, which caused the Company's stock price to be artificially inflated throughout the Class

Period.  Defendants Ambler, Viegas and Vogel sold nearly all of their personally held Immersion

stock (100%, 93% and 100%, respectively) almost *immediately* after announcing Immersion's

falsely *overstated* 2Q07 and 3Q07 revenues, while the stock was trading at or near record highs.

       28.     As a direct result of these fraudulent revenue recognition practices, defendants were

forced to restate Immersion's 2006 and 2007 financial statements on February 8, 2010 to account for

their material revenue misstatements, as shown below:

| | 2006 | 2007 | | | |
|---|---|---|---|---|---|
| | FY | Q1 | Q2 | Q3 | Q4 |
| Total Revenue Misstatements | **$125,000** | ($125,000) | **$154,000** | **$121,000** | ($361,000) |
| Total Revenue Originally Reported | $27,853,000 | $6,414,000 | $8,595,000 | $9,803,000 | $9,890,000 |
| % overstated (understated) | **0.5%** | (1.9%) | **1.8%** | **1.2%** | (3.5%) |
| Total Medical Revenue Originally Reported | $14,133,000 | $2,657,000 | $4,147,000 | $5,240,000 | $3,384,000 |
| % overstated (understated) | **0.9%** | (4.5%) | **3.9%** | **2.4%** | (9.6%) |

Through its February 8, 2010 restatement of the revenues described above, Immersion has admitted that it materially misstated revenues for each of the quarters of 2007.

**Defendants Continued to Fraudulently Recognize Revenue on Medical Sales and Reported False Revenues and Growth in 2008 and 1Q09**

29.     Despite defendants' deceptive efforts to show sequential and sizeable growth in 2007, by 2008, investors had begun to express frustration with the Company's lackluster performance. In particular, investors questioned defendants as to when they could expect "a real substantial growth in [Immersion's] revenues." Investors also began to question defendants' confidence in the Company, as senior executives, going forward. These exchanges put significant pressure on defendants to report even higher sales and revenue growth.

30.     Defendants' manipulation of Immersion's Medical sales and reported revenues allowed them to do just that. Defendants reported false and overstated revenues for each of Immersion's quarters in 2008. In particular, defendants trumpeted Immersion's international Medical sales as driving the Company's revenue growth. For example, on May 1, 2008, defendants Viegas and Richardson told investors that their focus on international Medical sales would result in a "*dramatic increase in the revenues*" in 2008. On October 30, 2008, defendant Richardson told investors that Immersion's international Medical sales "*grew more than 3 times*" over the prior-

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                    - 11 -

year's quarter and, as a result, Immersion's revenue was "***the highest . . . in [its] history***." On March 2, 2009, defendants reported that "Medical international revenues grew ***135%*** over the year-ago period," or nearly "***tripled***" over the prior-year's quarter, and nearly "***doubled***" in full year 2008.

31. Defendants' reported revenues and earnings during 2008, and their laudatory statements about Immersion's international Medical sales, were false and misleading. At the same time defendants were telling investors that international Medical sales had "doubled" and "tripled," and that revenues were at "record highs," defendants were fraudulently booking putative Medical "sales" and improperly recognizing revenue on those "sales" in order to inflate the Company's sales revenues and, in turn, its stock price.

32. Defendants have admitted that the same improper revenue recognition practices occurring in 2006 and 2007 carried into 2008 and 1Q09. These included: (i) ***premature revenue recognition*** on improper "bill and hold" sales, including sales where the products were not shipped, were shipped to a storage facility instead of the customer, or were sold with FOB Destination or other similar shipping terms; (ii) non-standard terms and conditions that prevented recognition of revenue upon shipment, such as rights of return, extended payment terms and product replacement commitments for products that did not work; and (iii) lack of probable collectability at the time revenue was recognized. In addition, defendants have admitted that Immersion improperly recognized revenue on sales in 2008 and 1Q09 where the products were ***not available*** or ***lacked sufficient functionality*** to permit revenue recognition.

33. Former Immersion employees have confirmed the wide-spread employment and internal knowledge of these improper practices. For example, a former senior accountant at Immersion Medical during the Class Period stated that Immersion recognized revenue on sales when there was no such available item in inventory to ship, when the products shipped were not functional, and when there was no signed PO from the customer or evidence of acceptance. The

accountant stated that defendant Vogel, along with his right-hand-man, Meents, *personally insisted* on improperly recognizing revenue on such transactions, despite sharp resistance from his subordinates.  In addition, Vogel and Meents intentionally recognized revenue on FOB Destination sales prematurely, *before* receiving proof of delivery, in violation of the Company's revenue recognition policies.  Based on his communications with Meents, a former marketing product manager at Immersion Medical stated that Viegas and Ambler had numerous discussions with Vogel and Meents regarding improper revenue recognition on these sales.  Moreover, a former customer service and production manager at Immersion Medical confirmed that Immersion regularly accepted returns of Medical products, particularly from its Chinese customers, directly contradicting the Company's publicly stated no return policy.

34.     Defendants have also admitted that the Company improperly recognized revenue in 2008 and 1Q09 on sales to a customer pursuant to a "side agreement," which contained payment and shipping terms that violated the Company's publicly stated revenue recognition policies, as well as GAAP.  Revenue recognition on these sales was improper because:  (i) the product remained in a third-party warehouse and was not shipped to the customer; (ii) commitments in the side agreement caused the sales to be deemed not final; (iii) the Company had conflicting exclusivity agreements in effect; and (iv) concessions related to payment terms caused the amount to not be fixed and determinable.

35.     Defendants admitted in Immersion's February 8, 2010 restatement that the improper "side agreement" was signed by Immersion's Vice President of International Medical Sales, David Barkay ("Barkay").  Barkay was hired by defendant Vogel in mid-2008 to lead Immersion's international Medical sales.  Once hired, Barkay specifically focused on the Company's Asian Medical sales.  A former product manager at Immersion Medical has confirmed that the customer involved in the improper side agreement was a Chinese distributor.  A former corporate controller

for the Medical Division further reported that all information about deals with this particular distributor **went directly from Barkay to defendants Richardson and Ambler, and that Barkay and defendant Richardson spoke regularly and at length about these sales**.  Moreover, defendant Ambler was directly responsible for reviewing and recognizing revenue on these Medical sales.

36.     According to Immersion's February 8, 2010 restatement, the improper side agreement signed by Barkay was dated in the **fourth quarter** of 2008.  Immersion stated that "[it] had previously executed a distribution agreement in May 2008" with this customer, and had entered into "various sales transactions" with the customer both before and after the date of the side agreement.  Critically, Immersion admitted that it improperly recognized revenue in the **second, third** and **fourth** quarters of 2008 on sales to this customer.  In other words, Immersion falsely recognized revenue on sales to this customer pursuant to both the side agreement signed by Barkay **and** the May 2008 distribution agreement **entered into by defendants**.

37.     The revenue recognition practices described above represent blatant manipulative devices and schemes to defraud.  Importantly, at least 17% of the improperly recognized 2008 revenue was based purely on **fictitious sales**.  Further, at least 72% of the improperly recognized 2008 revenue, having been removed from prior reported revenue after the Class Period, still could not be recognized as of February 2010, if at all.

38.     In addition to their direct involvement in these improper practices, numerous red flags evidence defendants' knowledge (or reckless disregard) of the Company's fraudulent revenue recognition and accounting:

- **First**, Immersion was a small company with very few Medical sales.  One witness estimated only 25 Medical sales per quarter company-wide.  These sales, however, were the largest contributor to Immersion's revenue – over **40%** during the Class Period.  As the top executives of Immersion and Immersion Medical, defendants were acutely aware of (and responsible for) these sales and their affect on Immersion's bottom line.

- **Second**, defendants specifically focused on these sales during the Class Period.  Indeed, defendants told investors that international Medical sales had "doubled" and

"tripled" in 2008, resulting in "record high[]" Company revenues – *the same sales that were later disclosed as improper*. By choosing to speak, defendants had a duty to speak knowledgably and to tell the whole truth. Defendants were, at the very least, deliberately reckless in not questioning the veracity of these extraordinary numbers before announcing them to the public.

- **Third**, according to percipient witnesses, defendants had access to and reviewed numerous reports indicating: (i) that numerous Medical products were being returned, despite Immersion's stated no return policy; (ii) the significant DSO and low collection probability for certain Asian Medical sales; (iii) the technical close versus the financial close of the sales; and (iv) the significant accounts receivable for Medical sales. These reports showed, *inter alia*, that payment on the Company's Chinese Medical sales was very tardy, with the longest DSO of any customer (over 180 days), and that revenue was being recognized on sales before they were finalized. Defendants reviewed this information and, indeed, specifically reported on Immersion's DSOs during conference calls with analysts and investors each quarter of the Class Period.

- **Fourth**, defendants undertook "a careful analysis of the operations and forecasts" of Immersion's Medical business and intentionally reorganized it during the Class Period in order to have more direct control over its revenue and operations. A "careful analysis" of operations would have revealed Immersion's glaring revenue recognition and accounting violations.

- **Fifth**, defendants Viegas, Richardson and Ambler signed Sarbanes-Oxley Act of 2002 ("SOX") certifications stating that they had *personally reviewed* Immersion's financial statements, evaluated Immersion's disclosure controls and evaluated Immersion's internal controls over financial reporting.

Under these circumstances, defendants either knew that Immersion was wrongly booking revenue on fictitious sales, sales of incomplete products, fraudulent bill and hold transactions, and other improper Medical sales, or, at the very least, were deliberately reckless in not knowing.

39. Defendants violated the basic tenets of accounting principles in order to deceive investors into believing that Immersion was growing and would become profitable when it was not. In total, defendants overstated Immersion's revenues by at least $3.7 million and net income by at least $3.3 million from 2006 through 2008, including an overstatement of *over 32%* of Medical line revenue in 2008. As a direct result of these fraudulent revenue recognition practices, defendants were forced to restate Immersion's 2008 financial statements to account for their material revenue, growth and earnings misstatements, as shown below:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                                    - 15 -

| | 2008 | | | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | FY |
| Total Revenue Misstatements | **$89,000** | **$602,000** | **$1,822,000** | **$1,146,000** | **$3,659,000** |
| Total Revenue Originally Reported | $8,155,000 | $9,313,000 | $10,081,000 | $8,986,000 | $36,535,000 |
| % overstated (understated) | **1.1%** | **6.9%** | **22.1%** | **14.6%** | **11.1%** |
| Total Medical Revenue Originally Reported | $3,008,000 | $4,301,000 | $3,221,000 | $4,309,000 | $14,839,000 |
| % overstated (understated) | **3.0%** | **16.3%** | **130.2%** | **36.2%** | **32.7%** |

Through its February 8, 2010 restatement of the revenue described above, Immersion has admitted that it materially overstated revenue for each quarter of 2008.

40. Not only did defendants' fraudulent revenue recognition practices falsely inflate Immersion's reported quarterly and fiscal 2008 revenues in violation of GAAP, they directly contradicted defendants' representations to investors in Immersion's Forms 10-Q and Forms 10-K filed with the SEC during the Class Period that Immersion: (i) recognized revenue *only* "when persuasive evidence of an arrangement exists, delivery has occurred . . . , the fee is fixed and determinable, and collectability is probable"; (ii) did *not* offer a "general right of return on its products"; and (iii) reported earnings "in accordance with GAAP."

**Defendants Issued False Statements About Other Income and Expense Items, Accounting Practices and Internal Controls Throughout the Class Period**

41. In addition to falsely reporting earnings and revenue, defendants also falsely reported Immersion's stock-based compensation expense, amortization expense and interest income in each quarter during the Class Period. As part of Immersion's February 8, 2010 restatement, defendants have admitted that they improperly recognized stock-based compensation expense, amortization expense and interest income in violation of GAAP in 2006, 2007, 2008 and 1Q09. As a result of these material errors, defendants were forced to restate Immersion's 2006, 2007, 2008 and 1Q09 results to account for these material misstatements, as shown below:

**Income Statement Effect of Misstatements:**

| | 2006 | 2007 | 2008 | | | | | 2009 |
|---|---|---|---|---|---|---|---|---|
| | FY | FY | Q1 | Q2 | Q3 | Q4 | FY | Q1 |
| Net Revenue (less expenses) | ($104,000) | $188,000 | ($68,000) | ($350,000) | ($1,021,000) | ($706,000) | ($2,145,000) | $999,000 |
| Stock-based Compensation | | ($717,000) | ($643,000) | ($187,000) | ($247,000) | ($192,000) | ($1,269,000) | ($163,000) |
| Amortization of Intangibles | ($57,000) | ($58,000) | ($35,000) | ($27,000) | ($22,000) | ($21,000) | ($105,000) | $161,000 |
| Total (before taxes) | ($161,000) | ($587,000) | ($746,000) | ($564,000) | ($1,290,000) | ($919,000) | ($3,519,000) | $997,000 |
| Originally Reported Pre-Tax Income | ($10,280,000) | $130,506,000 | ($3,593,000) | ($4,715,000) | ($25,036,000) | ($9,167,000) | ($42,511,000) | ($7,770,000) |
| **% overstated (understated)** | **1.5%** | **0.5%** | **17.2%** | **10.7%** | **4.9%** | **9.1%** | **7.6%** | **(14.7%)** |
| | | | | | | | | |
| Other errors corrected as part of Restatement | | $769,000 | $128,000 | $64,000 | | ($64,000) | $128,000 | $352,000 |
| Total Restatement Adjustments (incl. income tax effect) | ($158,000) | $68,000 | ($567,000) | ($352,000) | ($1,366,000) | ($1,020,000) | ($3,305,000) | $1,349,000 |
| **Originally Reported Net Income (Loss)** | ($10,424,000) | $117,018,000 | ($2,585,000) | ($3,091,000) | ($32,298,000) | ($9,711,000) | ($47,685,000) | ($7,459,000) |
| **% overstated (understated)** | **1.5%** | **(0.1%)** | **18.0%** | **10.2%** | **4.1%** | **9.5%** | **6.5%** | **(22.1%)** |

Through its February 8, 2010 restatement of these accounting misstatements, Immersion has admitted that these misstatements were material.

42.     Defendants also made false and misleading statements about Immersion's internal controls and procedures.  Throughout the Class Period, Immersion represented to investors that its internal controls over financial reporting were "*sufficiently effective*," and that its financial statements were "*prepared in accordance with GAAP*."  In addition, defendants Viegas, Richardson and Ambler certified that they were personally "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting," had "[e]valuated the effectiveness of [Immersion's] disclosure controls and procedures" regarding the Company's financial reporting during the Class Period, and that Immersion's financial statements "*d[id] not contain any untrue statement of a material fact*."  As defendants admitted in Immersion's February 8, 2010 restatement, however, Immersion's "internal control over financial reporting was *not* effective" during the Class Period and, as a result, defendants materially misstated

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                      - 17 -

1   Immersion's 2006, 2007, 2008 and 1Q09 earnings, revenues, stock-based compensation expense,

2   amortization expense and interest income.

3   **Investors Begin to Learn the Truth**

4         43.     On July 1, 2009, after more than ***three years*** of reporting false Medical sales and

5   revenues, the Company issued a press release announcing that its Audit Committee was "conducting

6   an internal investigation into certain previous revenue transactions in its Medical line of business"

7   and that, as a result, "Immersion may discover information that could raise issues with respect to its

8   previously-reported financial information, which could be material."  On this news, Immersion's

9   stock price dropped ***over 23%*** from a close of $4.94 on June 30, 2009 to a close of $3.80 on July 1,

10  2009, with 1.5 million shares trading in a single day.  Shortly after this announcement, Immersion's

11  CFO, defendant Ambler's, and Senior Vice President and General Manager of Immersion Medical,

12  Daniel J. Chavez's ("Chavez") employment with the Company was terminated on July 31, 2009 and

13  August 7, 2009, respectively.  Immersion's CEO defendant Richardson's employment with the

14  Company was terminated on October 21, 2009, while the internal investigation of Immersion's prior

15  financials was still pending.  The almost immediate mass exodus of Immersion's top executives

16  following the announcement of an investigation into improper practices suggests intentional

17  wrongdoing by the defendants.

18        44.     On August 10, 2009, Immersion announced that, because of "certain revenue

19  transactions in Immersion's Medical line of business," its previously issued quarterly and fiscal

20  financial statements for 2008 "should no longer be relied upon because of one or more errors in such

21  financial statements."  The Company also announced that it would be unable to timely file its 2Q09

22  Form 10-Q.  On August 17, 2009 and November 17, 2009, Immersion announced that it had

23  received notices of delisting from the NASDAQ Stock Market ("NASDAQ") for failing to file its

24  2Q09 and 3Q09 Forms 10-Q.

1    45.    On February 8, 2010, Immersion finally issued restatements of its 2006, 2007, 2008

2    and 1Q09 financial statements, along with its delinquent 2Q09 and 3Q09 Forms 10-Q.  In its

3    restatements, the Company admitted what defendants knew all along, that Immersion: (i) improperly

4    recognized revenue in its Medical line of business; (ii) improperly accounted for stock-based

5    compensation expense, amortization expense and interest income; and (iii) lacked effective internal

6    controls, throughout the Class Period.  Immersion also announced on February 8, 2010, that its

7    "current medical product offerings are no longer core to the Company's go-forward strategy."

8

9    46.    On March 30, 2010, Immersion entered into an agreement with CAE Healthcare

10   ("CAE") for the sale to CAE of Immersion Medical's assets and liabilities, including the transfer of

11   certain employees (including Barkay), distribution agreements and customer relationships to CAE.

12   Immersion also entered into a licensing agreement with CAE for Immersion's patent portfolio for

13   use in the field of Medical Training.  Defendant Viegas stated that "we believe CAE Healthcare

14   provides a great opportunity for our medical employees, customers, and distributors to take our

15   simulation business forward."  Barkay remains currently employed at CAE.

16

17                              **JURISDICTION AND VENUE**

18   47.    Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein

19   arise under §§10(b), 20(a) and 20A of the Exchange Act and SEC Rule 10b-5.

20   48.    Venue is proper in this District pursuant to §27 of the Exchange Act.  Many of the

21   false and misleading statements were made in or issued from this District.

22

23   49.    Immersion's principal executive offices are located at 801 Fox Lane, San Jose,

24   California.

25                                    **PARTIES**

26   50.    Lead plaintiff John P. Loos, as set forth in the accompanying certification filed

27   previously on November 2, 2009 and attached hereto as Exhibit A, purchased the common stock of

28

1    Immersion at artificially inflated prices during the Class Period and, when the truth was revealed at

2    the end of the Class Period, he suffered damages resulting from defendants' Class Period

3    misconduct.

4        51.    Defendant Immersion provides haptic technologies, which allow people to use their

5    sense of touch while operating a variety of digital devices.  Immersion is headquartered in San Jose,

6    California, and as of December 31, 2008, had 186 employees, including 68 in research and

7    development, 54 in sales and marketing, 64 in legal, finance, administration and operations, and, as

8    of March 30, 2010, approximately 35 in medical.

9        52.    Defendant Viegas was President and CEO of Immersion from October 2002 to April

10   28, 2008 and was Chairman of Immersion's Board of Directors from October 2007 to February

11   2009.  Defendant Viegas joined Immersion in August 1999 and previously held the positions of

12   CFO, Vice President of Finance and Chief Operating Officer.  He is a Certified Public Accountant in

13   the State of California and has an MBA from Santa Clara University as well as a Bachelor of

14   Science in Accounting.  Defendant Viegas gained significant finance and accounting experience

15   during the 20 years prior to working at Immersion.  Defendant Viegas worked as Vice President of

16   Finance and CFO of Macrovision Corp. from June 1996 to August 1999, and as Vice President of

17   Finance and CFO of Balco Inc. from October 1986 to June 1996.  Defendant Viegas signed

18   Immersion's Forms 10-K filed with the SEC and SOX certifications attached to the Company's

19   Forms 10-Q and Forms 10-K filed during the Class Period.

20       53.    Defendant Richardson was President and CEO of Immersion from April 28, 2008 to

21   October 21, 2009 and was a Director of the Company from April 30, 2008 to October 21, 2009.

22   Richardson had significant business experience and held senior positions at several public companies

23   during the ten years prior to joining Immersion, including at Tivo, Inc.; Nortel Networks, Inc.;

24   America Online, Inc.; T-Mobile; Apple Computer, Inc.; and GTE Corporation.   Defendant

1  Richardson signed Immersion's Forms 10-K filed with the SEC and certifications pursuant to SOX

2  attached to the Company's Forms 10-Q and Forms 10-K filed during the Class Period.

3          54.      Defendant Ambler was CFO and Vice President of Finance of Immersion from

4  March 2005 to July 31, 2009.  Defendant Ambler has a diploma in Accounting Studies from Oxford

5  Polytechnic and is a Chartered Accountant in England and Wales.  Defendant Ambler had significant

6  finance and accounting experience at publicly traded companies prior to joining Immersion,

7  including as Vice President of Finance and CFO of Bam! Entertainment, Inc. and Senior Vice

8  President of Finance and CFO of Insignia Solutions PLC.  Defendant Ambler signed Immersion's

9  Forms 10-Q and Forms 10-K filed with the SEC and certifications pursuant to SOX attached to the

10  Company's Forms 10-Q and Forms 10-K filed during the Class Period.

11          55.      Defendant Vogel was Senior Vice President and General Manager of Immersion

12  Medical from March 2004 to July 14, 2008.  Defendant Vogel has an MBA from Harvard Business

13  School.[4]  Defendant Vogel had significant business experience and held senior positions at public

14  medial companies during the 25 years prior to joining Immersion, including Kinetic Concepts, Inc.

15  and American Cyanamid.  According to a Senior Accountant at Immersion Medical during the Class

16  Period, defendant Vogel was fired from the Company in July 2008.

17          56.      The Individual Defendants, by virtue of their high-level positions with Immersion,

18  directly participated in the management of Immersion, were directly involved in the day-to-day

19  operations of Immersion at the highest levels and were privy to confidential proprietary information

20  concerning Immersion and its business, operations, products, sales, growth, financial statements and

21  financial condition and were aware of, or deliberately disregarded, that the false and misleading

---

[4]      Among the required curriculum at Harvard Business School is "Financial Reporting and
Control," which instructs students on financial statement accounting rules and concepts.  *See*
www.hbs.edu/mba/ academics/term1.html.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                                                      - 21 -

statements made by and regarding the Company were still alive in the market and causing the Company's stock to trade at inflated prices.  Because of their managerial positions with Immersion, each had access to the adverse undisclosed information about Immersion's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

57.     The Individual Defendants controlled and/or possessed the authority to control the contents of Immersion's reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were also responsible for Immersion's reported sales, revenues and financial results, including its Medical sales, presented to investors.

58.     Defendant Vogel held the position of Senior Vice President and General Manager of Immersion Medical during the Class Period.  As the top executive of Immersion Medical, defendant Vogel was responsible for its reported Medical sales, revenues, and financial results, which were ultimately presented to investors.  Defendant Vogel also participated substantially in creating and drafting the Company's press releases issued to the investing public.  According to Immersion's 2009 proxy statement, 15% of defendant Vogel's 2008 bonus was based on his achievement of corporate initiatives, including his involvement in "international operations" and "press releases." Defendant Vogel was provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  In addition, a senior accountant at Immersion Medical during the Class Period has confirmed that defendant Vogel was directly responsible for revenue recognition on Medical sales.

59.     Defendants Viegas and Richardson each held the position of President and CEO of Immersion, and defendant Ambler held the position of CFO of Immersion, during the Class Period. As Immersion's top executive officers, these defendants were responsible for the Company's

reported sales, revenues, and financial results (including the Medical Division) presented to investors.  Defendants Viegas, Richardson and Ambler participated substantially in creating and drafting the Company's statements and press releases issued to the investing public.  According to Immersion's 2009 proxy statement, 40% of defendants Viegas, Richardson and Ambler's 2008 bonuses were based on their achievement of corporate initiatives, including their involvement in "international operations" and "press releases."  Defendant Viegas, Richardson and Ambler were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  In addition, as set forth below, numerous former Immersion employees employed during the Class Period have confirmed that defendants Viegas, Richardson and Ambler were directly involved in and responsible for revenue recognition on Immersion's Medical sales.

60.     Defendants Viegas, Richardson and Ambler also made statements alleged herein to be false and misleading during Immersion's conference calls, and all Individual Defendants reviewed and/or contributed to the statements alleged herein to be false and misleading prior to their release, and/or were present when the statements were made, and had the ability and opportunity to prevent the statements from being made or cause them to be corrected.

61.     Because of their managerial positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations being made were therefore materially false and misleading.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

62.     The Individual Defendants, by reason of their status as senior executive officers of Immersion and Immersion Medical, were also "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful

conduct complained of herein.  Because of their positions of control, and the conduct alleged herein, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Immersion's business, the reported financials of its Medical line, and other Company officers and employees.

63.     As senior executive officers and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Immersion's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Immersion's common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## CONFIDENTIAL WITNESSES

64.     The allegations herein are supported by first-hand accounts of confidential witnesses ("CWs").  These witnesses are comprised of former Immersion employees employed during the Class Period and/or with knowledge of the events alleged herein.  The CWs provided facts from different departmental and geographic vantage points within the Company.

65.     CW1 was a Senior Accountant at Immersion Medical in Gaithersburg, Maryland from April 2004 to May 15, 2009.  His[5] job responsibilities included cash management, daily oversight of bank accounts that received customer payments, and review of sales reports in order to make a

---

[5]     The use of the words "he," "his" and "him" in connection with CWs is not meant to be gender specific and shall also be meant to pertain to the female gender.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                   - 24 -

determination whether to recommend recognizing revenue on Medical sales.  With regard to revenue recognition, CW1 reviewed packets of information regarding Medical sales to determine whether the criteria for booking the sale and recognizing revenue had been met.  The criteria he used to decide were: (i) whether there was an official PO signed by the customer; (ii) whether the customer was a known entity; and (iii) whether the customer had passed a credit check.  If these criteria were met, then CW1 would enter the sale status into a "Made to Manage" order system as final and would recommend booking the revenue.  If CW1 found that a sale did not meet the criteria for booking, he would "sound the alarm" to everyone in the Gaithersburg, Maryland building – and did so during the Class Period – including, specifically, to the Corporate Controller for Immersion Medical and the Medical Division Vice President of Finance and Operations Hernan Cortes ("Cortes"), who in turn reported to defendant Ambler.  CW1 also had numerous disagreements with defendant Vogel and Meents during the Class Period regarding defendant Vogel's improper revenue recognition practices.  After sounding the alarm, CW1 sent the issue to Immersion's Corporate Controller who, along with defendant Ambler, made the final decision on whether to book the sale and record revenue on it.  In addition, CW1 prepared sales packets for each account receivable in the Medical Division for defendant Ambler's review.  Defendant Ambler reviewed the packets at least quarterly.  According to CW1, these packets identified instances where credit approval was received *after* Meents, defendant Vogel or Barkay had instructed shipment of a product.  As a result of his position, CW1 had direct knowledge of Immersion Medical's issues with booking sales and revenue recognition as well as payments received and outstanding for Immersion Medical's customers.  Thus, CW1 was in a position to have knowledge of the facts attributed to him throughout this complaint.

66.	CW2 was a Customer Service Manager, Director of Assembly and Production Manager for Immersion Medical from October 2005 to July 2009.  His job involved managing the operations of Immersion Medical, including product shipment and returns.  With regard to product

returns, CW2 indicated that returned items were processed through Shipping and Receiving in Gaithersburg, Maryland and put into an "incoming line" in a room adjacent to the Shipping and Receiving Department.  The products were then sent to CW2's group for troubleshooting.  CW2 had weekly meetings with Vice President of Finance and Operations for the Medical Division Cortes on Tuesdays in the Front Conference Room in Gaithersburg regarding disposition of customer complaints and whether to replace or repair returned products.  Cortes made the final decision on disposition of domestic product returns, whereas Vice President and General Manager, International Sales for the Medical Division, Barkay made the final decision on disposition of international product returns.  Cortes and Barkay then communicated these decisions to CW2.  Thus, CW2 had direct knowledge of Immersion Medical's product sales and returns and was in a position to have knowledge of the facts attributed to him throughout this complaint.

67.     CW3 was Vice President of Domestic Sales at Immersion Medical from February 1, 2009 to April 30, 2009.  His responsibilities included oversight of a domestic sales force of six regionally located sales people and preparing quarterly sales forecasts and Strategic Account Selling Sheets concerning each customer.  CW3 reported directly to the Senior Vice President and General Manager of Immersion Medical, Daniel Chavez.  CW3 also prepared sales forecasts using a manual system developed in-house.  The system ranked the probability of a sale based on where in the sales process a customer fell.   Immersion maintained a sales process "checklist" that included identification of a prospective customer or "lead," qualification of the lead as a likely customer, and the technical close and financial close of the sale.  CW3 captured the forecast data on an Excel spreadsheet and sent his sales forecasts to Chavez, who reported to Ambler, weekly via e-mail.  The sales forecasts were also available on the Company computer system for anyone to see.  According to CW3, whether to recognize revenue on the sale was a function of defendant Ambler's office in

1   San Jose, California.  Thus, CW3 had direct knowledge of Immersion Medical's sales process and

2   was in a position to have knowledge of the facts attributed to him throughout this complaint.

3          68.     CW4 was Vice President of Domestic and International Sales for Immersion Medical

4   from 2002 to March 2007.  According to CW4, for domestic Medical sales, orders were placed by

5   the in-house sales person who made the sale.  For international Medical sales, orders were placed

6   through an independent distributor who had made the sale to the end customer.  CW4 received sales

7   reports via e-mail in Excel spreadsheet format.  CW4 indicated that because the Medical Division's

8   sales volumes were so low, he typically knew about a sale before receiving the sales report from

9   Customer Service.  This, coupled with the fact that he typically spent about 40 weeks per year on the

10  road working with the international distributors directly, contributed to his knowledge of Immersion

11  Medical's sales.  In addition, CW4 met with defendant Ambler, Cortes and the Corporate Controller

12  for Immersion Medical when defendant Ambler was in Gaithersburg, Maryland for quarterly

13  management meetings.  Defendant Ambler went over the DSO numbers with CW4 during these

14  meetings.  CW4 prepared the DSO data, which included each customer and distributor and the

15  number of days outstanding that money was due from each of them to Immersion Medical.  Thus,

16  CW4 had direct knowledge of Immersion Medical's sales process and was in a position to have

17  knowledge of the facts attributed to him throughout this complaint.

18         69.     CW5 was the Corporate Controller for Immersion Medical in Gaithersburg, Maryland

19  throughout the Class Period until June 2009.  His job responsibilities involved reviewing Medical

20  sales and related documentation and reporting the sales to Immersion's corporate headquarters.

21  Prior to 2008, CW5 reported directly to Immersion's Corporate Controller, Mary Beth Baust

22  ("Baust"), in the Company's San Jose, California headquarters.  From 2008 until his departure in

23  June 2009, CW5 reported to Cortes.  CW5 confirmed that both Baust and Cortes reported directly to

24  defendant Ambler.  Throughout his employment, CW5 reported that all Medical Division sales were

sent to the corporate headquarters in San Jose, where the decision on whether to recognize revenue on Medical sales was made.  During defendant Viegas' tenure as CEO, CW5 submitted all Medical sales information and supporting documentation directly to Baust in hard copy format, including the PO and any related e-mails or other documentation that related to the sale, who then conferred with Ambler about whether to recognize revenue on the sales.  During defendant Richardson's tenure as CEO, Immersion's corporate headquarters closely controlled the Medical Division's operations. Under this regime, CW5 supplied the sales data to corporate headquarters, and the decision on whether to recognize was made entirely at corporate headquarters.  CW5 reported that throughout the Class Period (under both defendants Viegas and Richardson), defendant Ambler made the ultimate decision on whether to recognize revenue on Medical sales.  As a result of his position, CW5 had direct knowledge of Immersion Medical's sales and revenue recognition process and was in a position to have knowledge of the facts attributed to him throughout this complaint.

70.     CW6 was a Product Manager at Immersion Medical in Gaithersburg, Maryland from April 2005 to June 31, 2009.  CW6 reported to Meents (and, later, Sarah Adkins), who, in turn, reported to defendant Vogel (and, later, Chavez).  In this position, CW6 worked with sales representatives in the field, assisted with product demonstrations for customers and trained sales representatives on product use.  CW6 also worked with international sales representatives, including those based in Montreal, Quebec, Canada (where Barkay was based).  In particular, CW6 provided simulator training for the Company's Chinese distributor, a customer gained shortly after Barkay joined the Company.  CW6 stated that a representative of the Chinese distributor came to Gaithersburg, Maryland for training on the simulators by CW6.  Based on his direct contact with Immersion Medical's international sales representatives and the Chinese distributor, CW6 was aware that there were promises made outside of the scope of the original agreement with this distributor.  In other words, the side agreement varied the payment terms in violation of the Company's own

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                                                      - 28 -

policies and GAAP.   CW6 further confirmed that sales to the Chinese distributor were a subject of Immersion's 2010 restatement.   CW6 understood that Barkay updated his superiors, including defendant Richardson, Chavez and defendant Vogel, about the deals and terms with this distributor. As a result of his position, CW6 had direct knowledge of Immersion Medical's sales, distributors and improper revenue recognition, and was in a position to have knowledge of the facts attributed to him throughout this complaint.

71.   CW7 was a Marketing Product Manager at Immersion Medical in Gaithersburg, Maryland from March 2006 to February 2009.   CW7 reported to Vice President of Sales and Marketing, Mark Meents.  Meents reported directly to defendant Vogel who, in turn, reported to defendant Viegas.  CW7 described Meents as defendant Vogel's right-hand-man or minion.  In his position, CW7 provided assistance to the corporate marketing department on press releases pertaining to Medical products.   He created sales and marketing collateral, such as marketing materials or brochures, for Medical products, scheduled tradeshows, and developed product plans or suggested product lines based on market research and industry trends.  He also communicated with customers and key opinion leaders (*i.e.*, surgeons) about what was needed in the medical field in order to advise research and development and suggest product lines.

72.   CW7 worked closely with Meents and defendant Vogel, communicating with Meents frequently.  Based on these communications, CW7 understood that defendant Vogel (who left in July 2008) and Meents pushed to have revenue recognized before the Company received proof of delivery, despite the Company's policy of not recognizing revenue until after it received proof of delivery (*i.e.*, FOB Destination sales).  CW7 also knew through his communications with Meents that Meents and defendant Vogel had discussions with defendants CEO Viegas and CFO Ambler about recognizing revenue without proof of delivery during the Class Period.

73.     CW7 stated that defendants Viegas and Ambler personally visited the Medical Division in Maryland often, at least quarterly, during the Class Period.  CW7 also stated that, like defendant Viegas, defendant Richardson was aware of and involved in the Medical Division's sales and revenue recognition.  Further, he stated that the Company's improper revenue recognition on international sales should have been obvious to defendants, as there was a substantial increase in international sales without any release of new Medical products. As a result of his position, CW7 had direct knowledge of Immersion Medical's sales and improper revenue recognition, and was in a position to have knowledge of the facts attributed to him throughout this complaint.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

74.     Defendants are liable for: (i) making false statements; (ii) failing to disclose adverse facts known to them about Immersion; and (iii) participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Immersion publicly traded securities. Defendants' fraud was a success, as it: (i) deceived the investing public regarding Immersion's revenue, earnings, income from operations, net income, gross profit, net income per share, accounts receivable, interest income and stock-based compensation expense; (ii) deceived the investing public regarding Immersion's accounting practices, revenue recognition practices and internal controls; (iii) artificially inflated the price of Immersion's securities; (iv) enabled defendants Ambler, Viegas and Vogel to collectively sell 172,752 shares of their personally held Immersion common stock for proceeds in excess of $2.7 million during the Class Period at times when Immersion's revenue was artificially inflated; and (v) caused lead plaintiff and other members of the Class to purchase Immersion publicly traded securities at inflated prices and be damaged thereby.

1

**DEFENDANTS' FALSE REVENUE, GROWTH AND EARNINGS STATEMENTS DURING THE CLASS PERIOD**

2

3

**Defendants' Statements Regarding Immersion's 2007 Revenue, Growth, Earnings and Medical Sales Were False and Misleading**

4

5

  75.  Prior to the Class Period, Immersion had yet to report a profit. In March 2007, Immersion successfully concluded a highly publicized litigation with Sony. This lawsuit resulted in the payment of over $150 million to Immersion and helped the Company to report its first profitable quarter ever.

6

7

8

  76.  On May 3, 2007, the start of the Class Period, Immersion issued a press release reporting its 1Q07 financial results. With regard to Immersion's revenues and earnings, the press release stated[6]:

9

10

11

12

  ***Revenues*** were ***$6.4 million*** for the quarter ended March 31, 2007 compared to revenues of $6.0 million for the first quarter of 2006.

13

  ***Operating income*** for the first quarter of 2007 was ***$131.0 million*** . . . .

14

15

  ***Net income*** for the first quarter was ***$122.4 million*** compared to a net loss of $2.9 million for the first quarter of 2006. ***Diluted earnings per share*** were ***$4.13*** for the quarter compared to $0.12 loss per share for the first quarter of 2006.

16

17

  77.  That same day, May 3, 2007, following the press release, defendants held an earnings conference call with investors and analysts. During the conference call, defendant Viegas reiterated Immersion's 1Q07 results:

18

19

20

  The first quarter ***revenues*** were ***$6.4 million***, a ***6%*** growth over the same quarter last year. The growth was led by our medical touch interface products, mobility, and gaming businesses offset by a decline in our 3D products group. ***Net income*** for the first quarter was ***$122.4 million*** compared to a net loss of $2.9 million for the first quarter of 2006.

21

22

23

  ***Diluted EPS*** were ***$4.13*** for the quarter compared to a $0.12 loss per share for the first quarter of 2006.

24

25

---

26

[6]  Defendants' false and misleading statements are provided in quotation format to provide the appropriate context for the false and misleading statements and omissions. Specific false and misleading statements in quotations are in bold and italics throughout.

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC  - 31 -

78.     Defendant Ambler also reiterated Immersion's 1Q07 results on the earnings conference call:

> For the first quarter of 2007, our **revenues** were **$6.4 million**, compared to $6 million in the first quarter of 2006, an increase of 6%.  Our **net income** was **$122.4 million** or **$4.13 profit per diluted share**, compared to a loss of $2.9 million, or $0.12 loss per share in the first quarter of 2006.
>
> \*          \*          \*
>
> **[R]evenues from our medical business**, which comprised 41% of total company revenues, **grew 2% to $2.7 million**, from $2.6 million in the year ago quarter.
>
>      **Medical product sales grew 17%** over the year ago quarter and comprised 93% of medical revenues in the quarter.

79.     On May 10, 2007, Immersion filed with the SEC its quarterly report on Form 10-Q for 1Q07, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as follows:

| 1Q07 Form 10-Q | | | |
|---|---|---|---|
| Revenue | Net Income | Product Sales | Revenue From Immersion Medical |
| "*6% increase*" *to $6.41 million* | "*$122.4 million*" | "*$3.6 million, an increase of $224,000 or 7%*" | "*$2.7 million, an increase of $56,000 or 2%*" |

80.     In addition, the Form 10-Q stated that 1Q07 "was [Immersion's] first profitable quarter as a public company."

81.     Defendants Viegas and Ambler certified that they personally reviewed Immersion's financial statements contained in the 1Q07 Form 10-Q, evaluated Immersion's disclosure controls, and evaluated Immersion's internal controls over financial reporting; and that the Form 10-Q "fairly present[ed], in all material respects, the financial condition and result of operations of the Company."

82.     Shortly thereafter, on May 25, 2007, defendant Viegas sold 22,919 shares of his personally held Immersion stock for proceeds of over $252,000.

83.     Defendants' statements regarding Immersion's 1Q07 sales, revenue and earnings in ¶¶76-81 above were knowingly false and misleading when made.  As set forth in ¶¶115-127, *infra*, Immersion admitted in its February 8, 2010 restatement that: (i) during 2006 and 2007, defendants improperly booked revenue on improper "bill and hold" sales, sales transactions with non-standard terms such as rights of return and extended payment terms, and transactions that lacked probable collectability from customers; (ii) Immersion lacked proper accounting controls in 2007; and (iii) defendants violated basic accounting principles as well as Immersion's internal accounting policies in 2007.

84.     On August 2, 2007, Immersion issued a press release reporting its 2Q07 financial results.  The press release stated, in pertinent part:

> ***Revenues*** were ***$8.6 million*** for the quarter ended June 30, 2007 or ***29% higher*** when compared to revenues of $6.7 million for the second quarter of 2006.
>
>          ***Net income*** for the second quarter was ***$176,000*** compared to a net loss of $2.4 million for the second quarter of 2006. ***Diluted earnings per share*** were ***$0.01*** for the quarter compared to $(0.10) loss per share for the second quarter of 2006.
>
>          ***Revenues*** were ***$15.0 million*** for the six months ended June 30, 2007 compared to revenues of $12.7 million for the first six months of 2006. ***Net income*** for the first six months of 2007 was ***$122.6 million***, or ***$4.03 diluted earnings per share***, compared to a net loss of $(5.3) million, or $(0.22) loss per share, for the first six months of 2006.

85.     In the press release, defendant Viegas trumpeted the Company's 2Q07 results and "***back-to-back profitable quarters***":

> "Second quarter ***revenue*** from our Medical, Gaming, and Touch Interface Products groups led our ***29% revenue growth*** over the second quarter of last year," said Victor Viegas, Immersion CEO and president.  "***Our back-to-back profitable quarters this year reflect our continued efforts to achieve sustained profitability***."

86.     That same day, August 2, 2007, following the press release, defendants held an earnings conference call with analysts and investors.  During the conference call, defendant Viegas reiterated Immersion's 2Q07 financial results:

> ***Revenue*** for the quarter grew to ***$8.6 million***, an ***increase of 29%*** over the second quarter of 2006.  Our ***net income*** for the quarter was ***$0.01 of earnings per diluted***

*share* compared to a loss of $0.10 per share in the second quarter of 2006. ***This makes two profitable quarters in a row for Immersion***.

\*          \*          \*

Moving on to a brief business update, our ***medical revenue grew 19%*** compared to the second quarter of last year. Product sales for all product platforms grew substantially, as did international sales.

87.      Defendant Ambler also reiterated Immersion's 2Q07 false results:

For the second quarter of 2007, our ***revenues*** were ***$8.6 million*** compared to $6.7 million in the second quarter of 2006, an ***increase of 29%***. The revenues for the quarter equaled our previous highest quarterly revenues achieved in Q4 2006. Our year-to-date ***revenues*** were ***$15 million*** compared to $12.7 million in 2006, an ***increase of 18%***. Our ***net income*** for the quarter was ***$176,000***, or ***$0.01 of earnings per diluted share*** compared to a loss of $2.4 million, or $0.10 loss per share in the second quarter of 2006.

\*          \*          \*

Looking at each of these businesses in turn, revenue from our ***medical business***, which comprised 48% of total company revenues, grew ***19% to $4.1 million*** from $3.5 million in the year-ago quarter. ***Medical product sales grew 55%*** over the year-ago quarter, and medical product sales comprised 98% of total medical revenues in the quarter.

88.      In addition, with regard to international Medical sales, defendant Viegas assured investors that the Company was having "a lot of interest and success in deploying products in China":

[INVESTOR]:  Are you finding that the reception [for medical platforms] is a little bit stronger internationally versus domestically, or vice-versa?

[VICTOR VIEGAS]:  Hard to tell. I think it's universally accepted and appreciated. I think we have a stronger set of resources and an established presence in the U.S. ***But, I can also tell you that we've had a lot of interest and success in deploying products in China***, for example. So, I think we see those potential advantages, and we want to deploy and take some time and add resources in these other markets. And we think we'll have a lot of success there.

89.      Defendants' purported "success in deploying products in China" was misleading because, as explained in ¶¶115-122, defendants were prematurely recognizing revenue on products sold with FOB Destination shipping terms, on incomplete shipment of products, on "sales" with non-standard terms or conditions where collectability was not probable, and on products that had not been shipped to customers. Thus, defendants'' purported "success" was not based on organic

1    demand for Immersion's products, but on revenue improperly recognized in violation of

2    Immersion's accounting policies and GAAP.

3        90.    In response to defendants' false August 2, 2007 statements, the Company's stock

4    price rose 8.51% to close at $16.55 on August 3, 2007.

5        91.    On August 8, 2007, Immersion filed with the SEC its quarterly report on Form 10-Q

6    for 2Q07, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as

7

8    follows:

9

| 2Q07 Form 10-Q | | | | |
|---|---|---|---|---|
| Period | Revenue | Net Income | Product Sales | Revenue From Immersion Medical |
| For the three months ended June 30, 2007 | "*29% increase*" to *$8.6 million* | "*$176,000*" | "*$5.3 million, an increase of $1.4 million or 35%*" | "*$4.1 million, an increase of $672,000 or 19%*" |
| For the six months ended June 30, 2007 | "*18% increase*" to *$15 million* | "*122.6 million*" | "*increased by $1.6 million or 22%*" | |

14

15       92.    In addition, the Form 10-Q stated that "[t]he increase in product sales was primarily

16   due to *increased medical product sales of $1.4 million* [for the three months ended June 30, 2007,

17   and] . . . *$1.8 million* [for the six months ended June 30, 2007]."

18       93.    Defendants Viegas and Ambler certified that they personally reviewed Immersion's

19   financial statements contained in the 2Q07 Form 10-Q, evaluated Immersion's disclosure controls,

20   and evaluated Immersion's internal controls over financial reporting; and that the Form 10-Q "fairly

21   present[ed], in all material respects, the financial condition and result of operations of the

22   Company."

23

24       94.    Shortly thereafter, on August 27, 2007, defendant Ambler unloaded 20,000 shares of

25   his personally held Immersion stock for proceeds of over $292,000.  Defendant Viegas followed suit,

26   selling 102,081 shares of Immersion stock between September 27, 2007 and October 8, 2007 for

27   proceeds of over $1.68 million.

28

1    95.    Defendants' statements regarding Immersion's 2Q07 sales, revenue and earnings in

2  ¶¶84-88, 91-93 above were knowingly false and misleading when made.  As set forth in ¶¶115-127,

3  *infra*, Immersion admitted in its February 8, 2010 restatement that: (i) during 2006 and 2007,

4  defendants improperly booked revenue on improper "bill and hold" sales, sales transactions with

5  non-standard terms such as rights of return and extended payment terms, and transactions that lacked

6  probable collectability from customers; (ii) Immersion lacked proper accounting controls in 2007;

7  and (iii) defendants violated basic accounting principles as well as Immersion's internal accounting

8  policies in 2007.

9

10    96.    On November 1, 2007, Immersion issued a press release reporting its 3Q07 financial

11  results.  The press release stated:

12
13          ***Revenues*** were ***$9.8 million*** for the quarter ended September 30, 2007 or ***49%
            higher*** when compared to revenues of $6.6 million for the third quarter of 2006.

14          ***Net income*** for the third quarter was ***$493,000*** compared to a net loss of
            $(3.2) million for the third quarter of 2006.  ***Diluted earnings per share were $0.02***
15          for the quarter compared to $(0.13) loss per share for the third quarter of 2006.

16          ***Revenues*** were ***$24.8 million*** for the nine months ended September 30, 2007
            compared to revenues of $19.2 million for the first nine months of 2006.  ***Net income***
17          for the first nine months of 2007 was ***$123.1 million, or $3.93 diluted earnings per
            share***, compared to a net loss of $(8.4) million, or $(0.34) loss per share, for the first
18          nine months of 2006.

19    97.    In the press release, defendant Viegas emphasized Immersion's "***very strong year-to-***

20  ***date revenue growth***":

21
            "Immersion has now completed ***three consecutive profitable quarters*** with
22          ***very strong year-to-date revenue growth*** compared to the first nine months of 2006.
            ***Revenue from our Medical business grew 22%,*** Touch Interface Products 32%, and
23          Gaming 47%.  We also reached a significant level of third-quarter revenue of
            $930,000 in our Mobility business," said Victor Viegas, Immersion CEO, president,
24          and chairman of the board.

25    98.    In addition, the press release announced a new "strategic plan" to grow revenues.  As

26  part of the plan, defendant Viegas would step down as CEO of the Company and become chairman

27  of the board of directors, and Immersion would hire a new CEO to replace defendant Viegas.

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                                                    - 36 -

99.     That same day, November 1, 2007, following the press release, defendants held an earnings conference call with analysts and investors.  On the conference call, defendant Viegas reiterated Immersion's false 3Q07 results:

> Immersion's third quarter performance was good.  Highlights of the third quarter include; number one, ***strong revenue growth of 49%*** over the third quarter of 2006, achieving a record $9.8 million in revenue.  This revenue level sets a ***new quarterly record***, surpassing our previous revenue record by $1.2 million.
>
> Profitability for each of the last three quarters; our ***net income*** for the third quarter was ***$0.02 of earnings per diluted share***, compared to a loss of $0.13 per share in the third quarter of 2006.  ***Medical revenue growth of 39% to $5.2 million***, compared to the third quarter of last year.
>
> *        *        *
>
> For the third quarter of 2007, our ***revenues*** were ***$9.8 million***, compared to $6.6 million in the third quarter of 2006, ***an increase of 49%***.  Our year-to-date revenue was ***$24.8 million***, compared to $19.2 million in 2006, an ***increase of 29%***.
>
> Our ***net income*** for the quarter was ***$493.000***, or ***$0.02 of earnings per diluted share***, compared to a loss of $3.2 million, or $0.13 loss per share in the third quarter of 2006. . . .
>
> Looking at each of these businesses in turn, ***revenue from our Medical business***, which comprised 53% of total company revenue, ***grew 39% to $5.2 million***, from $3.8 million in the year ago quarter.  ***Medical product sales grew 33%*** over the year ago quarter and Medical product sales comprised 77% of total Medical revenue in the quarter.

100.     In response to defendants' November 1, 2007 statements, the Company's stock price rose 12.7% over the next two trading days, to close at $17.57 on November 5, 2007.

101.     Six days later, defendants Ambler and Vogel unloaded ***all*** of their remaining Immersion stock.  Defendant Ambler sold 20,000 shares (100% of his holdings) for proceeds of over $347,000 on November 6, 2007, and defendant Vogel sold 7,752 shares (100% of his holdings) for proceeds of over $134,000 on November 7, 2007.

102.     On November 8, 2007, Immersion filed with the SEC its quarterly report on Form 10-Q for 3Q07, signed by defendant Ambler.  The Form 10-Q reported Immersion's 3Q07 earnings results as follows:

| 3Q07 Form 10-Q | | | | |
|---|---|---|---|---|
| Period | Revenue | Net Income | Product Sales | Revenue From Immersion Medical |
| For the three months ended September 30, 2007 | "*49% increase*" *to $9.8 million* | "*$493,000*" | "*$5.4 million, an increase of $1.2 million or 27%*" | "*$5.2 million, an increase of $1.5 million or 39%*" |
| For the nine months ended September 30, 2007 | "*29% increase*" *to $24.8 million* | "*123.1 million*" | "*increased by $2.8 million or 24%*" | "*$12.0 million, an increase of $2.2 million or 22%*" |

103.    In addition, the Form 10-Q stated that "[t]he increase in product sales was primarily due to **increased medical product sales of $1.0 million** [for the three months ended September 30, 2007, and] . . . **$2.8 million** [for the nine months ended September 30, 2007]."

104.    Defendants Viegas and Ambler certified that they personally reviewed Immersion's financial statements contained in the 3Q07 Form 10-Q, evaluated Immersion's disclosure controls, and evaluated Immersion's internal controls over financial reporting; and that the Form 10-Q "fairly present[ed], in all material respects, the financial condition and result of operations of the Company."

105.    Defendants' statements regarding Immersion's 3Q07 sales, revenue and earnings in ¶¶96-99, 102-104 above were knowingly false and misleading when made.  As set forth in ¶¶115-127, *infra*, Immersion admitted in its February 8, 2010 restatement that: (i) during 2006 and 2007, defendants improperly booked revenue on improper "bill and hold" sales, sales transactions with non-standard terms such as rights of return and extended payment terms, transactions that lacked probable collectability from customers; (ii) Immersion lacked proper accounting controls in 2007; and (iii) defendants violated basic accounting principles as well as Immersion's internal accounting policies in 2007.

106.    On February 28, 2008, Immersion issued a press release reporting its 4Q07 and fiscal 2007 financial results.  The press release stated, in pertinent part:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                    - 38 -

1

*Revenues* were ***$9.9 million*** for the quarter ended December 31, 2007 or ***15 percent higher*** when compared to revenues of $8.6 million for the fourth quarter of 2006.

2

3

*Net income* for the fourth quarter was ***$0.5 million*** compared to a net loss of $(2.0) million for the fourth quarter of 2006. ***Diluted earnings per share*** were ***$0.02*** for the quarter compared to $(0.08) loss per share for the fourth quarter of 2006.

4

5

*Revenues* were ***$34.7 million*** for the year ended December 31, 2007 compared to revenues of $27.9 million for the year ended December 31, 2006, an ***increase of 25 percent***. *Net income* for the year ended December 31, 2007 was ***$117.0 million, or $3.71 diluted earnings per share***, compared to a net loss of $(10.4) million, or $(0.42) loss per share, for the year ended December 31, 2006.

6

7

8

107.     Regarding the Company's 4Q07 and 2007 results, defendant Viegas stated in the press release:

9

10

"***In 2007, Immersion achieved revenue growth of 25 percent and profitability in each of the four quarters***," said Victor Viegas, Immersion CEO, president, and chairman of the board.  "We have substantial organic growth opportunities in our medical, mobility, and touch interface products businesses.  We have a strong balance sheet that allows us to increase investment in new product development and in sales and marketing to drive a faster pace of customer adoption of our products and technologies worldwide."

11

12

13

14

108.     In addition, in the press release, Immersion disclosed that it had made an accounting error in its previously issued financial reports for the three months ended March 31, 2007 and for the six and nine months ended June 30, 2007 and September 30, 2007, respectively, with regard to its income tax accounting.  The result of this restatement was a decrease in Immersion's net income for 1Q07 from $122.4 million to $115.8 million.  The Company stated, however, that "[t]his correction ha[d] *no effect* on revenue, operating income, or cash balances."  On this disclosure of this "error," Immersion's shares dropped from over $10 per share to $8.43 per share, or nearly 18%.  However, because the accounting problem was purportedly related only to income tax expense, rather than core operations, the stock soon recovered.

15

16

17

18

19

20

21

22

23

24

109.     That same day, February 28, 2008, following the press release, defendants held an earnings conference call with analysts and investors.  During the conference call, defendant Viegas reiterated Immersion's 4Q07 and fiscal year 2007 results, calling them the "***best in Immersion's history***":

25

26

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

- 39 -

First, a summary of our fourth quarter and full-year 2007 financial results. We achieved a *record $9.9 million in revenue* in the fourth quarter, a *growth of 15%* over the same quarter in 2006. For the year, *revenue grew 25% over 2006 to $34.7 million*. *Immersion has been profitable for each of the last four quarters*. Our *net income* for the fourth quarter was $511,000 or *$0.02 of earnings per diluted share* compared to a loss of $2 million or $0.08 loss per share in the fourth quarter of 2006.

For 2007, our *net income* was *$117 million* or *$3.71 of earnings per diluted share* compared to a net loss of $10.4 million or $0.42 loss per share in 2006. *Overall, our 2007 financial results are the best in Immersion's history*. These results coupled with cash, cash equivalents and short-term investments totaling $138.1 million, as well as numerous organic growth opportunities provide a solid foundation for continued growth into the future.

110.    Defendant Ambler also reiterated the Company's "*record high[]*" 4Q07 and fiscal 2007 results:

For the fourth quarter of 2007, our *revenues* were *$9.9 million* compared to $8.6 million for the fourth quarter of 2006, an *increase of 15%*. Our year's *revenues* totaled *$34.7 million* compared to $27.9 million in 2006, an *increase of 25%*. *Both the quarter and the annual revenue numbers were record highs for the Company*.

Our *net income* for the quarter was *$511,000* or *$0.02 of earnings per diluted share* compared to a loss of $2 million or $0.08 loss per share in the fourth quarter of 2006. *This was the fourth straight quarter the Company has had positive earnings*. For the year, our *net income* totaled *$117 million* or *$3.71 of earnings per diluted share* compared to a loss of $10.4 million or $0.42 loss per share in 2006.

*        *        *

Looking at each of these businesses in turn, *revenues from our medical business*, which comprised 34% of total Company revenues for the quarter, were *$3.4 million* compared to $4.3 million in the year ago quarter, which was when we launched our endovascular 3.0 product.

For the year, our *medical revenues* totaled *$15.4 million, up 9%* from 2006 and represented 44% of our total revenues.

111.    On March 17, 2008, Immersion filed its 2007 Form 10-K with the SEC, signed by defendants Viegas and Ambler. The Form 10-K reported Immersion's 2007 earnings results as follows:

| 2007 Form 10-K | | | | |
|---|---|---|---|---|
| Revenue | Net Income | Product Sales | Revenue From Immersion Medical | Net Income From Immersion Medical |
| "*increased by $6.8 million or 25% to $34.7 million*" | "*$117.0 million*" | "*increased by $1.5 million or 9%*" | "*increased by $1.3 million, or 9%*" | "*$635,000*" |

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                    - 40 -

112.    In addition, the Form 10-K stated that "[t]he increase in product sales was primarily due to *increased medical product sales of $1.1 million* . . . ."

113.    Defendants Viegas and Ambler certified that they personally reviewed Immersion's financial statements contained in the 2007 Form 10-K, evaluated Immersion's disclosure controls, and evaluated Immersion's internal controls over financial reporting; and that the Form 10-K "fairly present[ed], in all material respects, the financial condition and result of operations of the Company."

114.    Defendants' statements regarding Immersion's 4Q07 and fiscal 2007 sales, revenue and earnings in ¶¶106-107, 109-113 above were knowingly false and misleading when made.  As set forth in ¶¶115-127, *infra*, Immersion admitted in its February 8, 2010 restatement that: (i) during 2006 and 2007, defendants improperly booked revenue on improper "bill and hold" sales, sales transactions with non-standard terms such as rights of return and extended payment terms, and transactions that lacked probable collectability from customers; (ii) Immersion lacked proper accounting controls in 2007; and (iii) defendants violated basic accounting principles as well as Immersion's internal accounting policies in 2007.

**Reasons Why Defendants' 2007 Revenue, Growth, Earnings and Medical Sales Statements Were Knowingly False and Misleading**

115.    Defendants' statements regarding Immersion's quarterly and fiscal 2007 sales, revenue and earnings were knowingly false and misleading when made.  In Immersion's February 8, 2010 restatement, defendants admitted that they did *not* properly recognize revenue in Immersion's Medical business during 2006 and 2007 due to: (i) "*Premature recognition of revenue* for products sold with FOB Destination or other similar shipping terms, or for *incomplete shipment* of products or *storage* of products following shipment" (*i.e.*, improper "bill and hold" sales); (ii) "Non-standard terms and conditions that prevented recognition of revenue upon shipment, including *rights of*

1   *return*, extended payment terms, product replacement commitments, potential free upgrades and

2   other non-standard commitments, that prevented recognition of revenue upon shipment"; and (iii)

3   "Lack of probable collectability at the time revenue was recognized."

4       116.    Particularly egregious is that Immersion recognized revenue on sales *without*

5   *shipping the products to the customers*.  In some instances, Immersion shipped the products to a

6

7   third-party warehouse for storage after the sale.  In others, Immersion shipped no products at all.

8   Moreover, Immersion recognized revenue on products that were *returned* and on sales that *lacked*

9   *probable collectability*.  These practices violate the most basic revenue recognition rules and are

10  highly indicative of intentional fraud.  As described below, defendants were aware of (or deliberately

11  disregarded) these improper practices throughout the Class Period.

12      117.    CW1 reported that defendants knowingly disregarded the Company's internal revenue

13  recognition criteria during 2007.  CW1 was responsible for reviewing sales packets for Medical sales

14  to determine whether the criteria for booking a sale and recognizing revenue had been met.  The

15

16  criteria CW1 used were: (i) whether there was an official PO signed by the customer; (ii) whether the

17  customer was a known entity; and (iii) whether the customer had passed a credit check.  If these

18  criteria were met, he would make a recommendation to CW5 and Cortes to book the sale and record

19  revenue.   During 2007, while defendant Viegas was CEO, CW5 submitted all Medical sales

20  information and supporting documentation directly to the Corporate Controller in hard copy format,

21

22  including the PO and any related e-mails or other documentation that related to the sale, who

23  reviewed every Medical sale at the end of every quarter and conferred with CFO defendant Ambler

24  regarding whether to recognize revenue on the sales.

25      118.    If CW1 found that a sale did not meet the booking criteria, he would sound the alarm

26  to all who would hear it – and did so during the Class Period.  After that, CW1 sent the issue to

27  Immersion's Corporate Controller in San Jose, California, who, along with CFO defendant Ambler,

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                      - 42 -

1   reviewed the sale and made the final decision on whether to book the sale and record revenue.  CW2,

2   CW3, CW4 and CW5 corroborated that defendant Ambler made the ultimate decision to recognize

3   revenue on Immersion's Medical sales.  Once that decision was made, CW1 updated the Made to

4   Manage order entry for the customer, which was then uploaded into an Oracle system and forwarded

5   electronically to the Corporate Controller.

6

7          119.    CW1 reported that defendants recognized revenue in 2007 on Medical sales that did

8   not meet the revenue recognition criteria.  For instance, CW1 stated that defendant Vogel knowingly

9   shipped Medical products and recognized revenue on sales without a signed PO from the customer (a

10  criteria for recognizing revenue).  CW1 stated that Meents (Vogel's right-hand-man) bullied the

11  shipping department to ship products without a formal PO in place.  Instead, the sales department,

12  who worked directly under Meents and Vogel, created unofficial and unsigned "POs" in Microsoft

13  Word in order to book the sales and record revenue.  In other words, they created *fictitious invoices*

14  in order to book revenue.

15

16         120.    In addition, CW1 confirmed that, notwithstanding defendants' statements of "a lot

17  of . . . success in deploying [medical] products in China," Immersion's main revenue recognition

18  issues underlying its restatement related to its Chinese Medical sales.  CW1 stated that it was often

19  difficult to determine the legitimacy or creditworthiness of certain Chinese customers (a criteria for

20  recognizing revenue).  Nonetheless, he was "bullied" by members of the sales department, who

21  worked directly under the supervision of defendant Vogel, into recognizing revenue on sales to these

22  customers.  CW1 complained about the bullying via e-mail to Cortes, who reported directly to

23  defendant Ambler.  CW1 stated that these improper revenue recognition practices happened

24  frequently, and he had constant disagreements with the Medical Division about improperly booking

25  sales and recognizing revenue on these orders, including defendant Vogel and Meents.  CW1's

26

27

28

disagreements with defendant Vogel regarding revenue recognition on these sales were both face-to-face and via e-mail, and often resulted in CW1 being reminded that he was an at-will employee.

121.    Additionally, CW1 stated that Immersion booked Medical sales when there was no such item in inventory to ship to the customer, and that defendant Vogel *personally insisted* on shipping known non-functional Medical products, such as road-worn demonstration units, in order to book a sale.  CW1 stated that these non-functional products were often returned to Immersion shortly thereafter.  CW2 corroborated that he had heard the Company was shipping Medical prototypes to customers, calling them products, in order to recognize a sale.  Moreover, CW2 stated and that there were many instances when customers returned products to the Medical Division, sometimes within a matter of days – directly contradicting defendants' statements in Immersion's Forms 10-K and 10-Q filed during the Class Period that Immersion offered no general "right of return."  Immersion closely tracked these returns in its Customer Services Response module.

122.    Further, CW7 confirmed defendants' premature (and improper) revenue recognition on FOB Destination sales in 2007.  CW7 stated that revenue on these sales was not supposed to be recognized until *after* the Company received proof of delivery from the customer.  Defendant Vogel and Meents, however, often wanted to recognize revenue prematurely, *before* receiving proof of delivery.  Based on his communications with Meents, CW7 stated that defendants Viegas and Ambler were involved in and aware of these sales.  Moreover, defendants Viegas and Ambler had numerous discussions with defendant Vogel and Meents regarding the timing of their improper revenue recognition on these sales.

123.    In addition to their direct involvement in revenue recognition, periodic reviews of sales, sales returns and accounts receivable aging reports informed defendants of Immersion's improper revenue recognition practices.  As described in ¶¶251-256, *infra*, defendants had access to and regularly reviewed periodic reports regarding Immersion's Medical sales, product returns, accounts receivable collections, and DSOs.  CW4 reported that defendant Ambler personally

reviewed the Company's DSO numbers during the Class Period.  Moreover, CW1 stated that defendant Ambler reviewed sales packets for every account receivable in the Medical Division at least quarterly during the Class Period.  According to CW1 and CW4, these reports revealed that Immersion was not receiving timely payments from certain Asian customers, if at all, and that revenue was being recognized prematurely on sales before they were finalized.

124.    Moreover, Immersion was a small company with relatively few Medical sales.  CW2 estimated sales of only 10 Endoscopy systems and 15 Laparoscopy systems *per quarter*.  These sales, however, made up *over 40%* of Immersion's reported revenue during 2007.  Defendants can be presumed to know of the improper practices described above affecting the Company's core operation or, at least, were deliberately reckless in not knowing.

125.    As a result of these improper practices, defendants knowingly or recklessly falsely reported Immersion's revenues and net earnings in each quarter of 2007.  Defendants recognized at least $125,000 in 2006 that should not have been recognized until 1Q07.  Defendants also improperly recognized at least $154,000 in 2Q07 and $121,000 in 3Q07 that should not have been recognized in those quarters, if at all.  By manipulating Immersion's revenues, defendants were able to overstate Immersion's 2006, 2Q07 and 3Q07 revenues, falsely report sequential and substantial revenue growth, particularly in 2Q07 and 3Q07, and inflate the Company's stock price to an all-time high of $20.50 per share on July 13, 2007.

126.    As revealed in Immersion's February 8, 2010 restatement, defendants' deliberate revenue manipulation also had the effect of understating Immersion's 1Q07 and 4Q07 revenues.  Not only was Immersion's reported revenues in these periods false, it was a direct result of defendants' *overstatement* of revenue in the preceding quarters.  In other words, defendants improperly recognized revenue on sales in 2006, 2Q07 and 3Q07 that were not complete (or recognizable) until

the following quarters.  Defendants' material misstatements of Immersion's 2006 and 2007 revenue are set forth in the following chart:

|  | 2006 | 2007 | | | |
|---|---|---|---|---|---|
|  | FY | Q1 | Q2 | Q3 | Q4 |
| Total Revenue Misstatements | **$125,000** | ($125,000) | **$154,000** | **$121,000** | ($361,000) |
| Total Revenue Originally Reported | $27,853,000 | $6,414,000 | $8,595,000 | $9,803,000 | $9,890,000 |
| % overstated (understated) | **0.5%** | (1.9%) | **1.8%** | **1.2%** | (3.5%) |
| Total Medical Revenue Originally Reported | $14,133,000 | $2,657,000 | $4,147,000 | $5,240,000 | $3,384,000 |
| % overstated (understated) | **0.9%** | (4.5%) | **3.9%** | **2.4%** | (9.6%) |

127.    Immersion also lacked internal controls throughout 2007 and, as a result, defendants improperly accounted for interest income on the Sony judgment, amortization and impairment of intangibles, and stock-based compensation.  These accounting misstatements resulted in a significant overstatement of Immersion's 1Q07 net income of $7.02 million, and minor understatements of Immersion's 2Q07, 3Q07 and 4Q07 net income ($362,000, $9,000, and $155,000, respectively).  As set forth in ¶108, defendants restated Immersion's 1Q07 net income on February 28, 2008, to account for purported tax-based misstatements, but reassured investors that "[t]his correction ha[d] no effect on revenue, operating income, or cash balances."  Even after this adjustment, however, defendants continued to overstate Immersion's 1Q07 net income by at least $458,000.

**Defendants' 2007 Revenue Statements Were Also False Because They Violated GAAP**

128.    In addition to falsely reporting revenue and net income, defendants' practices violated basic accounting principles as well as Immersion's own stated policies.  Defendants' significant GAAP violations during 2007 further evidences their knowledge of the Company's improper revenue recognition practices and falsely reported revenue.  Financial Accounting Standards Board

Statement of Financial Accounting Concepts No. 5 ("FASCON 5") clearly and concisely states that revenue cannot be recognized until it is both realized (or realizable) and earned.  SEC Staff Accounting Bulletin ("SAB") No. 104 ("SAB 104") has further clarified revenue rules under GAAP by requiring that revenue can be recognized only when ***all*** of the following criteria are met:

> (a)    persuasive evidence of an arrangement exists;
>
> (b)    delivery has occurred or services have been rendered;
>
> (c)    the seller's price to the buyer is fixed or determinable; and
>
> (d)    collectability is reasonably assured.

129.    Defendants acknowledged these requirements in Immersion's 2007 Forms 10-Q and 10-K, and told investors that "[t]he Company recognizes revenues in accordance with applicable accounting standards, including Staff Accounting Bulletin ("SAB") No. 104, "Revenue Recognition" ("SAB No. 104") . . . .  Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or service has been rendered, the fee is fixed and determinable, and collectability is probable."  Defendants further represented that "[t]he Company recognizes revenues from product sales when the product is shipped, provided that collection is determined to be probable and no significant obligation remains."

130.    Immersion's Medical sales violated these basic accounting standards.   First, Immersion's sales transactions failed to meet the SAB 104 requirement of "persuasive evidence of an arrangement" because of the "non-standard" commitments associated with the sales.

131.    Second, the sales transactions failed to meet the SAB 104 requirement that "[d]elivery has occurred" because of "FOB destination" or other similar shipping terms and/or incomplete shipment or storage of products.  Specifically, SAB 104 states:

> The staff believes that delivery generally is ***not*** considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement.  Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

132.   Third, the sales transactions failed to meet the SAB 104 requirement that "[c]ollect[a]bility is reasonably assured" because, as defendants have admitted, the sales lacked probable collectability.  Specifically, SAB 104 precludes revenue recognition when:

(i)   The buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates; or

(ii)   The buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product or subsequently consumes or uses the product.

133.   The sales transactions also included a "right of return."  Statement of Financial Accounting Standards ("SFAS" or "FAS") No. 48, *Revenue Recognition When Right of Return Exists* ("FAS 48") clearly and concisely states:

If an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met:

  a.   The seller's price to the buyer is substantially fixed or determinable at the date of sale.

  b.   The buyer has paid the seller, or the buyer is obligated to pay the seller and ***the obligation is not contingent on resale of the product***.

  c.   The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

  d.   The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

  e.   The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

  f.   The amount of future returns can be reasonably estimated.

134.   In addition, SAB 104 states that if a sales transaction fails to meet all of the conditions of FAS 48, as outlined above, "***no revenue may be recognized*** until those conditions are subsequently met or the return privilege has substantially expired."  As defendants have admitted, Immersion's 2007 sales and reported revenues violated these requirements.

135.   Finally, GAAP require that uncertainties and risks inherent in business be adequately considered and conservatism be used as a prudent reaction to any uncertainty regarding financial reporting.  *See* Statement of Financial Accounting Concepts ("SFAC") No. 2, ¶¶95, 97.  In other

1   words, defendants should err on the side of ***not*** recognizing revenue in the face of any uncertainty.

2   Because Immersion's 2007 sales and revenue recognition practices ***clearly violated GAAP***,

3   defendants should ***not*** have recognized revenue on these sales.

4   **Defendants' Statements Regarding Immersion's 2008 Revenue, Growth, Earnings and
    Medical Sales Were False and Misleading**

5
6          136.    By 2008, investors had begun to express frustration about Immersion's revenue

7   growth and disappointing earnings.  For example, during a February 28, 2008 conference call, an

8   investor pressed defendants as to when he would see "a real substantial growth in [Immersion's]

9   revenues":

10         [INVESTOR]:  Having been a long-term shareholder and visiting with you guys on
           numerous occasions, I have always kind of consistently asked you the question, when
11         you think our revenue is really going to start to ramp.  And for the last quarter, it
           doesn't sound like we had any significant really ramping of our revenue.  <u>Do you
12         have any kind of guidance for us in terms of when you might expect to see a real
           substantial growth in our revenues?</u>
13
           [VICTOR VIEGAS]:  Sure. The answer is, right now, we are not providing guidance.
14         So, I can't give you estimates on 2008 or into the future. . . .  But, right now, I think
           we had good growth in all our business across the board in each of the different
15         product areas.

16                                   *       *       *

17         [INVESTOR]:  <u>Do you understand the frustration though for your investor group out
           here?</u>  I mean, there are [a] lot of dedicated long-term shareholders in this Company
18         who really just don't feel like we have a good grasp of where things are heading and
           what the time table is going to be in order to achieve that and a lot of us initially
19         came in purely as a result of the publicity that was generated through the Sony
           lawsuit, <u>with the expectation that once we had that wad of cash in our pocket, we
20         would really be able to ramp things [up]</u> . . . .  And I mean, I have a sort of dollar cost
           averaged into this Company over the course of the last four years and was just
21         reviewing my purchases from spring of 2006 and I paid $8.94 which is about where
           we were last week. And so, <u>I'm a patient long-term investor, but I also expect to be
22         achieving some kind of return on my investment over time</u>, particularly since I am a
           dedicated long-term shareholder.
23
           137.    Investors also questioned defendants' lack of stock purchases and whether it relayed a
24
     lack of confidence in the Company:
25
           [INVESTOR]:  <u>Why is it that there has not been at these stock price levels more
26         interest in inside ownership</u> where we have been able to see that you believe that the
           Company is undervalued as well and (inaudible) as investors some sense that we are
27         on the right direction by having some inside ownership, additional purchases?

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                        - 49 -

1                              *        *        *

2      [VICTOR VIEGAS]:  I don't see the correlation between my buying and selling and
       the confidence I have in the future of the Company.

3

4      [INVESTOR]:  Well, again, we don't have the information that you do obviously
       working there at the Company, but as investors certainly we have always been taught
       that when you see insides [sic] buying of a Company's stock by the insiders that
5      certainly is a very good sign; and if the stock is trading down into the single-digit
       levels, that if we don't see it, it gives us pause to wonder exactly why that's not the
6      case.

7                              *        *        *

8      [INVESTOR]:  And the other last point that I would like to make is that when I look
       at the percentage of ownership that I have in the Company and I look at the
9      percentage of ownership by insiders in the Company, it would seem to me that, at
       this particular level, that people within the Company ought to be thinking about
10     investing in the Company . . . .

11          138.    These exchanges put significant pressure on defendants to report increasing sales and

12     revenues in order to inflate Immersion's stock price.

13          139.    On April 24, 2008, Immersion issued a press release announcing that defendant

14     Richardson had been appointed President and CEO of the Company to replace defendant Viegas,

15     effective April 28, 2008.  CW5 reported that, shortly after being appointed to this position, defendant

16     Richardson restructured the Medical Division so that its operations and revenue recognition became

17     even more closely controlled by Immersion's corporate headquarters, including defendants

18

19     Richardson and Ambler.

20          140.    On May 1, 2008, Immersion issued a press release announcing its 1Q08 financial

21     results.  The press release stated:

22
       *Revenues* were *$8.2 million* for the quarter ended March 31, 2008 or *27 percent
23     higher* when compared to revenues of $6.4 million for the first quarter of 2007.

24          *Net loss* for the first quarter was *$(2.6) million* compared to a net income of
       $115.8 million for the first quarter of 2007. Net income for the first quarter of 2007
25     included $134.9 million of litigation conclusions and patent license.  *Loss per share*
       was *$(0.08)* for the quarter compared to $3.91 diluted earnings per share for the first
26     quarter of 2007.

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                          - 50 -

1    141.    That same day, on May 1, 2008, following the press release, defendants held an

2    earnings conference call with analysts and investors.  During the conference call, defendant Viegas

3    reiterated Immersion's 1Q08 results:

4
        Our *revenue grew 27%* in the first quarter, over the same quarter in 2007, *to $8.2*
5        *million*.  Our *net loss* for the first quarter was *$2.6 million or $0.08 per share*.

6    142.    Defendant Ambler also reiterated Immersion's false 1Q08 results during the

7    conference call:

8
        For the first quarter of 2008, our *revenues* were *$8.2 million* compared to $6.4
9        million for the first quarter of 2007, an *increase of 27%*.  Our *net loss* for the quarter
        was *$2.6 million* or *$0.08 per share*, compared to net income of $115.8 million or
10       $3.91 of earnings per diluted share in the first quarter of 2007, which is when we
         accounted for our litigation conclusion on patent license with Sony.

11
         I would like to discuss each section of our income statement in order, starting
12       with revenue.  Looking at each of these businesses in turn, *revenues from our*
         *medical business*, which comprised 37% of total company revenues for the quarter,
13       were *$3 million* compared to $2.7 million in the year-ago quarter.  That's an *increase*
         *of 13%*.

14                                              *        *        *

15
         Analyzing our first quarter revenues by category, first quarter *total product*
16       *sales grew 7%* compared to the first quarter of 2007, and represented 47% of revenue
         for the quarter, compared to 56% in the year-ago period.  *64% of product sale*
17       *revenues came from our medical business*, 31% came from our 3D business and 5%
         came from our touch interface products business.

18    143.    For context, when questioned by analysts about the progress of Immersion's

19    international Medical sales, defendants Richardson and Viegas assured the analysts that the

20    Company was adding "very senior type of VP people" to its Medical Division and would see a

21    "*dramatic increase in the revenues* . . . in the next three quarters."

22

23    144.    On May 9, 2008, Immersion filed with the SEC its quarterly report on Form 10-Q for

24    1Q08, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as

25    follows:

26

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                        - 51 -

| 1Q08 Form 10-Q | | | | |
|---|---|---|---|---|
| Revenue | Net Loss | Product Sales | Revenue From Immersion Medical | Net Loss From Immersion Medical |
| *"27% increase"* to *$8.2 million* | *"$2.6 million"* | *"$3.9 million, an increase of $261,000 or 7%"* | *"$3.0 million, an increase of $351,000 or 13%"* | *"$1.2 million, an increase of $297,000 or 34%"* |

145.     Defendants Richardson and Ambler certified that they personally reviewed Immersion's financial statements contained in the 1Q08 Form 10-Q, evaluated Immersion's disclosure controls, and evaluated Immersion's internal controls over financial reporting; and that the Form 10-Q "fairly present[ed], in all material respects, the financial condition and result of operations of the Company."

146.     Defendants' statements regarding Immersion's 1Q08 sales, revenue and earnings in ¶¶140-145 above were knowingly false and misleading when made.  As set forth in ¶¶178-191, *infra*, Immersion admitted in its February 8, 2010 restatement that: (i) during 2008 defendants improperly booked revenue on improper "bill and hold" sales, sales transactions with non-standard terms such as rights of return and extended payment terms, transactions that lacked probable collectability from customers and transactions involving products that were not functional; (ii) Immersion lacked proper accounting controls in 2008 and, as a result, it significantly overstated its 2008 quarterly and fiscal net income; and (iii) defendants violated basic accounting principles as well as Immersion's internal accounting policies in 2008.

147.     On July 14, 2008, Immersion issued a press release announcing defendant Vogel's resignation as Senior Vice President and General Manager of Immersion Medical for undisclosed reasons.  CW1 reported, however, that defendant Vogel had been fired from the Company.  Notably, while the firing of a division's top executive typically accompanies or precedes negative results, Immersion Medical announced substantial Medical sales and revenue growth *just two weeks later*.

148.     According to a December 8, 2008 press release, Immersion appointed Daniel Chavez to replace defendant Vogel in August 2008.  CW1 stated that Immersion's executives (*i.e.*, defendants Richardson and Ambler) hired Chavez to advise the Company on what to do with its Medical Division.

149.     On August 14, 2008, Immersion announced that it had hired Barkay "to lead [Immersion Medical's] global expansion and serve as vice president and general manager, International."  Defendant Richardson told investors that "[u]nder [Barkay's] leadership, we will staff with the very best people who will focus on generating new business and providing world-class service to customers in our significant markets around the world."  According to CW1 and CW7, Barkay was hired by Vogel in Spring 2008 (before Vogel was fired).  Once hired, Barkay became Immersion Medical's main Asian sales representative.

150.     On July 31, 2008, Immersion issued a press release reporting its 2Q08 financial results.  The press release stated, in pertinent part:

> *Revenues* were *$9.3 million* for the quarter ended June 30, 2008, compared to revenues of $8.6 million for the second quarter of 2007, an *increase of 8%*.
>
> *Net loss* for the second quarter was *$(3.1) million*, compared to net income of $176,000 for the second quarter of 2007.  *Loss per share* was *$(0.10)* for the quarter, compared to $0.01 diluted earnings per share for the second quarter of 2007.
>
> *Revenues* were *$17.5 million* for the six months ended June 30, 2008, compared to revenues of $15.0 million for the first six months of 2007, *an increase of 16%*.  *Net loss* for the first six months of 2008 was *$(5.7) million*, or *$(0.19) loss per share*, compared to net income of $116.0 million, or $3.81 diluted earnings per share, for the first six months of 2007.

151.     In the press release, defendant Richardson continued to stress defendants' focus on international sales:

> "An important goal of ours for long term growth is increasing international sales and balancing the mix of domestic and international revenue," said Immersion president and CEO Clent Richardson.  "We are aggressively expanding our global reach to support our focused growth opportunities in medical, mobility, and touchscreen tactile feedback.  Our efforts include staffing with the very best people and locating them where the opportunities exist around the world.  *We are already seeing positive and measurable results from our investments.  Second quarter*

*international revenues reached $4.5 million, almost 50% of total revenue and an increase of 25% compared to the year ago quarter*."

152.  That same day, July 31, 2008, following the press release, defendants held an earnings conference call with analysts and investors.  During the call, defendant Richardson reiterated the Company's false 2Q08 results:

Our ***revenue grew 8%*** in the second quarter over the same quarter in 2007, to ***$9.3 million, a record second quarter revenue***.

Our ***net loss*** for second quarter was ***$3.1 million, or $0.10 per share***, compared to net income for the second quarter of last year of $176,000, or ***$0.01 of earnings per diluted share***.

153.  During the conference call, defendant Ambler also reiterated the Company's false 2Q08 results:

For the second quarter of 2008, our ***revenues*** were ***$9.3 million***, compared to $8.6 million for the second quarter of 2007, an ***increase of 8%***.

Our ***net loss*** for the quarter was ***$3.1 million, or $0.10 per share***, compared to net income of $0.2 million, or ***$0.01 of earnings per diluted share***, in the second quarter of 2007.

*            *            *

***Revenues from our medical business***, which comprised 46% of total company revenues, were ***$4.3 million***, compared to $4.1 million in the year-ago quarter, an increase of 4%.

*            *            *

Analyzing our second quarter revenues by category, second quarter ***total product sale revenues grew 2%*** compared to the second quarter of 2007 and represented ***58% of revenue***, compared to 62% in the year-ago period.  ***75% of product sale revenues came from our medical business***, with 19% coming from our 3D business and 6% from our touch interface products business.

*            *            *

One major goal for the year has been to ***grow our international revenues***. ***We are achieving this goal***.  For the quarter, ***international revenues grew 25%, to $4.5 million***, from $3.6 million in the second quarter of 2007, and in percentage terms represented ***49% of our revenues*** for the quarter, compared to 42% in the comparable period.

154.  In addition, defendant Richardson reiterated Immersion's substantial growth in international sales, particularly in the Company's Medical business:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*We are already seeing positive and measurable results from our investments.  Second quarter of international revenues reached $4.5 million, almost 50% of total revenue, and an increase of 25% compared to the year-ago quarter*.

\*       \*       \*

Our international team is purs[u]ing major opportunities in Asia and is developing important channel relationships that we will announce at a later date.  Even though the team has been on board only a short time, *we've seen substantial growth, up 60% in our international sales in the second quarter* over the year-ago period.  We will continue to aggressively build our global team and establish the necessary infrastructure to support international operations, localize our solutions where appropriate, to capture additional market share and substantially grow revenue.

155.    Defendants' July 31, 2008 announcement of a net loss partially disclosed that Immersion did not have the growth drivers that defendants had led investors to believe.  As a result, Immersion's stock price fell nearly 18% in the next two trading days, to close at $5.85 on August 4, 2008.  Had defendants disclosed the truth about their improper revenue recognition practices and the Company's true financial condition, however, the stock price would have dropped much further.  Thus, the Company's stock price remained artificially inflated as a result of defendants' false and misleading statements and omissions.

156.    On August 8, 2008, Immersion filed with the SEC its quarterly report on Form 10-Q for 2Q08, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as follows:

| 2Q08 Form 10-Q | | | | | |
|---|---|---|---|---|---|
| Period | Revenue | Net Loss | Product Sales | Revenue From Immersion Medical | Net Loss From Immersion Medical |
| Three months ended June 30, 2008 | *"8% increase"* *to $9.3 million* | *"$3.1 million"* | *"$5.4 million, an increase of $97,000 or 2%"* | *"$4.3 million, an increase of $154,000 or 4%"* | *"$456,000, an increase of $479,000"* |
| Six months ended June 30, 2008 | *"16% increase"* *to $17.5 million* | *"$5.7 million"* | *"$9.2 million, an increase of $358,000 or 4%"* | *"$7.3 million, an increase of $505,000 or 7%"* | *"$1.6 million, an increase of $776,000 or 92%"* |

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

157.   Defendants Richardson and Ambler certified that they personally reviewed Immersion's financial statements contained in the 2Q08 Form 10-Q, evaluated Immersion's disclosure controls, and evaluated Immersion's internal controls over financial reporting; and that the Form 10-Q "fairly present[ed], in all material respects, the financial condition and result of operations of the Company."

158.   Defendants' statements regarding Immersion's 2Q08 sales, revenue and earnings in ¶¶150-154, 156-157 above were knowingly false and misleading when made.  As set forth in ¶¶178-191, *infra*, Immersion admitted in its February 8, 2010 restatement that: (i) during 2008 defendants improperly booked revenue on improper "bill and hold" sales, sales transactions with non-standard terms such as rights of return and extended payment terms, transactions that lacked probable collectability from customers and transactions involving products that were not functional; (ii) Immersion lacked proper accounting controls in 2008 and, as a result, it significantly overstated its 2008 quarterly and fiscal net income; and (iii) defendants violated basic accounting principles as well as Immersion's internal accounting policies in 2008.

159.   On October 30, 2008, Immersion issued a press release reporting its 3Q08 financial results.  The press release stated, in pertinent part:

> **Revenues** for the third quarter of fiscal 2008 were **$10.1 million**, an **increase of approximately 3%** over revenues of $9.8 million for the third quarter of 2007.  **Net loss** for the third quarter, which included a one-time charge of $20.75 million related to the settlement of Immersion's litigation with Microsoft, was **$(32.3) million**, or **$(1.10) per share**.  Excluding the one-time charge, and tax effects of $7.3 million, **net loss** for the third quarter was **$(4.3) million, or $(0.15) per share**.

160.   In the press release, defendant Richardson reiterated Immersion's 3Q08 revenue results and stated that its international Medical sales were "**robust**":

> "**Immersion's revenue of $10.1 million was not only the highest revenue total in our history, but also the first time that quarterly revenue has exceeded the $10 million mark**," said Immersion president and CEO Clent Richardson. "Results for the touch side of our business were highlighted by strong adoption of our solutions in high-volume mobile phones, **while international sales for our medical line of business were robust**."

1    161.    Contrary to defendants' claim that Immersion's "international sales for [its] Medical

2  line of business were robust," as described in ¶¶178-187, Immersion's international sales were a

3  direct result of improper side agreements (which altered payment terms, in violation of the

4  Company's policies), premature revenue recognition and fictitious sales.

5    162.    Also, on October 30, 2008, following the press release, defendants held an earnings

6  conference call with analysts and investors.  During the call, defendant Richardson again reiterated

7  Immersion's 3Q08 revenue results:

8

9      Immersion posted *record revenue of $10.1 million* in the third quarter of 2008.  This
      is not only the *highest revenue total in our company's history*, but also the first time
10     that Immersion's quarterly revenue has exceeded the $10 million mark.

11    163.    Defendant Ambler also reiterated the Company's 3Q08 results:

12     *Immersion's revenues of $10.1 for the third quarter of 2008 were a new quarterly
      record, and revenues exceeded $10 million for the first time in our history*.  Total
13     revenues *increased approximately 3%* over the comparable period last year. . . .

14         Looking at a breakdown of revenues across our various business lines,
      *revenues from medical of $3.2 million represented 32% of total revenues*, and were
15     down 39% relative to the same quarter last year.  As Clent will discuss in a few
      minutes, this decline was a result in a short fall in US sales, while international sales
16     and our global opportunity grew sharply during the quarter.  We see very strong
      opportunities for our medical solutions globally.
17

18                    *        *        *

19         We continue to make good progress in expanding our international revenues.
      For the quarter, *international revenues grew 112% year-over-year to $5.6 million*.
20     That represented *56% of total revenues*.  We are seeking significant opportunities for
      Immersion products on a global basis, and you will see a continued focus on
21     international activities as we seek to capture additional revenue.

22    164.    In addition, defendant Richardson further reported on Immersion's international

23  Medical sales, announcing that they had grown "*more than 3 times*" over 3Q07:

24         In contrast, as disappointing as our US sales were, our international results
      were predictably and equally promising.  *Overseas revenue for medical grew more
25     than 3 times* over the third quarter of last year.  As I stated in our last quarterly call,
      we are committed and heavily focused on the global market for our medical
26     solutions.  As our research shows, the international market is in excess of 2 times that
      of the US market.

27

28

1
2
3
4
5
6

165.    In response to defendants' October 30, 2008 statements, particularly that Immersion's revenues had exceeded the "$10 million mark" for the first time in its history, the Company's stock price rose **23.56%** over the next two trading days, to close at $5.75 on November 3, 2008.  As set forth in ¶190, defendants could not have made this momentous claim without falsely recognizing Medical revenue.

7
8
9

166.    On November 7, 2008, Immersion filed with the SEC its quarterly report on Form 10-Q for 3Q08, signed by defendant Ambler.  The Form 10-Q reported Immersion's earnings results as follows:

10
11
12
13
14
15
16
17

| 3Q08 Form 10-Q | | | | | |
|---|---|---|---|---|---|
| Period | Revenue | Net Loss | Product Sales | Revenue From Immersion Medical | Net Loss From Immersion Medical |
| Three months ended September 30, 2008 | *"3% increase"* *to $10.1 million* | *"$32.3 million"* | *"$4.8 million, a decrease of $665,000 or 12%"* | *"3.2 million, a decrease of $2.0 million or 39%"* | *"$2.3 million, an increase of $3.6 million"* |
| Nine months ended September 30, 2008 | *"11% increase"* *to $27.5 million* | *"$38.0 million"* | *"$14.0 million, a decrease of $307,000 or 2%"* | *"$10.5 million, a decrease of $1.5 million or 13%"* | *"$3.9 million, an increase of $4.4 million"* |

18
19
20
21
22
23

167.    Defendants Richardson and Ambler certified that they personally reviewed Immersion's financial statements contained in the 3Q08 Form 10-Q, evaluated Immersion's disclosure controls, and evaluated Immersion's internal controls over financial reporting; and that the Form 10-Q "fairly present[ed], in all material respects, the financial condition and result of operations of the Company."

24
25
26
27

168.    Defendants' statements regarding Immersion's 3Q08 sales, revenue and earnings in ¶¶159-160, 162-164, 166-167 above were knowingly false and misleading when made.  As set forth in ¶¶178-191, *infra*, Immersion admitted in its February 8, 2010 restatement that: (i) during 2008 defendants improperly booked revenue on improper "bill and hold" sales, sales transactions with

28

1    non-standard terms such as rights of return and extended payment terms, transactions that lacked

2    probable collectability from customers and transactions involving products that were not functional;

3    (ii) Immersion lacked proper accounting controls in 2008 and, as a result, it significantly overstated

4    its 2008 quarterly and fiscal net income; and (iii) defendants violated basic accounting principles as

5    well as Immersion's internal accounting policies in 2008.

6
7         169.   On March 2, 2009, Immersion issued a press release reporting its 4Q08 and fiscal

8    2008 financial results.  The press release stated:

9              **Revenues** for the fourth quarter of fiscal 2008 were ***$9.0 million, a decrease
              of 9%*** compared to revenues of $9.9 million for the fourth quarter of 2007 and a
10             ***decrease of 11%*** compared to $10.1 million in the third quarter of 2008.  Excluding
              $1.1 million in one-time deferred revenues for the third quarter of 2008, revenues for
11             the fourth quarter were flat sequentially.  *Net loss* for the fourth quarter, which
              included one-time charges of $2.6 million related to the divestiture of the 3D line of
12             business, was ***$(9.7) million***, or ***$(0.35) per share***.  Excluding the one-time charges,
              net loss for the fourth quarter was $(7.1) million, or $(0.26) per share. . . .
13
              **Revenues** for fiscal 2008 were ***$36.5 million, an increase of 5%*** over
14             revenues of $34.7 million for fiscal 2007.  *Net loss* for fiscal 2008, which included
              one-time charges of $2.6 million related to the divestiture of the 3D line of business,
15             and a $20.75 million settlement of Immersion's lawsuit with Microsoft, was ***$(47.7)
              million***, or ***$(1.61) per share***.  Excluding the one-time charges and settlement, ***net
16             loss*** for fiscal 2008 was ***$(24.4) million***, or ***$(0.82) per share***.

17        170.   The same day, March 2, 2009, following the press release, defendants held an

18   earnings conference call with analysts and investors.  During the call, defendants Richardson and

19   Ambler reiterated Immersion's false 4Q08 and fiscal 2008 results and reported "***strong growth***" in

20   Immersion's international Medical sales:

21
22             [CLENT RICHARDSON]:  Immersion's fourth quarter **revenue** was ***$9 million***,
              which was flat with last quarter, excluding the one-time deferred revenue from IS,
23             LLC recognized in that period.

24             **Revenue** for the fiscal year grew to ***$36.5 million, a 5% increase*** over fiscal
              2007.

25                                 *       *       *

26             [STEPHEN AMBLER]:  For the fourth quarter of 2008, ***revenues*** were ***$9 million***,
              sequentially flat compared to the preceding quarter, when you exclude $1.1 million
27             of one-time deferred revenues from IS, LLC recognized in Q3, and a ***decrease of 9%***
              from $9.9 million in the comparable period last year. . . .
28

620905_1

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                          - 59 -

*Revenues* for the fiscal year totaled *$36.5 million, an increase of 5%*, compared to $34.7 million for fiscal 2007. Excluding the 3D line of business, revenues totaled *$31.6 million in 2008*, and $29.9 million in 2007, *an increase of 6%*. Looking at a breakdown of revenue across our various lines of business, fourth quarter *revenues from medical* were *$4.3 million*, represented *48% of total revenues*. This is *up 27%* from the year ago period, and *up 34%* sequentially. For the year, our *medical revenues* totaled *$14.8 million*, down 4% from 2007, and represented *41%* of our total revenues.

*We continued to see strong growth in international sales with our medical line of business. Medical international revenues grew 135%* over the year-ago period, and also *grew 24%* sequentially.

\*        \*        \*

Analyzing our fourth quarter and year end revenues by category, *total product sale revenues increased 30%* compared to the fourth quarter of 2007, 16% sequentially, and represented 61% of revenue. *72% of product sale revenues came from our medical business*, 24% came from our 3D business, and 4% came from our touch interface products business.

For the year, *product sale revenues* accounted for *53%* of total revenues, and *grew 5%* over 2007.

\*        \*        \*

After accounting for the one-time charge related to the disposal of our 3D line of business, our *net loss* for the quarter was *$9.7 million*, or *$0.35 per share*. Excluding the one-time items, net loss would have been $7.1 million, or $0.26 per share. . . .

For the year, our *net loss* totaled *$47.7 million*, or *$1.61 per share*, including the one-time charges previously mentioned. Excluding these items, net loss would have been $24.4 million, or $0.82 per share.

171.    Defendant Richardson also continued to reassure investors as to the strength of Immersion's Medical business:

*Medical represented 48% of our revenue in Q4, and 41% for fiscal 2008*. While Immersion's touch products are undeniably hot, and of great interest on Wall Street, it is critical for investors in our Company to understand our Medical line of business. Historically, the largest contributor of Immersion's revenue on a percentage basis, the Medical line of business, is one of the most meaningful and vital growth drivers of our Company. In Q4, our team delivered revenue that was up both year-over-year and sequentially, following a disappointing Q3.

\*        \*        \*

Second, this is a capital based business with reasonably high per unit pricing. Given the macroeconomic climate, we are pleased that our team is able to identify and close customers, and we believe this is a firm indicator of demand for Immersion Medical simulation products. And finally, *international revenue for our Medical line of business nearly tripled in the fourth quarter of 2008 over Q4 2007, and*

*doubled in full year 2008*, demonstrating the magnitude of the global opportunity for Immersion.

172.     When questioned about Immersion's 4Q08 and fiscal 2008 results, defendant Ambler told analysts that the Company's Medical business had "increased it's [sic] revenues by over $1 million":

> [ANALYST]:  [C]ould you help us understand a little bit, on the conference call for the third quarter earnings, if I am not mistaken you guys had guided to maybe a little bit better in revenues than what was reported.  That was around the end of October.
>
>           Obviously everyone has been going through this macro environment, certainly a change across the industry.  Could you guide us through what happened to Immersion specifically there, and where a lot of the erosion cam from in the timeframe from November to December?
>
> [STEPHEN AMBLER]:  Yes.  I will take that one.  Hi, Jeff.  If you actually look at our revenue, *the Medical side of our business increased it's [sic] revenues by over $1 million compared to Q3*, so we are recently happy with that, and I think it shows that despite the tough economic environment out there, Medical can grow.

173.     These results were disappointing ($0.12 below estimates) and partially revealed that Immersion did not have the growth drivers defendants had led investors to believe.  As a result, Immersion's stock price fell to $2.78 per share on March 3, 2009, or nearly 29%, down from $3.69 per share prior to the announcement.  Defendants, however, continued to conceal the full extent and effect of defendants' improper revenue recognition and significant overstatement of Immersion's revenue.  Thus, the Company's stock price remained artificially inflated as a result of defendants' false and misleading statements and omissions.

174.     On March 9, 2009, Immersion filed its 2008 Form 10-K with the SEC, signed by defendants Richardson and Ambler.  The Form 10-K reported Immersion's earnings results as follows:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

| 2008 Form 10-K | | | | |
|---|---|---|---|---|
| Revenue | Net Loss | Product Sales | Revenue From Immersion Medical | Net Loss From Immersion Medical |
| *"increased by $1.8 million, or 5%, to $36.5 million"* | *"$47.7 million"* | *"increased by $963,000 or 5%"* | *"decreased by $589,000 or 4%"* | *"[t]he segment's results changed by $6.9 million to a loss"* |

175.    In addition, the Form 10-K stated that "[t]he increase in product sales was primarily due to *increased medical product sales of $746,000 . . . ."*

176.    Defendants Richardson and Ambler certified that they personally reviewed Immersion's financial statements contained in the 2008 Form 10-K, evaluated Immersion's disclosure controls, and evaluated Immersion's internal controls over financial reporting; and that the Form 10-K "fairly present[ed], in all material respects, the financial condition and result of operations of the Company."

177.    Defendants' statements regarding Immersion's 4Q08 and fiscal 2008 sales, revenue and earnings in ¶¶169-172, 174-176 above were knowingly false and misleading when made.  As set forth in ¶¶178-191, *infra*, Immersion admitted in its February 8, 2010 restatement that: (i) during 2008 defendants improperly booked revenue on improper "bill and hold" sales, sales transactions with non-standard terms such as rights of return and extended payment terms, transactions that lacked probable collectability from customers and transactions involving products that were not functional; (ii) Immersion lacked proper accounting controls in 2008 and, as a result, it significantly overstated its 2008 quarterly and fiscal net income; and (iii) defendants violated basic accounting principles as well as Immersion's internal accounting policies in 2008.

**Reasons Why Defendants' 2008 Revenue, Growth, Earnings and Medical Sales Statements Were False and Misleading**

178.    Defendants' statements regarding Immersion's 2008 sales, revenues and earnings were knowingly false and misleading when made.  In its February 8, 2010 restatement, Immersion admitted that it improperly recognized revenue in its Medical business during 2008 due to:

(i) "**Premature recognition of revenue** for products sold with FOB Destination or other similar shipping terms, or for **incomplete shipment** of products or **storage** of products following shipment" (*i.e.*, improper "bill and hold" sales); (ii) "Non-standard terms and conditions that prevented recognition of revenue upon shipment, including **rights of return**, extended payment terms, product replacement commitments, potential free upgrades and other non-standard commitments, that prevented recognition of revenue upon shipment"; and (iii) "**Lack of probable collectability** at the time revenue was recognized."  As a result of these material errors, Immersion was forced to restate its fiscal 2008 results to account for at least **$1.3 million** of improperly recognized revenue.

179.    In addition, Immersion admitted in its February 8, 2010 restatement that it improperly recognized premature, inflated and fictitious revenue on several Medical sales during 2008 where the products were either **unavailable** or **not functional**.  In 4Q08, Immersion recorded revenue for five transactions where the product sold lacked sufficient functionality to permit revenue recognition.  As a result of these material misstatements, Immersion was forced to restate its 4Q08 and fiscal 2008 earnings to account for **$727,000** of improperly recognized revenue from these transactions.

180.    CW7 has confirmed defendants' improper revenue recognition on FOB Destination sales during 2008.  CW7 stated that revenue recognition on these sales was not proper until **after** the Company received proof of delivery to the customer.  Defendant Vogel and Meents, however, intentionally recognized revenue prematurely, **before** receiving proof of delivery.  CW7 stated that defendants Viegas and Ambler were involved in and aware of these sales and had numerous discussions with defendant Vogel and Meents regarding the timing of their revenue recognition.  Importantly, defendant Ambler made the final decision to recognize revenue improperly on these sales.

181.    In addition, CW1 stated that defendant Vogel shipped Medical products without a signed PO from the customer (a criteria for recognizing revenue) in 2008, and that Meents, Vogel's

1   direct report, bullied the shipping department into shipping products without a formal PO in place.

2   CW1 said that Vogel's sales department created unofficial and unsigned "POs" in Microsoft Word

3   and booked the sales based on these unofficial POs instead.  In other words, the sales department

4   created *fictitious invoices* in order to book revenue.  CW1 complained about the bullying via e-mail

5   to Cortes and had constant disagreements, via e-mail and face-to-face, with defendant Vogel and

6   Meents regarding these improper revenue recognition practices.

7

8          182.    Moreover, CW1 has confirmed that Immersion booked Medical sales in 2008 when

9   there was no functional item in inventory to ship to the customer.  CW1 stated that defendant Vogel

10  *personally insisted* on shipping known non-functional Medical products, such as road-worn

11  demonstration units, in order to book a sale, and that these shoddy products were often returned to

12  the Company.  CW2 similarly stated that he had heard Immersion was shipping non-functional

13  Medical prototypes to customers, calling them products, in order to recognize a sale, and that

14  numerous Medical products were returned by customers to Immersion during 2008.  In particular,

15  CW2 reported that by Spring 2008, numerous products shipped to China were being returned shortly

16  after shipment – directly contradicting defendants' statements in Immersion's Forms 10-Q and 10-K

17  filed during the Class Period that the Company offered no general right of return.  As described in

18  ¶251, the Company tracked these returns in a Customer Service Response module.

19

20         183.    In addition, Immersion admitted in its February 8, 2010 restatement that it improperly

21  recognized revenue during 2008 on sales pursuant to a "side agreement" signed by Barkay, which

22  contained payment and shipping terms that violated the Company's publicly stated revenue

23  recognition policies as well as GAAP.  Defendants have admitted that Immersion improperly

24  recognized revenue of at least ***$511,000*** in 2Q08, ***$523,000*** in 3Q08, and ***$585,000*** in 4Q08 pursuant

25  to this side agreement that should not have been recognized because: (i) the product was stored in a

26  third-party warehouse and was not shipped to the customer; (ii) the commitments in the side

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                                              - 64 -

agreement caused the terms of earlier transactions to be deemed "not final" until the parties terminated the distribution agreement in the third quarter of fiscal 2009; (iii) defendants had conflicting exclusivity arrangements in effect from 2Q08 through 4Q08; and (iv) concessions related to payment terms caused the amount to not be "fixed and determinable."  As a result of these material errors, defendants were forced to restate Immersion's quarterly and fiscal 2008 results to account for at least *$1.6 million* of improperly recognized revenue.

184.    Side agreements, such as those described above, often accompany channel stuffing. Channel stuffing is the practice of shipping substantially more inventory to a reseller than he can reasonably use so that the supplier can record more sales in the current period than it otherwise would if sales were simply driven by market conditions.  To encourage the reseller to accept excess goods, the parties enter into a "side agreement" modifying the normal terms of the sale.  Such agreements often include unusual or extraordinary terms, such as extended payment terms, deep discounts, or allowing the return of unsold goods for full credit.  These arrangements are generally characterized as relieving the reseller of some of the risk and rewards of ownership and often result in the supplier recording revenue in violation of GAAP.

185.    As set forth above, defendants have admitted that Immersion's improper "side agreement" involved: (i) storing products at a third-party warehouse; (ii) sales that were "not final" until the distribution agreement was terminated; and (iii) unusual payment terms that were not "fixed and determinable" – *all basic indicators of channel stuffing*.

186.    Barkay was hired by defendant Vogel in Spring 2008 to lead Immersion's "global expansion."  Once hired, Barkay specifically focused on Immersion Medical's Asian sales.  CW1 stated, however, that he had difficulty verifying the validity of Barkay's Chinese distributors (a criteria for recognizing revenue), such that CW1 believed that some of these customers were figments of Barkay's imagination.  Moreover, Barkay, a former major of Israeli military intelligence,

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

would yell at CW1 if questioned about when payment would be received on his Chinese sales. Barkay also threatened shipping and production employees to follow his orders regarding sales, even if improper.  For instance, CW1 reported that, on one occasion, Barkay told shipping and production employees in a meeting not to question his directives because he was only good at two things:  (1) making Medical simulators, and (2) killing people.

187.    Defendants have admitted that Barkay signed the improper "side agreement," and CW6 has confirmed that the improper side agreement involved sales to the Company's Chinese distributor.  According to CW5, defendant CEO Richardson was ***personally involved*** in sales to this distributor.  CW5 stated that all information about deals with the Company's Chinese distributor went directly from Barkay to defendants CEO Richardson and CFO Ambler.  CW5 stated that Barkay and Richardson had regular communications and spoke at length about these sales.  CW6 corroborated this report, stating that Barkay updated his superiors, including defendants Richardson, Vogel and Chavez, about the specific terms of deals with distributor.  Further, defendant Richardson admitted on October 30, 2008 that he traveled to Asia and "personally assist[ed]" Barkay and his sales team with Asian Medical sales in 2008.  CW7 stated that Immersion's improper sales practices should have been obvious to defendants, as its international sales increased significantly in 2008 (during Barkay's tenure) without Immersion Medical releasing any new products.

188.    In addition, CW5 stated that, shortly after becoming CEO in April 2008, defendant Richardson restructured Immersion Medical so that its operations and revenue recognition process were more closely controlled by Immersion's corporate office, including defendants Richardson and Ambler.  CW5 emphasized, however, that both before and after this reorganization, defendant Ambler made the final decision on whether to recognize revenue on a sale.  CW7 also stated that defendants Ambler, Viegas and Richardson (once he became CEO) were involved in and aware of the Medical Division's sales and revenue recognition.

189.   Further, CW4 regularly met with defendant Ambler during 2008 to review DSO reports.  CW4 stated that these reports showed that Immersion's Chinese distributor typically had the longest days outstanding (over 180 days) of any customer.  In addition, CW1 reported that defendant Ambler traveled to Gaithersburg, Maryland quarterly to audit the Medical Division's accounts receivable and reviewed a sales packet for each sale with outstanding payment.  CW1 stated that the sales packets identified instances where credit approval for the customer (a criteria for recognizing revenue) was received *after* Meents, Barkay or defendant Vogel had instructed shipment of the product and recognized revenue on the sale.  These red flags should have alerted defendants that Immersion was improperly recognizing revenue on these sales.

190.   As a result of their fraudulent revenue recognition practices, defendants materially overstated Immersion's earnings and revenue during 2008.  Ultimately, defendants overstated Immersion's revenues by *over $3.6 million* in 2008, and overstated Medical revenues by *over 32%*, including an *overstatement* of Immersion's revenues and net earnings (or understated its net loss) in each quarter of 2008.  Moreover, defendants' laudatory (albeit false) announcement in 3Q08 that Immersion had finally hit the "$10 million mark" was based on their fraudulent overstatement of revenues.  Absent their fraudulent accounting and sales practices, defendants would not have been able to make this momentous claim.  Defendants' material misstatement of Immersion's 2008 revenues is set forth in the following chart:

| | 2008 | | | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | FY |
| Total Revenue Misstatements | **$89,000** | **$602,000** | **$1,822,000** | **$1,146,000** | **$3,659,000** |
| Total Revenue Originally Reported | $8,155,000 | $9,313,000 | $10,081,000 | $8,986,000 | $36,535,000 |
| % overstated (understated) | **1.1%** | **6.9%** | **22.1%** | **14.6%** | **11.1%** |
| Total Medical Revenue Originally Reported | $3,008,000 | $4,301,000 | $3,221,000 | $4,309,000 | $14,839,000 |
| % overstated (understated) | **3.0%** | **16.3%** | **130.2%** | **36.2%** | **32.7%** |

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                  - 67 -

191.    Immersion also lacked internal controls throughout 2008 and, as a result, defendants improperly accounted for interest income on the Sony judgment, amortization and impairment of intangibles, and stock-based compensation.  These accounting misstatements resulted in significant overstatements of Immersion's quarterly and fiscal 2008 net income, as set forth in the chart in ¶41.

**Defendants' 2008 Revenue Statements Were Also False Because They Violated GAAP**

192.    In addition to falsely reporting sales and revenue, defendants' practices violated basic accounting principles as well as Immersion's own stated policies.  Defendants' significant GAAP violations during 2008 further evidence their knowledge of the Company's improper revenue recognition practices and falsely reported revenue.  FASCON 5 clearly and concisely states that revenue cannot be recognized until it is both realized (or realizable) and earned.  SEC SAB 104 has further clarified revenue rules under GAAP by requiring that revenue be recognized only when ***all*** of the following criteria are met:

> (a)    persuasive evidence of an arrangement exists;
>
> (b)    delivery has occurred or services have been rendered;
>
> (c)    the seller's price to the buyer is fixed or determinable; and
>
> (d)    collectability is reasonably assured.

193.    Defendants acknowledged these requirements in Immersion's 2007 Forms 10-Q and 10-K, and told investors that "[t]he Company recognizes revenues in accordance with applicable accounting standards, including Staff Accounting Bulletin ("SAB") No. 104, "Revenue Recognition" ("SAB No. 104") . . . .  Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or service has been rendered, the fee is fixed and determinable, and collectability is probable."  Defendants further represented that "[t]he Company recognizes revenues from product sales when the product is shipped, provided that collection is determined to be probable and no significant obligation remains."  As set forth in ¶¶128-135, Immersion's Medical sales violated these basic accounting standards.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                                    - 68 -

1    194.    In addition, with regard to sales where the products were either **_unavailable_** or **_not_**

2  **_functional_**, Immersion has admitted in its February 8, 2010 restatement that the revenue recognition

3  on these transactions violated GAAP:

4          In reviewing the transactions where sales personnel in our Medical line of
         business had made commitments by us to provide **_products that were not available_**

5       or products that included **_components that were not fully developed at the time of_**
         **_sale_**, we concluded that **_revenue was not appropriately recognized_** on certain

6       transactions resulting in restatement adjustments to revenue in various reporting
         periods.

7                                          *          *          *

8          In the fourth quarter of fiscal 2008, we recorded revenue for five transactions

9       where **_the product sold lacked sufficient functionality to permit recognition of_**
         **_revenue_**. . . .    In the fourth transaction for which we had recorded $130,000 in

10      revenue, sales personnel also **_promised a deliverable that was not available_** in the
         fourth quarter of fiscal 2008. . . .  In the fifth transaction, for which we had recorded

11      $129,000 in revenue, **_the purchase order provided for certain acceptance criteria_**
         **_that were not met_** in the fourth quarter of fiscal 2008.

12   195.    Well-established accounting principles require that, prior to revenue recognition, an

13
14  entity must provide the actual product or service that entitles it to the revenue to be received:

15      Revenue should not be recognized until the seller has substantially accomplished
         what it must do pursuant to the terms of the arrangement, which usually occurs upon

16      delivery or performance of the services.

17  *See* SAB 104; FASCON 5, ¶84(a), (b), (d).

18   196.    Because Immersion failed to deliver a functional product on the transactions

19  described above, Immersion had not substantially accomplished what it was required to do in order

20  to recognize revenue under GAAP.

21   197.    These sales transactions also failed to meet the SAB 104 requirement that "[d]elivery

22  has occurred" because a functional product had not been delivered and/or acceptance criteria had not

23  been met.  SAB 104 specifically states:

24      After delivery of a product or performance of a service, if uncertainty exists about
         customer acceptance, revenue should not be recognized until acceptance occurs.

25   198.    Defendants' revenue recognition practices pursuant to the side agreement also

26  violated basic accounting standards.  FASCON 5 clearly and concisely states that revenue cannot be

27  recognized until it is both realized (or realizable) and earned.  In addition, under SAB 104, revenue

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                          - 69 -

cannot be recognized unless: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the seller's price to the buyer is fixed or determinable; **and** (iv) collectability is reasonably assured.  Immersion's recognition of revenue on the sales with "side agreement[s]" violated these basic accounting standards as follows:

(a)     First, these sales violated the requirement that "[p]ersuasive evidence of an arrangement exists" because of the nature of the side agreements.  SAB 104 specifically states:

> [I]f an arrangement is subject to subsequent approval (*e.g.*, by the management committee or board of directors) or execution of another agreement, revenue recognition would be *inappropriate* until that subsequent approval or agreement is complete.

Immersion violated this requirement because the side agreements signed by Immersion resulted in earlier sales transactions to be deemed "not final" until a subsequent agreement between the parties was terminated.

(b)     Second, Immersion's revenue recognition on these "side agreement" sales violated the SAB 104 requirement that "[t]he seller's price to the buyer is fixed or determinable" as a result of the payment term concessions offered by Immersion to its customer.  SAB 104 clearly states that without a fixed price, "*revenue recognition is not appropriate*."

(c)     Third, Immersion violated the SAB 104 requirement that "[d]elivery has occurred" because the products were either not shipped at all or were stored in a third party warehouse rather than shipped to the customer.  SAB 104 specifically states:

> The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement.  Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

199.    Defendants knew or were reckless in not knowing about Immersion's side agreements.  CW5 and CW6 have confirmed that defendants Richardson and Ambler were directly involved in and aware of these deals.  Importantly, the SEC has alerted companies to be aware of side agreements and their affect on revenue recognition:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

1    Registrants should ensure that appropriate policies, procedures, and internal controls
     exist and are properly documented so as to provide reasonable assurances that sales
2    transactions, including those affected by side agreements, are properly accounted for
     in accordance with GAAP and to ensure compliance with Section 13 of the Securities
3    Exchange Act of 1934 (*i.e.*, the Foreign Corrupt Practices Act).  Side agreements
     could include cancellation, termination, or other provisions that affect revenue
4    recognition.  The existence of a subsequently executed side agreement may be an
     indicator that the original agreement was not final and revenue recognition was not
5    appropriate.

6    SAB 104, §A.2, Persuasive Evidence of an Arrangement.

7    **Defendants' Statements Regarding Immersion's 1Q09 Revenues, Growth, Earnings and
     Medical Sales Were False and Misleading**

8
         200.   On May 4, 2009, Immersion issued a press release reporting its 1Q09 financial
9
10   results.  The press release stated, in pertinent part:

11       ***Revenues*** from Continuing Operations for the first quarter of 2009 were ***$7.0
         million***, ***an increase of 1%*** compared to revenues from Continuing Operations of
12       $6.9 million for the first quarter of 2008 and a ***decrease of 8%*** compared to revenues
         from Continuing Operations of $7.6 million for the fourth quarter of 2008.  Total
13       ***revenue*** generated during the first quarter of 2009 by the Company was ***$7.5 million***,
         $531,000 of which was included within Gain from Discontinued Operations.

14                                    *      *      *

15       ***Net loss*** for the first quarter of 2009 was ***$(7.5) million, or $(0.27) per share***,
         compared to net loss for the first quarter of 2008 of $(2.6) million, or $(0.08) per
16       share and net loss of $(9.7) million, or $(0.35) per share, for the fourth quarter of
         2008, which included one-time charges of $2.6 million related to the divesture of the
17       3D line of business.

18       201.   That same day, May 4, 2009, following the press release, defendants held an earnings
19
     conference call with investors and analysts.  During the call, defendants Richardson and Ambler
20
21   reiterated Immersion's 1Q09 results:

22       [CLENT RICHARDSON]:   Immersion posted revenue of approximately ***$7.5
         million*** in total revenue for the first quarter 2009[,] $7 million from continuing
23       operations and slightly over $0.5 million in discontinued operations.  Revenue mix
         from continuing operations was $4.5 million from our touch line of business and $2.5
24       million from our medical line of business.  Our ***net loss*** was approximately ***$7.5
         million*** and cash burned during the quarter was approximately $5 million.

25                                    *      *      *

26       [STEPHEN AMBLER]:  Looking at a breakdown of revenue across our two lines of
27       business, medical and touch, first quarter ***revenues from medical of $2.5 million
         represented 36% of total revenues***.  This is down 16% from the year-ago period and
28       down 41% sequentially.  Although we did experience significant weakness in
         revenue from our domestic medical market, which accounted for most of the

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                          - 71 -

1   shortfall, some of the drop from Q4 2008 was caused by normal seasonal buying
2   cycles.

3   202.    In addition, on the May 4, 2009 conference call, defendants disclosed for the first

4   time that "[Immersion's] medical line of business ha[d] not met revenue expectations." Defendants

5   also reported an increase in DSOs and disclosed that "payments [were] not taking place on a timely

6   basis from some of our overseas customers."  In other words, Immersion was having difficulty

7   receiving payments from certain international customers.  These negative disclosures were a direct

8   result of defendants' improper revenue recognition practices.  As a result of these disclosures,

9   Immersion's stock price fell 20% over the next three trading days, to close at $3.63 on May 7, 2009.

10  Defendants, however, continued to conceal the full extent of their revenue manipulation and

11  significant overstatement of revenues, and, as a result, the Company's stock price remained

12  artificially inflated.

13

14  203.    On May 6, 2009, Immersion filed with the SEC its quarterly report on Form 10-Q for

15  1Q09.  The Form 10-Q reported Immersion's earnings results as follows:

16

| 1Q09 Form 10-Q | | | | |
|---|---|---|---|---|
| Revenue | Net Loss | Product Sales | Revenues From Immersion Medical | Net Loss For Immersion Medical |
| "*1% increase*" *to $7.0 million* | "*$7.5 million*" | "*$2.8 million, an increase of $82,000 or 3%*" | "*$2.5 million, a decrease of $470,000 or 16%*" | "*$3.2 million, an increase of $2.0 million*" |

20  204.    In the Form 10-Q, Immersion also reported "an increase in bad debt expense of

21  $571,000 primarily from one customer that has not paid within terms . . . ."  The significant increase

22  in reported bad debt from one customer should have alerted defendants that revenue was being

23  recognized improperly or, at least, instigated on investigation into Immersion's revenue recognition

24  practices.  In its February 8, 2010 restatement, Immersion admitted that, even with this reported

25  increase, it had understated 1Q09 bad debt expense by at least $675,000.

26

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                                    - 72 -

205.    Defendants Richardson and Ambler certified that they personally reviewed Immersion's financial statements contained in the 1Q09 Form 10-Q, evaluated Immersion's disclosure controls, and evaluated Immersion's internal controls over financial reporting; and that the Form 10-Q "fairly present[ed], in all material respects, the financial condition and result of operations of the Company."

**Reasons Why Defendants' 1Q09 Revenue, Growth, Earnings and Medical Sales Statements Were False and Misleading**

206.    Defendants' statements regarding Immersion's 1Q09 actual sales, revenues and earnings in the press release, conference call and Form 10-Q were false when made.  Immersion admitted in its February 8, 2010 restatement that it improperly recognized revenue in its Medical business during 1Q09 due to: (i) "*Premature recognition of revenue* for products sold with FOB Destination or other similar shipping terms, or for *incomplete shipment* of products or *storage* of products following shipment" (*i.e.*, improper "bill and hold" sales); (ii) "Non-standard terms and conditions that prevented recognition of revenue upon shipment, including *rights of return*, extended payment terms, product replacement commitments, potential free upgrades and other non-standard commitments, that prevented recognition of revenue upon shipment"; and (iii) "*Lack of probable collectability* at the time revenue was recognized."  For the same reasons set forth in ¶¶128-135, 192-193, these sales transactions were false and violated GAAP, SAB 104 and FAS 48. As a result of these material errors, Immersion was forced to restate its 1Q09 results to account for at least $67,000 of improperly recognized revenue.  According to Immersion's 1Q09 Form 10-Q/A, filed on February 8, 2010, this restatement represented an increase of $536,000 of revenue that was improperly recorded in earlier periods and a decrease of $469,000 of revenue originally recorded in 1Q09 that was reversed.

207.    In addition, Immersion admitted in its February 8, 2010 restatement that it improperly recognized revenue on sales where products were *not available* or *lacked functionally* at the time of

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                              - 73 -

sale.  For the same reasons set forth in ¶¶194-197, these transactions were false and violated GAAP and basic accounting standards.  As a result of these material errors, Immersion recognized $468,000 in 1Q09 that had been improperly recognized in prior quarters.

208.     Further, Immersion admitted in its February 8, 2010 restatement that it improperly recognized revenue in 1Q09 on sales pursuant to a "side agreement" signed by Barkay, which contained terms that violated the Company's publicly stated revenue recognition policies as well as GAAP.  For the same reasons set forth in ¶¶198-199, Immersion's accounting of these transactions violated GAAP and basic accounting standards and resulted in a restatement in 2008 revenue.  As a result of these material misstatements, Immersion reversed $623,000 of bad debt expense and allowance for doubtful accounts in 1Q09 that had been inappropriately recorded in earlier periods.

209.     In total, Immersion recognized additional revenue of $528,000 in 1Q09 as part of its restatement.  Not only was Immersion's understatement of earnings in this quarter false, it was a direct result of its significant *overstatement* of revenue in prior quarters.  Immersion's understatement of its 1Q09 earnings further evidences defendants' manipulation of the Company's financial statements, their ongoing violation of GAAP, and Immersion's complete lack of internal controls during the Class Period.

210.     Immersion's understatement of 1Q09 revenue is also indicative of intentional channel stuffing.  Companies engaged in channel stuffing often overstate revenues in the period when the products are shipped to the reseller, only to understate revenues in a later period if and when the product is actually sold.  Similarly, here, Immersion falsely overstated its 2008 revenues, then subsequently shifted a portion of those same revenues into 1Q09, when the products were purportedly actually sold.  In addition, defendants have admitted that Immersion's improper revenue recognition involved: (i) improper storage of products following shipment; (ii) storage of products at a third-party warehouse; (iii) non-standard terms and conditions, including "rights of return" and

1   "extended payment terms"; (iv) commitments that caused earlier transactions to be deemed "not

2   final" until a distribution agreement was terminated; and (v) unusual payment terms that were not

3   fixed and determinable – *all basic indicators of channel stuffing*.

4   211.    For the reasons outlined in ¶¶178-191, defendants knew that their statements

5   regarding Immersion's revenue in 1Q09 were false and misleading.  Former Immersion employees

6   have confirmed that Immersion was improperly recognizing revenue on Medical sales where its

7   products were not available for shipment or included components that were not fully developed at

8   the time of sale.  For instance, CW1 stated that Immersion booked Medical sales when the products

9   were unavailable or lacked functionality, which CW2 corroborated.

10

11   212.    Moreover, defendants were aware of the Company's improper practices regarding

12   Medical sales to Chinese customers.  CW6 has confirmed that the improper side agreement involved

13   the Company's Chinese distributor.  CW5 reported that defendant Richardson was personally

14   involved in Medical sales to this distributor.  Moreover, CW5 stated that all information about these

15   sales went directly from Barkay to defendants Richardson and Ambler, and that Barkay and

16   defendant Richardson had regular communications and spoke at length about these sales.  In

17   addition, CW2 reported that, with regard to Chinese customers in particular, there were many

18   instances when customers returned products to the Medical Division, sometimes within a matter of

19   days.  CW1, CW2, CW3, CW4 and CW5 have *all* confirmed that defendant Ambler was ***directly***

20   ***responsible*** for recognizing revenue on these sales.

21

22

23   **DEFENDANTS' FALSE STATEMENTS REGARDING IMMERSION'S REVENUE**
     **RECOGNITION AND INTERNAL CONTROLS**

24   **Defendants' Critical Accounting Policies and Estimates Statements Were False and**
     **Misleading**

25

26   213.    In each quarter from Immersion's 1Q07 through 1Q09, the Company made false and

27   misleading statements in its Forms 10-Q and Forms 10-K filed with the SEC regarding its

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                      - 75 -

1  accounting policies and estimates, GAAP compliance, revenue recognition practices and internal

2  controls.

3     214.    Regarding Immersion's accounting policies and revenue recognition, the Company's

4  1Q07, 2Q07 and 3Q07 Forms 10-Q, filed on May 10, 2007, August 8, 2007 and November 8, 2007,

5

6  respectively, stated:

7        CRITICAL ACCOUNTING POLICIES AND ESTIMATES

8            Our discussion and analysis of our financial condition and results of
   operations are based upon our condensed consolidated financial statements, *which
9   have been prepared in accordance with GAAP. . . .  On an ongoing basis, we
   evaluate our estimates and assumptions, including those related to revenue
10  recognition, stock-based compensation*, bad debts, inventory reserves, warranty
   obligations, patents and intangible assets, contingencies, and litigation. . . .

11           We believe the following are our *most critical accounting policies* as they
12  require our significant judgments and estimates in the preparation of our condensed
   consolidated financial statements:

13           *Revenue Recognition – We recognize revenues in accordance with
   applicable accounting standards . . . .  Revenue is recognized when persuasive
14  evidence of an arrangement exists, delivery has occurred or service has been
   rendered, the fee is fixed and determinable, and collectibility[sic] is probable*.
15

16                *     *     *

17           *Product sales – We recognize revenues from product sales when the product
   is shipped, provided collection is determined to be probable and no significant
18  obligation remains*. . . .  We offer a general right of return on the MicroScribe
   product line for 14 days after purchase.  We recognize revenue at the time of
19  shipment of a MicroScribe digitizer and provide an accrual for potential returns
   based on historical experience.  *We offer no other general right of return on our
20  products*.

21                *     *     *

22           Our revenue recognition policies are *significant* because our revenues are a
   key component of our results of operations.

23     215.    Regarding Immersion's accounting policies and revenue recognition, the Company's

24  1Q08, 2Q08, 3Q08 and 1Q09 Forms 10-Q and 2007 and 2008 Forms 10-K, filed on May 9, 2008,

25  August 8, 2008, November 7, 2008, May 6, 2009, March 17, 2008 and March 9, 2009, respectively,

26  stated:

27

28        CRITICAL ACCOUNTING POLICIES AND ESTIMATES

1   Our discussion and analysis of our financial condition and results of operations are based upon our condensed consolidated financial statements, **which have been prepared in accordance with GAAP. . . .  On an ongoing basis, we evaluate our estimates and assumptions, including those related to revenue recognition, stock-based compensation**, bad debts, inventory reserves, short-term investments, warranty obligations, patents and intangible assets, contingencies, and litigation. . . .

We believe the following are our **most critical accounting policies** as they require our significant judgments and estimates in the preparation of our condensed consolidated financial statements:

**Revenue Recognition – We recognize revenues in accordance with applicable accounting standards . . . .  Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred or service has been rendered, the fee is fixed and determinable, and collectability is probable**.

*            *            *

*Product sales –* **We recognize revenues from product sales when the product is shipped, provided the other revenue recognition criteria are met, including that collection is determined to be probable and no significant obligation remains**. . . . We offer a general right of return on the MicroScribe product line for 14 days after purchase.  We recognize revenue at the time of shipment of a MicroScribe digitizer and provide an accrual for potential returns based on historical experience.  **We offer no other general right of return on our products**.

*            *            *

Our revenue recognition policies are **significant** because our revenues are a key component of our results of operations.

216.    Defendants' critical accounting policies and estimates statements were false and misleading when made.  As detailed in ¶¶128-135, 192-199, Immersion did **not** "recognize revenues in accordance with applicable accounting standards" during the Class Period.  In addition, contrary to its statement that the Company offered "no . . . general right of return," Immersion offered and accepted right of returns on its Medical products throughout the Class Period.  According to CW2, there were many instances when customers **returned products** to the Medical Division, sometimes within a matter of days.  With regard to Chinese customers in particular, CW2 reported that by spring of 2008, Medical products shipped to Chinese customers were being returned shortly after they were shipped.

217.    As detailed herein, in order to improperly inflate Immersion's revenue, income from operations, net income, and earnings per share, defendants caused the Company to falsely report its financial results included in Immersion's publicly issued financial statements and related earnings releases during the Class Period.  These financial results were materially false and misleading and in violation of GAAP because:

(a)    Immersion improperly recognized premature, inflated and fictitious revenue on several transactions in its Medical line of business; and

(b)    Immersion improperly accounted for several other items including stock-based compensation expense, amortization and impairment of intangibles and interest income.

218.    As a result of these GAAP violations, each of Immersion's quarterly and annual public financial statements filed with the SEC during the Class Period were materially false and misleading.  In total, Immersion overstated Class Period revenue by at least *$3.7 million*, including an overstatement of over *32% of Medical line revenue* in fiscal year 2008.  In addition, Immersion materially overstated income from operations, net income and earnings per share throughout the Class Period.  Defendants do not dispute that these overstatements were material.  Defendants' accounting violations were deliberate and the means by which defendants accomplished their improper revenue recognition scheme, including but not limited to storing products at third-party warehouses and providing customers with rights to return products, which were intended to deceive Immersion's outside auditors and the investing public, and made it difficult, if not impossible, for a proper, independent third-party review of the Company's true financial condition and results.

219.    On August 10, 2009, the Company announced a massive restatement and admitted that its "previously issued consolidated financial statements as of and for the year ended December

31, 2008 and auditor's report thereon,[7] and previously issued unaudited financial statements as of and for the periods ended March 31, 2009, December 31, 2008, September 30, 2008, June 30, 2008 and March, 2008, ***should no longer be relied upon*** because of one or more errors in such financial statements."

220.     The restatement of previously issued public financial statements is a material event. The accounting rules governing correction of errors or fraud in previously issued financial statements do not allow a registrant any discretion or election in deciding whether or not to retroactively restate the previous financial statements.   GAAP only permits (and requires) restatements of previously issued financial statements to correct ***material*** errors, resulting from either: (a) mathematical mistakes, mistakes in the application of GAAP or oversight ***or misuse of facts that existed at the time the financial statements were prepared***; or (b) a change in accounting principle or change in the reporting entity.  *See* SFAS No. 154, *Accounting Changes and Error Corrections*, ¶¶2, 4-10, 23-26.  In this case, Immersion has admitted that its restatement was done solely to correct "errors," and not to change accounting principles or the reporting entity.  Therefore, Immersion's restatement of its previous financial statements is an admission that: (i) Immersion's financial results originally issued during the Class Period and defendants' public statements regarding those results were ***materially false***; and (ii) Immersion's financial statements reported during the Class Period were incorrect ***based on information available to defendants at the time the results were originally reported***.

---

[7]     Subsequently, on November 17, 2009, the Company announced that it would also restate its financial statements for the fiscal year ended December 31, 2007.  On February 28, 2010, the Company announced further restatement adjustments for the year ended December 31, 2006.

1   **Defendants' Internal Controls and Procedure Statements Were False and Misleading**

2   221.   In each quarter from Immersion's 1Q07 through 1Q09, the Company made false and

3   misleading statements in its Forms 10-Q and Forms 10-K filed with the SEC regarding its internal

4   controls and procedures.

5   222.   With regard to Immersion's internal controls and procedures, the Company's 1Q07,

6   2Q07 and 3Q07 Forms 10-Q, filed on May 10, 2007, August 8, 2007 and November 8, 2007,

7   respectively, stated:

8

9       **CONTROLS AND PROCEDURES**

10      Based on their evaluation as of [March 31, 2007/June 30, 2007/September 30,
        2007], our management with the participation of our Chief Executive Officer and

11      Chief Financial Officer, have concluded that our disclosure controls and procedures
        (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of

12      1934, as amended) were ***sufficiently effective*** to ensure that the information required
        to be disclosed by us in this quarterly report on Form 10-Q was recorded, processed,

13      summarized and reported within the time periods specified in the SEC's rules for
        Form 10-Q.

14
        There were ***no changes*** to internal controls over financial reporting during

15      the quarter ended [March 31, 2007/June 30, 2007/September 30, 2007] ***that have
        materially affected or are reasonably likely to materially affect our internal control***

16      ***over financial reporting***.

17  223.   With regard to Immersion's internal controls and procedures, the Company's 2007

18  Form 10-K, filed March 17, 2008, reported a material weakness with respect to accounting for

19  income taxes.   The Company reassured investors, however, that its financial statements were

20  otherwise "***prepared in accordance with [GAAP]***":

21
        **Management's Evaluation of Disclosure Controls and Procedures**

22
        Our management evaluated, with the participation of our Chief Executive

23      Officer and our Chief Financial Officer, the effectiveness of our disclosure controls
        and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange

24      Act) as of December 31, 2007.   Based on this evaluation, our Chief Executive
        Officer and our Chief Financial Officer have concluded that, as of December 31,

25      2007, due to a material weakness related to our internal controls ***with respect to the
        accounting for income taxes*** . . . our disclosure controls and procedures were not

26      effective. ***Additional review, evaluation and oversight were undertaken on the part
        of management in order to ensure our consolidated financial statements were***

27      ***prepared in accordance with generally accepted accounting principles and, as a
        result, management has concluded that the consolidated financial statements in***

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                          - 80 -

*this Annual Report on Form 10-K fairly presents, in all material respects, our financial position, results of operations and cash flows for the periods presented.*

\*       \*       \*

Except for the material weakness described above, there were no changes to internal controls over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended) for the quarter ended December 31, 2007, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

224.    The Company's 1Q08 Form 10-Q, filed on May 9, 2008, similarly reported a material weakness with internal controls, but *only* with respect to accounting for income taxes:

**CONTROLS AND PROCEDURES**

Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2008.  Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that due to a material weakness related to our internal controls *with respect to the accounting for income taxes* identified at December 31, 2007 that has not been remediated as of March 31, 2008, our disclosure controls and procedures were not effective as of March 31, 2008. *Additional review, evaluation and oversight were undertaken on the part of management in order to ensure that the information required to be disclosed by us in this quarterly report on Form 10-Q was recorded, processed, summarized and reported within the time periods specified in the SEC's rules for Form 10-Q.*

225.    Immersion's 2Q08 and 3Q08 Forms 10-Q, filed on August 8, 2008 and November 7, 2008, respectively, similarly represented that the Company's *only* weakness with respect to internal controls related to accounting for income taxes:

**CONTROLS AND PROCEDURES**

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of [June 30, 2008/September 30, 2008].  Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were not effective as of [June 30, 2008/September 30, 2008] due to a material weakness in our internal control over financial reporting *with respect to accounting for income taxes* that was initially determined and disclosed in our Annual Report on Form 10-K for our fiscal year ended December 31, 2007.

The material weakness we disclosed was in the area of accounting for income taxes. . . .

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC                                                                      - 81 -

1   In connection with our plan to remediate this material weakness, we have
2   engaged in, and are continuing to engage in, substantial efforts to improve our
    internal control over financial reporting and disclosure controls and procedures
3   *related to income tax matters* . . . .

4   226.   With regard to internal controls and procedures, Immersion's 2008 Form 10-K, filed

5   on March 9, 2009, similarly stated:

6   **Management's Evaluation of Disclosure Controls and Procedures**

7        Our management, with the participation of our Chief Executive Officer and
8   our Chief Financial Officer, evaluated the effectiveness of our disclosure controls
    and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act as
9   of December 31, 2008. *The purpose of these controls and procedures is to ensure*
    *that information required to be disclosed in the reports we file or submit under the*
10  *Exchange Act is recorded, processed, summarized, and reported within the time*
    *periods specified in the SEC's rules, and that such information is accumulated and*
11  *communicated to our management, including our CEO and our CFO, to allow*
    *timely decisions regarding required disclosures*.  As set forth in our Annual Report
12  on Form 10-K for the fiscal year ended December 31, 2007, our management
    determined that a material weakness existed in controls over accounting *for income*
13  *taxes* as of December 31, 2007. . . .  Our management, including the CEO and the
    CFO, has concluded that the Company's disclosure controls and procedures were not
14  effective as of December 31, 2008 due to the continuing presence of the material
    weakness *with respect to income taxes* or ongoing implementation of remedial
15  actions as of December 31, 2008.

16                          *          *          *

17        Other than the activities to remediate our material weakness [regarding
    income taxes], there were *no changes* in our internal control over financial reporting
18  during the three months ended December 31, 2008 that have materially affected or
    are reasonably likely to materially affect, our internal control over financial
19  reporting.

20  227.   The Company's 1Q09 Form 10-Q, filed May 6, 2009, made similar representations

21  regarding Immersion's internal controls and procedures:

22  **CONTROLS AND PROCEDURES**

23  EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

24        Our management evaluated, with the participation of our Chief Executive
    Officer and our Chief Financial Officer, the effectiveness of our disclosure controls
25  and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange
    Act) as of March 31, 2009.  Based on this evaluation, our Chief Executive Officer
26  and our Chief Financial Officer have concluded that our disclosure controls and
    procedures were not effective as of March 31, 2009 due to the previously reported
27  material weakness in our internal control over financial reporting *with respect to*
    *accounting for income taxes* that was disclosed in our Annual Report on Form 10-K
28  for our fiscal year ended December 31, 2008.

1

\*       \*       \*

2        In connection with our plan to remediate this material weakness, we have
3  engaged in, and are continuing to engage in, substantial efforts to improve our
internal control over financial reporting and disclosure controls and procedures
4  ***related to income tax matters*** . . . .

5  228.    In addition, Immersion's 1Q07, 2Q07, 3Q07, 1Q08, 2Q08, 3Q08 and 1Q09

6  Forms 10-Q and 2007 and 2008 Forms 10-K, filed on May 10, 2007, August 8, 2007, November 8,

7  2007, May 9, 2008, August 8, 2008, November 7, 2008, May 6, 2009, March 17, 2008 and March 9,

8  2009, respectively, contained the following certification pursuant to SOX.  The 1Q07, 2Q07 and

9  3Q07 Forms 10-Q and 2007 Form 10-K certifications were signed by defendants Viegas and

10  Ambler, and the 1Q08, 2Q08, 3Q08 and 1Q09 Forms 10-Q and 2008 Form 10-K certifications were

11  signed by defendants Richardson and Ambler:

12
13      ***[T]his report does not contain any untrue statement of a material fact or omit to
state a material fact necessary to make the statements made, in light of the
circumstances under which such statements were made, not misleading*** with
14  respect to the period covered by this report;

15      . . . [T]he financial statements, and other financial information included in this report,
***fairly present in all material respects*** the financial condition, results of operations,
16  and cash flows of the registrant as of, and for, the periods presented in this report;

17      . . . The registrant's other certifying officer(s) and I are responsible for establishing
and maintaining disclosure controls and procedures (as defined in Exchange Act
18  Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as
defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
19

20      a)    Designed such disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under our supervision, to ***ensure
21  that material information relating to the registrant, including its consolidated
subsidiaries, is made known to us by others within those entities***, particularly during
22  the period in which this report is being prepared;

23      b)    Designed such internal control over financial reporting, or caused
such internal control over financial reporting to be designed under our supervision, to
24  ***provide reasonable assurance regarding the reliability of financial reporting*** and
the preparation of financial statements for external purposes in accordance with
generally accepted accounting principles;
25

26      c)    ***Evaluated the effectiveness of the registrant's disclosure controls
and procedures*** and presented in this report our conclusions about the effectiveness
27  of the disclosure controls and procedures, as of the end of the period covered by this
report based on such evaluation; and

28

1

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

2

3

4

. . . The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

5

6

7

a)      *All significant deficiencies and material weaknesses* in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

8

9

b)      *Any fraud, whether or not material, that involves management or other employees* who have a significant role in the registrant's internal control over financial reporting.

10

11

\*      \*      \*

12

(1)      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

13

14

(2)      The information contained in the Report *fairly presents, in all material respects, the financial condition and result of operations of the Company*.

15

229.      Defendants' internal controls and procedure statements and SOX certifications were

16

false and misleading when made.  As detailed herein, defendants caused the Company to falsely

17

report its financial results included in Immersion's publicly issued financial statements and related

18

earnings releases during the Class Period in order to improperly inflate Immersion's revenue, income

19

from operations, net income and earnings per share.  The Company has admitted in its February 8,

20

2010 restatement that its 2007, 2008 and 1Q09 financial statements did *not* "fairly present in all

21

22

material respects the financial condition, results of operations, and cash flows of [Immersion]."  The

23

Company has also admitted that it did *not* maintain effective disclosure controls or internal controls

24

over financial reporting during the Class Period.  In its Form 10-K/A for 2008, the Company stated:

25

Based on this re-evaluation and because of the material weaknesses described below, our Interim Chief Executive Officer and Interim Chief Financial Officer have concluded that our *disclosure controls and procedures were not effective* as of December 31, 2008.

26

27

28

\*      \*      \*

[O]ur management concluded that, as of December 31, 2008, our internal control over financial reporting *was not effective* to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP because of the following material weaknesses:

\*      \*      \*

- *Revenue Recognition*: Modifications to Sales Arrangements – Our controls relating to the modification of our standard sales arrangements *were not designed or operating effectively* as of December 31, 2008.  These controls are intended to ensure that changes, written or otherwise, to the terms and conditions governing each sale are documented, approved and recorded timely and accurately.  This control deficiency led to a misstatement in our consolidated financial statements which resulted in a restatement thereof.

- *Revenue Recognition*: Compliance with Specified Shipping Terms – Our controls relating to the identification of and accounting for shipping terms in our sales arrangements *were not operating effectively* as of December 31, 2008.  These controls are intended to determine the point at which title and risk of loss passes to the customer and to properly apply this information in the determination of our revenue recognition.  This control deficiency led to a misstatement in our consolidated financial statements which resulted in a restatement thereof.

- *Revenue Recognition*: Release of New Products for sale – Our controls relating to the release and approval for sale of new products *were not operating effectively* as of December 31, 2008.  These controls are intended to ensure that revenue is recognized only on fully functional products which have final approval by management prior to release for sale to customers.  This control deficiency led to a misstatement in our consolidated financial statements which resulted in a restatement thereof.

- Stock-based Compensation – Our controls related to the application of forfeiture rates in the determination of stock-based compensation *were not operating effectively* as of December 31, 2008.  This control deficiency led to a misstatement in our consolidated financial statements which resulted in a restatement thereof.

**Immersion's Other Accounting Misstatements**

230.   As a result of its lack of internal controls, Immersion has admitted that, during the Class Period, its accounting and financial reporting violated GAAP in several other areas in addition to revenue recognition.  The additional accounting misstatements include improperly accounting for stock-based compensation expense, amortization and impairment of intangibles, and interest income associated with the Sony license agreement.  These misstatements resulted in an understatement of

1   expenses which, consistent with the overstating of its revenue, allowed Immersion to overstate its net

2   income during the Class Period.

3         **i.      Immersion Understated Stock-Based Compensation Expense**

4         231.    Defendants falsely reported Immersion's stock-based compensation expense during

5   the Class Period:

6         (a)    In a May 3, 2007 press release, the Company reported "stock-based

7   compensation expense of ***$634,000***" for 1Q07.

8         (b)    During an August 2, 2007 earnings conference call, defendant Ambler stated

9   that: "We incurred non-cash stock-based compensation charges of ***$609,000*** in the [2Q07] quarter, of

10  which $583,000 are included in operating expenses."

11        (c)    During a November 1, 2007 earnings conference call, defendant Viegas

12  stated: "We incurred non cash stock-based compensation charges of ***$699,000*** in the [3Q07] quarter,

13  of which $667,000 is included in operating expenses."

14        (d)    During a May 1, 2008 earnings conference call, defendant Ambler stated: "We

15  incurred non-cash stock based compensation charges of ***$963,000*** in the [1Q08] quarter, of which

16  $943,000 were included in operating expenses."

17        (e)    During a July 31, 2008 earnings conference call, defendant Ambler stated:

18  "We incurred non-cash stock-based compensation charges of ***$964,000*** in the [2Q08] quarter, of

19  which $912,000 were included in operating expenses."

20        (f)    In each of its Forms 10-Q for 1Q07, 2Q07, 3Q07, 1Q08, 2Q08, 3Q08 and

21  1Q09, filed May 10, 2007, August 8, 2007, November 8, 2007, May 9, 2008, August 8, 2008,

22  November 7, 2008, and May 6, 2009, respectively, and its 2007 and 2008 Forms 10-K, filed

23  March 17, 2008 and March 9, 2009, respectively, Immersion represented to investors that: "***[w]e***

24  ***account for stock-based compensation in accordance with SFAS No. 123R***."

25        232.    Defendants' statements regarding Immersion's stock-based compensation expense

26  were false and misleading.  In its February 8, 2010 restatement, Immersion admitted that it

27  improperly accounted for stock-based compensation expense in violation of GAAP and SFAS No.

28

123R.  As a result of these errors, defendants were forced to restate Immersion's 2007, 2008 and 1Q09 results to account for $717,000, $1.3 million, and $163,000, respectively, of improperly accounted for stock-based compensation expense.

### ii.    Immersion Understated Amortization Expense

233.    In its February 8, 2010 restatement, Immersion admitted that, during the Class Period, its accounting for amortization expense associated with certain patents violated GAAP.  Specifically, the Company disclosed on February 8, 2010 that:

> We identified instances where we had not commenced amortization of patents in the periods the patents were granted.  In addition, we identified certain patent applications that were abandoned but had not been previously identified as such and have corrected this error by increasing amortization and impairment of intangibles . . . .

As a result of this material error, Immersion was forced to restate its 2007, 2008 and 1Q09 results to account for $58,000, $105,000 and $161,000, respectively, of improperly accounted for amortization and impairment of intangibles.

### iii.    Immersion Improperly Accounted For Interest Income

234.    Defendants also falsely reported Immersion's interest income during each of its 1Q07 through 1Q09 quarters.  During these quarters, defendants made the following false statements:

(a)    Immersion's 1Q07 Form 10-Q, filed on May 10, 2007, stated: "Interest and other income *increased by $258,000* in the first three months of 2007 compared to the same period in 2006."

(b)    During an August 2, 2007 earnings conference call, defendant Ambler stated: "Interest and other income *totaled $1.8 million* for the [2Q07] quarter while interest expense totaled $407,000 in the period, for a net total of $1.4 million income."

(c)    Immersion's 2Q07 Form 10-Q, filed August 8, 2007, stated: "Interest and other income *increased by $1.7 million* in the second quarter of 2007 compared to the same period in 2006."

1     (d)     During a November 1, 2007 earnings conference call, defendant Viegas

2 stated: "Interest and other *income totaled $1.9 million* for the [3Q07] quarter, while interest expense

3 and accretion totaled $211,000 in the period, for a net total of $1.6 million in income."

4     (e)     Immersion's 3Q07 Form 10-Q, filed November 8, 2007, stated: "Interest and

5 other income *increased by $1.8 million* in the third quarter of 2007 compared to the same period in

6 2006. . . .   Interest and other income *increased by $3.8 million* in the first nine months of 2007

7 compared to the same period in 200[6]."

8     (f)     Immersion's 2007 Form 10-K, filed March 17, 2008, stated: "Interest and

9 other income *increased by $5.6 million* from 2006 to 2007 . . . ."

10     (g)     During a May 1, 2008 earnings conference call, defendant Ambler stated:

11 "Interest and other income expense *totaled $1.5 million* income for the [1Q08] quarter."

12     (h)     Immersion's 1Q08 Form 10-Q, filed May 9, 2008, stated: "Interest and other

13 income *increased by $1.1 million* in the first quarter of 2008 compared to the same period in 2007."

14     (i)     During a July 31, 2008 earnings conference call, defendant Ambler stated:

15 "Interest and other income *totaled $909,000* for the [2Q07] quarter . . . ."

16     (j)     Immersion's 2Q08 Form 10-Q, filed August 8, 2008, stated: "Interest and

17 other income *decreased by $911,000* in the second quarter of 2008 compared to the same period in

18 2007. . . .   Interest and other income *increased by $235,000* in the first six months of 2008 compared

19 to the same period in 2007."

20     (k)     During an October 30, 2008 earnings conference call, defendant Ambler

21 stated: "Interest and other income *totaled $988,000* for the [3Q08] quarter . . . ."

22     (l)     Immersion's 3Q08 Form 10-Q, filed November 7, 2008, stated: "Interest and

23 other income *decreased by $868,000* in the third quarter of 2008 compared to the same period in

24 2007. . . .   Interest and other income *decreased by $633,000* in the first nine months of 2008

25 compared to the same period in 2007."

26     (m)     Immersion's 2008 Form 10-K, filed March 9, 2009, stated: "Interest and other

27 income *decreased by $1.8 million* from 2007 to 2008."

28

1          (n)     Immersion's 1Q09 Form 10-Q, filed May 6, 2009, stated: "Interest and other

2    income **decreased by $1.1 million** in the first three months of 2009 compared to the same period in

3    2008."

4          235.    Defendants' statements regarding Immersion's interest income during the Class

5    Period were false.  Immersion admitted in its February 8, 2010 restatement that it improperly

6    recognized interest income on installment payments associated with a significant license agreement

7    with Sony in violation of GAAP.  As a result of this material error, Immersion was forced to restate

8    its 2007, 2008 results and 1Q09 results to account for $769,000, $128,000 and $128,000,

9/10 respectively, of improperly accounted for interest income.

11         236.    Defendants were well aware of the Sony license agreement and the income derived

12   therefrom, and specifically reported on this interest income throughout the Class Period.  For

13   example, on May 3, 2007, defendant Ambler stated that "[w]e also entered into a new business

14   agreement with Sony, effective March 19, 2007.  Under the new agreement, we received 12

15   quarterly payments of $1.875 million each between the 31st of March 2007 and December 31st,

16   2009. . . .  Under U.S. GAAP rules, we are required to allocate $149.9 million, the present value of

17   these cash flows, between the fair value of elements related to past events and the fair value of

18   elements related to future events."  Defendants, and defendant CFO Ambler in particular, were

19/20 responsible for ensuring the proper accounting of this interest income.

21   **INVESTORS BEGIN TO LEARN THE TRUTH**

22         237.    On July 1, 2009, before the market opened, the Company issued a press release

23   entitled "Immersion Corporation Announces Internal Investigation."  The press release stated, in

24   part:

25/26     Immersion Corporation (NASDAQ:IMMR) announced that the Audit Committee of
     the Board of Directors of Immersion Corporation ("Immersion") ***is conducting an
     internal investigation into certain previous revenue transactions in its Medical line
     of business***.  The investigation is being conducted with the assistance of outside
27   counsel.  The Audit Committee has not yet determined the impact, if any, to
     Immersion's historical financial statements.  ***As a result of this investigation,***

28

***Immersion may discover information that could raise issues with respect to its previously-reported financial information, which could be material***.  Immersion will not be able to evaluate the full impact of the aforementioned matters until the Audit Committee completes its review and further analysis is completed.

Although Immersion currently intends to be in a position to file its quarterly report on Form 10-Q for the second quarter of fiscal 2009 on time and is diligently pursuing this investigation, it is possible that as a result of the investigation, Immersion would be unable to file its quarterly report and announce financial results in a timely manner.

238.    On this news, Immersion's stock dropped ***over 23%*** from a close of $4.94 per share on June 30, 2009 to a close of $3.80 per share on July 1, 2009, a drop of $1.14 per share on volume of 1.5 million shares in one day.

239.    Shortly thereafter, defendant Ambler's (CFO), Chavez's (Senior Vice President and General Manager of Immersion Medical) and defendant Richardson's (CEO) employment with the Company was terminated (on July 31, 2009, August 7, 2009, and October 21, 2009, respectively), while the internal investigation into Immersion's accounting practices was still pending.  The almost immediate mass exodus of Immersion's top executives shortly after the announcement of an investigation into improper practices strongly suggests defendants' intentional wrongdoing.  Indeed, an April 15, 2010, Brigantine Advisors report noted that Immersion's "whirlwind" management change following its investigation announcement left the Company with only an interim CEO and ***no CFO***.

240.    As a result of defendants' false and misleading statements, Immersion's publicly traded securities traded at inflated levels during the Class Period.  This drop removed inflation from Immersion's securities, causing real economic loss to investors who had purchased the securities during the Class Period.

## ADDITIONAL SCIENTER ALLEGATIONS

241.    As alleged herein, defendants acted with scienter in that they knew (or recklessly disregarded) that the public documents and statements issued or disseminated in the name of

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

1  Immersion were materially false and misleading, knew that such statements or documents would be

2  issued or disseminated to the investing public, and knowingly and substantially participated or

3  acquiesced in the issuance or dissemination of such statements or documents as primary violators of

4  the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their

5  receipt of information reflecting the true facts regarding Immersion, their control over, and/or receipt

6  and/or modification of Immersion's allegedly materially misleading misstatements, participated in

7  the fraudulent scheme alleged herein.

8

9      242.   Immersion has admitted that it misstated its revenues and net earnings during the

10  Class Period by, *inter alia*, improperly recognizing revenue on its Medical sales when the products:

11  (i) were not shipped to the customer until a later time (or not at all); (ii) were unavailable; (iii) were

12  not functional or proper for sale; or (iv) were returned after shipment, and on sales where the

13  revenue lacked probable collectability.  Immersion has also admitted that a senior officer of

14  Immersion Medical, Barkay, signed and executed improper "side agreements that violated Company

15  policies," resulting in improper revenue recognition.  These practices were the product of affirmative

16  (and improper) conduct and were ***not*** due to error or rule misinterpretation.  Indeed, revenues do not

17  recognize themselves.  The types of revenue recognition gimmicks employed alone strongly suggests

18  defendants' intentional misconduct.

19

20  **Defendants Were Directly Responsible For Immersion's Falsely Recognized Revenue**

21      243.   The Individual Defendants were the top executive officers of Immersion and were

22  directly responsible for its reported revenues and earnings.  Defendant Vogel (Senior Vice President

23  and General Manager of Immersion Medical) was ***directly responsible*** for the Medical Division's

24  sales, revenues and revenue recognition processes.  Defendant Vogel was also directly responsible

25  for the Medical Division's revenues, earnings and results that were ultimately presented to investors

26  and substantially participated in the creation of Immersion's press releases, including those alleged

herein to be false and misleading.  According to Immersion's 2009 proxy statement, filed on April 28, 2009, 15% of defendant Vogel's 2008 bonus was based on his achievement of corporate initiatives, including "international operations" and "press releases."

244.    Likewise, defendants Viegas (President and CEO), Richardson (President and CEO) and Ambler (CFO) were each ***directly responsible*** for the Company's reported sales, revenues, revenue recognition processes, and earnings, including the Medical Division.  These defendants were also responsible for reporting Immersion's revenues, earnings and results to investors based, in part, on reports from defendant Vogel, and substantially participated in the creation of Immersion's press releases, including those alleged herein to be false and misleading.  According to Immersion's 2009 proxy statement, filed on April 28, 2009, 40% of defendants Viegas, Richardson and Ambler's 2008 bonuses were based on their achievement of corporate initiatives, including "international operations" and "press releases."  In addition, defendant Ambler personally made the final decision on whether to recognize revenue on Immersion's Medical sales.  Defendant Immersion was, at all times, responsible for the actions of its officers and employees.

245.    Former Immersion employees have confirmed the Individual Defendants' involvement in and knowledge of Immersion's improper revenue recognition practices.  For example, CW1 stated defendant Vogel personally insisted on shipping known non-functional Medical products in order to book sales and recognize revenue, many of which were returned to Immersion.  CW1 also stated that defendant Vogel shipped Medical products without a signed PO from the customer (a criteria for recognizing revenue), and that Meents (who reported to defendant Vogel) bullied the shipping department into shipping products without a formal PO in place.  Instead, defendant Vogel's sales department created unofficial and unsigned "POs" (*i.e.*, fictitious invoices) in Microsoft Word in order to book the sales.  CW1 had constant disagreements about these improper revenue recognition practices, via e-mail and face-to-face, with defendant Vogel.

These disagreements were ultimately escalated to defendant Ambler, who made the final decision on whether to recognize revenue on these sales.

246.    In addition, CW7 stated that defendant Vogel and Meents intentionally recognized revenue on FOB Destination sales prematurely, before receiving proof of delivery.  CW7 stated that defendant Viegas and Ambler were involved in and aware of these sales and had discussions with defendant Vogel and Meents regarding the timing of revenue recognition.  Despite these discussions about the improper revenue recognition, defendants continued to recognize revenue improperly.

247.    Defendant Richardson was also intimately involved in Immersion's fraudulent sales. CW7 stated that, like defendant Viegas, defendant Richardson was aware of and involved in the Medical Division's sales and revenue recognition.  CW6 has confirmed that Immersion's improper sales pursuant to a "side agreement," which contained payment terms in violation of the Company's policies and GAAP, involved the Company's Chinese distributor.  According to CW5, defendant Richardson was directly involved in sales to this distributor.  CW5 reported that defendant Richardson and Barkay (who signed the "side agreement") had regular communications and spoke at length about these sales, and all information about these sales went directly from Barkay to defendants Richardson and Ambler.  Moreover, defendant Richardson admitted on October 30, 2008 that he traveled to Asia and "personally assist[ed]" Barkay with the Company's Asian Medical sales.

248.    According to Immersion's February 8, 2010 restatement, the improper side agreement signed by Barkay was dated in the ***fourth quarter*** of 2008.  Immersion stated that "[it] had previously executed a distribution agreement in May 2008" with this customer, and had entered into "various sales transactions" with the customer both before and after the date of the side agreement. Critically, Immersion has admitted that it improperly recognized revenue in the ***second, third*** and ***fourth*** quarters of 2008 on sales to this customer.  In other words, Immersion falsely recognized revenue on sales to this customer pursuant to both the side agreement signed by Barkay ***and*** the May

1   2008 distribution agreement *entered into by defendants*.  Notably, while defendants Ambler,

2   Richardson and Senior Vice President and General Manager of Immersion Medical Chavez were

3   forced from the Company during its investigation into these practices, Barkay continues to work for

4   Immersion Medical (now owned by CAE).

5   249.    Moreover, CW1, CW2, CW3, CW4 and CW5 have all confirmed that defendant

6   Ambler personally reviewed Immersion's Medical sales and made the final decision on whether to

7   recognize revenue throughout the Class Period.

**Defendants Were Deliberately Reckless in Ignoring Numerous Red Flags that Would Have Alerted Them to Immersion's Improper Revenue Recognition and GAAP Violations**

250.    In addition to their direct involvement in Immersion's improper practices, numerous

red flags should have alerted defendants to the Company's improper revenue recognition and

accounting improprieties.  For example, according to CW4, after remaining flat for several quarters,

Immersion's international Medical sales suddenly jumped *over 200%* from 2Q07 to 3Q07.

Defendants focused on this dramatic increase in revenue, calling it a "*new quarterly record*," and

stated that the resulting revenues "were *record highs* for the Company" and "[we]re the *best* in

Immersion's history."  Moreover, Immersion was able to significantly increase its  international

Medical sales in 2008 (during Barkay's tenure) without Immersion Medical releasing any new

products.  Such extraordinary results would have, at the very least, alerted defendants to question the

basis and veracity of Immersion's reported revenues.

251.    In addition – and contrary to defendants' stated no return policy – numerous Medical

products booked as sales were returned to Immersion during the Class Period.  According to CW1

and CW2, there were many instances when customers returned products to the Medical Division,

sometimes within a matter of days.  In particular, CW2 reported that by Spring 2008, numerous

Medical products shipped to China were being returned shortly after they were shipped.  Immersion

tracked this information closely.  CW2 stated that all information regarding product returns and

dispositions was entered into the Company's Made to Manage system in the form of entries into the Customer Service Response ("CSR") module.  Typically, all e-mails relating to a return were pasted into the CSR, along with photos of the product as shipped and as returned, the product serial number and any shipment tracking information.  These well-documented and pervasive returns should have alerted defendants as to both the falsity of their stated no return policy and that revenue was being improperly recognized on these sales.

252.    Other internal reports also should have alerted defendants as to Immersion's fraudulent practices.  For example, Immersion tracked individual Medical sales and customers closely.  According to CW3, Immersion prepared and tracked sales forecasts using a manual system.  The system ranked the probability of a sale based on where in the sales process a customer fell.  Immersion maintained a sales process "checklist" that included identification of a prospective customer or "lead," qualification of the lead as a likely customer, the technical close and the financial close of the sale.  Thus, this checklist would have identified sales where revenue was recognized *before* the sale was finalized.  CW3 maintained this forecast data on an Excel spreadsheet.  According to CW3, the Individual Defendants had access to these sales forecasts.  CW3 also sent these forecasts directly to Chavez, who reported to defendants Ambler and Richardson, via e-mail on a weekly basis.

253.    Moreover, CW5 reported that, throughout the Class Period, all Medical sales were documented and sent to Immersion's corporate headquarters in San Jose, California.  During 2007, while defendant Viegas was CEO, CW5 submitted all Medical sales information and supporting documentation directly to the Corporate Controller, including the PO and any related e-mails or other documentation related to the sale, who reviewed every Medical sale and conferred with defendant Ambler regarding whether to recognize revenue on the sales.  According to CW5, after Richardson became CEO in April 2008, Immersion's revenue recognition for Medical sales became

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 09-cv-04073-MMC

1    even more closely controlled by the Company's corporate office, including defendants Richardson

2    and Ambler.

3         254.    Immersion Medical's reports on outstanding collections and accounts receivable,

4    particularly from Chinese customers, also should have alerted defendants as to Immersion's

5    improper revenue recognition and accounting improprieties.   During the Class Period, CW1

6    generated monthly Excel spreadsheet reports on collection projections for the Medical Division.   The

7    reports listed any sales for which collection was pending, and included the customer contact name,

8    the date by which payment was promised, and any notes on the status of the collection based on

9    conversations with the customer for each sale.   CW1 reported that defendant Ambler periodically

10   asked for status updates on collections based on these reports and ***focused specifically on customers***

11   ***whose payment was long overdue***.   In addition, defendant Ambler requested copies of the report

12   itself.   According to CW1, these reports indicated that Immersion's Chinese customers were

13   typically very tardy on their payments – a red flag that should have, at the very least, triggered an

14   investigation into these sales.

15        255.    Additionally, CW1 stated that defendant Ambler personally visited Gaithersburg,

16   Maryland quarterly to audit the Medical Division's receivables.   CW1 was responsible for putting

17   together sales packets for each receivable, and stated that defendant Ambler reviewed each sales

18   packet and spent time going through the information.   According to CW1, the sales packets

19   identified instances in which credit approval for the customer (a criteria for recognizing revenue)

20   was received *after* Meents, defendant Vogel or Barkay had instructed shipment of products.   CW1

21   reported that defendant Ambler questioned some of the receivables and, when he did, extra effort

22   was made to collect those receivables, because as long as payment was ultimately received,

23   defendant Ambler considered it to be a good sale (even if the revenue was recognized improperly).

24   CW1 stated that defendant Ambler conducted these audits from 2005 until 1Q09.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                    - 96 -

256.     Defendants were also very focused on Immersion's DSOs.  Indeed, defendants regularly reported on Immersion's DSOs during conference calls with analysts.  For example, on May 3, 2007, defendant Ambler reported that "[Immersion's] days sales outstanding, or DSO on March 31, 2007 was 46."  On May 1, 2008, defendant Ambler reported that "[Immersion's] days sales outstanding or DSO on March 31, 2008, was 37 days."  On October 30, 2008, defendant Ambler again reported that "DSOs at the end of the [third] quarter were 48 days."  When defendant Ambler traveled to Gaithersburg for the quarterly management meetings, he met with CW4 to go over the DSO numbers.  CW4 prepared the DSO data that included each customer and/or distributor and the number of days outstanding that money was due from each of them to Immersion Medical.  Thus, defendant Ambler knew *exactly* how many days payment was outstanding for each Medical customer.  According to CW4, the DSO number for international Medical customers typically ran *higher than 180 days*, and the Company's Chinese distributor typically had the longest outstanding payments due of all customers.  Such abnormally high DSOs – much higher than the 37 to 48 days defendants publicly disclosed – should have alerted defendants to the irregular practices regarding these sales.

257.     Defendants also knew that Immersion did not expect timely payments (or "probable collectability") for its Medical sales to certain Asian customers, if at all, thereby preventing revenue from being properly recognized at the time of sale.  For example, CW1 stated that it was difficult to verify the legitimacy and credit validity of Immersion's Chinese customers – a criteria for recognizing revenue – and that he had disagreements with defendant Vogel, as well as Meents and Barkay, regarding sales to these customers.  In addition, CW1 stated that many Asian Medical accounts remained unpaid throughout the Class Period – a red flag that revenue had been recognized improperly.  If and when payment did suddenly come in, such as in early 2009, CW1 reported that Immersion's Finance group, including defendant Ambler, made a big deal of it and scrambled to

1    update their reports for review by Deloitte & Touche, Immersion's outside auditor.   As such,

2    defendant Ambler was acutely aware of the timing and amounts of payments, or lack thereof, from

3    international Medical sales.

4           258.    In addition, CW1 reported that payments from Chinese customers, when received,

5    were peculiar and often from unknown Asian-named subjects other than the customer, such as

6    "Peking Duck Restaurant" in Los Angeles, California.  CW1 was told that certain Asian customers

7    paid in this manner because of difficulties in getting money out of mainland China.  Because he was

8    not comfortable with this practice, CW1 escalated such transactions to Vice President of Finance and

9    Operations for Immersion Medical Cortes, who reported directly to defendant CFO Ambler.

10          259.    CW1 also reported that, because of its overdue receivables, the Medical Division did

11   not have enough money to make payroll and pay vendor invoices during the Class Period and, as a

12   result, had to "beg" for money from Corporate Accounting to cover payroll and accounts payable.

13   When this occurred, Corporate Accounting would ask for the status of collections on outstanding

14   receivables, and an e-copy of a collections report would be forwarded to Corporate Accounting for

15   review.  Thus, Corporate Accounting was aware of Immersion Medical's outstanding collections and

16   accounts receivable throughout the Class Period.

17          260.    In addition, the Individual Defendants regularly communicated with each other and

18   Medical Division employees, including Meents and Barkay, regarding Immersion's Medical

19   business.  According to CW4, defendants held quarterly management meetings during the Class

20   Period to discuss Immersion's Medical business.   These meetings were sometimes held in

21   Gaithersburg, Maryland (in a first floor conference room) or in San Jose, California.  Attendees

22   included Immersion Medical personnel and Immersion's CEO and CFO, defendants Viegas (and

23   later Richardson) and Ambler.   Defendant Vogel also held weekly management meetings on

24   Monday mornings to discuss the Medical Division.  These meetings were held in defendant Vogel's

1  office and typically lasted one and a half to two hours.  Attendees included defendant Vogel and

2  other Medical Division personnel.

3  **Defendants' Reorganization of Immersion Medical During the Class Period Supports a
   Strong Inference of Scienter**

4

5       261.    Defendants' active reorganization of Immersion Medical's business during the Class

6  Period further evidences their knowledge of its improper revenue recognition practices and internal

7  control problems.   CW5 stated that, shortly after becoming CEO in April 2008, defendant

8  Richardson restructured Immersion Medical so that Immersion's corporate headquarters more

9  closely controlled its operations and revenue recognition processes.  Notably, CW1 reported that

10  defendant Vogel was fired shortly thereafter.  As a result of the restructuring, Immersion's senior

11  officers, including defendants Richardson and Ambler, more closely controlled the revenue

12  recognition decision-making on its Medical sales.  Thereafter, on March 2, 2009, defendants further

13  announced that they were reorganizing Immersion Medical and relocating it to Immersion's

14  corporate headquarters in San Jose, California, in order to improve its "execution, operations and

15  management."  On May 4, 2009, defendant Richardson admitted that, as a result of the restructuring,

16  reorganization and relocating of Immersion Medical, defendants had undertaken "a ***careful analysis***

17  of the operations and forecasts for the medical business" in 2008 and had "an opportunity to take a

18  ***look at the entire business inside out,*** which we've done."  The Individual Defendants' desire to

19  have more direct control over Immersion Medical and its revenue recognition practices during the

20  Class Period strongly suggests their knowledge of its accounting improprieties.  Moreover, a "careful

21  analysis" of Immersion's entire Medical business "inside out" would have undoubtedly revealed the

22  glaring revenue recognition and accounting improprieties and GAAP violations alleged herein.

23  **The Magnitude and Nature of Immersion's Restatement Reinforces a Strong Inference of
   Scienter**

24

25       262.    Immersion's February 8, 2010 restatement also supports a strong inference of

26  scienter.  As described above, Immersion's restatement is an admission that: (i) Immersion's

financial statements originally issued during the Class Period and defendants' public statements regarding those results were *materially* false and misleading; and (ii) the financial statements reported during the Class Period were incorrect *based on information available to the defendants at the time the results were originally reported*.  Additionally, Immersion's restatement, as described herein, contains at least the following indicators of defendants' knowledge:

(a)     **The type of restatement (misuse of the facts)** – The restated items at issue were not due to simple mathematical error or honest misapplication of an accounting standard or oversight.  For example, as set forth in ¶¶128-135, 192-199, the restatement of revenue was the result of several sales transactions that were structured to circumvent GAAP revenue recognition criteria in order to record premature and inflated revenues on sales that otherwise would have resulted in delayed, decreased, and/or no revenue recognition at all.

(b)     **The duration over which the improper accounting was perpetrated** – As detailed herein, the restatement does not hinge on an honest mistake or oversight during a single quarter or even a single year that was later corrected on a good faith basis.  Here, Immersion was forced to restate its financial statements covering fiscal years 2006, 2007 and 2008, each quarterly period during 2007 and 2008, and the first quarter of 2009 to correct its accounting improprieties that could no longer be concealed.

(c)     **The magnitude or size of the restatement** – The magnitude of Immersion's restatement was material.  Overall, Immersion overstated its fiscal year 2006 through fiscal year 2008 revenues by at least $3.7 million, including an overstatement of over 32% of its Medical line revenue in fiscal year 2008.  Immersion also materially overstated income from operations, net income, and earnings per share during the Class Period.  From 2006 to 2008, Immersion overstated net income by at least $3.3 million.

(d)     **The types of accounting gimmicks employed** – As detailed herein, the improper accounting corrected by this restatement did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated, vague or arcane accounting rules, and the

1    Company does not claim otherwise.  Rather, Immersion's accounting improprieties violated clear

2    and well-established basic revenue recognition and accounting standards.

3              (e)    **The income statement effect of the misstatements** – The aggregate

4    purported "errors" in seven of the ten restated periods had the effect of inflating, not reducing,

5    revenues and net income.

6         263.    In addition, it is notable that in 2002, the SEC reiterated its position that, in its

7    investigations of restated financial statements, it often finds that the persons responsible for the

8    improper accounting (here, the Individual Defendants) acted with scienter:

9
          [T]he Commission often seeks to enter into evidence restated financial statements,
10        and the documentation behind those restatements, in its securities fraud enforcement
          actions in order, ***inter alia, to prove the falsity and materiality of the original***
11        ***financial statements [and] to demonstrate that persons responsible for the original***
          ***misstatements acted with scienter*** . . . .
12
     *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and
13
     Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude
14
     Evidence of the Restatement and Restatement Report (S.D. Fla. Feb. 22, 2002).
15
     **Defendants' SOX Certifications Support a Strong Inference of Scienter**
16
          264.    In addition to being false (as set forth in ¶¶228-229), defendants' SOX certifications
17
     attached to Immersion's Forms 10-Q and Forms 10-K also support an inference scienter.  As set
18
     forth in ¶228, defendants Viegas, Richardson and Ambler certified that they had ***personally reviewed***
19
20   Immersion's financial statements, evaluated Immersion's disclosure controls and evaluated

21   Immersion's internal controls over financial reporting.  Such reviews and evaluations would have

22   undoubtedly alerted defendants to the presence of Immersion's glaring accounting misstatements and

23   material weaknesses in internal and disclosure controls described herein.  In addition, defendants

24   admitted during the Class Period, on February 28, 2008, that Immersion had misstated net income

25   for 1Q07.  While defendants continued to overstate 1Q07 net income, this partial "correction" should

26   have alerted defendants to the Company's internal control problems.  It is hard to believe that a

27   "review and evaluation" of internal controls would identify this accounting misstatement, but miss

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                         - 101 -

the numerous other material misstatements plaguing the Company's financials.  Thus, defendants either: (i) knew of the material misstatements in the financial statements, the ineffectiveness of the disclosure controls, and the material weaknesses in internal controls; *or* (ii) knowingly failed to carry out the required review of the financial statements, evaluation of internal controls and evaluation of disclosure controls and falsely represented that they had.  In either case, defendants knew or recklessly disregarded that the SOX certifications defendants Viegas, Richardson and Ambler signed were false and misleading.

**The Pervasiveness and Effect of the Fraud on Immersion's Core Business Supports a Strong Inference of Scienter**

265.    The Individual Defendants, as senior executive officers of Immersion, can be presumed to have knowledge of adverse facts affecting the Company's core business.  The Individual Defendants, as CEO, CFO and Senior Vice President/General Manager of Immersion Medical, were the ***only executive officers*** at Immersion during 2007 and 2008.  Notably, Immersion's most egregious overstatements of Medical revenue – at least ***130.2%*** in 3Q08, ***36.2%*** in 4Q08 and ***32.7%*** in fiscal 2008 – occurred while defendant Richardson was CEO of the Company. Defendant Viegas was either CEO or Chairman of the Board of Directors, and defendant Ambler was CFO, ***during the entire Class Period***.

266.    According to CW1, CW2 and CW4, Immersion's Medical business was small with relatively few sales (CW2 estimated 25 sales per quarter).  During the Class Period, however, ***over 40%*** of Immersion's total revenue came from its Medical line of business.  Indeed, defendant Richardson characterized the Medical line of business as "the ***largest*** contributor of Immersion's revenue on a percentage basis" and "***one of the most meaningful and vital growth drivers of [the] Company***."  Moreover, defendants specifically focused on the Company's Medical sales throughout the Class Period, claiming they had "doubled" and "tripled," and led to the "highest revenue total in [Immersion's] history."   Given the significant effect on Immersion's core operations, and

1   defendants' own emphasis on Medical sales, defendants can be presumed to have knowledge of

2   Immersion's improper revenue recognition on Medical sales throughout the Class Period.

3          267.    In addition, defendant Richardson admitted, on March 2, 2009, that "the leadership

4   team [Immersion] ha[s] in place is ***very, very hands-on,*** as you know that I am."  As "very, very

5   hands-on" executives, the Individual Defendants can be presumed to have knowledge of the adverse

6   facts alleged herein, affecting the Company's revenues and operations during the Class Period.

7   Moreover, as illustrated above, numerous red flags would have alerted defendants to Immersion's

8   improper revenue recognition and accounting improprieties.  Given the financial impact and

9   pervasiveness of the fraud, defendants were, at the very least, deliberately reckless in not knowing.

10  **Immersion's Corporate Scienter**

11         268.    Immersion's officers' and employees' scienter can be imputed to Immersion.  As

12  outlined above, the Individual Defendants knew (or recklessly disregarded) that Immersion was

13  improperly recognizing revenue on Medical sales and that its financial statements violated GAAP.

14  The Individual Defendants' scienter is imputable to Immersion.

15         269.    Deliberate wrongs by an employee may be imputed to the employer if the employee's

16  wrongs are within the scope of employment and in furtherance of the employer's goals.  Here,

17  Immersion has admitted in its restatement that Barkay, the Vice President  and General Manager of

18  International Sales for the Medical line, ***knowingly*** executed improper side agreements with certain

19  customers and improperly recognized revenue on those sales.  Barkay was a senior officer at

20  Immersion Medical who reported directly to defendants Vogel (and later Chavez) and Richardson.

21  Defendant CEO Richardson publicly emphasized Barkay's leadership position, stating that "[u]nder

22  David[] [Barkay's] leadership, we will staff with the very best people who will focus on generating

23  new business and providing world-class service to customers in our significant markets around the

24  world."  In addition, Barkay had authority to act on behalf of Immersion.  For example, on August

1  14, 2008, Barkay told investors and analysts, on behalf of the Company, that "[Immersion's] new

2  international team will focus on developing relationships with healthcare institutions and Medical

3  associations as well as on establishing channels to provide excellent customer service and increased

4  revenue growth in these vibrant and growing markets."  Barkay's sales pursuant to the improper side

5  agreement were done within the scope of his employment at Immersion for the sole benefit of the

6  Company.  Thus, his scienter is imputable to the Company.

7

8          270.    Further, defendants have admitted that "certain sales personnel" **knowingly** made

9  commitments to customers in connection with sales of products that were not available or were not

10 functional at the time revenue was recognized.  As set forth above, CWs have confirmed that

11 defendants Vogel and Richardson, as well as their direct reports, Meents and Barkay, were directly

12 involved in these sales.  As senior officers acting within the scope of their duties, their scienter

13 regarding these sales is imputable to the Company.

14

15 **Defendants' Insider Sales Support a Strong Inference of Scienter**

16         271.    The Individual Defendants' insider sales further support a strong inference of

17 scienter.  During the Class Period, defendants Ambler, Viegas and Vogel collectively sold ***172,752***

18 ***shares*** of their personally held Immersion common stock for gross proceeds of ***over $2.7 million***.

19 The insider trading is set forth in detail in the chart attached as Exhibit B to this complaint.

20         272.    Defendants Ambler, Viegas and Vogel sold significant amounts of their personally

21 held Immersion stock during the Class Period while in possession of material, non-public

22 information about Immersion.  As set forth above, defendants Ambler, Viegas and Vogel knew, and

23 failed to disclose, at the time they sold their Immersion stock that: (i) Immersion had materially

24 overstated its revenues, product sales, earnings, income from operations, net income, gross profit, net

25 income per share and understated its inventory; (ii) Immersion was improperly recognizing revenue

26 on its Medical sales; (iii) Immersion was improperly accounting for and reporting stock-based

27

28

1   compensation expense, amortization expense and interest income; (iv) Immersion lacked effective

2   internal controls and procedures; and (v) as a result, defendants' Class Period statements were false

3   and misleading.

4       273.    Defendants Ambler's, Viegas' and Vogel's insider sales were suspicious in amount

5   and provide additional indicia of scienter.  Defendant Ambler sold 40,000 shares (**100%** of his

6   holdings) for proceeds of ***over $639,000*** during the Class Period; defendant Viegas sold 125,000

7   shares (**93%** of his holdings) for proceeds of ***over $1.9 million*** during the Class Period; and

8   defendant Vogel sold 7,752 shares (**100%** of his holdings) for proceeds of ***over $134,000*** during the

9   Class Period, all while Immersion's stock price was artificially inflated as a result of defendants'

10  false and misleading statements and material omissions.  While options are not stock holdings and

11  should not be included in the insiders' retained holdings, even including options, the percentages and

12  amounts sold are highly suspicious, especially when considered with the suspicious circumstances

13  surrounding the sales.  *See* Exhibit B.

14      274.    The timing of defendants Ambler's, Viegas' and Vogel's insider sales was also highly

15  suspicious, as they were timed to take maximum advantage of the artificial price inflation caused by

16  defendants' misrepresentations and while Immersion stock was trading at or near Class Period highs.

17  For example, defendant Ambler sold 20,000 shares on August 27, 2007 – shortly after announcing

18  Immersion's ***overstated 2Q07 revenues*** on August 2, 2007.  Defendant Ambler sold his remaining

19  20,000 shares on November 6, 2007 – almost immediately after announcing Immersion's ***overstated***

20  ***3Q07 revenues*** on November 1, 2007.  Through these well-timed sales, Ambler received prices as

21  high as ***$17.37 per share***.  Likewise, defendant Viegas sold 22,919 shares on May 25, 2007 – shortly

22  after defendants' May 3, 2007 misrepresentations – and 102,081 shares between September 27 and

23  October 8, 2007 – following defendants' August 2, 2007, overstatement of 2Q07 revenues.  The

24  propitious timing of Viegas' sales rewarded him with prices as high as ***$18.02 per share***.  And

defendant Vogel sold 100% of his shares on November 7, 2007 – almost immediately following defendants' *overstatement of 3Q07 revenues* – reaping prices as high as *$17.29 per share*. Notably, the prices defendants received on their well-timed sales were much higher than the *$3.80 per share* that investors received after defendants' misrepresentations were revealed. Indeed, the vast majority of insider sales during the Class Period were between May 2007 and November 2007, when Immersion's stock price was most inflated from defendants' misrepresentations.

275.   Defendant Ambler's, Viegas' and Vogel's Class Period sales were also suspicious as they were out of line with defendants' prior trading histories. For example, prior to his Class Period sales, defendant Viegas had sold stock only *twice* since 2000, when he sold 10,113 shares on November 30, 2005 and 5,100 shares on December 1, 2005. Defendants Ambler and Vogel had *no sales* in the past several years prior to their Class Period sales. In addition, defendant Ambler's, Viegas' and Vogel's sales are not protected under Rule 10b5-1 as pursuant to a predetermined trading plan. *None* of defendant Vogel's Class Period sales were pursuant to a predetermined trading plan. Defendants Ambler's and Viegas' Class Period sales on August 27, 2007 and May 25, 2007, respectively, were also *not* pursuant to predetermined trading plans. Shortly after these sales, however, defendants Ambler and Viegas adopted trading plans to allow them to sell more stock and through which they made their remaining Class Period sales. Defendant Ambler adopted his trading plan on September 7, 2007, and defendant Viegas adopted his trading plan on June 8, 2007. As set forth above, however, defendants Ambler and Viegas had knowledge of numerous materially adverse, non-public facts at the time they entered into these trading plans. Thus, any trades made pursuant to these plans are *not* protected under Rule 10b5-1.

276.   Defendants were also personally motivated to fraudulently report Immersion's Medical business unit revenue, particularly revenue obtained from overseas transactions. For example, according to Immersion's Form 8-K filed on May 23, 2008, defendant Vogel's bonus plan

1  for 2008 was intended to focus on "Immersion's revenue." The bonus plan directly tied defendant

2  Vogel's bonus to Immersion's 2008 fiscal results in the Medical business unit (52.5%) as well as the

3  expansion of Immersion's Medical business, including its international revenues (17.5%). Similarly,

4  Immersion's Form 8-K filed on April 21, 2008, indicated that defendants Viegas' and Ambler's

5  fiscal 2008 bonuses depended, *inter alia*, on revenue targets as well as "increasing the percentage of

6  Immersion's total revenue that is derived from international sources." Moreover, portions of

7  defendants Vogel, Viegas, Ambler and Richardson's 2008 bonuses were all tied directly to

8  Immersion's reported GAAP revenues. As a result of their fraudulent practices, defendants Viegas,

9  Ambler and Richardson received 2008 bonuses of $48,000, $55,167 and $120,960, respectively.[8]

### LOSS CAUSATION/ECONOMIC LOSS

12       277.    By misrepresenting its financial results and condition, defendants presented a

misleading picture of Immersion's business and prospects. Thus, instead of truthfully disclosing

during the Class Period that: (i) Immersion's revenues from its Medical line of business had been

falsely reported; (ii) Immersion's reported growth was based on manipulated reported revenues and

did not accurately represent the Company's financial condition; (iii) Immersion was fraudulently

recognizing revenue in its Medical line of business; (iv) Immersion was improperly reporting

revenue, earnings, interest income and stock-based compensation expense; and (v) Immersion lacked

effective internal controls and procedures, defendants falsely reported the Company's business

condition and financial results. These false financial results caused and maintained the artificial

inflation in Immersion's stock price throughout the Class Period until the truth began to be revealed

to the market as reflected in the following chart:

---

[8]      Despite his efforts, defendant Vogel did not receive a bonus in 2008, as he was fired from the Company mid-year.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                    - 107 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   278.   While defendants continued to conceal the full extent of their fraud, the true financial

17 condition of the Company began to leak out into the public through a series of partial disclosures

18 beginning in 2008.  On May 1, 2008, defendants announced a net loss for 1Q08 of $2.6 million.

19 This disclosure partially revealed that Immersion did not have the growth drivers and was not

20 "acheiv[ing] sustained profitability" as defendants had previously led investors to believe.  *See* ¶85.

21 As a result, Immersion's stock price fell nearly 11% over the following three trading days, to close at

22 $10.11 on May 5, 2008.  Defendants, however, failed to disclose that, as a result of their fictitious

23 sales and revenue manipulations, they had understated Immersion's net loss by ***over 28%***.  Trying to

24 counter this negative news, defendants emphasized a 27% increase in revenues over the same quarter

25 the prior year, and told investors to expect a "***dramatic increase*** in the [international medical]

26 revenues" in the "very near-term."  *See* ¶¶142-143.  Had defendants disclosed their fraudulent

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                          - 108 -

revenue recognition, accounting manipulations, lack of internal controls and the Company's true financial condition, the stock price would have dropped much further.  Instead, the Company's stock price remained artificially inflated as a result of defendants' concealment of the full impact of the Company's fraud.

279.    On July 31, 2008, the Company announced a net loss for 2Q08 of $3.1 million.  This disclosure again partially revealed that Immersion did not have the growth drivers and profitability that defendants had led investors to believe.  As a result, Immersion's stock price fell nearly 18% over the following two trading days, to close at $5.85 on August 4, 2008.  Defendants, however, failed to disclose that, as a result of their revenue recognition and accounting manipulations, they had overstated revenues by ***nearly 7%*** (and Medical revenues by ***over 16%***) and understated Immersion's net loss by ***nearly 13%***.  Moreover, defendants falsely reported an 8% increase in revenues and said they had reached "a record second quarter revenue."  *See* ¶152.  Had defendants disclosed their fraudulent revenue recognition, accounting manipulations, lack of internal controls and the Company's true financial condition, the stock price would have dropped much further.  Instead, the Company's stock price remained artificially inflated as a result of defendants' continued concealment of the fraud.

280.    On March 2, 2009, the Company announced disappointing results for 4Q08 and fiscal 2008 ($0.12 below estimates).  Undermining defendants' statements of "robust" and record-setting revenues (which were based on falsely recognized revenue), this disclosure partially revealed that Immersion did not have the growth drivers and profitability that defendants had led investors to believe.  *See* ¶160.  As a result, Immersion's stock price fell nearly 29% to close at $2.78 on March 3, 2009.  Defendants, however, failed to disclose that, as a result of their revenue recognition and accounting manipulations, they had overstated revenues by ***nearly 15%*** (and Medical revenues by ***over 36%***) and understated Immersion's net loss by ***nearly 12%***.  Had defendants disclosed their

1    improper revenue recognition, accounting manipulations, lack of internal controls and the

2    Company's true financial condition, the stock price would have dropped much further.  Instead, the

3    Company's stock price remained artificially inflated as a result of defendants' continued

4    concealment of the fraud.

5         281.    On May 4, 2009, the Company announced a net loss for 1Q09.  On a conference call

6    with analysts that day, defendants disclosed for the first time that "[Immersion's] medical line of

7    business ha[d] not met revenue expectations."  Defendants also reported an increase in DSOs and

8    disclosed that "payments [were] not taking place on a timely basis from some of our overseas

9    customers."  In other words, Immersion was having difficulty receiving payments from certain

10   international customers.  These negative disclosures were a direct result of and partially revealed

11   defendants' improper revenue recognition practices.  As a result of these disclosures, Immersion's

12   stock price fell 20% over the next three trading days, to close at $3.63 on May 7, 2009.  Defendants,

13   however, continued to conceal the full extent of their fraud.  Consequently, the Company's stock

14   price remained artificially inflated.

15        282.    As set forth in ¶237, on July 1, 2009, before the market opened, defendants were

16   forced to publicly disclose that Immersion had launched an investigation into the Company's

17   previous revenue transactions in its Medical business, which could impact Immersion's historical

18   financial statements.  As a result of this investigation, defendants later admitted that Immersion: (i)

19   improperly recognized revenue in its Medical line of business; (ii) improperly accounted for stock-

20   based compensation expense, amortization expense and interest income; and (iii) lacked effective

21   internal controls, during the Class Period.  Defendants' announcement of an internal investigation

22   into previous revenue transactions and the potential impact on Immersion's historical financials was

23   a direct result of their improper revenue recognition, fraudulent accounting practices and lack of

24   internal controls.

1    283.    As a direct result of defendants' July 1, 2009 disclosure, Immersion's stock price fell

2    *23%* in one day, with 1.5 million shares trading in a single day, to close at $3.80 per share on July 1,

3    2009.  This drop resulted in a market capitalization loss of $31.9 million and removed the inflation

4    from Immersion's publicly traded securities, causing real economic loss to investors who had

5    purchased the securities during the Class Period.

6

7                              **CLASS ACTION ALLEGATIONS**

8    284.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

9    of Civil Procedure on behalf of all persons who purchased or otherwise acquired Immersion publicly

10   traded securities during the Class Period (the "Class").  Excluded from the Class are defendants, the

11   officers and directors of the Company, at all relevant times, members of their immediate families and

12   their legal representatives, heirs, successors or assigns, and any entity in which defendants have or

13   had a controlling interest.

14

15   285.    The members of the Class are so numerous that joinder of all members is

16   impracticable.  The disposition of their claims in a class action will provide substantial benefits to

17   the parties and the Court.  Immersion has over 27 million shares of stock outstanding, owned by

18   hundreds if not thousands of persons.

19

20   286.    There is a well-defined community of interest in the questions of law and fact

21   involved in this case.  Questions of law and fact common to the members of the Class which

22   predominate over questions which may affect individual Class members include:

23          (a)    whether defendants violated the Exchange Act;

24          (b)    whether defendants omitted and/or misrepresented material facts;

25          (c)    whether defendants' statements omitted material facts necessary to make the

26   statements made, in light of the circumstances under which they were made, not misleading;

27          (d)    whether defendants knew or deliberately disregarded that their statements

28   were false and misleading;

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                                        - 111 -

1      (e)      whether the prices of Immersion publicly traded securities were artificially

2  inflated; and

3      (f)      the extent of damage sustained by Class members and the appropriate measure

4  of damages.

5      287.    Lead plaintiff's claims are typical of those of the Class because lead plaintiff and the

6  Class sustained damages from defendants' wrongful conduct.

7      288.    Lead plaintiff will adequately protect the interests of the Class and has retained

8  counsel who are experienced in class action securities litigation.  Lead plaintiff has no interests

9  which conflict with those of the Class.

10

11     289.    A class action is superior to other available methods for the fair and efficient

12  adjudication of this controversy.

13                  **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
                    **FRAUD ON THE MARKET DOCTRINE**
14

15     290.    At all relevant times, the market for Immersion common stock was an efficient

16  market for the following reasons, among others:

17     (a)      Immersion common stock met the requirements for listing, and was listed and

18  actively traded on the NASDAQ, a highly efficient and automated market;

19     (b)      As a regulated issuer, Immersion filed periodic reports with the SEC and the

20  NASDAQ;

21     (c)      Immersion regularly communicated with public investors via established

22  market communication mechanisms, including through regular disseminations of press releases on

23  the national circuits of major newswire services and through other wide-ranging public disclosures,

24  such as communications with the financial press and other similar reporting services; and

25     (d)      Immersion was followed by several securities analysts employed by major

26  brokerage firms who wrote reports which were distributed to the sales force and certain customers of

27  their respective brokerage firms.  Each of these reports was publicly available and entered the public

28  marketplace.

291.   As a result of the foregoing, the market for Immersion common stock promptly digested current information regarding Immersion from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Immersion common stock during the Class Period suffered similar injury through their purchase of Immersion common stock at artificially inflated prices, and a presumption of reliance applies.

**NO SAFE HARBOR**

292.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Immersion who knew that those statements were false when made.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) & (c)
Against All Defendants**

293.   Lead plaintiff incorporates ¶¶1-292 by reference.

294.   During the Class Period, defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

295.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon lead plaintiff and others similarly situated in connection with their purchases of Immersion publicly traded securities during the Class Period.

296.     Defendants also violated §10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

297.     Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Immersion as specified herein.

298.     Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Immersion securities during the Class Period.

299.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Immersion's true financial condition from the investing public and supporting the artificially inflated price of Immersion's securities.

300.     Lead plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Immersion publicly traded securities. Lead

1   plaintiff and the Class would not have purchased Immersion publicly traded securities at the prices

2   they paid, or at all, had they been aware that the market prices for Immersion's securities had been

3   artificially inflated by defendants' materially false and misleading statements.

4

5                                          **COUNT II**

6                          **For Violation of Section 20(a) of the Exchange Act**
                                        **Against All Defendants**

7       301.    Lead plaintiff incorporates ¶¶1-300 by reference.

8       302.    The Individual Defendants acted as controlling persons of Immersion within the

9   meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their

10  ownership of Immersion stock, the Individual Defendants had the power and authority to cause

11  Immersion to engage in the wrongful conduct complained of herein.  Immersion controlled the

12  Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable

13

14  pursuant to §20(a) of the Exchange Act.

15                                         **COUNT III**

16                         **For Violation of Section 20A of the Exchange Act**
                             **Against Defendants Viegas, Ambler and Vogel**
17
        303.    Lead plaintiff incorporates ¶¶1-302 by reference.
18
        304.    While Immersion securities traded at artificially inflated prices, defendants Viegas,
19
20  Ambler and Vogel personally profited by selling 172,752 shares of their holdings in Immersion

21  securities while in possession of adverse, material non-public information about Immersion,

22  pocketing over $2.71 million in illegal insider trading proceeds, as detailed above.

23      305.    By contrast, lead plaintiff purchased contemporaneously, as follows:

24          (a)    Lead plaintiff and members of the Class traded contemporaneously with

25  defendant Viegas by purchasing Immersion securities at artificially inflated prices on September 25,

26  2007 and were damaged thereby.

27

28

1

(b)      Lead plaintiff and members of the Class traded contemporaneously with

2    defendant Ambler by purchasing Immersion securities at artificially inflated prices on November 6,

3    2007 and were damaged thereby.

4

(c)      Lead plaintiff and members of the Class traded contemporaneously with

5    defendant Vogel by purchasing Immersion securities at artificially inflated prices on November 7,

6    2007 and were damaged thereby.

7       306.    As a result of the wrongful conduct alleged herein, lead plaintiff and other members

8    of the Class have suffered damages.

9       307.    By reason of the foregoing, defendants Viegas, Ambler and Vogel violated §20A of

10   the Exchange Act and are liable to lead plaintiff and other members of the Class.  Lead plaintiff and

11   other members of the Class are entitled to disgorgement of defendant Viegas', Ambler's and Vogel's

12   profits in connection with their sale of Immersion securities during the Class Period.

13

14                              **PRAYER FOR RELIEF**

15       WHEREFORE, lead plaintiff prays for judgment as follows:

16       A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

17       B.      Awarding lead plaintiff and the members of the Class damages, including interest;

18       C.      Awarding lead plaintiff reasonable costs and attorneys' fees; and

19       D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

20   proper.

21                                 **JURY DEMAND**

22       Lead plaintiff demands a trial by jury.

23

24

25

26

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS - 09-cv-04073-MMC                                              - 116 -

1    DATED:  April 29, 2011                        BROWER PIVEN
                                                     A Professional Corporation
2                                                  DAVID A.P. BROWER

3
                                                   _David A.P. Brower / YT_
4                                                        DAVID A.P. BROWER

5
                                                   488 Madison Avenue, 8th Floor
6                                                  New York, NY  10022
                                                   Telephone:  212/501-9000
7                                                  212/501-0300 (fax)

8                                                  Lead Counsel for Plaintiffs

9                                                  ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
10                                                 WILLOW E. RADCLIFFE
                                                   SARAH R. HOLLOWAY
11                                                 Post Montgomery Center
                                                   One Montgomery Street, Suite 1800
12                                                 San Francisco, CA  94104
                                                   Telephone:  415/288-4545
13                                                 415/288-4534 (fax)

14                                                 Liaison Counsel for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

620905_1
        AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
        LAWS - 09-cv-04073-MMC                                                      - 117 -

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on April 29, 2011, I authorized the electronic filing of the foregoing with

3  the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4  e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5  caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6  CM/ECF participants indicated on the attached Manual Notice List.

7        I further certify that I caused this document to be forwarded to the following Designated

8  Internet Site at:  http://securities.stanford.edu.

9        I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on April 29, 2011.

11

12                                    s/ Willow E. Radcliffe

                                   WILLOW E. RADCLIFFE

13

14                                   ROBBINS GELLER RUDMAN
                                        & DOWD LLP

15                                   Post Montgomery Center
                                   One Montgomery Street, Suite 1800

16                                   San Francisco, CA  94104
                                   Telephone:  415/288-4545

17                                   415/288-4534 (fax)
                                   E-mail:willowr@rgrdlaw.com

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:09-cv-04073-MMC

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Corinne Bretan**
  jbretan@fenwick.com,mbafus@fenwick.com,kayoung@fenwick.com,mmelcher@fenwick.com,knesbit@fenwick.com

- **David A.P. Brower**
  brower@browerpiven.com

- **Steven D. Cohn**
  scohn@kmllp.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Sarah Renee Holloway**
  SHolloway@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Frank James Johnson**
  frankj@johnsonbottini.com,brett@johnsonbottini.com,paralegal@johnsonbottini.com,frankb@johnsonbottini.com

- **Felix Shih-Young Lee**
  flee@fenwick.com

- **Betsy Carol Manifold**
  manifold@whafh.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Susan Samuels Muck**
  smuck@fenwick.com,kayoung@fenwick.com,cprocida@fenwick.com,knesbit@fenwick.com,kdeleon@fenwick.com

- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com,ptoovey@bramsonplutzik.com

- **Jay L. Pomerantz**
  jpomerantz@fenwick.com,slim@fenwick.com

- **Ira M. Press**
  ipress@kmllp.com,plinden@kmllp.com,lmorris@kmllp.com,slopez@kmllp.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,SHolloway@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

EXHIBIT A

## PLAINTIFF'S CERTIFICATION

John P. Loos ("Plaintiff") declares that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.      Plaintiff's transactions in Immersion Corporation securities during the Class Period are attached hereto.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.  Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 30 day of October 2009.

_____
John P. Loos

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: 410-332-0030
Facsimile:  410-685-1300
www.browerpiven.com

# John P. Loos

## Immersion Corporation Securities Litigation

### Schedule of Transactions

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 100 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 200 | $10.3000 | | | |
| 5/3/2007 | Buy | 300 | $10.3000 | | | |
| 5/3/2007 | Buy | 300 | $10.3000 | | | |
| 5/9/2007 | Sell | 500 | $9.7600 | | | |
| 5/9/2007 | Sell | 100 | $9.7600 | | | |
| 5/9/2007 | Sell | 100 | $9.7600 | | | |
| 5/9/2007 | Sell | 100 | $9.7500 | | | |
| 5/9/2007 | Sell | 100 | $9.7100 | | | |
| 5/9/2007 | Sell | 6,700 | $9.7000 | | | |
| 5/9/2007 | Sell | 5,000 | $9.7000 | | | |
| 5/9/2007 | Sell | 900 | $9.7000 | | | |
| 5/9/2007 | Sell | 700 | $9.7000 | | | |
| 5/9/2007 | Sell | 350 | $9.7000 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 5/9/2007 | Sell | 250 | $9.7000 | | | |
| 5/9/2007 | Sell | 100 | $9.7000 | | | |
| 5/9/2007 | Sell | 100 | $9.7000 | | | |
| 5/30/2007 | Sell | 900 | $11.9900 | | | |
| 5/30/2007 | Sell | 500 | $11.9900 | | | |
| 5/30/2007 | Sell | 200 | $11.9900 | | | |
| 5/30/2007 | Sell | 100 | $11.9900 | | | |
| 5/30/2007 | Sell | 100 | $11.9900 | | | |
| 5/30/2007 | Sell | 100 | $11.9900 | | | |
| 5/30/2007 | Sell | 100 | $11.9900 | | | |
| 5/30/2007 | Sell | 27 | $11.9900 | | | |
| 5/30/2007 | Sell | 200 | $11.9800 | | | |
| 5/30/2007 | Sell | 200 | $11.9800 | | | |
| 5/30/2007 | Sell | 100 | $11.9800 | | | |
| 5/30/2007 | Sell | 100 | $11.9800 | | | |
| 5/30/2007 | Sell | 100 | $11.9800 | | | |
| 5/30/2007 | Sell | 100 | $11.9800 | | | |
| 5/30/2007 | Sell | 1,100 | $11.9700 | | | |
| 5/30/2007 | Sell | 1,000 | $11.9700 | | | |
| 5/30/2007 | Sell | 200 | $11.9700 | | | |
| 5/30/2007 | Sell | 200 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 100 | $11.9700 | | | |
| 5/30/2007 | Sell | 73 | $11.9700 | | | |
| 5/30/2007 | Sell | 27 | $11.9700 | | | |
| 5/30/2007 | Sell | 800 | $11.9500 | | | |
| 5/30/2007 | Sell | 700 | $11.9500 | | | |
| 5/30/2007 | Sell | 300 | $11.9500 | | | |
| 5/30/2007 | Sell | 200 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 100 | $11.9500 | | | |
| 5/30/2007 | Sell | 55 | $11.9500 | | | |
| 5/30/2007 | Sell | 18 | $11.9500 | | | |
| 6/1/2007 | Sell | 400 | $12.5800 | | | |
| 6/1/2007 | Sell | 1,671 | $12.5600 | | | |
| 6/1/2007 | Sell | 100 | $12.5600 | | | |
| 6/1/2007 | Sell | 100 | $12.5600 | | | |
| 6/1/2007 | Sell | 100 | $12.5600 | | | |
| 6/1/2007 | Sell | 100 | $12.5500 | | | |
| 6/1/2007 | Sell | 100 | $12.5200 | | | |
| 6/1/2007 | Sell | 100 | $12.5200 | | | |
| 6/1/2007 | Sell | 3,300 | $12.5100 | | | |
| 6/1/2007 | Sell | 100 | $12.5100 | | | |
| 6/1/2007 | Sell | 5,000 | $12.5000 | | | |
| 6/1/2007 | Sell | 1,600 | $12.5000 | | | |
| 6/1/2007 | Sell | 800 | $12.5000 | | | |
| 6/1/2007 | Sell | 500 | $12.5000 | | | |
| 6/1/2007 | Sell | 200 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 100 | $12.5000 | | | |
| 6/1/2007 | Sell | 29 | $12.5000 | | | |
| 7/13/2007 | Sell | 700 | $20.3800 | | | |
| 7/13/2007 | Sell | 100 | $20.3800 | | | |
| 7/13/2007 | Sell | 100 | $20.3800 | | | |
| 7/13/2007 | Sell | 200 | $20.3700 | | | |
| 7/13/2007 | Sell | 200 | $20.3700 | | | |
| 7/13/2007 | Sell | 100 | $20.3700 | | | |
| 7/13/2007 | Sell | 2,554 | $20.3600 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 7/13/2007 | Sell | 2,095 | $20.3600 | | | |
| 7/13/2007 | Sell | 1,000 | $20.3600 | | | |
| 7/13/2007 | Sell | 795 | $20.3600 | | | |
| 7/13/2007 | Sell | 656 | $20.3600 | | | |
| 7/13/2007 | Sell | 300 | $20.3600 | | | |
| 7/13/2007 | Sell | 200 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/13/2007 | Sell | 100 | $20.3600 | | | |
| 7/16/2007 | Buy | 93 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 100 | $17.3000 | | | |
| 7/16/2007 | Buy | 107 | $17.3000 | | | |
| 7/16/2007 | Buy | 107 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 200 | $17.3000 | | | |
| 7/16/2007 | Buy | 275 | $17.3000 | | | |
| 7/16/2007 | Buy | 377 | $17.3000 | | | |
| 7/16/2007 | Buy | 3,280 | $17.3000 | | | |
| 7/16/2007 | Buy | 50 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2900 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 7/16/2007 | Buy | 100 | $17.2900 | | | |
| 7/16/2007 | Buy | 500 | $17.2900 | | | |
| 7/16/2007 | Buy | 1,223 | $17.2900 | | | |
| 7/16/2007 | Buy | 100 | $17.2800 | | | |
| 7/16/2007 | Buy | 100 | $17.2800 | | | |
| 7/16/2007 | Buy | 100 | $17.2800 | | | |
| 7/16/2007 | Buy | 88 | $17.2700 | | | |
| 7/16/2007 | Buy | 100 | $17.2700 | | | |
| 7/16/2007 | Buy | 100 | $17.2700 | | | |
| 7/16/2007 | Buy | 100 | $17.2700 | | | |
| 7/30/2007 | Buy | 100 | $15.3000 | | | |
| 7/30/2007 | Buy | 100 | $15.3000 | | | |
| 7/30/2007 | Buy | 200 | $15.3000 | | | |
| 7/30/2007 | Buy | 200 | $15.3000 | | | |
| 7/30/2007 | Buy | 300 | $15.3000 | | | |
| 7/30/2007 | Buy | 400 | $15.3000 | | | |
| 7/30/2007 | Buy | 100 | $15.2900 | | | |
| 7/30/2007 | Buy | 2,000 | $15.2900 | | | |
| 7/30/2007 | Buy | 100 | $15.2800 | | | |
| 7/30/2007 | Buy | 100 | $15.2800 | | | |
| 7/30/2007 | Buy | 100 | $15.2800 | | | |
| 7/30/2007 | Buy | 100 | $15.2700 | | | |
| 7/30/2007 | Buy | 100 | $15.2700 | | | |
| 7/30/2007 | Buy | 100 | $15.2700 | | | |
| 7/30/2007 | Buy | 100 | $15.2700 | | | |
| 7/30/2007 | Buy | 200 | $15.2600 | | | |
| 7/30/2007 | Buy | 5,700 | $15.2600 | | | |
| 7/31/2007 | Sell | 600 | $16.3000 | | | |
| 7/31/2007 | Sell | 800 | $16.2900 | | | |
| 7/31/2007 | Sell | 200 | $16.2900 | | | |
| 7/31/2007 | Sell | 900 | $16.2700 | | | |
| 7/31/2007 | Sell | 100 | $16.2700 | | | |
| 7/31/2007 | Sell | 700 | $16.2600 | | | |
| 7/31/2007 | Sell | 300 | $16.2600 | | | |
| 7/31/2007 | Sell | 200 | $16.2600 | | | |
| 7/31/2007 | Sell | 100 | $16.2600 | | | |
| 7/31/2007 | Sell | 100 | $16.2600 | | | |
| 7/31/2007 | Sell | 701 | $16.2500 | | | |
| 7/31/2007 | Sell | 600 | $16.2500 | | | |
| 7/31/2007 | Sell | 299 | $16.2500 | | | |
| 7/31/2007 | Sell | 800 | $15.8200 | | | |
| 7/31/2007 | Sell | 300 | $15.8200 | | | |
| 7/31/2007 | Sell | 100 | $15.8200 | | | |
| 7/31/2007 | Sell | 100 | $15.8200 | | | |
| 7/31/2007 | Sell | 100 | $15.8200 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 7/31/2007 | Sell | 100 | $15.8200 | | | |
| 7/31/2007 | Sell | 100 | $15.8200 | | | |
| 7/31/2007 | Sell | 800 | $15.8100 | | | |
| 7/31/2007 | Sell | 500 | $15.8100 | | | |
| 7/31/2007 | Sell | 200 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 100 | $15.8100 | | | |
| 7/31/2007 | Sell | 700 | $15.8000 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 100 | $13.4900 | | | |
| 8/16/2007 | Buy | 2,800 | $13.4900 | | | |
| 8/16/2007 | Buy | 200 | $13.4400 | | | |
| 8/16/2007 | Buy | 200 | $13.4400 | | | |
| 8/16/2007 | Buy | 200 | $13.4400 | | | |
| 8/16/2007 | Buy | 100 | $13.4300 | | | |
| 8/16/2007 | Buy | 100 | $13.3700 | | | |
| 8/16/2007 | Buy | 100 | $13.3600 | | | |
| 8/16/2007 | Buy | 100 | $13.3600 | | | |
| 8/16/2007 | Buy | 200 | $13.3600 | | | |
| 8/16/2007 | Buy | 400 | $13.3600 | | | |
| 8/16/2007 | Buy | 1,200 | $13.3600 | | | |
| 8/16/2007 | Buy | 200 | $13.3200 | | | |
| 8/16/2007 | Buy | 200 | $13.3200 | | | |
| 8/16/2007 | Buy | 700 | $13.3200 | | | |
| 8/16/2007 | Buy | 900 | $13.3200 | | | |
| 8/16/2007 | Buy | 100 | $13.3100 | | | |
| 8/16/2007 | Buy | 100 | $13.2900 | | | |
| 8/16/2007 | Buy | 300 | $13.2800 | | | |
| 8/16/2007 | Buy | 100 | $13.2500 | | | |
| 8/16/2007 | Buy | 100 | $13.2500 | | | |
| 8/16/2007 | Buy | 200 | $13.2500 | | | |
| 8/16/2007 | Buy | 200 | $13.2500 | | | |
| 8/16/2007 | Buy | 200 | $13.2500 | | | |
| 8/16/2007 | Buy | 200 | $13.2400 | | | |
| 8/16/2007 | Buy | 100 | $13.2200 | | | |
| 8/16/2007 | Buy | 100 | $13.2100 | | | |
| 8/16/2007 | Buy | 200 | $13.2100 | | | |
| 8/31/2007 | Sell | 1,000 | $15.0700 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 8/31/2007 | Sell | 1,000 | $15.0700 | | | |
| 8/31/2007 | Sell | 1,000 | $15.0700 | | | |
| 8/31/2007 | Sell | 1,000 | $15.0700 | | | |
| 8/31/2007 | Sell | 900 | $15.0700 | | | |
| 8/31/2007 | Sell | 900 | $15.0700 | | | |
| 8/31/2007 | Sell | 800 | $15.0700 | | | |
| 8/31/2007 | Sell | 400 | $15.0700 | | | |
| 8/31/2007 | Sell | 400 | $15.0700 | | | |
| 8/31/2007 | Sell | 300 | $15.0700 | | | |
| 8/31/2007 | Sell | 300 | $15.0700 | | | |
| 8/31/2007 | Sell | 300 | $15.0700 | | | |
| 8/31/2007 | Sell | 200 | $15.0700 | | | |
| 8/31/2007 | Sell | 200 | $15.0700 | | | |
| 8/31/2007 | Sell | 200 | $15.0700 | | | |
| 8/31/2007 | Sell | 200 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 8/31/2007 | Sell | 100 | $15.0700 | | | |
| 9/7/2007 | Buy | 100 | $14.0000 | | | |
| 9/7/2007 | Buy | 100 | $14.0000 | | | |
| 9/7/2007 | Buy | 200 | $14.0000 | | | |
| 9/7/2007 | Buy | 2,734 | $14.0000 | | | |
| 9/7/2007 | Buy | 200 | $13.9900 | | | |
| 9/7/2007 | Buy | 500 | $13.9700 | | | |
| 9/7/2007 | Buy | 100 | $13.9600 | | | |
| 9/7/2007 | Buy | 200 | $13.9600 | | | |
| 9/25/2007 | Buy | 8,900 | $14.5400 | | | |
| 9/25/2007 | Buy | 100 | $14.5300 | | | |
| 9/25/2007 | Buy | 100 | $14.5300 | | | |
| 9/25/2007 | Buy | 100 | $14.5300 | | | |
| 9/25/2007 | Buy | 100 | $14.5300 | | | |
| 9/25/2007 | Buy | 200 | $14.5300 | | | |
| 9/25/2007 | Buy | 400 | $14.5300 | | | |
| 9/25/2007 | Buy | 100 | $14.5200 | | | |
| 10/15/2007 | Buy | 100 | $17.1200 | | | |
| 10/15/2007 | Buy | 100 | $17.1200 | | | |
| 10/15/2007 | Buy | 200 | $17.1200 | | | |
| 10/15/2007 | Buy | 200 | $17.1200 | | | |
| 10/15/2007 | Buy | 232 | $17.1200 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 10/15/2007 | Buy | 400 | $17.1200 | | | |
| 10/15/2007 | Buy | 500 | $17.1200 | | | |
| 10/15/2007 | Buy | 1,714 | $17.1200 | | | |
| 10/15/2007 | Buy | 100 | $17.1000 | | | |
| 10/15/2007 | Buy | 2,000 | $17.1000 | | | |
| 10/15/2007 | Buy | 100 | $17.0800 | | | |
| 10/15/2007 | Buy | 400 | $17.0800 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0700 | | | |
| 10/15/2007 | Buy | 200 | $17.0700 | | | |
| 10/15/2007 | Buy | 1,000 | $17.0700 | | | |
| 10/15/2007 | Buy | 100 | $17.0600 | | | |
| 10/15/2007 | Buy | 100 | $17.0600 | | | |
| 10/15/2007 | Buy | 100 | $17.0600 | | | |
| 10/15/2007 | Buy | 100 | $17.0600 | | | |
| 10/15/2007 | Buy | 200 | $17.0600 | | | |
| 10/15/2007 | Buy | 500 | $17.0600 | | | |
| 10/15/2007 | Buy | 100 | $17.0500 | | | |
| 10/15/2007 | Buy | 100 | $17.0400 | | | |
| 10/15/2007 | Buy | 100 | $17.0400 | | | |
| 10/15/2007 | Buy | 107 | $17.0400 | | | |
| 10/15/2007 | Buy | 147 | $17.0400 | | | |
| 10/15/2007 | Buy | 500 | $17.0400 | | | |
| 10/16/2007 | Buy | 1,300 | $17.0000 | | | |
| 10/16/2007 | Buy | 1,600 | $17.0000 | | | |
| 10/16/2007 | Buy | 2,200 | $17.0000 | | | |
| 10/16/2007 | Buy | 100 | $16.9900 | | | |
| 10/16/2007 | Buy | 16 | $16.9800 | | | |
| 10/16/2007 | Buy | 42 | $16.9800 | | | |
| 10/16/2007 | Buy | 42 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 100 | $16.9800 | | | |
| 10/16/2007 | Buy | 200 | $16.9800 | | | |
| 10/16/2007 | Buy | 200 | $16.9700 | | | |
| 10/16/2007 | Buy | 220 | $16.9500 | | | |
| 10/16/2007 | Buy | 300 | $16.9500 | | | |
| 10/16/2007 | Buy | 1,206 | $16.9500 | | | |
| 10/16/2007 | Buy | 1,274 | $16.9500 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 10/16/2007 | Buy | 100 | $16.8500 | | | |
| 10/16/2007 | Buy | 1,900 | $16.8500 | | | |
| 10/16/2007 | Buy | 100 | $16.8000 | | | |
| 10/16/2007 | Buy | 1,900 | $16.8000 | | | |
| 10/18/2007 | Buy | 15 | $16.9800 | | | |
| 10/18/2007 | Buy | 100 | $16.9800 | | | |
| 10/18/2007 | Buy | 100 | $16.9800 | | | |
| 10/18/2007 | Buy | 796 | $16.9800 | | | |
| 10/18/2007 | Buy | 100 | $16.9500 | | | |
| 10/18/2007 | Buy | 100 | $16.9500 | | | |
| 10/18/2007 | Buy | 189 | $16.9500 | | | |
| 10/18/2007 | Buy | 400 | $16.9500 | | | |
| 10/24/2007 | Buy | 8 | $15.9800 | | | |
| 10/24/2007 | Buy | 33 | $15.9800 | | | |
| 10/24/2007 | Buy | 41 | $15.9800 | | | |
| 10/24/2007 | Buy | 41 | $15.9800 | | | |
| 10/24/2007 | Buy | 100 | $15.9800 | | | |
| 10/24/2007 | Buy | 100 | $15.9800 | | | |
| 10/24/2007 | Buy | 100 | $15.9800 | | | |
| 10/24/2007 | Buy | 1,000 | $15.9800 | | | |
| 10/24/2007 | Buy | 3,577 | $15.9800 | | | |
| 11/7/2007 | Buy | 866 | $16.0100 | | | |
| 11/8/2007 | Sell | 100 | $16.7200 | | | |
| 11/8/2007 | Sell | 100 | $16.7000 | | | |
| 11/8/2007 | Sell | 100 | $16.7000 | | | |
| 11/8/2007 | Sell | 100 | $16.7000 | | | |
| 11/14/2007 | Sell | 200 | $15.3200 | | | |
| 11/14/2007 | Sell | 100 | $15.3200 | | | |
| 11/14/2007 | Sell | 500 | $15.3100 | | | |
| 11/14/2007 | Sell | 100 | $15.2200 | | | |
| 11/14/2007 | Sell | 476 | $15.1900 | | | |
| 11/14/2007 | Sell | 200 | $15.1900 | | | |
| 11/14/2007 | Sell | 100 | $15.1900 | | | |
| 11/14/2007 | Sell | 100 | $15.1900 | | | |
| 11/14/2007 | Sell | 2,125 | $15.1800 | | | |
| 11/14/2007 | Sell | 699 | $15.1800 | | | |
| 1/9/2008 | Sell | 10,000 | $9.3914 | | | |
| 1/25/2008 | Buy | 10,000 | $9.4149 | | | |
| 1/25/2008 | Buy | 10,000 | $8.9981 | | | |
| 2/6/2008 | Buy | 100 | $8.5100 | | | |
| 2/6/2008 | Buy | 100 | $8.5100 | | | |
| 2/6/2008 | Buy | 200 | $8.5100 | | | |
| 2/6/2008 | Buy | 300 | $8.5100 | | | |
| 2/6/2008 | Buy | 1,000 | $8.5100 | | | |
| 2/6/2008 | Buy | 1,116 | $8.5100 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 2/6/2008 | Buy | 1,200 | $8.5100 | | | |
| 2/6/2008 | Buy | 5,984 | $8.5100 | | | |
| 2/11/2008 | Sell | 1,500 | $9.0000 | | | |
| 2/11/2008 | Sell | 900 | $9.0000 | | | |
| 2/11/2008 | Sell | 1,300 | $8.9900 | | | |
| 2/11/2008 | Sell | 900 | $8.9900 | | | |
| 2/11/2008 | Sell | 200 | $8.9900 | | | |
| 2/11/2008 | Sell | 100 | $8.9900 | | | |
| 2/11/2008 | Sell | 100 | $8.9900 | | | |
| 2/11/2008 | Buy | 5,000 | $8.5000 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 100 | $9.2500 | | | |
| 2/12/2008 | Buy | 200 | $9.2500 | | | |
| 2/12/2008 | Buy | 200 | $9.2500 | | | |
| 2/12/2008 | Buy | 200 | $9.2500 | | | |
| 2/12/2008 | Buy | 200 | $9.2500 | | | |
| 2/12/2008 | Buy | 400 | $9.2500 | | | |
| 2/12/2008 | Buy | 500 | $9.2500 | | | |
| 2/12/2008 | Buy | 2,500 | $9.2500 | | | |
| 2/12/2008 | Buy | 3,371 | $9.2500 | | | |
| 2/12/2008 | Buy | 5,000 | $9.2400 | | | |
| 2/12/2008 | Buy | 100 | $9.2000 | | | |
| 2/12/2008 | Buy | 100 | $9.2000 | | | |
| 2/12/2008 | Buy | 100 | $9.2000 | | | |
| 2/12/2008 | Buy | 129 | $9.2000 | | | |
| 2/12/2008 | Buy | 200 | $9.2000 | | | |
| 2/12/2008 | Buy | 300 | $9.2000 | | | |
| 2/12/2008 | Buy | 500 | $9.2000 | | | |
| 2/12/2008 | Buy | 500 | $9.2000 | | | |
| 2/13/2008 | Sell | 200 | $9.3100 | | | |
| 2/13/2008 | Sell | 200 | $9.3100 | | | |
| 2/13/2008 | Sell | 100 | $9.3100 | | | |
| 2/13/2008 | Sell | 3,750 | $9.3000 | | | |
| 2/13/2008 | Sell | 200 | $9.3000 | | | |
| 2/13/2008 | Sell | 134 | $9.3000 | | | |
| 2/13/2008 | Sell | 100 | $9.3000 | | | |
| 2/13/2008 | Sell | 100 | $9.3000 | | | |
| 2/13/2008 | Sell | 100 | $9.3000 | | | |
| 2/13/2008 | Sell | 100 | $9.3000 | | | |
| 2/13/2008 | Sell | 16 | $9.3000 | | | |
| 2/14/2008 | Buy | 100 | $8.9400 | | | |
| 2/14/2008 | Buy | 200 | $8.9400 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 2/14/2008 | Buy | 400 | $8.9400 | | | |
| 2/14/2008 | Buy | 4,300 | $8.9400 | | | |
| 2/15/2008 | Buy | 300 | $8.9900 | | | |
| 2/15/2008 | Buy | 500 | $8.9900 | | | |
| 2/15/2008 | Buy | 2,686 | $8.9900 | | | |
| 2/15/2008 | Buy | 100 | $8.9800 | | | |
| 2/15/2008 | Buy | 14 | $8.9700 | | | |
| 2/15/2008 | Buy | 50 | $8.9700 | | | |
| 2/15/2008 | Buy | 50 | $8.9700 | | | |
| 2/15/2008 | Buy | 100 | $8.9700 | | | |
| 2/15/2008 | Buy | 200 | $8.9700 | | | |
| 2/15/2008 | Buy | 500 | $8.9700 | | | |
| 2/15/2008 | Buy | 500 | $8.9700 | | | |
| 2/20/2008 | Buy | 100 | $8.9000 | | | |
| 2/20/2008 | Buy | 100 | $8.9000 | | | |
| 2/20/2008 | Buy | 700 | $8.9000 | | | |
| 2/20/2008 | Buy | 8,300 | $8.9000 | | | |
| 2/20/2008 | Buy | 100 | $8.8900 | | | |
| 2/20/2008 | Buy | 100 | $8.8900 | | | |
| 2/20/2008 | Buy | 200 | $8.8900 | | | |
| 2/20/2008 | Buy | 400 | $8.8900 | | | |
| 2/21/2008 | Buy | 37 | $9.2500 | | | |
| 2/21/2008 | Buy | 100 | $9.2500 | | | |
| 2/21/2008 | Buy | 300 | $9.2500 | | | |
| 2/21/2008 | Buy | 376 | $9.2500 | | | |
| 2/21/2008 | Buy | 400 | $9.2500 | | | |
| 2/21/2008 | Buy | 400 | $9.2500 | | | |
| 2/21/2008 | Buy | 427 | $9.2500 | | | |
| 2/21/2008 | Buy | 500 | $9.2500 | | | |
| 2/21/2008 | Buy | 924 | $9.2500 | | | |
| 2/21/2008 | Buy | 1,536 | $9.2500 | | | |
| 2/21/2008 | Buy | 5,000 | $8.7500 | | | |
| 2/25/2008 | Sell | 400 | $9.5300 | | | |
| 2/25/2008 | Sell | 200 | $9.5300 | | | |
| 2/25/2008 | Sell | 100 | $9.5300 | | | |
| 2/25/2008 | Sell | 100 | $9.5300 | | | |
| 2/25/2008 | Sell | 100 | $9.5300 | | | |
| 2/25/2008 | Sell | 100 | $9.5300 | | | |
| 2/25/2008 | Sell | 200 | $9.5100 | | | |
| 2/25/2008 | Sell | 2,900 | $9.5000 | | | |
| 2/25/2008 | Sell | 187 | $9.5000 | | | |
| 2/25/2008 | Sell | 113 | $9.5000 | | | |
| 2/25/2008 | Sell | 100 | $9.5000 | | | |
| 2/25/2008 | Sell | 100 | $9.5000 | | | |
| 2/25/2008 | Sell | 100 | $9.5000 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 100 | $9.0500 | | | |
| 2/25/2008 | Buy | 700 | $9.0500 | | | |
| 2/25/2008 | Buy | 1,301 | $9.0500 | | | |
| 2/25/2008 | Buy | 1,999 | $9.0500 | | | |
| 2/28/2008 | Buy | 100 | $10.2000 | | | |
| 2/28/2008 | Buy | 100 | $10.2000 | | | |
| 2/28/2008 | Buy | 100 | $10.2000 | | | |
| 2/28/2008 | Buy | 100 | $10.2000 | | | |
| 2/28/2008 | Buy | 200 | $10.2000 | | | |
| 2/28/2008 | Buy | 1,500 | $10.2000 | | | |
| 2/28/2008 | Buy | 1,800 | $10.2000 | | | |
| 2/28/2008 | Buy | 100 | $10.1900 | | | |
| 2/28/2008 | Buy | 100 | $10.1800 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 100 | $10.1700 | | | |
| 2/28/2008 | Buy | 200 | $10.1700 | | | |
| 2/28/2008 | Buy | 200 | $10.1700 | | | |
| 2/28/2008 | Buy | 33 | $10.0100 | | | |
| 2/28/2008 | Buy | 200 | $10.0100 | | | |
| 2/28/2008 | Buy | 367 | $10.0100 | | | |
| 2/28/2008 | Buy | 500 | $10.0100 | | | |
| 2/28/2008 | Buy | 1,100 | $10.0100 | | | |
| 2/28/2008 | Buy | 2,800 | $10.0100 | | | |
| 2/29/2008 | Sell | 20,000 | $9.4100 | | | |
| 3/6/2008 | Sell | 200 | $8.0200 | | | |
| 3/6/2008 | Sell | 100 | $8.0200 | | | |
| 3/6/2008 | Sell | 100 | $8.0200 | | | |
| 3/6/2008 | Sell | 100 | $8.0200 | | | |
| 3/6/2008 | Sell | 100 | $8.0100 | | | |
| 3/6/2008 | Sell | 30,000 | $8.0000 | | | |
| 3/6/2008 | Sell | 12,500 | $8.0000 | | | |
| 3/6/2008 | Sell | 5,000 | $8.0000 | | | |
| 3/6/2008 | Sell | 600 | $8.0000 | | | |
| 3/6/2008 | Sell | 400 | $8.0000 | | | |
| 3/6/2008 | Sell | 300 | $8.0000 | | | |
| 3/6/2008 | Sell | 200 | $8.0000 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 3/6/2008 | Sell | 100 | $8.0000 | | | |
| 3/6/2008 | Sell | 100 | $8.0000 | | | |
| 3/6/2008 | Sell | 100 | $8.0000 | | | |
| 3/6/2008 | Sell | 100 | $8.0000 | | | |
| 3/6/2008 | Sell | 800 | $7.9800 | | | |
| 3/6/2008 | Sell | 300 | $7.9800 | | | |
| 3/6/2008 | Sell | 100 | $7.9800 | | | |
| 3/6/2008 | Sell | 91 | $7.9800 | | | |
| 3/6/2008 | Sell | 400 | $7.9600 | | | |
| 3/6/2008 | Sell | 100 | $7.9500 | | | |
| 3/6/2008 | Sell | 100 | $7.9500 | | | |
| 3/6/2008 | Sell | 100 | $7.9400 | | | |
| 3/6/2008 | Sell | 100 | $7.9300 | | | |
| 3/6/2008 | Sell | 200 | $7.9200 | | | |
| 3/6/2008 | Sell | 500 | $7.9100 | | | |
| 3/6/2008 | Sell | 200 | $7.9100 | | | |
| 3/6/2008 | Sell | 200 | $7.9100 | | | |
| 3/6/2008 | Sell | 100 | $7.9100 | | | |
| 3/6/2008 | Sell | 100 | $7.9100 | | | |
| 3/6/2008 | Sell | 11,168 | $7.9000 | | | |
| 3/6/2008 | Sell | 1,500 | $7.9000 | | | |
| 3/6/2008 | Sell | 700 | $7.9000 | | | |
| 3/6/2008 | Sell | 600 | $7.9000 | | | |
| 3/6/2008 | Sell | 500 | $7.9000 | | | |
| 3/6/2008 | Sell | 400 | $7.9000 | | | |
| 3/6/2008 | Sell | 250 | $7.9000 | | | |
| 3/6/2008 | Sell | 200 | $7.9000 | | | |
| 3/6/2008 | Sell | 200 | $7.9000 | | | |
| 3/6/2008 | Sell | 200 | $7.9000 | | | |
| 3/6/2008 | Sell | 191 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 3/6/2008 | Sell | 100 | $7.9000 | | | |
| 5/2/2008 | Sell | 7,075 | $10.7500 | | | |
| 5/2/2008 | Sell | 1,300 | $10.7500 | | | |
| 5/2/2008 | Sell | 1,225 | $10.7500 | | | |
| 5/2/2008 | Sell | 200 | $10.7500 | | | |
| 5/2/2008 | Sell | 100 | $10.7500 | | | |
| 5/2/2008 | Sell | 100 | $10.7500 | | | |
| 5/7/2008 | Buy | 100 | $10.3500 | | | |
| 5/7/2008 | Buy | 100 | $10.3500 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|------|------|--------|-------------|-----------|--------|----------------|
| 5/7/2008 | Buy | 200 | $10.3500 | | | |
| 5/7/2008 | Buy | 300 | $10.3500 | | | |
| 5/7/2008 | Buy | 500 | $10.3500 | | | |
| 5/7/2008 | Buy | 700 | $10.3500 | | | |
| 5/7/2008 | Buy | 700 | $10.3500 | | | |
| 5/7/2008 | Buy | 5,000 | $10.3500 | | | |
| 5/7/2008 | Buy | 100 | $10.3400 | | | |
| 5/7/2008 | Buy | 2,000 | $10.3200 | | | |
| 5/7/2008 | Buy | 200 | $10.3000 | | | |
| 5/7/2008 | Buy | 100 | $10.2800 | | | |
| 5/8/2008 | Sell | 1,400 | $10.6750 | | | |
| 5/8/2008 | Buy | 11 | $10.5300 | | | |
| 5/8/2008 | Buy | 44 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 100 | $10.5300 | | | |
| 5/8/2008 | Buy | 500 | $10.5300 | | | |
| 5/8/2008 | Buy | 200 | $10.5250 | | | |
| 5/8/2008 | Buy | 745 | $10.5250 | | | |
| 5/8/2008 | Buy | 2,000 | $10.5250 | | | |
| 5/8/2008 | Buy | 111 | $10.5200 | | | |
| 5/8/2008 | Buy | 400 | $10.5150 | | | |
| 5/8/2008 | Buy | 489 | $10.5150 | | | |
| 5/8/2008 | Buy | 100 | $10.1000 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 100 | $10.0800 | | | |
| 5/8/2008 | Buy | 400 | $10.0800 | | | |
| 6/13/2008 | Sell | 5,500 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 100 | $7.7800 | | | |
| 6/13/2008 | Sell | 125 | $7.7700 | | | |
| 6/13/2008 | Sell | 100 | $7.7700 | | | |
| 6/13/2008 | Sell | 100 | $7.7700 | | | |

| Date | Type | Shares | Share Price | Contracts | Option | Contract Price |
|---|---|---|---|---|---|---|
| 6/13/2008 | Sell | 100 | $7.7700 | | | |
| 6/13/2008 | Sell | 75 | $7.7700 | | | |
| 6/13/2008 | Sell | 100 | $7.7600 | | | |
| 6/13/2008 | Sell | 200 | $7.7400 | | | |
| 6/13/2008 | Sell | 700 | $7.7200 | | | |
| 6/13/2008 | Sell | 700 | $7.7200 | | | |
| 6/13/2008 | Sell | 100 | $7.7100 | | | |
| 6/13/2008 | Sell | 1,300 | $7.7000 | | | |
| 6/13/2008 | Sell | 300 | $7.7000 | | | |
| 6/13/2008 | Sell | 100 | $7.7000 | | | |
| 6/24/2008 | Buy | | | 160 | Call $7.50 Nov. | $125.00 |
| 6/24/2008 | Buy | | | 40 | Call $7.50 Nov. | $130.00 |
| 6/26/2008 | Sell | 14,400 | $6.7700 | | | |
| 6/26/2008 | Sell | 600 | $6.7700 | | | |
| 8/12/2008 | Buy | | | 24 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 13 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 11 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 10 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 13 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 34 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 34 | Call $7.50 Nov. | $135.00 |
| 8/12/2008 | Buy | | | 11 | Call $7.50 Nov. | $135.00 |
| 10/30/2008 | Sell | 2,800 | $4.7800 | | | |
| 3/10/2009 | Sell | 44,200 | $2.6015 | | | |
| 3/11/2009 | Sell | 225 | $2.6700 | | | |
| 5/5/2009 | Sell | 3,000 | $4.3180 | | | |
| 5/5/2009 | Sell | 9,775 | $4.3055 | | | |
| 5/26/2009 | Sell | 20,000 | $4.1590 | | | |
| 5/26/2009 | Sell | 10,000 | $4.1040 | | | |
| 5/26/2009 | Sell | 10,000 | $4.0175 | | | |

# EXHIBIT B

**Exhibit B**

**Immersion Insider Sales During the Class Period:**

| Insider | Date | Shares | Price | Proceeds | % of Holdings Sold | % of Holdings Sold incl. options |
|---------|------|--------|-------|----------|--------------------|----------------------------------|
| **STEPHEN AMBLER** | 08/27/2007 | 20,000 | $14.61 | $292,200 | | |
| CFO and Vice | 11/06/2007 | 20,000 | $17.37 | $347,400 | | |
| President, Finance | | **40,000** | | **$639,600** | **100.00%** | **20.19%** |
| | | | | | | |
| **VICTOR VIEGAS** | 05/25/2007 | 22,919 | $11.01 | $252,338 | | |
| President and CEO, | 09/27/2007 | 52,081 | $15.60 | $812,464 | | |
| Director | 09/28/2007 | 25,000 | $16.99 | $424,750 | | |
| | 10/08/2007 | 25,000 | $18.02 | $450,500 | | |
| | | **125,000** | | **$1,940,052** | **92.88%** | **9.72%** |
| | | | | | | |
| **RICHARD VOGEL** | 11/07/2007 | 7,752 | $17.29 | $134,032 | | |
| Senior Vice President | | **7,752** | | **$134,032** | **100.00%** | **100.00%** |
| and General Manager, | | | | | | |
| Immersion Medical Inc. | | | | | | |
| | | | | | | |
| **TOTAL** | | **172,752** | | **$2,713,684** | | |