SUSAN S. MUCK (CSB NO. 126930)
smuck@fenwick.com
JENNIFER BRETAN (CSB NO. 233475)
jbretan@fenwick.com
MARIE C. BAFUS (CSB NO. 258417)
mbafus@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, California 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

JAY L. POMERANTZ (CSB NO. 209869)
jpomerantz@fenwick.com
FELIX S. LEE (CSB NO. 197084)
flee@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, California 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

Attorneys for Defendants Immersion Corporation, Victor A. Viegas, Clent Richardson, Stephen Ambler and Richard Vogel

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re IMMERSION CORPORATION SECURITIES LITIGATION

This Document Relates to:

ALL ACTIONS

Case No. CV 09-4073 MMC

CLASS ACTION

**NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED CONSOLIDATED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing Date: October 28, 2011
Hearing Time: 9:00 am
Courtroom: 7

Judge: The Honorable Maxine M. Chesney

Date Action Filed: September 2, 2009

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ..... 1

ISSUES TO BE DECIDED ..... 1

I. PRELIMINARY STATEMENT ..... 2

II. STATEMENT OF FACTS ..... 3

A. Immersion And Its Business ..... 3

B. Immersion Discloses The Audit Committee Investigation And Potential Restatement ..... 4

C. The Restated Financials Increase Fiscal 2007 Revenue And Defer Most Other Affected Revenue ..... 4

D. Procedural History, Parties And Claims ..... 5

III. LEGAL STANDARDS ..... 6

IV. PLAINTIFF'S ACC MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE PARTICULARIZED FACTS ESTABLISHING A STRONG INFERENCE OF SCIENTER AS TO EACH DEFENDANT ..... 7

A. Plaintiff's Accounting Allegations Fail To Raise A Strong Inference of Scienter ..... 7

1. The Restatement Does Not Establish Scienter ..... 7

2. Plaintiff's Core Operations Allegations Do Not Support Scienter ..... 10

3. Plaintiff Also Fails To Plead Scienter On The Basis Of SOX Certifications Or Internal Control Deficiencies ..... 11

B. The Alleged 2009 Side Agreement Does Not Establish Scienter ..... 12

C. Plaintiff's Confidential Witness Allegations Again Fail To Establish Scienter ..... 13

1. The Confidential Witnesses Continue to Lack Personal Knowledge of Facts Raising A Strong Inference of Scienter ..... 14

2. Plaintiff's Confidential Witnesses Never Once Allege That Defendants Committed Fraud ..... 15

D. Plaintiff Cannot Salvage His Scienter Allegations By Reference To Defendants' Trading ..... 19

V. PLAINTIFF FAILS TO STATE A CLAIM AGAINST NON-SPEAKER VOGEL ..... 21



FENWICK & WEST LLP ATTORNEYS AT LAW SAN FRANCISCO

VI. THE ACC STILL FAILS TO PLEAD LOSS CAUSATION ..... 22

VII. THE ACC FAILS TO PLEAD SECTION 20(A) CONTROL PERSON LIABILITY ..... 24

VIII. THE ACC FAILS TO PLEAD A SECTION 20A INSIDER TRADING CLAIM ..... 24

IX. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008).......... 10

*Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008) .......... 15, 25

*Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104 (N.D. Cal. 2009) .......... 11, 20

*DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002).......... 2, 6

*Dura Pharms. Inc. v. Broudo*, 544 U.S. 336 (2005) .......... 23

*Glazer Capital Mgmt. L.P. v. Magistri*, 549 F.3d 736 (9th Cir. 2008).......... 10, 11, 18

*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002).......... 7

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000).......... 21

*In re 3Com Sec. Litig.*, 1999 WL 1039715 (N.D. Cal. July 8, 1999).......... 25

*In re Allergan Inc. Sec. Litig.*, 1993 WL 623321 (C.D. Cal. Nov. 29, 1993).......... 20

*In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012 (N.D. Cal. 2002) .......... 22

*In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037 (N.D. Cal. 2009) .......... 11, 16, 17

*In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964 (N.D. Cal. 2010) .......... 18

*In re Comshare, Inc. Sec. Litig.*, 1997 WL 1091468 (E.D. Mich. Sept. 18, 1997), *aff'd*, 183 F.3d 542 (6th Cir. 1999).......... 13

*In re Connetics Corp. Sec. Litig.*, 2008 WL 269467 (N.D. Cal. Jan. 29, 2008) .......... 13

*In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996 (N.D. Cal. 2008) .......... 8

*In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069 (N.D. Cal. 2005) .......... 8

*In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005).......... 6, 24

*In re Downey Sec. Litig.*, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).......... 21

*In re Exodus Commc'ns, Inc. Sec. Litig.*, 2005 WL 1869289 (N.D. Cal. Aug. 5, 2005).......... 12

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ........ 23

*In re Foundry Networks, Inc. Sec. Litig.*,
2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ........ 24

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ........ 12, 17, 23, 24

*In re Hypercom Corp. Sec. Litig.*,
2006 WL 1836181 (D. Ariz. July 5, 2006) ........ 12

*In re ICN Pharms., Inc. Sec. Litig.*,
299 F. Supp. 2d 1055 (C.D. Cal. 2004) ........ 13

*In re NextCard Inc. Sec. Litig.*,
2006 WL 708663 (N.D. Cal. Mar. 20, 2006) ........ 21

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ........ 15

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ........ 11

*In re Silicon Graphics, Inc. Sec. Litig*,
183 F.3d 970 (9th Cir. 1999) ........ 6, 7, 19

*In re Silicon Image, Inc. Sec. Litig.*,
2007 WL 2778414 (N.D. Cal. Sept. 21, 2007), *aff'd*, 325 Fed. Appx. 560 (9th Cir. 2009) ........ 14

*In re Skechers U.S.A., Inc. Sec. Litig.*,
273 Fed. Appx. 626 (9th Cir. 2008) ........ 19

*In re Splash Tech. Holdings Inc., Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ........ 13

*In re Taleo Corp. Sec. Litig.*,
2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ........ 11, 20

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ........ 9, 17

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ........ 20

*In re Verifone Holdings, Inc. Sec. Litig.*,
2009 WL 1458211 (N.D. Cal. May 26, 2009) ........ 8, 11

*In re Verifone Holdings, Inc. Sec. Litig.*,
2011 WL 1045120 (N.D. Cal. Mar. 22, 2011) ........ 12, 21, 22

*In re VeriFone Sec. Litig.*,
11 F.3d 865 (9th Cir. 1993) ........ 24

*In re Verifone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir 1993) ........ 25

*In re WatchGuard Sec. Litig.*,
2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ........ 13

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) .......... 8

*Janus Capital Group, Inc. v. First Deriv. Traders*,
--- S.Ct. ---, 2011 WL 2297762 (June 13, 2011) .......... 22

*Kelley v. Rambus, Inc.*,
2008 WL 5170598 (N.D. Cal. Dec. 9, 2008), *aff'd*, 384 Fed. Appx. 570 (9th Cir. 2010) .......... 21

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) .......... 20

*Mathews v. Centex Telemanagement, Inc.*,
1994 WL 269734 (N.D. Cal. June 8, 1994) .......... 21

*McCasland v. FormFactor Inc.*,
2009 WL 2086168 (N.D. Cal. July 14, 2009) .......... 8, 9, 17

*Merck & Co. v. Reynolds*,
130 S. Ct. 1784 (2010) .......... 10

*Metawave Commc'ns Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003) .......... 12, 14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... 7, 20, 23, 24

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993) .......... 25

*Paracor Fin., Inc. v. General Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) .......... 24

*Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
673 F. Supp. 2d 718 (S.D. Ind. 2009) .......... 21

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .......... 7

*Rudolph v. UTStarcom*,
560 F. Supp. 2d 880 (N.D. Cal. 2008) .......... 2, 8

*Shurkin v. Golden State Vintners Inc.*,
471 F. Supp. 2d 998 (N.D. Cal. 2006) .......... 14

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .......... 9, 10

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008) .......... 6, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......... 7

*Weiss v. Amkor Tech., Inc.*,
527 F. Supp. 2d 938 (D. Ariz. 2007) .......... 23

*Weitschner v. Monterey Pasta Co.*,
294 F. Supp. 2d 1102 (N.D. Cal. 2003) .......... 20

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Zack v. Allied Waste Indus., Inc.*,
2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 Fed. Appx. 722 (9th Cir. 2008) ...... 20

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)........................................................................................ *passim*

## STATUTES

15 U.S.C. § 78t-1 .............................................................................................................. 25

15 U.S.C. § 78t(a) .............................................................................................................. 24

15 U.S.C. § 78u-4(b)(1) ............................................................................................... 6, 15

15 U.S.C. § 78u-4(b)(2) ...................................................................................................... 6

15 U.S.C. § 78u-4(b)(3) ...................................................................................................... 7

## RULES

Federal Rules of Civil Procedure
§ 9(b) ........................................................................................................................... 1, 6

Federal Rules of Civil Procedure
§ 12(b)(6) ..................................................................................................................... 1, 7

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 28, 2011, at 9:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of The Honorable Maxine M. Chesney, United States District Court, Northern District of California, defendants Immersion Corporation ("Immersion" or the "Company"), Victor A. Viegas, Clent Richardson, Stephen Ambler and Richard Vogel (the "Individual Defendants") will, and hereby do, move to dismiss with prejudice all claims asserted against them in plaintiff's Amended Consolidated Complaint ("ACC"). Defendants move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA") on the grounds that plaintiff has failed to allege facts sufficient to state a claim for violation of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act"). This motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; Defendants' Request for Judicial Notice ("RJN"); the Declaration of Susan S. Muck ("Muck Decl.") and accompanying exhibits thereto ("Ex.");[1] the [Proposed] Order; the pleadings and records on file herein; the argument of counsel; and such other matters as may be presented to the Court.

## ISSUES TO BE DECIDED

1) Should plaintiff's Section 10(b)[2] claim be dismissed for failure to state a claim where he: (i) fails, under the PSLRA, to plead particularized facts raising a strong inference of scienter as to any defendant; and (ii) fails to plead loss causation as to any alleged misstatement?

2) Should plaintiff's Section 20(a) claim be dismissed for failure to adequately allege an underlying violation of Section 10(b) or facts demonstrating the requisite control?

3) Should plaintiff's 20A claim be dismissed where the ACC fails to plead: (i) an underlying violation of Section 10(b); (ii) particularized facts demonstrating that any defendant sold Immersion stock while in possession of material non-public information; and (iii) that plaintiff's trading was "contemporaneous" with each defendant?

---

[1] Unless otherwise noted, references to Exhibits ("Ex.") are to Exhibits to the Muck Declaration.

[2] Unless otherwise noted, all statutory references are to the 1934 Act.

## I. PRELIMINARY STATEMENT

Plaintiff's latest attempt to plead a securities fraud complaint against Immersion, and its current and former officers, should meet the same fate as his last. On March 11, 2011, this Court dismissed plaintiff's prior complaint and rejected as deficient each of plaintiff's stated bases for suggesting that defendants had engaged in securities fraud, finding the claims wanting both individually and in the aggregate. *See* Dkt. 87, Order Granting Defendants' Motion To Dismiss ("Order") at 6-13. The ACC does not come close to curing those defects. The ACC restates *the very same arguments*, cloaked in slightly embellished language, and does nothing to substantively address the deficiencies that forced to the Court to dismiss plaintiff's prior complaint.

The basic facts remain straightforward. In late 2009 and early 2010, Immersion announced that it would restate its financials, primarily on the basis that the Company had: (i) identified certain non-revenue accounting errors; and (ii) discovered a side-agreement affecting revenue in the fiscal 2008 time period and which necessitated shifting those revenues into fiscal 2009. As part of the restatement process, Immersion also corrected certain other errors affecting the timing of revenue in earlier periods. This latter-category of adjustments was negligible and had the effect of *increasing* the Company's income for fiscal 2007. On the basis of these unremarkable facts, and undeterred by the Court's Order rejecting his claims, plaintiff persists in accusing the Company and its current and former officers of engaging in securities fraud.

As this Court made clear (Order at 4), the PSLRA imposes stringent pleading standards in cases such as this one. Those standards require plaintiffs to plead facts – not bald conclusions or speculation – that raise a strong inference of scienter. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002). Where, as here, inaccurate financials are alleged, plaintiffs must also plead facts showing that "defendants knew specific facts at the time that rendered their accounting determinations fraudulent." *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 889 (N.D. Cal. 2008).

Like its predecessor, the ACC is devoid of facts demonstrating contemporaneous knowledge of accounting errors by defendants. As this Court has already ruled, plaintiff cannot rely upon the mere fact of "a restatement" as evidence of scienter. Nor is scienter established on

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the basis that certain defendants certified the prior financial statements under Sarbanes-Oxley or parted ways with the Company in the wake of a restatement. Moreover, plaintiff's "confidential witnesses" continue to add nothing to bolster plaintiff's claims. As before, two of those purported witnesses were not even at the Company during the relevant time period. Of the remainder, not one appears to have personal knowledge of actual accounting improprieties or otherwise identifies *particular facts* demonstrating fraud by defendants here. At most, the witnesses offer up vague generalizations, innuendo, or innocuously describe ordinary job responsibilities of the defendants—none of which suffices to plead scienter under the PSLRA.

Plaintiff's ACC also fails for a further reason: he still cannot plead (as he must) the element of loss causation, *i.e.*, that disclosure of the alleged accounting fraud actually and proximately caused Immersion's stock price to decline. The ACC inexplicably relies on exactly the same four alleged "corrective disclosures" that the Court already ruled are legally insufficient to serve as a basis for loss causation, and blithely adds a fifth that is deficient for exactly the same reasons as the previous four. Thus, dismissal remains warranted for the same reasons.

Similarly deficient is plaintiff's attempts to salvage his claims regarding defendants' sales of stock, which this Court noted were lacking the requisite indicia of suspicious timing or amount, and indeed, actually rebutted an inference of scienter, given that they were all made in 2007 when Immersion had ***understated*** its net income. Not a single new fact is pleaded in the ACC that would warrant a reversal of the Court's conclusion.

In sum, plaintiff has made only cosmetic revisions to a fatally defective complaint that do not come close to remedying its flaws. The ACC should be dismissed with prejudice.

## II. STATEMENT OF FACTS

### A. Immersion And Its Business

Immersion, a Delaware corporation, is a leading developer and licensor of haptics technologies—technologies that allow people to use their sense of touch more fully when operating a wide variety of digital devices. ACC ¶ 2. During the period at issue in the ACC, Immersion's business was divided into two segments: (i) the Touch Line of Business, which primarily licensed haptics technology to third parties; and (ii) the Medical Line of Business,

which developed and sold medical simulation devices used to teach physicians and nurses how to perform medical procedures that require use of robotics and other instruments. Ex. A at 10, 13-17 (SEC Form 10-K/A for the fiscal year ended December 31, 2008, filed on February 8, 2010).[3] The ACC focuses on events affecting solely the Medical line of business, which, in 2007, accounted for less than 1% of the Company's profits, and in 2008 and 2009, accounted for 18% and 49%, respectively, of Immersion's operating loss.[4]

### B. Immersion Discloses The Audit Committee Investigation And Potential Restatement

On July 1, 2009, Immersion announced that its Audit Committee was conducting an investigation into certain revenue transactions in the Medical line of business. The announcement noted that the Company had not yet determined the impact, if any, to Immersion's historical financial statements. ACC ¶ 237. Approximately six weeks later, on August 10, 2009, the Company disclosed that certain accounting errors had been identified as a result of the investigation and that Immersion's financial statements for the year ended December 31, 2008, for the interim quarterly periods of 2008, and for the first quarter of 2009 should no longer be relied upon. *Id.* ¶¶ 44, 219. The Company noted that correction of the errors would likely require restatement of the Company's financial statements for those periods, that the Audit Committee investigation was not yet complete, and that the Company was not yet in a position to quantify any adjustments. *Id.* ¶ 219; Ex. D (Form 8-K filed with the SEC on August 10, 2009).

### C. The Restated Financials Increase Fiscal 2007 Revenue And Defer Most Other Affected Revenue

Immersion ultimately reported two categories of financial adjustments. The first, announced on November 17, 2009 and in connection with the February 8, 2010 restatement, was entirely unrelated to Immersion's revenues. It involved corrections for (i) a software error resulting in *non-revenue* adjustments to the timing of stock compensation expense, (ii) *non-revenue* errors in accounting for the amortization of patents; and (iii) *non-revenue* accounting

[3] On March 30, 2010, Immersion announced the acquisition of much of its Medical simulation division by CAE Healthcare, in a return to the Company's core licensing strategy. Ex. B (Form 8-K, filed with the SEC on March 31, 2010).

[4] Ex. C at 44 (SEC Form 10-K for the fiscal year ended Dec. 31, 2009, filed on March 30, 2010).

adjustments to the timing of interest income arising from Immersion's successful resolution of a patent litigation with Sony. Ex. A at 8; Ex. E (SEC Form 8-K, filed on November 17, 2009); ACC ¶¶ 231, 233, 234. As those changes required the Company to restate its 2007 financial statements, the Company also took the opportunity to review and correct for some limited adjustments affecting Medical revenues in 2007—the net effect of which was a determination that those revenues had originally been *understated*. Ex. A at 9; ACC ¶ 41 (2007 net income moves *upward* by $68,000).

The second category of adjustments – related to the findings of the Audit Committee investigation into previously reported Medical revenue – were likewise contained in Immersion's restated financial statements filed on February 8, 2010. Ex. A at 4-9; Ex. F at 4-8 (SEC Form 10-Q/A for the quarter ended March 31, 2009, filed on February 8, 2010). As alleged in the ACC and set forth in the 10-K/A, the investigation leading to the restatement was prompted by the discovery of an apparent side agreement relating to Medical product sales in 2008 and the determination that the corresponding revenue needed to be adjusted. ACC ¶¶ 34-36; Ex. A at 4-7. Notably, the vast majority of revenue adjustments in the restatement simply shifted the revenue to a later period, for example, moving revenue previously reported in Q4 2008 to Q1 2009. Ex. F at 5-6. Ultimately, revenue for Q1 2009 was adjusted *upward* by $999,000. *Id.* at 8; ACC ¶ 41.

**D. Procedural History, Parties And Claims**

The first of five securities class actions was filed on September 2, 2009. Plaintiff filed his amended Consolidated Complaint ("Complaint") on April 9, 2010, two months after Immersion's restatement. On June 15, 2010, Defendants moved to dismiss on the grounds that plaintiff could not state a cognizable claim for securities fraud under the PSLRA and had not pleaded particularized facts supporting such an allegation. On March 11, 2011, The Court granted Defendants' motion. Included in the Court's detailed opinion were the following findings:

- Immersion's restatement was insufficient to create a strong inference of scienter;
- "[N]o confidential witness provided facts demonstrating defendants, at the relevant time, had knowledge of information showing revenues were improperly recognized";
- Stock sales by defendants and other officers during the class period were not unusual or suspicious in timing and amount, and did not support an inference of scienter;

- Defendants' SOX certifications did not support a strong inference of scienter;
- Plaintiff failed to plead facts showing "substantial participation or intricate involvement in the preparation of fraudulent statements" by non-speakers Vogel and Chavez, thus removing any basis for liability;
- Plaintiff's Section 20A and 20(a) claims failed for lack of a predicate violation.

Plaintiffs filed their ACC – now their third complaint in this matter – on April 29, 2011. As before, the ACC alleges a series of false statements between May 2007 and July 2009 relating to Immersion's revenue, growth and earnings, and the causes of action remain the same. ACC ¶¶ 1, 3-4, 75-212. As before, the ACC primarily attributes misstatements concerning Immersion's financial performance to defendants Victor Viegas (CEO until April 28, 2008), Stephen Ambler (CFO throughout the class period), and Clent Richardson (CEO from April 28, 2008 through the end of the class period). *Id.* ¶¶ 75-212. In addition, plaintiff continues to name Richard Vogel (GM of Medical from March 2004 to July 2008), despite the fact that he is not alleged to be a "speaker" of any purported misstatements, and despite the fact that his tenure ended almost a year before the end of the class period, and long before the side agreement that led to the Audit Committee investigation. *Id.* ¶¶ 36, 55. Plaintiff also names the Company. *Id.* ¶ 51.[5]

## III. LEGAL STANDARDS

To state a Section 10(b) claim, a plaintiff must plead facts demonstrating "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Section 10(b) claims are subject to the requirements of Fed. R. Civ. P. 9(b) and the PSLRA that fraud be pleaded with heightened particularity. *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

In addition, with respect to each alleged misstatement, plaintiff must establish a "strong inference that each defendant acted with scienter, the "nefarious mental state necessary to constitute securities fraud." *DSAM*, 288 F.3d at 391. *See also* 15 U.S.C. § 78u-4(b)(1)-(2). Scienter encompasses either the intent to defraud or deliberate recklessness. *In re Silicon*

[5] Plaintiff did not name former defendant Daniel Chavez as a defendant in the ACC.



FENWICK & WEST LLP ATTORNEYS AT LAW SAN FRANCISCO

*Graphics, Inc. Sec. Litig*, 183 F.3d 970, 976-77 (9th Cir. 1999). The complaint must contain "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent" as to each defendant and each alleged misstatement. *Id*. at 979. Moreover, the scienter inference "must be more than merely plausible or reasonable – it must be *cogent and at least as compelling* as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007) (emphasis added).

A complaint failing to meet any of these pleading requirements must be dismissed. 15 U.S.C. § 78u-4(b)(3). Motions to dismiss were intended to serve as a powerful tool for protecting securities issuers from unwarranted litigation. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc*., 540 F.3d 1049, 1054-55 (9th Cir. 2008) ("Due in large part to the enactment of the [PSLRA], plaintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6).") (citations omitted). Moreover, in assessing a securities complaint, *all* reasonable inferences must be considered – including those unfavorable to plaintiffs. *Tellabs*, 551 U.S. at 323; *Gompper v. VISX, Inc*., 298 F.3d 893, 897 (9th Cir. 2002). Indeed, "[i]n few other areas are motions to dismiss … so powerful." *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).

## IV. PLAINTIFF'S ACC MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE PARTICULARIZED FACTS ESTABLISHING A STRONG INFERENCE OF SCIENTER AS TO EACH DEFENDANT

Notwithstanding the Court's detailed guidance on flaws in plaintiff's prior pleading, the ACC can be read in vain for particularized facts raising a strong inference of scienter. Instead, plaintiff relies on the restatement itself; assertions by seven confidential witnesses – not one of whom claims that any defendant knew of or deliberately made a material misstatement; and a handful of stock sales by three defendants, most of which preceded the alleged misstatements that supposedly inflated the stock price. Each of these arguments has been deemed insufficient by the Court, and plaintiff has not come close to pleading facts sufficient to rehabilitate those claims.

### A. Plaintiff's Accounting Allegations Fail to Raise a Strong Inference of Scienter

#### 1. The Restatement Does Not Establish Scienter

Once again, plaintiff's pivotal theory is that Immersion's restatement raises an inference

of scienter – a theory roundly rejected by this Court and other courts in the Ninth Circuit. Order at 7; *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) ("the mere publication of a restatement is not enough to create a strong inference of scienter"); *In re Verifone Holdings, Inc. Sec. Litig.*, 2009 WL 1458211, at *7 (N.D. Cal. May 26, 2009) (same).[6]

Instead of conclusory allegations regarding the mere existence and magnitude of a restatement, plaintiff must provide particularized allegations suggesting that the defendants knew specific facts that rendered their accounting determinations fraudulent. *Rudolph*, 560 F. Supp. 2d at 889; *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005) ("[A]llegations of GAAP violations must be augmented by facts that shed light on the mental state of defendants, rather than conclusory allegations that defendant must have known of the accounting failures due to the degree of departure from established accounting principles.") (internal quotation marks omitted). Plaintiff once again fails to allege specific facts showing any such knowledge on the part of defendants. Rather, plaintiff pads the ACC with additional allegations that do nothing more than restate the same arguments regarding the restatement and GAAP violations that the Court has already found insufficient.

The ACC does not plead a single additional fact to challenge the Court's conclusion that the magnitude and nature of the restatement fails to supports an inference of scienter. Order at 7-9. Plaintiff still cannot dispute that net revenue was *understated by $188,000* in 2007, a fact that eviscerates plaintiff's fraud theory. Ex. A at 8; *McCasland v. FormFactor Inc.*, 2009 WL 2086168, at *8 (N.D. Cal. July 14, 2009) (no inference of scienter where alleged overstatement of costs and corresponding understatement of gross margins were "logical[ly] inconsisten[t]" with the "fraud theories asserted."). Nor does plaintiff dispute that the vast majority of the 2007 restatement was based on non-revenue adjustments that even he does not characterize as nefarious, *i.e.*, a software error in calculation of stock-based compensation expense, and a miscalculation of interest income recognized from a patent litigation settlement. Ex. E.[7]

---

[6] Similarly, assertions of GAAP violations, without more, do not establish scienter. Order at 7 n.4; *see also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1012 (N.D. Cal. 2008); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994).

[7] Plaintiff argues the restatement is supportive of scienter because "[t]he restated items at issue



FENWICK & WEST LLP ATTORNEYS AT LAW SAN FRANCISCO

In a futile attempt to avoid these realities, the ACC now highlights the Company's correction of minor errors affecting 2007 revenue (generally alleging, with no supporting facts, improprieties involving FOB Destination terms, rights of return, extended payment terms and lack of probability of collection). ACC ¶¶ 20-22. Even if those allegations had support, the Court has already found these types of errors insufficient to raise an inference of scienter as they are ***"not due to clearly obvious facts"*** and are ***not of such 'unusual' nature*** as to give rise to an inference of scienter on the part of the named defendants." Order at 8-9 (emphasis added).

As for 2008, the vast majority of the revenue affected by the restatement was not reversed but merely deferred to a later period, with the total of just over $2 million being well below that supportive of a strong inference of scienter standing alone. Ex. A at 8; *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002) (finding no scienter on the basis of a $10 million restatement of net income, and distinguishing restatements which "involved . . . significantly larger amounts" and were accompanied by "additional, specific allegations that the defendants had actual knowledge of relevant facts from which scienter could be inferred"). Moreover, these revenue deferrals contributed to an upward total adjustment net of tax of almost $1.35 million in Q1 2009. Ex. F at 8. In other words, for financial statements covering half of the purported class period (fiscal 2007 and Q1 2009), the restatement reflected an increase in revenues—a result devastating to plaintiff's theory that defendants were knowingly inflating revenues throughout the class period. ACC ¶¶ 262(e); *see McCasland*, 2009 WL 2086168, at *8.

Like its predecessor, the ACC fails to allege that there was anything remarkable about the nature of the restatement in 2008 and 2009. Significantly, the Court has already found that "close to half of the restated revenue [in 2008] resulted from a 'side agreement' with one customer which agreement is ***not alleged to have been made known to defendants***." Order at 8 (emphasis added). The Court also found the remainder of the restated revenue was ***"not due to clearly obvious facts"*** and was ***"not of such 'unusual' nature*** as to give rise to an inference of scienter on the part of named defendants." *Id.* at 8-9 (emphasis added) (citing *South Ferry LP, No. 2 v.*

---

were not due to simple mathematical error or honest misapplication of an accounting standard or oversight." ACC ¶ 262(a). Yet, the adjustments underlying the restatement of 2007 financials were precisely that, and plaintiff makes no argument to the contrary.



FENWICK & WEST LLP ATTORNEYS AT LAW SAN FRANCISCO

*Killinger*, 542 F.3d 776, 786 (9th Cir. 2008)). The ACC adds nothing to these already debunked allegations. Consequently, absent particularized facts showing the restatement or alleged GAAP violations were the product of intentional wrongdoing by these defendants, the ACC should be dismissed. *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010) (innocent or negligent errors do not raise inference of scienter absent particularized facts showing "intent to deceive").

**2. Plaintiff's Core Operations Allegations Do Not Support Scienter**

As this Court noted, "in the absence of 'unusual circumstances'" plaintiff cannot salvage his restatement allegations merely by reference to the "core operations inference." Order at 7-8 (citing *South Ferry*, 542 F.3d at 784-85 & n.3). Specifically, that theory is brought to bear only when the "facts[at issue are] prominent enough that it would be 'absurd to suggest' that top management was unaware" of the falsity of their statements. *Zucco*, 552 F.3d at 1001 (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (emphasis added)); *see also* Order at 9. Moreover, "'[w]here a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard.'" Order at 8 (quoting *South Ferry*, 542 F.3d at 784).

This is not one of the "rare circumstances" in which the core operations inference is available. *South Ferry*, 542 F.3d at 786. Although plaintiff continues to ply his theory that Medical "had a significant effect on Immersion's core operations" (ACC ¶ 266), this is belied by the fact that the Medical line of business accounted for a mere 0.43% of Immersion's operating income in 2007, lost money in 2008 and 2009, and was eventually sold. Ex. A at 100; Ex. C at 44; Ex. B. Further, even if Medical were a core operation, this Court has already found that the facts and restatement here – correcting for an undisclosed side agreement and other adjustments "not due to clearly obvious facts" – are insufficient to support an inference of scienter. Order at 8-9.

Plaintiff's other "core operations" allegations are equally defective. The Court has already rejected plaintiff's assertion that Richardson's hands-on management style (ACC ¶ 267) is indicative of scienter. Order at 9; *see also Glazer Capital Mgmt. L.P. v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) ("[G]eneral allegations of defendants' 'hands-on' management style . . .

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

[is] insufficient to create strong inference of scienter.") (internal quotations and citations omitted). Likewise, allegations based on defendants' positions (ACC ¶ 265) and Immersion's size (ACC ¶¶ 124, 266) are unavailing. *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113 (N.D. Cal. 2009) (defendants' high level positions in the company did not provide a strong inference of scienter); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *11 (N.D. Cal. Aug. 27, 2010) (no inference based on small company size).

Finally, despite plaintiff's attempts to suggest that access to internal reports and other information should have raised "red flags," (*see e.g.*, ACC ¶¶ 38, 251, 252), nowhere does the ACC set forth facts showing defendants actually read or understood the data to have negative implications. *See Zucco*, 552 F.3d at 1000-01 (allegations that "management had access to the purportedly manipulated quarterly accounting numbers, or . . . analyzed the inventory numbers closely, do[es] not support the inference that management was in a position to know that such data was being manipulated," especially where there is no showing of access to the underlying information from which accounting numbers were derived); *Verifone*, 2009 WL 1458211, at *8.[8]

**3. Plaintiff Also Fails To Plead Scienter On The Basis Of SOX Certifications Or Internal Control Deficiencies**

In its Order, the Court held that signing of Sarbanes-Oxley ("SOX") certifications does not raise a strong inference of scienter because "[i]f [courts] were to accept [plaintiff's] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." Order at 12 (quoting *Glazer*, 549 F.3d at 747). The Court also found that plaintiff had failed to plead facts showing defendants were "severely reckless" in making the certifications, so plaintiff could not establish scienter on that basis. Order at 12 (quoting *Glazer*, 549 F.3d at 747). Plaintiff's rote assertion in the ACC

[8] *See also In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1048-49 (N.D. Cal. 2009) (fact that defendants "spent time" with customers or played a general role in approving transactions does not suggest they "were likely to know first hand" facts calling revenue recognition into question); *In re Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *9 (N.D. Cal. Feb. 17, 2010) (general knowledge of accounting procedures and financial results did not suggest defendants knew facts key to properly accounting for certain transactions).

that certain defendants signed certifications on a quarterly or annual basis (*see e.g*, ACC ¶¶ 11, 38, 81) does nothing to alter the Court's conclusion.

Likewise, plaintiff's vague scienter allegations based on internal control deficiencies remain virtually unchanged from the previous complaint and add nothing to the scienter analysis. *See In re Verifone Holdings, Inc. Sec. Litig.*, 2011 WL 1045120, at *12 (N.D. Cal. Mar. 22, 2011) (lack of adequate internal controls does not lead to a strong inference of scienter). Indeed, "[p]resumably every company that issues a financial restatement because of GAAP errors will cite as the reason a lack of effective internal controls." *In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, at *9 (D. Ariz. July 5, 2006). For that reason, control deficiencies are not, in and of themselves, indicative of knowing falsity. Any other result would permit a plaintiff to allege scienter whenever there is a restatement, which would be an anathema to the strict pleading standards of the Reform Act. *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007); *Hypercom*, 2006 WL 1836181, at *9.

**B. The Alleged 2009 Side Agreement Does Not Establish Scienter**

In dismissing plaintiff's prior complaint, this Court found that plaintiff failed to allege that the side agreement at issue here had been made known to defendants, and thus could not form a basis for scienter. Order at 8; *see also Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1078 (W.D. Wash. 2003) (allegation that officer defendants knew of side agreements because they interacted with the customers, traveled overseas to address a distributor's failure to timely pay invoices, and CFO termination were insufficient because plaintiffs cannot rely 'solely on their own conclusions regarding when [defendants] became aware of the side letters in lieu of pleading specific facts). The ACC nonetheless persists with this argument, but cannot augment it. Generalized allegations that Mr. Richardson (as CEO) and Mr. Ambler (as CFO) were aware of sales to a Chinese customer (ACC ¶¶ 35, 70, 187, 212, 247), and that unnamed Asian customers did not timely pay invoices or returned products (*id.* ¶¶ 212, 257), are no substitute for pleading particularized facts demonstrating that these defendants knew of a side agreement. *See In re Exodus Commc'ns, Inc. Sec. Litig.*, 2005 WL 1869289, at *18 (N.D. Cal. Aug. 5, 2005) (finding general allegation that customer "ultimately failed to pay" no basis for inferring defendants were

aware at the time of the deal that customer was not creditworthy); *see also In re Comshare, Inc. Sec. Litig.*, 1997 WL 1091468, at *8 (E.D. Mich. Sept. 18, 1997), *aff'd*, 183 F.3d 542 (6th Cir. 1999) (noting that "[n]owhere does the complaint state which defendants knew what; or how or when they knew it. Simply alleging that the defendants knew or should have know [sic] of a problem . . . because of their position in the Company and the fact that documents were available to them does not raise a strong inference of fraudulent intent…").[9]

Moreover, when Immersion discovered the apparent side agreement in mid-2009, it notified the Audit Committee, and the Committee began an investigation that resulted in the restatement. Ex. A at 4-7; ACC ¶ 13. Thus, rather than raising an inference of scienter, the steps taken by defendants suggest exactly the opposite. *See In re WatchGuard Sec. Litig.*, 2006 WL 2927663, at *8 (W.D. Wash. Oct. 12, 2006) (noting that a company's effort to investigate problems, including those raised by existence of side letter, is "more consistent with an attempt to remedy problems than with an intent to mislead investors").[10]

**C. Plaintiff's Confidential Witness Allegations Again Fail To Establish Scienter**

As before, plaintiff relies on a series of confidential witnesses as putative support for his allegations of fraud. Little has changed in this iteration, however, and the ACC offers nothing that would alter the Court's assessment that "no confidential witness provides facts demonstrating defendants, at the relevant time, had knowledge of information showing revenues were improperly recognized." Order at 11 (citing *Zucco*, 552 F.3d at 1000-01). To support an allegation of scienter, a confidential witness must (i) have personal knowledge of the alleged facts

[9] Plaintiff wrongly tries to infer scienter based on the SEC's observation that a "side agreement" may be an "indicator that the original agreement was not final and revenue recognition was not appropriate." ACC ¶ 199. If anything, the Company's actions were entirely consistent with the SEC's guidance: upon discovery of a side agreement, the Company undertook an immediate review of all revenue associated with the customer in question. Ex. A at 4-7; ACC ¶ 13.

[10] Likewise, plaintiff's conclusory channel stuffing allegation, (ACC ¶¶ 184, 185), is a non-starter as the ACC fails to set forth the particularized facts necessary to make a showing of channel stuffing. *See In re Connetics Corp. Sec. Litig.*, 2008 WL 269467, at *12-13 (N.D. Cal. Jan. 29, 2008) (dismissing channel stuffing claim for failure to identify specific shipments, customers, times, or dollar amounts relating to the alleged channel stuffing); *In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) (rejecting channel stuffing claim absent identification of specific transactions, shipments, customers, times, and dollar amounts)(citation omitted). Moreover, channel stuffing claims are disfavored in the Ninth Circuit. *In re Splash Tech. Holdings Inc., Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001).

and (ii) offer statements that are themselves "indicative of scienter." *Zucco*, 552 F.3d at 995. Because plaintiff's confidential witness allegations still fail to meet this test, they cannot establish scienter on the part of these defendants.

**1. The Confidential Witnesses Continue To Lack Personal Knowledge Of Facts Raising A Strong Inference Of Scienter**

As noted, plaintiff must establish that his confidential witnesses have personal knowledge of the asserted facts, before statements attributed to them can be given any weight in assessing scienter. *Zucco*, 552 F.3d at 995-96 (complaint must offer "sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge"); *In re Silicon Image, Inc. Sec. Litig.*, 2007 WL 2778414, at *2 (N.D. Cal. Sept. 21, 2007) (Chesney, J.), *aff'd*, 325 Fed. Appx. 560 (9th Cir. 2009) (dismissing with prejudice where, *inter alia*, plaintiffs "fail[ed] to provide a factual basis for the conclusory opinions assertedly provided . . . by [confidential witnesses]"); *Metawave*, 298 F. Supp. 2d at 1068 (same).

Just as in plaintiff's prior pleading, the ACC never once ascribes to any confidential witness first-hand knowledge of any improper act or event giving rise to a strong inference of scienter. The lack of knowledge remains most glaring in the case of **CW4**, who, as plaintiff admits, left the Company ***in March 2007***, two months *before* the class period began. ACC ¶ 68. Plaintiff nonetheless claims that **CW4** reported that Mr. Ambler "personally reviewed the Company's DSO numbers ***during the Class Period***" and that he/she "regularly met with [Ambler] ***during 2008*** to review DSO reports." ACC ¶¶ 123, 189. Putting aside that these observations are in no way suggestive of fraud, they cannot be reconciled with the fact that **CW4** was ***not even at the Company at that time of these alleged events/meetings***. *Silicon Image*, 2007 WL 2778414, at *2 (rejecting scienter assertions by confidential witness about events that post-date the term of his employment). Even more egregious is the notion that **CW4**, who left in early 2007, could weigh in on DSOs related to transactions with a Chinese distributor (ACC ¶ 256) when, as alleged in the ACC, that customer relationship did not even exist until mid 2008. ACC ¶ 70; *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1015 (N.D. Cal. 2006)

(confidential witness whose employment ended before the class lacked personal knowledge of activities during the class); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *8 (N.D. Cal. Jan. 13, 2010) (same).[11]

Similarly, **CW3** was at Immersion for only three months in 2009. ACC ¶ 67. As a result, **CW3**'s allegations regarding domestic sales reports – innocuous as they are (*see* Order at 9-10) – say nothing that could support an inference of scienter as to 2007 or 2008.[12] *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201 (N.D. Cal. 2008) ("temporal mismatch between a CW's statement and a Defendant's statement results in a failure to plead with particularity 'the reason or reasons why the statement is misleading.'") (quoting 15 U.S.C. § 78u-4(b)(1)).

### 2. Plaintiff's Confidential Witnesses Never Once Allege That Defendants Committed Fraud

None of the statements made by the CWs are "indicative of scienter." *Zucco*, 552 F.3d at 995. Not once does a confidential witness allege that any defendant intentionally misstated revenue, knew of the apparent side agreement, or knew of any material accounting errors. *See e.g.*, ACC ¶¶ 64-73. As this Court noted, generalized allegations that Immersion had a reporting structure, or that the defendants attended periodic meetings, or even that Mr. Ambler, as CFO, made the final decisions on revenue recognition are simply "insufficient to give rise to an inference of scienter under the PSLRA." Order at 9-10. If these confidential witnesses were in a position to have knowledge of fraud, the fact that none of them can identify *a single transaction* that was improper or raise any other specific allegation of fraud against these defendants bolsters this Court's conclusions that the CWs cannot be relied upon to support an inference of scienter.[13]

---

[11] Similarly unavailing is plaintiff's attempt to portray **CW4**'s observation that international revenue grew in the period after he/she left as a "red flag." ACC ¶ 250. Putting aside that **CW4** has no basis of insight into revenue post-dating his tenure, plaintiff never explains why such sales growth was necessarily the result of accounting improprieties.

[12] **CW3** states only that Immersion "prepared and tracked sales forecasts using a manual system" available "for anyone to see" and gives a basic account of the sales process in 2009 (ACC ¶¶ 67, 252). Such allegations say nothing about fraud by defendants here, much less about what plaintiff claims they knew in 2007 or 2008, years prior to **CW3**'s short-lived tenure.

[13] Invariably it is ***plaintiff*** who leaps to a conclusion of fraud from the neutral statements of his confidential witnesses. For example, among the new allegations added in the ACC are those of **CW6**, who purports to have been "aware that there were promises made outside the scope" of the Company's agreement with a Chinese distributor. ACC ¶ 70. **CW6** never states the nature of

As before, the bulk of the CW allegations in the ACC are little more than descriptive accounts of routine job activities that do not even hint at fraud, and as such do nothing to cure the deficiencies previously identified by the Court. Order at 10-11. With respect to **CW5**, for example, nothing has changed. The ACC still merely alleges that, in his role as a controller, **CW5** conferred with his superiors in the finance organization when making revenue determinations (ACC ¶ 69); that Mr. Ambler, as CFO, would make final decisions on revenue recognition (*id.* ¶ 118); that Medical product revenue recognition decisions were centralized in 2008 under the corporate finance umbrella (*id.* ¶¶ 188, 253, 261); and that, as CEO, Mr. Richardson knew of sales to and had once met with a customer in China (*id.* ¶ 187). These assertions do little more than raise an inference that people were doing their jobs. Order at 9 (finding allegations that a "confidential witness reported to a superior, who 'in turn reported' to a defendant" as insufficient for establishing scienter). *See also Cadence*, 654 F. Supp. 2d at 1048.

Likewise, plaintiff is unable to cure the deficiencies plaguing the allegations by **CW1,** who is putatively offered to suggest that fraud began in 2007. As this Court found previously, while **CW1** claims to have reviewed sales information to determine if revenue recognition criteria were met and states he would "sound the alarm" if he believed the criteria were not met (ACC ¶¶ 65, 118), **CW1** still never states that defendants heard (or ignored) any such alarm and does not provide any specific allegation suggesting defendants knowingly engaged in improper revenue recognition. Order at 10; ACC ¶¶ 117-18.[14] These activities do not create an inference of fraud;

---

those promises, or that defendants were aware of them. Plaintiff, however, improperly attempts to supply what **CW6** expressly ***did not say***, interjecting, "[i]n other words, the side agreement varied the payment terms in violation of the Company's policies and GAAP." *Id.* This conjecture is no substitute for the actual allegations of his purported witnesses. *Zucco*, 552 F.3d at 995 (statements of the confidential witness – not plaintiff – must be indicative of scienter).

[14] Suggestions that **CW1** had "disagreements" about recognizing revenue on unspecified sales, at unspecified times, and to unspecified customers, and that **CW1** claims to have felt "bullied" (ACC ¶¶ 65, 119) do not change that analysis. Disagreements on revenue recognition do not amount to fraud and **CW1** does not accompany these allegations with a single detail calling specific transactions into question. As before, such undifferentiated allegations fail to raise an inference of scienter. *Zucco*, 552 F.3d at 998 (disagreements over accounting processes are not, in and of themselves, indicative of scienter). In place of specific facts, **CW1** yet again resorts to cryptic allegations and insinuation. For example, **CW1** suggests that a payment received from an entity named "Peking Duck Restaurant" necessarily implies a specter of malfeasance (without ever explaining why such payment was improper) and implies that his own difficulty assessing the credit validity of overseas customers meant the customers were "figments of … imagination"

but describe the job duties of any senior accountant of a sales organization.[15]

In addition to alleging Immersion's CFO was directly responsible for revenue recognition decisions, **CW1** also alleges that the Company provided demo units of its medical simulation products, and tracked returns and accounts receivable. *See*, e.g., ACC ¶¶ 117-18, 121, 123. Again, these allegations do not indicate knowledge by **CW1** of any fraudulent accounting decisions, fabricated transactions, or knowing misstatements by the CFO or any other defendant.[16] *See U.S. Aggregates*, 235 F. Supp. 2d at 1074 (rejecting scienter allegations in accounting fraud claim where "confidential witnesses [did not] have any first-hand knowledge of [defendant's] accounting decisions"); *Hansen Natural*, 527 F. Supp. 2d at 1153.

Likewise, **CW2's** recycled assertion that certain unnamed customers returned product at unspecified times and for unspecified reasons (ACC ¶¶ 121, 182, 212) is devoid of the specificity required to show either that **CW2** is reliable or that the supposed returns give rise to a strong inference of scienter. *See McCasland*, 2008 WL 2951275, at *3 (confidential witnesses will not support a strong inference of scienter where complaint did not supply adequate corroborating details such as meetings, conversations, internal memoranda and reports provided to defendants "that contradicted or even cast doubt on a public statement made during the class period"). **CW2**

---

(without ever saying he was ultimately unable to establish such creditworthiness). ACC ¶¶ 182, 257-58. So too, as this Court recognized, the suggestion by **CW1** that certain "Asian" accounts were overdue, or that Mr. Ambler "made a big deal [when payment did come in] and scrambled to update [the Company's] reports for review by [the auditor]" (ACC ¶ 257), does nothing to support an inference that defendants thought the accounts would never be paid or link up those payments to the restatement at issue. *See* Order at 10. These nebulous assertions make clear, yet again, that plaintiff seeks to base scienter on innuendo rather than specific facts.

[15] Nothing offered in the ACC changes that view. While plaintiff now generally alleges, per **CW1**, that defendant Vogel "recognized revenue on sales" without a signed purchase order in 2007 (ACC ¶ 119), that allegation is at odds with the rest of the pleading. There is no allegation that Mr. Vogel was responsible for revenue recognition, and indeed, throughout the ACC, plaintiff states that this was Mr. Ambler's (and the finance department's) domain. *See, e.g.*, ACC ¶¶ 117-18. Finally, **CW1** again fails to identify a single specific transaction that was improperly recognized on this basis or that such issues resulted in the restatement of revenues in 2007.

[16] Indeed, **CW1** acknowledges that revenue recognition was a collaborative process, and that the CFO worked with and relied upon a team of accountants, controllers, and finance VPs in making revenue recognition decisions. ACC ¶¶ 65, 117. The picture of intentional fraud plaintiff tries to paint with his claims of "red flags" in the ACC would have required complicity by that entire group–*including* **CW1**. *Id.*; *see also Cadence*, 654 F. Supp. 2d at 1048 (confidential witness reports not indicative of scienter when transactions at issue involved numerous personnel and a chain of review). Needless to say, **CW1** still does not make such an allegation.

never suggests that Immersion or any individual defendant knowingly misrepresented facts about customer returns, and plaintiff never explains how such returns amount to fraud. Moreover, **CW2** notes that weekly meetings were held to determine "whether to replace or repair returned products." ACC ¶ 66. In other words, according to **CW2**, when products were returned it was not due to revenue shenanigans, but because something needed to be ***replaced*** or ***repaired***.

**CW5** is also used to suggest fraud dating back to 2007 on the basis of his report that he sent sales information and supporting documentation to the Corporate Controller, who then conferred with CFO Ambler about whether to recognize revenue on sales. ACC ¶ 69.[17] These "facts" still do not raise any inference of scienter; but remain wholly neutral descriptions of what controllers and CFOs do. *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 973 (N.D. Cal. 2010) ("[B]are allegations that . . . officers had access to financial statements and analyzed those statements does not support the inference that defendants knew about the accounting error") (citing *Glazer Capital Mgmt.*, 549 F.3d at 746). Moreover, these facts do not support an intentional fraud running back to 2007, a period when revenue was *understated*.

Finally, plaintiff newly offers **CW7**, a marketing product manager, who claims to have "understood" (through another individual) that defendant Vogel "pushed" to recognize revenue before receiving proof of delivery. ACC ¶¶ 72, 122, 180. Even if one were to credit these hearsay claims, **CW7** never identifies a specific transaction where revenue was knowingly prematurely recognized. *Zucco*, 552 F.3d at 997 (confidential witness allegations based on hearsay insufficient to meet reliability standard). Similarly, **CW7** offers no support for the suggestion that international sales growth *must have been* the result of improper revenue recognition, merely because no "new Medical products" had been released. ACC ¶ 73. No facts are offered substantiating that new product releases can be *the only* possible basis for sales growth.

---

[17] What plaintiff chose to delete from the ACC with respect to **CW5** is more telling than what he chose to repeat in his latest pleading. Where the prior complaint once stated "CW5 reported that all Medical Division sales ***were fully documented*** and were sent to the corporate headquarters," the ACC now omits that critical phrase. And, where the prior complaint once stated "***CW5 and [the Corporate Controller] reviewed every single medical sale and all documentation at the end of every quarter***" that information too has been omitted. *Compare* Dkt. 63, ¶ 44 *with* ACC ¶ 69. These deletions clearly demonstrate plaintiff's willingness to selectively reject statements by his confidential witnesses that run directly counter to the story of fraud he wants to be able to tell.

In sum, plaintiff located a small handful of people willing to talk about their former jobs at Immersion. What plaintiff still has not found is a single witness who has knowledge of fraud by these defendants. Accordingly, the confidential witness allegations do not satisfy plaintiff's burden of pleading particularized facts giving rise to a strong inference of intent.

### D. Plaintiff Cannot Salvage His Scienter Allegations By Reference To Defendants' Trading

Plaintiff's original complaint attempted to infer scienter by reference to alleged stock sales by certain defendants in 2007. Those efforts were decisively rejected by this Court for failure to show that any of these sales were "unusual" or "suspicious" in timing or amount. Order at 12-13. The ACC ignores the directives of the Order regarding pleading of insider trading, and dismissal is therefore mandated on the same grounds.

To begin with, the ACC disregards the instruction of the Court – and governing case law – that exercisable options must be included when analyzing insider sales. Order at 12-13. Plaintiff avoids that methodology because it eviscerates his insider trading claims, showing that not a single defendant sold a suspicious percentage of shares during the class period: Ambler, 20.19%; Viegas, 9.72%; and Vogel, 3.59%, Richardson, 0%. *See* Ex. G (Defendants' Form 4 filings for the relevant period). Sales of this magnitude are in no way indicative of scienter. *See e.g., Silicon Graphics*, 183 F.3d at 987 (finding sales of 43.6% of an individual's shares were not suspicious for purposes of scienter); *In re Skechers U.S.A., Inc. Sec. Litig.*, 273 Fed. Appx. 626, 628 (9th Cir. 2008) (sales of 17% and 42% not suspicious).

Plaintiff also cannot come to grips with the fact that every stock sale occurred in 2007, a period in which income was actually *understated*, a fact which the Court deemed to be an "inference of nonfraudulent intent." Order at 13; ACC ¶ 41. The ACC's attempt to salvage these claims by reference to just the second and third fiscal quarters of 2007, where revenue was allegedly overstated, does nothing to change this conclusion. ACC ¶ 274. The ACC opportunistically fails to point out that once *all* of the relevant accounting adjustments are taken into account – not just those selectively chosen by plaintiff – net income for those same quarters was actually ***understated***. *Id.* ¶ 127. Thus, the ACC pleads nothing to disturb the Court's



FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

conclusion that the timing of alleged insider trades was not unusual or suspicious, and indeed, actually served to rebut an inference of scienter. Order at 13.

It is also worth noting that almost 70% of the 2007 sales were made pursuant to 10b5-1 plans, further rebutting any inference of scienter. ACC ¶ 275; Ex. G; *Metzler*, 540 F.3d at 1067 n.11; *Taleo*, 2010 WL 597987, at *12 (timing of insider sales not suspicious and did not raise inference of scienter where defendants traded under a Rule 10b5-1 plan); *Weitschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (same).[18] Indeed, but for plaintiff's use of an artificially long class period, there would have been *zero stock sales by any defendant*.[19]

Moreover, Mr. Richardson *purchased* 8,675 shares of stock during the class period, a fact strongly negating any inference of scienter. Ex. G; *See Zack v. Allied Waste Indus., Inc.*, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 Fed. Appx. 722 (9th Cir. 2008) (purchases during the class period are "not actions demonstrating an intent to commit fraud, and instead gives rise to an inference of good faith"); *In re Allergan Inc. Sec. Litig.*, 1993 WL 623321, at *23 (C.D. Cal. Nov. 29, 1993) (significant investments during class period rendered plaintiff's claims of a fraudulent scheme to inflate revenues implausible). These purchases at supposedly inflated prices negate an intent to commit fraud. *Zack*, 2005 WL 3501414, at *14.

Finally, plaintiff also fails to take into account that the Company *bought back over $18 million* worth of its own shares during the class period. Ex. A at 90. Immersion's Board, including defendant Viegas, approved those purchases as part of a $50 million open-market stock

---

[18] Nor can plaintiff infer scienter from sales following earnings. ACC ¶ 274. Courts routinely rule that there is nothing suspicious about insider sales after earnings releases. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (noting that "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures"); *Brodsky*, 630 F. Supp. 2d at 1118 (finding timing of insider sales following earnings releases not suspicious).

[19] Plaintiff's reliance on insider sales hinges entirely on his artificially extending the class period to maximize the number of alleged trades. The Ninth Circuit criticized such gamesmanship in *Vantive*, where plaintiffs chose "an unusually long class period of sixty-three weeks . . . because *lengthening the class period has allowed plaintiffs to sweep as many stock sales into their totals as possible*, thereby making the stock sales *appear more suspicious* than they would be with a shorter class period." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (emphasis added). This tactic is especially unfair to defendants Vogel and Viegas, who resigned as officers of the Company a year or more before the class period ended, and before the alleged side agreement was entered into. ACC ¶¶ 52, 55.

repurchase plan in November 2007. *Id*. No rational director would approve these purchases at a time he or she knew the stock was artificially inflated. *See, e.g., Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 749 (S.D. Ind. 2009) ("[S]tock repurchase programs actually negate a finding of scienter.") (citation omitted); *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) ("It would have made no sense to purchase [the] stock if defendants knew the prices to be inflated").

## V. PLAINTIFF FAILS TO STATE A CLAIM AGAINST NON-SPEAKER VOGEL

Plaintiff's attempt to impose liability for supposed corporate misstatements on non-speaking defendant Vogel flies in the face of the PSLRA. The ACC, as before, does not allege that Vogel drafted, edited, signed, read or even knew about the content of Immersion's financial statements or other challenged statements. Absent a showing of substantial participation or intricate involvement in the preparation of the challenged statements, Vogel must be dismissed. Order at 5-6; *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).[20] Vague assertions that Vogel "was provided with" unidentified "copies of the Company's reports and press releases . . . prior to or shortly after their issuance" (ACC ¶ 58), do not change that result or show that Vogel *substantially participated* in the preparation of challenged statements. Nowhere does plaintiff indicate what, if any, press releases Vogel drafted or edited, much less whether those releases contained any of the challenged statements.

This Court has already found that plaintiff's allegations (now recycled in the ACC) are insufficient to support a finding of substantial participation in the preparation of the challenged statements. Order at 6 (finding allegations that Vogel insisted on shipping demo units, allowed products to be shipped prior to POs, and had disagreements with CW1 regarding revenue

[20] The discredited group pleading doctrine does not save plaintiff's claims against this non-speaking defendant. *See In re Downey Sec. Litig.*, 2009 WL 2767670, at *4 n.1 (C.D. Cal. Aug. 21, 2009) ("the group pleading doctrine did not survive the PSLRA"); *Kelley v. Rambus, Inc.*, 2008 WL 5170598, at *6 (N.D. Cal. Dec. 9, 2008), *aff'd*, 384 Fed. Appx. 570 (9th Cir. 2010) (same); *In re NextCard Inc. Sec. Litig.*, 2006 WL 708663, at *3 (N.D. Cal. Mar. 20, 2006) (same). Nor does plaintiff plead facts sufficient to show participation in a fraudulent scheme. Order at 6 (rejecting notion that "Vogel's conduct made it 'necessary or inevitable' that Immersion would overstate its revenues.") (quoting *Stoneridge*, 552 U.S. at 160-61); *see also Verifone*, 2011 WL 1045120, at *10 (evidence that non-speaker was responsible for mistaken accounting records "does not support the premise that he acted with the intent 'to further a scheme to misrepresent' VeriFone's earnings to the public) (quoting *Stoneridge*, 552 U.S. at 161).

recognition insufficient). Additional allegations along the same lines, (*see, e.g.*, ACC ¶¶ 23-25, 33), are equally unavailing and do not support an inference that Vogel had a substantial and intricate role in making the challenged statements. *Verifone*, 2011 WL 1045120, at *10. Indeed, "[i]f it did support such an inference, then any employee who had the misfortune of holding a position which involved the calculation or generation of information used by officers to make public statements could be held primarily liable under section 10b-5(b)." *Id.* As the Supreme Court just held: under "Rule 10b-5, the maker of a statement is the person or entity ***with ultimate authority over the statement***, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Janus Capital Group, Inc. v. First Deriv. Traders*, --- S.Ct. ---, 2011 WL 2297762, at *5 (June 13, 2011) (emphasis added). Because plaintiff does not (and cannot) allege that Mr. Vogel had any control whatsoever over the content and release of any alleged misstatement, plaintiff's 10b-5 allegation against him must fail. *Id.* at *5-6 (rejecting notion of liability based on provision of false or misleading information to another); *Verifone*, 2011 WL 1045120, at *10.[21]

## VI. THE ACC STILL FAILS TO PLEAD LOSS CAUSATION

The loss causation arguments in the ACC are virtually unchanged from those that were rejected by the Court in its prior Order. ACC ¶¶ 277-83. As before, Plaintiff attempts to plead loss causation by citing certain "corrective disclosures" that purportedly caused Immersion's stock price to fall and thereby damaged the shareholder class. *Id.* These are, however, ***exactly the same*** disclosures previously deemed insufficient by the Court. Order at 14 (holding that plaintiff failed to show that the stock declines following the disclosures were caused by a partial revelation of fraud, as opposed to a "typical market reaction to disappointing financial reports" or "a continuation of the general decline evident in Immersion's stock, and indeed the entire stock

[21] Plaintiff's inability to establish the scienter on the part of any person alleged to have made a challenged statement also means that his corporate scienter allegations (ACC ¶¶ 268-70) fail. *In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) ("A defendant corporation is deemed to have the requisite scienter for fraud ***only if the individual corporate officer making the statement*** has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement.") (emphasis added). Similarly, purported wrongs by Vogel or David Barkay (ACC ¶ 269) or other unspecified "sales personnel" (ACC ¶ 270) cannot be imputed to Immersion where none of these actors are alleged to have been speakers. *Verifone*, 2011 WL 1045120, at *9.

market, during the class period…"); *see also Metzler*, 540 F.3d at 1063 (a disclosure is corrective for loss causation purposes only if "the market learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally") (citation omitted). The only exception is the addition of one corrective disclosure on May 1, 2008 (ACC ¶ 278) – which is deficient for exactly the same reasons as the others, *i.e*., it is a routine earnings release lacking "factual allegations to tie the disclosures to the purported fraud." Order at 15; *see also Hansen Natural*, 527 F. Supp. 2d at 1162 (ruling that loss causation had not been plead because "none of the three public disclosures referenced in Plaintiff's Complaint contains a disclosure of wrongdoing"); *Metzler*, 540 F.3d at 1063.

The ACC does nothing to cure the defects in its alleged corrective disclosures, and indeed, its revised characterization of them further undermines plaintiff's loss causation claim. For each disclosure, the ACC adds the boilerplate claim that the disclosure misstated Immersion's true financial condition − and indeed, each of these disclosures is included in Plaintiff's list of ***false and misleading statements*** (ACC ¶¶ 75-220) − which Courts have deemed to be the ***antithesis*** of a "corrective" disclosure. *In re Flag Telecom Holdings Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009), citing *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 347-48 (2005) ("Plaintiffs cannot have it both ways. They cannot allege that Defendants made certain misstatements…and simultaneously argue that the misstatement itself constituted a corrective disclosure (citation omitted). To permit Plaintiffs to do so in this context would 'tend to transform a private securities action into a partial downside insurance policy'").

Put another way, a misstatement can only be actionable if it artificially ***inflates*** the price of a company's stock, while a corrective disclosure can only cause loss if it ***reduces*** such inflation – thus it is axiomatic that the exact same statement cannot simultaneously do both, which is exactly the brand of internally inconsistent pleading that the ACC attempts here. *Dura*, 544 U.S. at 342 (material misrepresentations artificially inflate stock prices); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 948 (D. Ariz. 2007) (corrective disclosures reduce stock price inflation causing economic loss). Consequently, the ACC's allegations actually bolster this Court's conclusion that plaintiff's pleading of loss causation is defective as a matter of law, and therefore

the ACC must be dismissed.[22]

## VII. THE ACC FAILS TO PLEAD SECTION 20(a) CONTROL PERSON LIABILITY

In the Order, this Court dismissed plaintiff's Section 20(a) claim for failure to state a primary violation. Order at 15. *See also Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (absent an underlying violation of the 1934 Act, there is no claim for control person liability under Section 20(a)). Because plaintiff again fails to plead a violation of Section 10(b) or Rule 10b-5, his control person claim against these defendants likewise fails.

The Section 20(a) claim must also be dismissed for failure to show any defendant acted to "induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Plaintiff largely alleges control based on defendants' positions at the Company (ACC ¶¶ 62, 63, 302), an approach that does not pass muster under the governing law. *Paracor*, 96 F.3d at 1163 (officer or director status does not create presumption of control for purposes of establishing control person liability). Nor can plaintiff salvage these claims by generically asserting that defendants "control the conduct of Immersion's business" or "had the power and authority to cause Immersion to engage in the wrongful conduct." ACC ¶¶ 62, 63, 302. Such allegations, untethered as they are to any specific alleged wrongdoing, are fatally flawed. *Hansen*, 527 F. Supp. 2d at 1163 ("boilerplate allegation[s] are insufficient to state a claim for control person liability."). For all these reasons, the 20(a) claim should be dismissed.

## VIII. THE ACC FAILS TO PLEAD A SECTION 20A INSIDER TRADING CLAIM

As before, plaintiff's Section 20A claim is subject to dismissal for failure to state a primary violation of the securities laws. Order at 15-16. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993) (section 20A requires, inter alia, an underlying violation of the 1934 Act); *In*

[22] Even under plaintiff's theory that the disclosures cited in the ACC were corrective for loss causation purposes, plaintiffs' admission that the first disclosure did not take place until May 1, 2008 eviscerates the bulk of any claim for economic loss. ACC ¶ 278. By necessity, any decline in a company's stock price prior to a corrective disclosure could not have been caused by fraud. *Daou*, 411 F.3d at 1027 (ruling that any decline in stock price prior to a corrective disclosure "cannot be considered causally related" to fraud and is therefore inactionable). Thus, the entirety of Immersion's stock price decline from its high of $20.50 in July of 2007 (ACC ¶ 12) to $11.06 prior to the first corrective disclosure (*id.* ¶ 277), by definition, were caused by factors other than fraud and therefore cannot be recoverable on loss causation grounds. *Meltzer*, 540 F.3d at 1063 (loss causation not adequately plead for losses prior to the first alleged corrective disclosure).

*re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729, at *16 (N.D. Cal. Aug. 29, 2003). In addition, Section 20A only applies to persons who trade contemporaneously with the alleged insider. 15 U.S.C. § 78t-1; *Neubronner v. Milken*, 6 F.3d 666, 669 n.5 (9th Cir. 1993); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1488 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir 1993). Here, plaintiff does not purport to identify contemporaneous trades with Messrs. Viegas or Ambler, and the Section 20A claim against them fails for that reason alone. *See id.* at 1488-89.

More fundamentally, plaintiff's 20A claims fail because the ACC lacks particularized facts establishing that defendants sold Immersion stock on the basis of material non-public information. *Brodsky*, 592 F. Supp. 2d at 1208 (dismissing Section 20A claim because plaintiffs "fail[ed] to identify any specific material nonpublic information in the possession of any Defendant at the time of a specific trade"); *see also Neubronner*, 6 F.3d at 672 (allegations must include "the times, dates, places, benefits received, and other details of the alleged fraudulent activity"). Although plaintiff cursorily alleges defendants were "in possession of material, non-public information" (ACC ¶ 272), such conclusory pleading is no substitute for "specifically [alleging] what information [each defendant] obtained, when and from whom he obtained it, and how he used it for his own advantage." *Neubronner*, 6 F.3d at 672; *see also In re 3Com Sec. Litig.*, 1999 WL 1039715, at *8 (N.D. Cal. July 8, 1999) (mere allegation that defendants possessed "material adverse non-public information . . . when they sold their shares of stock" rejected as being "too conclusory to give rise to liability for insider trading under Section 20A").

## IX. CONCLUSION

For all the foregoing reasons, defendants respectfully submit that plaintiff's ACC, having again failed to state a claim, must be dismissed with prejudice.

Dated: July 1, 2011

FENWICK & WEST LLP

By: /s/ Susan S. Muck
Susan S. Muck, Esq.
555 California Street, 12th Floor
San Francisco, California 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

Attorneys for Defendants