IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re IMMERSION CORPORATION SECURITIES LITIGATION | Master File No. C 09-4073 MMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED CONSOLIDATED COMPLAINT** |

Before the Court is defendants Victor A. Viegas ("Viegas"), Ralph Edwards Clenton Richardson ("Richardson"), Stephen Ambler ("Ambler"), and Richard Vogel's ("Vogel") (collectively, "Individual Defendants") and defendant Immersion Corporation's ("Immersion") motion, filed July 1, 2011, to dismiss plaintiff's Amended Consolidated Complaint ("ACC"). Plaintiff John P. Loos has filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**

Plaintiff's claims as set forth in the ACC are essentially the same as those alleged in plaintiff's Consolidated Complaint, filed April 9, 2010 ("Complaint").

According to the ACC, Immersion is a "provider of haptic technologies, which allow people to use their sense of touch while operating a variety of digital devices" (see ACC ¶¶

---

[1] On December 7, 2011, the Court took the matter under submission and vacated the hearing scheduled for December 9, 2011.

2, 51), including medical devices, and the "[m]edical line was '[h]istorically, the largest contributor of Immersion's revenue on a percentage basis and one of the most meaningful and vital growth drivers of the Company'" (see ACC ¶ 3). According to the ACC, Viegas was President and CEO of Immersion from October 2002 until April 28, 2008, and was Chairman of Immersion's Board of Directors from October 2007 until February 2009 (see ACC ¶ 52); Richardson was President and CEO of Immersion from April 28, 2008 until October 21, 2009, and was a Director of the company from April 30, 2008 until October 21, 2009 (see ACC ¶ 53); Ambler was CFO and Vice President of Finance of Immersion from March 2005 until July 31, 2009 (see ACC ¶ 54); and Vogel was Senior Vice President and General Manager of Immersion Medical from March 2004 until July 14, 2008 (see ACC ¶ 55).

Plaintiff alleges that, from May 3, 2007 to July 1, 2009 ("the class period"), defendants prematurely recognized revenue on sales of medical devices (see ACC ¶¶ 1, 4), in particular, by recognizing revenue "where: (i) the products were placed in a storage facility instead of shipped to the customer; (ii) the products were not shipped at all; and (iii) the products were sold with Freight on Board ('FOB') Destination or other similar shipping terms" (see ACC ¶¶ 20, 32); by improperly recognizing revenue on sales that included "non-standard terms and conditions, including rights of return, extended payment terms, product replacement commitments, and other commitments" (see ACC ¶¶ 21, 32); and by recognizing revenue "on sales that lacked probable collectability" (see ACC ¶¶ 22, 32). In addition, plaintiff alleges defendants falsely reported stock-based compensation expense, amortization expense, and interest income. (See ACC ¶ 41.) Plaintiff alleges the above-described accounting practices led defendants to materially misstate in financial disclosures Immersion's revenue and income, as well as to misrepresent therein the quality of Immersion's internal controls and Immersion's compliance with GAAP. (See ACC ¶ 7.)

Plaintiff further alleges that on July 1, 2009, Immersion issued a press release announcing its Audit Committee was "conducting an internal investigation into certain previous revenue transactions in its Medical line of business" (see ACC ¶¶ 13, 43); that on

August 10, 2009, Immersion announced that "because of 'certain revenue transactions in Immersion's Medical line of business,' its previously issued quarterly and fiscal financial statements for 2008 'should no longer be relied upon because of one or more errors in such financial statements'" (see ACC. ¶ 44); and that on February 8, 2010, Immersion issued restatements of its 2006, 2007, 2008, and first quarter 2009 financial statements, revising revenue, as well as stock-based compensation expense, amortization expense, and interest income, for those periods (see ACC ¶¶ 5, 28, 39, 41, 45).

Plaintiff asserts three causes of action in the ACC: (1) as against all defendants, violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder; (2) as against all defendants, violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and (3) as against Viegas, Ambler, and Vogel, violation of Section 20A the Exchange Act, 15 U.S.C. § 78t-1. Plaintiff brings said claims as a putative class action, alleging that he, and others similarly situated, purchased Immersion stock at artificially inflated prices during the class period. (See ACC ¶¶ 1, 50.)

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." See Iqbal, 129 S. Ct. at 1950 (internal

quotation and citation omitted).

## DISCUSSION[2]

I.  Section 10(b)

To allege a § 10(b) and Rule 10b-5 claim, plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005). Claims brought under § 10(b) and Rule 10b-5 must meet the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 9(b) ("In alleging fraud . . . , a party must state with particularity the circumstances constituting the fraud . . . ."); Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). "In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer." See Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995).

Further, the plaintiff must meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, which requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

//

---

[2] Defendants request the Court take judicial notice of certain of Immersion's filings with the SEC, as well as a chart listing the prices for Immersion stock during the class period and SEC filings made on behalf of defendants Viegas, Richardson, Ambler and Vogel. (See Decl. of Susan S. Muck in Supp. of Defs.' Mot. to Dismiss Pl.'s Am. Consolidated Compl. Exs. A-H.) Plaintiff opposes defendants' request to the extent Immersion offers its SEC filings for the truth of the matters stated therein. Additionally, plaintiff requests the Court take judicial notice of a transcript of remarks by SEC Chairman Arthur Levitt, and another of Immersion's SEC filings. (See Decl. of Willow E. Radcliffe in Supp. of Pl.'s Opp. to Defs.' Mot. to Dismiss Pl.'s Am. Consolidated Comp. Exs. 1, 2.) Defendants have not opposed plaintiff's request. Plaintiff's request is hereby GRANTED; defendants' request is hereby GRANTED to the extent such request is unopposed and DENIED as moot to the extent opposition thereto has been made, the Court not having relied on the truth of the noticed documents' contents for purposes of its analysis.

### A. Liability of Non-speaker

Defendants move to dismiss the claims against Vogel because he is not alleged to have made any of the alleged misstatements. (See Mot. at 21:7-14.) While a statement made by the named defendant himself is not necessary to a finding of liability under § 10(b), a plaintiff must show such defendant's "substantial participation or intricate involvement in the preparation" thereof. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2009).

The Court previously held the Complaint did not adequately allege Vogel's "substantial participation" in any misstatement. (See Order Granting Defendants' Motion to Dismiss Plaintiff's Consolidated Complaint ("Order") at 5:13-16 ("[P]laintiff's allegation that . . . Vogel, 'controlled and/or possessed the authority to control the contents of [Immersion's] reports, press releases and presentations to securities analysts and through them, to the investing public' (see Compl. ¶ 36), is conclusory and fails to allege specific facts.").) Plaintiff argues the ACC's allegations now show Vogel "was directly responsible for drafting and reviewing the press releases that reported the fraudulent revenue." (See Opp. at 19:18-20 (citing ACC ¶¶ 58, 243).) The ACC, however, alleges only that "Vogel also participated substantially in creating and drafting the Company's press releases to the investing public" (see ACC ¶ 58) and that Vogel "substantially participated in the creation of Immersion's press releases, including those alleged herein to be false and misleading" (see ACC ¶ 243.) The ACC alleges no facts describing Vogel's role in "creating" the press releases, nor does it contain any facts describing Vogel's asserted "participation" in any press releases, let alone the specific press releases identified in the ACC. Such allegations are not significantly different from the conclusory allegations in plaintiff's Complaint. A conclusory restatement of the "substantial participation" legal standard, without facts describing what Vogel in fact did, is insufficient to establish Vogel's liability. See Iqbal, 129 S. Ct. at 1950 (holding courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

Plaintiff's argument that Vogel is liable because he "was also involved in shipping,

booking and monitoring the very same Medical sales that were subsequently restated" and "personally insisted on" improper revenue recognition likewise is unavailing. (See Opp. at 20:1-14.) The Court previously rejected such allegations because the Complaint did "not allege Vogel had any role in the preparation of information concerning revenue recognition" ultimately incorporated into the alleged misstatements, "nor [did] it allege facts showing Vogel's conduct made it 'necessary or inevitable' that Immersion would overstate its revenues." (See Order at 6:12-22 (citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 158 (2008).) Plaintiff faces the same problem here, where the ACC, as did the Complaint, alleges that Ambler, not Vogel, was ultimately responsible for revenue recognition. (See ACC ¶¶ 25, 69, 118; see also Order at 6:19-22 ("Indeed, plaintiff alleges Ambler, not Vogel, 'made the ultimate decision on whether to recognize revenue,' and, after Richardson became CEO, Immersion's corporate headquarters excluded Medical, the division in which Vogel worked, from revenue recognition decisions.").) The ACC offers no new, detailed allegations sufficient to establish Vogel's conduct made it "necessary or inevitable," see Stoneridge, 552 U.S. at 161, that Immersion would overstate its revenues.

In sum, as in the Complaint, plaintiff's allegations as to Vogel are insufficient to establish his liability.

**B. Scienter**

Defendants move to dismiss the ACC in its entirety for failing to plead scienter on behalf of any defendant. (See Mot. at 7:17-21:6.) In response, plaintiff revives arguments made in support of the Complaint; in particular, plaintiff asserts the ACC sufficiently alleges scienter based on the need for and magnitude of Immersion's restatement of its financial statements (see Opp. at 4:11-9:13), defendants' role in the business (the "core business inference") (see Opp. at 17:1-18:11), information conveyed by confidential witnesses ("CWs") (see Opp. at 9:14-14:3), individual defendants' departures from Immersion (see Opp. at 18:12-28), SOX certifications (see Opp. at 19:1-19:15), and insider trading (see Opp. at 14:4-16:19).

6

Pursuant to the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To create a "strong inference," the allegations must raise an inference that is "more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues and Rights, Ltd., 551 U.S. 308, 314 (2007). The plaintiff need not allege facts giving rise to an "irrefutable" inference of scienter and the complaint must be "viewed in the required holistic context," but the plaintiff "must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." Id. at 324, 326, 328 (emphasis in original). In that regard, the complaint must state with particularity facts that "constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388-89 (9th Cir. 2002) (citing In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).) To raise a strong inference of deliberate recklessness, the plaintiff "must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." Silicon Graphics, 183 F.3d at 974.

**1. Need for and Magnitude of Restatements**

As before, plaintiff argues Immersion's restatement of prior financial statements provides a strong inference of scienter. (See Opp. at 4:11-7:11.)

On February 8, 2010, defendants issued a restatement of Immersion's financial statements for 2006, 2007, 2008 and the first quarter of 2009. (See ACC ¶¶ 5-7, 28, 39, 41.) Plaintiff argues the need for and magnitude of these restatements establishes scienter. (See Opp. at 4:11-9:13.)[3] As observed by the Court in its Order, "the mere publication of a restatement is not enough to create a strong inference of scienter." (See

---

[3] Plaintiff also argues the timing of the misstatements is relevant. (See Opp. at 7:12-9:13.) In support thereof, plaintiff argues a "cookie jar" accounting theory, i.e. "'smoothing' earnings by under-reporting revenues in fat quarters so they can be reported in lean quarters." (See Opp. at 2:4-5, 8:9-10:13.) Plaintiff's new "cookie jar" theory fails, however, to support scienter, because, as discussed below, plaintiff fails to allege facts demonstrating defendants were aware of the misstatements, whether based on "cookie jar" accounting or any other type of accounting fraud.

Order at 7:22-24 (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1000 (9th Cir. 2009).) The Court further held the Complaint's allegations as to the restatements were insufficient to raise a strong inference of scienter because "close to half of the restated revenue [in 2008] resulted from a 'side agreement' with one customer . . . which agreement is not alleged to have been made known to defendants" (see Order at 8:18-21) and the remainder of the restated revenue was otherwise "not due to clearly obvious facts, such as the loss of a major customer, but, rather, to an unspecified number of sales involving 'FOB' terms, rights of return, and lack of probability of collection" (see Order at 8:21-24; see also ACC ¶¶ 20-22). The ACC's allegations regarding Immersion's restatement do not cure these previously noted defects.

      First, plaintiff offers no additional factual allegations sufficient to demonstrate defendants knew of the existence of the side agreement. (See Opp. at 5:9-18.) Plaintiff relies on a new witness, designated CW6, who, plaintiff alleges, "was responsible for training Immersion's Chinese distributor." (See ACC ¶ 70.) According to the ACC, CW6 "was aware that there were promises made outside the scope of the original agreement," and "understood that [David] Barkay[4] updated his superiors, including defendant Richardson, [Daniel] Chavez and defendant Vogel, about the deals and terms with this distributor." (See ACC ¶ 70.)[5] Plaintiff argues the information from CW6 corroborates CW5's statement that "all information about deals with the Company's Chinese distributor went directly from Barkay to defendants CEO Richardson and CFO Ambler." (See ACC ¶ 187.) CW5's statements, as discussed by the Court in its Order, "are not sufficiently specific" (see Order at 10-11); CW6's "understanding" does not remedy that deficiency. Nowhere does Plaintiff allege facts showing the side agreement was made known to defendants. As defendants point out, a "side agreement," by definition, is "not . . . part of

---

[4] According to the ACC, David Barkay was Immersion's Vice President of International Medical sales. (See ACC ¶ 35.)

[5] Plaintiff has not named Daniel Chavez as a defendant to the ACC and, as set forth above, plaintiff fails to plead a misstatement attributable to Vogel.

8

1 standard deal terms or updates." (See Reply at 2:25-26); see also Glazer Capital Mgmt., L.P v. Magistri, 549 F.3d 736, 746-47 (9th Cir. 2008) (finding "surreptitious nature" of illegal payments precluded strong inference of scienter).

Second, plaintiff offers no new factual allegations sufficient to cure the previously noted deficiency that the "circumstances [giving rise to the restatements] are not of such 'unusual' nature as to give rise to an inference of scienter on the part of the named defendants." (See Order at 8:24-9:2 (citing South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 786 (9th Cir. 2008) (holding "without particularized allegations" as to "actual access" to restated information, plaintiff must show "the nature of the relevant fact is of such prominence that it would be 'absurd to suggest that management was without knowledge of the matter' or that defendants had 'actual access' to the restated information")).) Plaintiff argues only that the Court should "consider the red flags alleged in the ACC." (See Opp. at 6 n.6.) The "red flags" plaintiff identifies are: "international Medical sales jumped over 200% in one quarter after being flat for several quarters; Immersion was able to significantly increase sales in 2008 without releasing new products; there were returns despite a no return policy; Chinese customers were typically tardy on payments by more than six months; and [there were] payments from peculiar and/or unknown customers." (See id. (citing ACC ¶¶ 250-60).) All but the second of these alleged "red flags," however, were alleged in the complaint (see Compl. ¶¶ 4, 12, 17, 44, 82-85, 110, 140-42, 173-78), and found insufficient. The only new allegation in the group, that Immersion was able to significantly increase sales in 2008 without releasing new products, is not of a sufficiently "unusual" character as to create a strong inference of scienter. As discussed by the Court in its Order, plaintiff must show "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." (See Order at 9:3-6 (quoting South Ferry, 542 F.3d at 786); see also, e.g., Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 984, 987-88 & n.5 (9th Cir. 2008) (inferring scienter from knowledge of stop-work orders on contracts totaling tens of millions of dollars, which knowledge defendants admitted having shortly after alleged misstatements made).

**2. The Core Business Inference**

Plaintiff relies upon allegations as to the relatively small size of Immersion, defendants' educational backgrounds, and defendant Richardson's "hands-on" management style to establish scienter, arguing "it is absurd to suggest that defendants were not aware of the accounting violations alleged." (See Opp. at 17:11-13). The Court previously found such allegations insufficient to establish scienter, noting the allegations neither established actual knowledge of information underlying the restatement, nor facts of "such prominence" that it "would be absurd to suggest that management was without knowledge of the matter." (See Order at 9:14-18 (quoting South Ferry, 542 F.3d at 786).)

Plaintiff's ACC includes no allegations to cure the above-noted defects. Rather, plaintiff's allegations in the ACC as to the percentage of total revenue represented by Medical are identical to those in the prior Complaint (compare Compl. ¶ 75 with ACC ¶ 110), as are plaintiff's allegations as to defendant Richardson's statement that "the leadership team [Immersion] ha[s] in place is very, very hands-on, as you know I am" (compare Comp. ¶ 183 with ACC ¶ 267) and defendants' educational backgrounds (compare Comp. ¶¶ 30-33 with ACC ¶¶ 52-55). Such allegations were and remain insufficient to allege scienter. (See Order at 8:10-9:18.)

**3. Additional Allegations as to Information from Confidential Witnesses**

The Court previously held that "[e]ven assuming the confidential witnesses were in a position to obtain the information they provided to plaintiff . . . none provides sufficient facts to show defendants, at the time the incorrect financial reports were made, had actual access to information showing the content therein was incorrect." (See Order at 9:21-24.) Plaintiff argues "[t]he ACC now contains new allegations, which establish actual knowledge and when viewed holistically with other allegations are more than sufficient to plead a claim for securities fraud." (See Opp. at 10:8-10.) The "new" allegations to which plaintiff cites, however, do not cure the defects identified in the Order and, in many instances, were contained in the Complaint.

Plaintiff first points to statements attributed to CW1, to demonstrate defendants, at

the time the financial reports initially were filed, had actual access to information showing the content thereof was incorrect. (See Opp. at 10:10-18.) According to the ACC, CW1, a Senior Accountant at Immersion Medical (see ACC ¶ 65), stated he "had constant disagreements about . . . improper revenue recognition practices, via e-mail and face-to-face, with defendant Vogel" (see ACC ¶ 245). Further, according to the ACC, CW1 stated he "was responsible for putting together sales packets . . . identif[ying] instances in which credit approval for the customer . . . was received after . . . shipment of products," and that the sales packets were reviewed by defendant Ambler who "questioned some of the receivables." (See ACC ¶ 255.) As to Vogel, the allegations are essentially identical to the allegations the Court previously held inadequate to establish scienter. (See Order at 11:3-6.) The allegations as to Ambler, although new, likewise are unavailing. Although CW1 claims to have identified instances where credit approval was received after shipment, CW1 does not state such approval was not ultimately received prior to revenue recognition, nor does CW1 identify a single transaction where revenue was improperly recognized as a result of credit approval being received after shipment. (See ACC ¶¶ 65, 255.)

CW2's statements regarding returns are similarly inadequate to cure the deficiencies previously identified. According to the ACC, CW2 was a Customer Service Manager and a Director of Assembly and Production Manager for Immersion Medical. (See ACC ¶ 66.) As in the Complaint, plaintiff alleges CW2's statement that "numerous products shipped to China were being returned" (see ACC ¶ 251) and that "Immersion tracked this information closely" (see id.) demonstrates "defendants recorded revenue prematurely on Medical products." (see Opp. at 12:7-9). CW2 does not provide, however, any facts demonstrating revenue associated with any of the alleged returns was improperly recognized, nor any facts demonstrating information regarding the rate of return should have alerted defendants to accounting irregularities, or that defendants had "actual access" to such information. (See Order at 9:21-24.) Contrary to plaintiff's argument, allegations of information being "readily available to defendants" (see Opp. at 12 n.18) are insufficient. See In re Century Aluminum Co. Sec. Litig., 749 F. Supp. 2d 964, 973 (N.D. Cal. 2010)

11

1   ("[B]are allegations that . . . officers had access to financial statements and analyzed those
2   statements does not support the inference that defendants knew about the accounting
3   error.").

4   Plaintiff's allegations based on information from CW3, CW4 and CW5 fare no better.
5   The allegations as to CW3 are essentially the same as in the Complaint. According to the
6   ACC, CW3 states that he worked with Daniel Chavez, the General Manager of Medical,
7   that Immersion used a "sales process checklist" for tracking prospective customers and
8   sales, that he sent "these forecasts" to Chavez, who "reported" to Ambler and Richardson
9   on a weekly basis, and that the Individual Defendants "had access to" the forecasts. (See
10  ACC ¶ 252.) CW3 again provides no facts demonstrating defendants had actual access to
11  information establishing the statements at issue were incorrect. (See id.) Plaintiff argues
12  statements by CW4 show Ambler had "actual access" to information "from which the false
13  accounting numbers were derived." (See Opp. at 10:18-11:2.) In support thereof, plaintiff
14  again relies on CW4's statement that Ambler "met with CW4 to go over the DSO [days
15  sales outstanding] numbers" and that the DSOs for international medical customers were
16  180 days, which plaintiff describes as "abnormally high." (See ACC ¶ 256.) In its Order,
17  the Court addressed similar allegations and found them insufficient to give rise to an
18  inference of scienter. (See Order at 10:16-17 ("[W]hile CW4 states he met with Ambler to
19  go over the 'days sale[s] outstanding ("DSO") numbers' (see Compl. ¶¶ 43, 177), CW4
20  does not allege that he, or anyone else at such meetings, informed Ambler that revenue
21  was being improperly booked.").) Moreover, as defendants point out, CW4 is alleged to
22  have left Immersion before the inception of the class period (see ACC ¶ 68) and,
23  consequently, has no information as to reports prepared for that time period. (See Reply at
24  8:17-22.) According to the ACC, and as set forth in the Complaint, CW5 states he reported
25  Medical "sales information" to the Corporate Controller, who "then conferred with Ambler
26  about whether to recognize revenue as sales." (See ACC ¶ 69.) The ACC includes no
27  factual allegations, however, detailing what information was conveyed, let alone how any
28  such information would have alerted Ambler to accounting errors. See In re Century

Aluminum Co. Sec. Litig., 749 F. Supp. 2d at 973.

Plaintiff offers allegations based on two new CWs, designated CW6 and CW7. The new allegations, however, suffer from the same deficiencies as the above-referenced allegations. CW6, who plaintiff alleges was a Product Manager at Immersion Medical, states, as noted above, that a side agreement was made with a Chinese distributor (see ACC ¶ 70) and, as discussed above, provides no facts demonstrating defendants were aware of the side agreement. CW7, who according to the ACC, reported to the Vice President of Sales and Marketing, "understood" Vogel "pushed to have revenue recognized" before receiving proof of delivery, but never identifies a transaction where revenue was knowingly prematurely recognized by Vogel. (See ACC ¶ 72.)[6] Similarly unavailing is CW7's statement, without further elaboration, that "Vogel, Viegas and Ambler had discussions . . . about recognizing revenue without proof of delivery." (See id.)

In short, as in the prior Complaint, "no confidential witness provides facts demonstrating defendants, at the relevant time, had knowledge of information showing revenues were improperly recognized." (See Order at 11:7-9 (citing Zucco, 552 F.3d at 1000-01 (finding complaint insufficient to support inference of scienter where complaint alleged "management had access to purportedly manipulated quarterly accounting numbers [and] analyzed the inventory numbers closely," but failed to allege management was in a position to know data was being so "manipulated").)

**4. Departures**

Plaintiff argues the departures of Ambler, Chavez, and Richardson, shortly after the Audit Committee announced its investigation in June 2009, also support an inference of scienter. (See Opp. at 18:12-28.) The Court previously held plaintiff's allegations as to departures were insufficient to establish scienter because plaintiff "allege[d] these defendants 'resigned,' not that they were terminated for wrongdoing." (See Order at 11:14-17 (citing In re Cornerstone Propane Partners, L.P., 355 F. Supp. 2d 1069, 1093 (N.D. Cal.

---

[6] As discussed above, the allegations in the ACC are insufficient to attribute any misstatement to said defendant.

13

2005) (holding departures, absent termination on basis of fraud, did not give rise to inference of scienter).) Plaintiff now alleges Vogel was "fired" (see ACC ¶¶ 55, 147, 261) but includes no allegation that Vogel was terminated because of fraud. Moreover, the ACC, as noted, fails to plead a misstatement attributable to Vogel. As to the other Individual Defendants, plaintiff now alleges that Ambler and Richardson's "employment with the Company was terminated" (see ACC ¶ 239) but includes no allegation that the terminations were because of fraud. In sum, plaintiff's allegations as to defendants' departures remain inadequate for purposes of establishing scienter.

### 5. SOX Certifications

Plaintiff asserts Sarbanes-Oxley ("SOX") certifications signed by defendants Richardson, Viegas, and Ambler support an inference of scienter. As in the Complaint, plaintiff alleges said defendants certified that the relevant financial reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" such reports, which certification was incorrect. (See ACC ¶ 228.) As the Court previously held, "[a]bsent facts showing a defendant was 'severely reckless' in making such certification, facts not alleged here, plaintiff cannot establish scienter based on SOX certification." (See Order at 12:6-8 (citing Glazer Capital Mgmt. LP v. Magistri, 549 F.3d 736, 747 (9th Cir. 2008) ("If [courts] were to accept [plaintiff's] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." (internal quotation and citation omitted)).) Plaintiff's allegations regarding the SOX certifications are in all material respects the same as those set forth in the Complaint (compare Compl. ¶ 181 with ACC ¶ 264). Consequently, the allegations as to SOX certifications remain inadequate.

### 6. Insider Trading

In the ACC, plaintiff again alleges that stock sales by defendants Ambler, Vogel and

14

Viegas support an inference of scienter. (See ACC ¶¶ 271-76). The Court previously held plaintiff's insider trading allegations failed to support an inference of scienter because, as the Court noted, Ambler and Viegas retained "79.11% and 90.28%, respectively, of their holdings, when exercisable options are included . . . none of which are alleged to have been exercised at the time when revenues and income were overstated" (see Order at 12:19-13:3) and because "all of the class-period sales occurred in 2007, a period for which the Complaint alleges Immersion was understating its revenue and net income" (see Order at 13:6-9). Accordingly, the Court held, neither the timing nor the amount of shares sold supported a strong inference of scienter. (See Order at 23:12-14 ("To evaluate such stock sales, courts consider (1) the amount and percentage of shares sold, (2) the timing of the sales, and (3) the consistency with prior trading history." (citing Silicon Graphics, 183 F.3d at 986)).)

Plaintiff alleges no new facts pertaining to defendants' stock sales. Instead, plaintiff argues the Court erred when it included exercisable options in its prior analysis. (See Opp. at 14:9-15.) Plaintiff, however, presents no binding authority holding exercisable options should not be included in such analysis, or any authority otherwise calling into question the authority upon which the Court relied. (See Order at 12:16-13:5 (citing Silicon Graphics, 183 F.3d at 986-87).)[7] Plaintiff also argues that Viegas's sale of 10% of his stock and Ambler's sale of 20% of his stock were unusual even if exercisable options are included. (See Opp. at 14-19.)[8] The Ninth Circuit has held, however, that to support scienter, sales amounts larger than 37% of a defendant's holdings ordinarily are required. See Metzler

---

[7] Plaintiff argues the Ninth Circuit "questioned" Silicon Graphics in South Ferry. (See Opp. at 14:9-12). South Ferry's concern, however, was not with Silicon Graphic's holding as to exercisable options but, rather, with the degree of specificity it required for individual allegations. See South Ferry, 542 F.3d at 784.

[8] Plaintiff argues Vogel's sale of 100% of his stock is sufficiently unusual and suspicious to establish an inference of scienter. As set forth in the Order, the Court has not considered stock sales by Vogel (see Order at 12 n.6); as discussed, plaintiff's allegations are insufficient to show Vogel's substantial participation in any misstatement. Consequently his sales are not at issue. As further noted in the Order, even if the Court were to consider Vogel's sales, the timing thereof weighs against an inference of scienter. (See id.)

15

Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1067 (9th Cir. 2008) (finding allegation defendant sold 37% of total stock holdings insufficient; noting "[w]e typically require larger sales amounts–and corroborative sales by other defendants–to allow insider trading to support scienter").

Plaintiff also argues the Court was incorrect in relying on an understatement of revenues and net income in 2007. Plaintiff alleges defendants' sales occurred during the second and third quarters of that year, when Immersion's revenue was overstated rather than understated. (See ACC ¶¶ 28, 274.) As defendants point out, however, the allegations in the ACC, once all relevant accounting adjustments are taken into consideration, show net income was understated in the second and third quarters of 2007. (See ACC ¶ 127.) Consequently, neither the amounts nor the timing of defendants' stock sales, nor a combination thereof, is sufficient to raise a strong inference of scienter.

**C.     Loss Causation**

Lastly, defendants move to dismiss the entirety of the ACC for failure to plead loss causation. (See Mot. at 22:15-24:1.) To state a claim for securities fraud under the Exchange Act, a plaintiff must plead "loss causation," the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." Dura, 544 U.S. at 342. To plead loss causation, a plaintiff must allege (1) the fraudulent statement that caused the stock price to increase, (2) the disclosure that revealed the statement was fraudulent, and (3) the decline in stock price after the truth became known. See id. at 346-47. While a plaintiff must show the revelation of the fraud was a "substantial cause of the investment's decline in value," a plaintiff does not need to show the misrepresentation was the only reason for the decline in value. See In re Daou Systems, Inc., 411 F.3d 1006, 1025 (9th Cir. 2005).

The Court previously held plaintiff's loss causation allegations were inadequate because, with one exception, "plaintiff fail[ed] to plead facts sufficient to connect any of the disclosures . . . to the alleged fraud, such as to show any decline in stock price was caused by the alleged fraud rather than a typical market reaction to disappointing financial reports,

16

as well as a continuation of the general decline evident in Immersion's stock, and indeed the entire stock market, during the class period." (See Order at 14:23-28 (citing Metzler, 540 F.3d at 1063-64).) The Court held the remaining disclosure, the July 1, 2009 announcement regarding an Audit Committee investigation of Medical transactions, albeit "at least conceptually tied to the purported fraud," nonetheless was insufficient, as "the announcement of an investigation, standing alone, does not give rise to a viable loss causation allegation." (See Order at 15:8-12) (citing In re Maxim Integrated Products, Inc, Sec. Litig., 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009)).)

In the ACC, plaintiff alleges one additional disclosure, made on May 1, 2008. (See ACC ¶¶ 277-83.) According to the ACC, the May 1, 2008 announcement "partially revealed that Immersion did not have the growth drivers and was not 'acheiv[ing] sustained profitability' as defendants had previously led investors to believe." (See ACC ¶ 278.) This disclosure is similar in nature to the other alleged disclosures: a July 31, 2008 announcement of a net loss for the second quarter of 2008, "partially disclos[ing] that Immersion did not have the growth drivers and profitability that defendants had led investors to believe" (see Compl. ¶ 191; ACC ¶ 279); a March 2, 2009 disclosure "announc[ing] disappointing results for [fourth quarter of 2008] and fiscal 2008" of "$0.12 below estimates," which "partially revealed that Immersion did not have the growth drivers and profitability that defendants had led investors to believe" (see Compl. ¶ 192; ACC ¶ 280); and a May 4, 2009 disclosure that "Immersion was having difficulty receiving payments from certain international customers" (see Compl. ¶ 193; ACC ¶ 281).

Plaintiff's allegations remain insufficient to establish loss causation. "Disclosures that Immersion 'was not doing as well' as investors may have hoped . . . and a disclosure about Immersion's 'difficulty receiving payments from certain international customers' . . . do not tend to show previously reported revenue was incorrectly recognized." (See Order at 15:3-7.) Plaintiff argues the above-discussed "partial disclosures" are sufficient. (See Opp. at 22:1-4.) Contrary to plaintiff's argument, however, "[a] corrective disclosure must reveal some aspect of the alleged fraud to the market." See In re Maxim, 639 F. Supp. 2d

17

Case3:09-cv-04073-MMC Document110 Filed12/16/11 Page18 of 19

at 1045; see also Metzler, 540 F.3d at 1063-64 (holding, to plead loss causation, plaintiff must allege facts to show "the market learned of and reacted to th[e] fraud").[9]

Accordingly, plaintiff fails to adequately plead loss causation.

## II. Section 20(a)

As discussed above, plaintiff fails to plead a primary violation of the securities laws. Consequently, plaintiff's allegations under § 20(a) of the Exchange Act likewise fail. See 15 U.S.C. § 78t(a) (providing, to allege control person liability, plaintiff must allege (1) primary violation of federal securities laws and (2) defendant exercised actual power or control over primary violator).

## III. Insider Trading

Similarly, plaintiff's claim of insider trading under § 20A of the Exchange Act fails because plaintiff fails to plead a primary violation of the securities laws. See 15 U.S.C. § 78t-1(a) (limiting insider trading liability to "[a]ny person who violates any provision of this chapter"); In re Verifone Sec. Litig., 11 F.3d 865, 872 (9th Cir. 1993) (dismissing § 20A claim where complaint failed to plead primary violation).

## IV. Leave to Amend

Plaintiff requests leave to amend in the event the ACC is found deficient. In its Order, the Court assessed the Complaint and set forth in detail the deficiencies the Court noted therein, and afforded plaintiff a full opportunity to cure those deficiencies. As discussed in detail above, plaintiff has failed to cure those deficiencies. Nor does plaintiff suggest any new facts he could plead in support of his conclusory allegations. There is no indication that plaintiff would, if granted further leave to amend, be able to amend to cure the deficiencies in the ACC.

Accordingly, the ACC will be dismissed without further leave to amend. See Mir v.

---

[9] Plaintiff's reliance on In re Daou Systems, Inc., 411 F.3d 1006, and In re Gilead Scis. Sec. Litig., 536 F.3d. 1049 (9th Cir. 2008) is misplaced. (See Opp. at 22:5-19.) The disclosures found sufficient in those cases, unlike the disclosures here, did not stand alone, but, rather, were accompanied by other public announcements, which, together with the defendants' disclosures, revealed the fraud. See Daou, 411 F.3d at 1026; Gilead, 536 F.3d at 1052-55.

Fosburg, 646 F.2d 342, 347 (9th Cir. 1980) (noting "a district court has broad discretion to grant or deny leave to amend, particularly where the court has already given a plaintiff one or more opportunities to amend his complaint").

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the ACC is hereby GRANTED, and the ACC is hereby DISMISSED.

**IT IS SO ORDERED.**

Dated: December 16, 2011

MAXINE M. CHESNEY
United States District Judge